**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) | HAFF POULTRY, INC.; | Case No.   17-CV-033-SPS |
| (2) | CRAIG WATTS; | |
| (3) | JOHNNY UPCHURCH; | (Not Related to Any Previously Filed |
| (4) | JOHNATHAN WALTERS; | Case) |
| (5) | BRAD CARR, | |
| (6) | and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| | | |
| | Plaintiffs, | **JURY TRIAL DEMANDED** |
| | | |
| v. | | |
| | | |
| (1) | TYSON FOODS, INC.; | |
| (2) | TYSON CHICKEN, INC.; | |
| (3) | TYSON BREEDERS, INC.; | |
| (4) | TYSON POULTRY, INC.; | |
| (5) | PILGRIM PRIDE CORPORATION; | |
| (6) | PERDUE FARMS, INC.; | |
| (7) | KOCH FOODS, INC.; | |
| (8) | KOCH MEAT CO, INC., d/b/a KOCH | |
| | POULTRY CO., ; | |
| (9) | SANDERSON FARMS, INC., | |
| (10) | SANERSON FARMS, INC. (FOOD | |
| | DIVISION); and | |
| (11) | SANDERSON FARMS, INC. | |
| | (PROCESSING DIVISION), | |
| | | |
| | Defendants. | |

Plaintiffs Haff Poultry Inc., Craig Watts, Johnny Upchurch, Jonathan Walters, and Brad

Carr (collectively, "Plaintiffs"), on behalf of themselves and all other similarly situated broiler

chicken farmers, bring this antitrust and unfair competition action seeking treble damages under

Section 1 of the Sherman Antitrust Act and Section 202 of the Packers and Stockyards Act,

demanding a trial by jury of all issues so triable. Plaintiffs allege the following, based upon

personal knowledge as to matters relating to themselves, and upon information and belief and the

1

investigation of counsel as to all other matters:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of a proposed class of broiler chicken ("Broiler") farmers (also referred to herein as "Growers"), concerning anticompetitive, collusive, predatory, unfair, and bad faith conduct in the domestic market for Broiler raising services (also referred to herein as "Broiler Grow-Out Services") against the vertically-integrated poultry company defendants ("Integrators"), which operate localized Broiler processing plants ("Complexes") throughout the country. This case involves agreements by Defendants (defined below) and their Co-Conspirators (defined more fully *infra*, together the "Cartel")—dating back to at least 2008—not to compete for Broiler Grow-Out Services, with the purpose and effect of fixing, maintaining, and/or stabilizing Grower compensation below competitive levels.

2.      The Cartel illegally agreed to share detailed data on Grower compensation with one another, with the purpose and effect of depressing Grower compensation below competitive levels. By disclosing their highly sensitive and confidential compensation rates to each other, they eliminated competition and drove down farmer compensation. By sharing this information on a frequent and contemporaneous basis, the Cartel has been able to keep farmer compensation lower than it would have been in a competitive market, and to keep the increased profits for themselves. This illegal information exchange drove down base farmer compensation nationwide.

3.      The Cartel realized the benefits of sharing this highly sensitive and otherwise confidential farmer compensation information with each other, but not with the farmers themselves. In furtherance of their agreement to maintain an information deficit over their farmers, the Cartel also agreed not to solicit, and often agreed not to hire, farmers from other

Integrators. By agreeing not to compete for the services of one another's farmers, the Cartel attempted to insulate itself from normal competitive pressures that could potentially erode the effects of their information sharing agreement. This illegal "no poach" agreement inoculated the Cartel against potential cheating by its members.

4.     These agreements were designed to keep Broiler farmers, as author Christopher Leonard noted in *The Meat Racket: The Secret Takeover of America's Food Business*, "in a state of indebted servitude, living like modern-day sharecroppers on the ragged edge of bankruptcy."

## PARTIES

5.     Plaintiff Haff Poultry, Inc. is owned by Steve Haff, his wife, and his father in law. Haff Poultry, Inc. (collectively with Steve Haff, "Haff") began providing Broiler Grow-Out Services for Hudson in Oklahoma in 1996. Haff borrowed $365,000 to build four Broiler houses to Hudson's specifications. When Tyson purchased Hudson, Haff became a grower for Tyson. Over Haff's time providing Broiler Grow-Out Services for Tyson, Tyson demanded that Haff make further investments into its Broiler houses. Haff borrowed or spent another $250,000 making these improvements to its Broiler houses because Tyson threatened to not deliver Broilers for Haff to raise unless Haff did so. Haff would not have been able to make ends meet with Tyson's compensation, and so ran a separate and profitable cattle-raising operation at the same time. In October 2015, Haff quit providing Broiler Grow-Out Services. Haff was left with four Broiler houses that have no value other than raising Broilers, and $130,000 in lingering debt.

6.     Plaintiff Craig Watts began providing Broiler Grow-Out Services for Perdue in North Carolina in 1992. Mr. Watts borrowed $400,000 to build four Broiler houses to Perdue's specifications. Over his time raising Broilers, Perdue demanded that Mr. Watt's make further

investments into his Broiler houses. Mr. Watts borrowed or spent a total of approximately
$600,000 making these improvements to his Broiler houses because Perdue threatened not to
deliver Broilers for Mr. Watts to raise unless he did so. Throughout his time raising Broilers, he
was barely able to make ends meet with the compensation provided by Perdue. In January 2016,
after nearly 24 years in the business, Mr. Watts quit raising Broilers. He was left with four
Broiler houses that have no value outside of raising Broilers and $16,000 in outstanding debt, of
which he still owes half.

       7.    Plaintiff Johnny Upchurch began providing Broiler Grow-Out Services for Spring
Valley around 1980 in Alabama, and then began providing Broiler Grow-Out Services for Tyson
in approximately 1990. In 2000, Koch bought the Tyson Complex for which Mr. Upchurch
provided Broiler Grow-Out Services, at which point Mr. Upchurch began providing Broiler
Grow-Out Services for Koch. Mr. Upchurch spent well over a hundred thousand dollars on six
Broiler houses. Throughout his time providing Broiler Grow-Out Services, he was barely able to
make ends meet with the compensation provided by Tyson or Koch. In December 2014, after 24
years with Tyson and Koch, Mr. Upchurch was finally financially able to quit providing Broiler
Grow-Out Services and did so. Mr. Upchurch was left with four Broiler houses that have no
value outside of raising Broilers.

       8.    Plaintiff Jonathan Walters began providing Broiler Grow-Out Services for
Sanderson in Mississippi in approximately 2001. Mr. Walters borrowed $639,000 to build four
Broiler houses to Sanderson's specifications. Over his time providing Broiler Grow-Out
Services, Sanderson demanded that Mr. Walters make further investments into his Broiler
houses. Mr. Walters borrowed or spent another $100,000 making these improvements to his
Broiler houses because Sanderson threatened not to deliver Broilers for Mr. Walters to raise

unless he did so. Mr. Walters would not have been able to make ends meet with Sanderson's compensation, and so worked several other part-time jobs while raising Broilers. In December 2015, Mr. Walters quit providing Broiler Grow-Out Services. Mr. Walters was left with four Broiler houses that have no value outside of raising Broilers and $130,000 in debt. Mr. Walters had to mortgage his residence—which he owned outright before he began raising Broilers—to secure that debt.

9.     Plaintiff Brad Carr began providing Broiler Grow-Out Services in 1996 for Pilgrim's in Texas. Mr. Carr borrowed $600,000 to build four Broiler houses to Pilgrim's specifications. Over his time providing Broiler Grow-Out Services, Pilgrim's demanded that Mr. Carr make further investments into his Broiler houses. Mr. Carr borrowed or spent another $350,000 making these improvements because Pilgrim's threatened not to deliver Broilers for Mr. Carr to raise unless he did so. He would not have been able to make ends meet with Pilgrim's compensation, and so ran a separate and profitable cattle-raising operation. In late 2013, Mr. Carr quit providing Broiler Grow-Out Services.

10.     Defendant Tyson Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas. Tyson Foods, Inc. is the largest Integrator in the country, operating thirty-three Broiler processing plants ("Complexes") located throughout the United States and processing some 35.4 million Broilers weekly, and accounting for 21.8% of the market.

11.     Defendant Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and a wholly-owned subsidiary of Tyson Foods, Inc.

12.     Defendant Tyson Breeders, Inc., is a Delaware corporation headquartered in Springdale, Arkansas and a wholly-owned subsidiary of Tyson Foods, Inc.

13.     Defendant Tyson Poultry, Inc., is a Delaware corporation headquartered in

Springdale, Arkansas and a wholly-owned subsidiary of Tyson Foods, Inc.

14.     Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc., are collectively referred to herein as "Tyson."

15.     Defendant Pilgrim Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado ("Pilgrim's). JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's. JBS USA Holdings, Inc. and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil. Pilgrim's is the second largest Integrator in the country, operating twenty-six Complexes located throughout the United States and processing 33.1 million Broilers weekly, and accounting for 20.4% of the market.

16.     Defendant Perdue Farms, Inc. ("Perdue) is a Maryland corporation headquartered in Salisbury, Maryland. Perdue Farms, Inc. is the third largest Integrator in the country, operating twelve Complexes located throughout the United States and processing 12.01 million Broilers weekly, and accounting for 7.4% of the market.

17.     Defendant Koch Foods, Inc. is registered as a Delaware corporation headquartered in Park Ridge, Illinois. Koch Foods, Inc. is the fourth largest Integrator in the country, operating eight Complexes located throughout the United States and processing 12 million Broilers weekly, and accounting for 7.4% of the market.

18.     Defendant Koch Meat Co., Inc., d/b/a Koch Poultry Co., is registered as an Illinois corporation headquartered in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. Defendants Koch Foods, Inc. and Koch Meat, Co., Inc. are collectively referred to herein as "Koch."

19.     Defendant Sanderson Farms, Inc. is a Mississippi corporation headquartered in Laurel, Mississippi. Sanderson Farms, Inc. is the fifth largest Integrator in the country, operating

nine Complexes located throughout the United States and processing 8.62 million Broilers weekly, and accounting for 5.3% of the market.

20.     Defendant Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation headquartered in Laurel, Mississippi and a wholly-owned subsidiary of Sanderson Farms, Inc.

21.     Defendant Sanderson Farms, Inc. (Production Division) is a Mississippi corporation headquartered in Laurel, Mississippi and a wholly-owned subsidiary of Sanderson Farms, Inc.

22.     Defendant Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation headquartered in Laurel, Mississippi and a wholly-owned subsidiary of Sanderson Farms, Inc.

23.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division), are collectively referred to herein as "Sanderson."

24.     Defendants Tyson, Pilgrim's, Perdue, Koch, and Sanderson are collectively referred to herein as "Defendants."

**AGENTS AND CO-CONSPIRATORS**

25.     Agri Stats, Inc. ("Agri Stats") is an Indiana Corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana. Agri Stats, which purports to be a third party data aggregation service, served as a conduit by which the Cartel shared detailed, competitively sensitive, non-public information about Grower compensation.

26.     Foster Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of

suppressing Grower compensation below competitive levels.

27.     Mountaire Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

28.     Wayne Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

29.     George's, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

30.     Peco Foods, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

31.     House of Raeford Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

32.     Simmons Foods is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

33.     Keystone Foods, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

34.     Fieldale Farms Corp. is an Integrator that collusively shares nonpublic

information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

35. O.K. Industries is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

36. Case Foods is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

37. Marshall Durbin Companies is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

38. Amick Farms, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

39. Claxton Poultry Farms (collectively with the non-parties identified in Paragraphs 26 through 38, *supra*, "Co-Conspirators"), is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged *infra*, with the aim and effect of suppressing Grower compensation below competitive levels.

## JURISDICTION AND VENUE

40. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the Packers and Stockyards Act of 1921, 7 U.S.C. § 192, Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, and Sections Four and Sixteen of the Clayton Act Antitrust Act of 1914, 15 U.S.C. §§ 15, and 26.

41.     This Court has personal jurisdiction over each of the Defendants under Section Twelve of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state.

42.     Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state, including the domestic sale of Broilers.

43.     Defendants, directly or through their agents, engage in interstate commerce in the production, processing, and distribution of Broilers for sale in the United States.

44.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District, and certain of the unlawful acts alleged herein were performed and had effects within this District.

## FACTUAL BACKGROUND

### The Broiler Grow-Out Services Industry

45.     Broilers—young chickens bred for meat—account for nearly all domestic chicken consumption.[1] Broiler production is concentrated into localized networks of production dominated by vertically integrated poultry companies ("Integrators"). Integrators (such as Defendants herein) control virtually every aspect of Broiler production, although they do not raise the birds themselves. Instead, they enter into so-called contract farming arrangements ("CFAs") with thousands of Growers, which are predominately small, family-owned operations that provide the Integrators with Broiler Grow-Out Services until the birds reach slaughtering age. Broiler Growers operating under CFAs raise over 97% of Broilers produced annually. For decades, there has not been a spot or cash market for Broilers, given that the Defendants and Co-

---

[1] The term "Broilers" as used here excludes chicken that is grown, processed, and sold according to halal, kosher, free range, pasture-raised, or organic standards.

Conspirators, through their vertically integrated operations, control of all aspects of production.

46.     Defendants Tyson, Pilgrim's, Perdue, Koch, and Sanderson are by far the five largest Integrators operating in the United States, collectively contracting for over 60% of the Broiler Grow-Out Services performed domestically.

47.     Commercial poultry production began in the United States in the 1930s with the development of the Broiler—a chicken specifically bred for meat (prior to that, poultry was a byproduct of egg production). At that time, hatcheries, feed mills, farms, and processors were generally all separate entities.

48.     To ensure patrons, hatcheries began to vertically coordinate activities between the feed mill operators, Growers, and processors. Feed mill operators began to extend credit to Growers to buy baby chicks and the necessary feed. When the flock became market-ready, the Grower would sell the chicken to the processor and pay off the debt it owed to the feed mill operator.

49.     In the middle of the century, a dramatic shift took place in the way that poultry was raised for consumption. By the 1960s, some ninety percent of Broilers came from vertically integrated operations that owned or otherwise controlled the hatcheries, feed mills, farms, and processors.

50.     The result of this market shift was the creation of the modern Broiler Industry, the most vertically integrated segment of agriculture today. There are only approximately 25 Integrators in the nation. They supply their vertically integrated production complexes ("Complexes") with Broilers raised pursuant to agreements with approximately thirty-thousand Growers. Complexes typically include one or more hatcheries, feed mills, slaughter plants, and further processing plants that are owned and operated by the Integrator.

51.    Defendants have devised a system of "farming" that effectively transfers the risk of Broiler production on to Growers, while allowing Integrators to maintain supracompetitive profits.

52.    Integrators provide birds, feed, veterinary services, and professional supervision to their Growers; the Growers provide labor, utilities, and substantial up-front investment capital required to raise the Broilers to slaughtering age, *i.e.*, Broiler Grow-Out Services. The Integrators determine the precise specifications for Grower's grow-out houses and other equipment. Integrators provide no capital for the grow-out facilities, although they must be built to Integrators' precise, onerous, and sometimes arbitrary specifications. Growers are prohibited from using any inputs (*e.g.*, birds, feed, or medicine) other than those provided by their Integrator or from raising Broilers provided by any competing Integrator.

53.    Growers must also maintain roads to their facilities, provide utilities and other fixed costs (including purchasing land and building grow-out facilities), and dispose of dead birds (even if they are ***delivered*** dead). Integrators have an unlimited right to enter Growers' facilities to inspect birds, and can seize Growers' facilities—taking control until such time as the birds are ready for processing—if the Integrator determines in its sole discretion that the Grower is not performing adequately.

54.    Most CFAs have similar terms governing Integrator control and Grower compensation.

55.    CFAs are exclusive to one Integrator. In furtherance of their agreement to maintain an information deficit over Growers to maintain their ability to pay sub-competitive compensation, the Cartel members do not permit Growers to provide Broiler Grow-Out Services for any other Integrator, even if their Integrator delays delivery of chicks or fails to deliver

chicks at all and even if they could keep separate grow-out facilities on their farms for each specific Integrator.

56.    Growers also must finance their buildings according to these Integrator-specific requirements (as opposed to industry standards). A single grow-out house or coop can cost $300,000 or more. Most Growers have three or more coops. According to one study, while the average Grower surveyed had been in the Broiler business for 16 years, one third still had more than $200,000 in total farm debt.

57.    Broiler grow-out houses have almost no value outside of raising Broilers for the specific Integrator for whom they were built and no value generally outside of Broiler production. Due to the Grower's large investment into structuring the coop according to the Integrator's specific directives, the Grower is forced to continue to contract with the initial Integrator for subsequent flocks (subject to the Integrator's whim) or risk financial ruin.

58.    Integrators have the most power over Growers when they are laden with debt from building or upgrading the grow-out facilities. Thus, Integrators often monitor Growers' debt burdens, requiring them to undertake unnecessary and expensive upgrades if they ever do near financial independence—with the intent of keeping Growers debt-laden and subservient to a specific Integrator. The increased dependence on their Integrator forces Growers to accept any CFA amendments and paltry pay offered by the Integrator or risk CFA termination (or non-delivery of flocks, a functional equivalent) and financial disaster.

59.    An invested and debt-laden Grower is trapped. An Integrator can demand worse terms because the Grower must continue to provide Broiler Grow-Out Services to repay the debt.

60.    A relatively well-performing Grower will often spend fifteen to twenty-five years recouping his or her investment or paying down their debt, and for those less fortunate the

possibility of economic independence is simply a fiction.

61.     The Grower's lack of bargaining power due to oppressive contractual terms, combined with their information deficit, is well documented by industry experts. For example, the USDA's economists have acknowledged that "once the investment is made, growers face the risk of opportunistic behavior by integrators, who may have considerable monopsony power at that point."

62.     Another commentator observes that "[o]nce one enters the life of a grower, the trap is closed: high capital costs and large debt to enter the business, no input on product prices, no market in which to sell the goods and no way out except bankruptcy[.]"

63.     A 2008 Pew Commission report reflects that "[o]nce the commitment is made to such capital investment, many farmers have no choice but to continue to produce until the loan is paid off. Such [CFAs] make it nearly impossible for there to be open and competitive markets for . . . poultry producers, who must enter into contracts with . . . integrators if they are to sell their product."

64.     Due to the control Integrators have over the grow-out process under their CFAs, Integrators are also the sole keepers of information that Growers need to adequately estimate their expected profits. Although Integrators have information concerning Grower compensation, expected returns, and likely costs, Integrators do not provide it to Growers. What information is provided to Growers by Integrators is either misrepresentative or omits material information— usually both.

65.     While the Cartel shares detailed confidential information with each other regarding Grower compensation, Growers are subject to strict confidentiality requirements and strictly prohibited from sharing information on compensation with other Growers. These

agreements have at times prevented some Growers from even sharing the terms of their agreements with lenders or other third-parties involved with financing.

66.     In 2015, the domestic Broiler industry produced almost 9 billion Broilers, weighing 53 billion pounds "liveweight." That same year, Americans spent $90 billion buying chicken—making it the number one protein consumed in the United States.

### Defendants' Unlawful Information Exchange Cartel

67.     Since at least 2008, and likely much earlier, Defendants and their Co-Conspirators have agreed to and have shared with themselves (but not with Growers) detailed Grower compensation information, with the purpose and effect of suppressing Grower compensation. This agreement has been bolstered by a parallel agreement among Defendants and their Co-Conspirators not to solicit, hire, or "poach" one another's Growers.

68.     This conspiracy has been effectuated in large part through the collusive dissemination of critical and sensitive business data through Agri Stats. Agri Stats is a "statistical research and analysis firm." It is a self-described "management reporting and benchmarking company," that "provides consultation on data analysis, action plan development and management practices of participating companies." Its mission is "[t]o improve the bottom line profitability of [its] participants by providing accurate and timely comparative data . . . ."

69.     Defendants' exchange of information on Grower compensation is anticompetitive, and has resulted in lower compensation for Growers than they would receive in a competitive market.

70.     Agri Stats "partners" with Integrators. Cartel members all disseminate information through Agri Stats, representing some 120 Complexes covering 98% of Broiler production. This data includes production information on individual Complexes, broken down by

15

region as well as viewable at the "farm [*i.e.*, Grower], flock [*i.e.*, transaction], or plant [*i.e.*, Complex] level"; in other words, the information is not aggregated, but disaggregated down to the transaction level.

71.   Cartel members provide granular data to Agri Stats. The data includes, *inter alia*:

   a.   Grower compensation;

   b.   the sex, breed, genetic makeup, and genetics company used for the primary breeder stock of the Broilers used by each Complex's Integrator;

   c.   the type of equipment and grow-out houses used by each Complex's Integrator, including numerous mechanical aspects of the facilities;

   d.   Broiler weight for each Complex;

   e.   the type of feed and medicine utilized by (and costs) for each Complex;

   f.   Broiler transportation costs from Grow-Out facilities to the each Complex;

   g.   the number of chicks delivered, bird mortality by week and overall percentage, average daily weigh gain by chicks (weighted against the feed utilized, referred to as a feed-conversion ratio) for each Complex;

   h.   live pound of Broiler produced per square foot of grow-out house for each Complex;

   i.   monthly operating profit per live pound, sales per live pound, and costs per live pound for each Complex;

   j.   anticipated capacity and future output for each Complex; and

   k.   the general geographic location of each Complex by Sub-Region (Agri Stats includes at least 50 and likely more Sub-Region identifier codes).

72.   This data can also be viewed by geographic region as opposed to by Complex.

73.     This data is provided to, and disseminated by, Agri Stats on a weekly basis.

74.     The data lacks adequate safeguards to prevent or limit access to competitors' competitively sensitive information. While the data is purportedly anonymous, it is so granular and disaggregated that anyone familiar with the industry can identify precisely which data belongs to which Integrator and even the location of the specific Complex. In particular, the Sub-Region identifier code, the type and genetic makeup of the Broiler, and the type of poultry house and equipment, can be quickly used to determine the Integrator that owns a given Complex and the specific identify of the Complex.

75.     The result is that Cartel members can identify, by Complex, various Grower compensation data, such as cost per liveweight pound, cost per square foot, and other "Actual Live Production Cost" data, including base compensation for Growers. The import of this is that every Cartel member knows the base Grower compensation paid by every other Cartel member for each Complex. The Cartel members are therefore able to constantly monitor each other's compensation level to Growers and ensure that no Integrator is offering more in compensation than another.

76.     Agri Stats facilitates this non-public information exchange between the members of the Cartel. Neither the Integrators, nor Agri Stats, will share the information with Growers. And because there are no open market transactions, there are no reported, public prices for live Broilers. A recent GAO report concludes, "We did not identify reliable information on prices poultry farmers received."

77.     The extensive exchange of information regarding pricing, output, and major costs is likely to and has had anticompetitive effects.

78.     As a result of this information exchange, the Cartel disrupts the competitive

process. Economic theory and antitrust jurisprudence show that such routine and granular exchanges reduce the intensity of price competition and place downward pressure on compensation levels.

### Defendants' "No Poach" Agreement

79.     Since at least 2008, and likely much earlier, to maintain their control over Growers and the information Growers have on compensation paid by "competitors," the Cartel members have agreed not to solicit or recruit Growers from one another, and in many instances, have agreed not to hire Growers from each other.

80.     For example, in a letter to the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), one Tyson Grower described how they were explicitly told about this agreement:

> [Co-conspirator Peco Foods] ran an ad in the paper about five months ago, and I called because I knew business was good. I talked to a secretary and *she told me that the companies had an agreement among each other to not take each other's growers*.

81.     One article noted another Grower's difficulty in switching Integrators:

> [The Broiler farmer] noted that there were three other poultry processors in her area, but in the murky world of agribusiness, none of the other integrators would offer her a contract as a grower. *For those not familiar with the poultry industry, there is an unwritten pact between poultry companies that each of them abide by: we won't poach your growers if you don't poach ours. For a farmer who falls out with one integrator in their area, it spells financial doom as no other company will pick up their contract to grow birds if they leave their current integrator.* This type of collusion has not only limited opportunities and markets for farmers, but also put them in a position where there is no other option than to comply with the corporation's "take it or leave it" contracts and constantly shifting demands.

82.     In a workshop entitled Exploring Competition in Agriculture before the Department of Justice, another Grower confirmed the Cartel members' agreement not solicit each other's Growers:

> When I started growing chickens in 1995 I bought land and moved 60 miles from where I

grew up.  I moved to the broiler capitol of my state.  I did this thinking that I had a -- that I had a reason -- that if I had a reason to switch from one integrator to another I could.  ***After a few months into the business I realized that the integrators have an unwritten pact with their sister integrators, "You don't take our growers and we won't take yours."***

83.     Another Grower testified: "In our area we have more than one company, but it seems to be a written rule that if you go grow for one company, you really don't have the opportunity to even cross those lines to go to another company."

84.     Similarly, another Grower stated: "But as everyone else has said, in our community there are several companies, ***but once you start with one, that's the only one that will allow you a contract. They won't cross the lines to come to your farm***."

85.     As a result of the Cartel's agreement, Growers very rarely switch Integrators. Studies show that few Growers have ever been able to successfully switch Integrators, and of those, almost none were able to obtain better contract terms in the switch. A study from 1999 reported that of the Growers who changed companies, 47% of those did so because "the old company closed or changed hands," while 12% reported that they were "cut off by their old company." Only a small percentage of Growers who switched did so of their own accord.

86.      Only 2.88% of Growers switched in 2014 to go to another Integrator.

87.     A recent study sponsored by the Defendants' own trade association (the National Chicken Council) indicated that in 2014, less than 5% of Growers were able to switch Integrators.

88.     In those rare instances where Growers are able to switch Integrators, it is usually accompanied by a benefit to an Integrator. For example, Tyson may have excess processing capacity and Pilgrim may have too many Growers under contract; in this scenario, the would-be horizontal competitors would allow Growers to switch from Pilgrim to Tyson, although without

19

conferring any meaningful benefits to the Growers as a result of the switch.

89.     Sanderson and Wayne almost never allowed their Growers to switch between the two Integrators, unless the switch would benefit Sanderson or Wayne.

**Factors Rendering the Broiler Industry Conducive to Collusion**

90.     The Broiler industry is characterized by numerous features, or plus factors, that render the industry susceptible to collusion and bolster the plausibility of conspiracy alleged herein. These include: (1) high entry barriers for Integrators; (2) high exit barriers for Growers; (3) inelastic demand and a lack of Broiler substitutes; (4) industry concentration; (5) fungibility of Broiler Grow-Out Services; and (6) numerous opportunities to collude.

91.     The Broiler industry is characterized by high entry barriers for Integrators. These include the high fixed costs of establishing a Broiler Complex and a distribution network capable of delivering Broilers to grocery chains or wholesalers for delivery to commercial eateries and end consumers and the high regulatory costs of ensuring compliance with onerous FDA mandates and regulations.

92.     The Broiler industry is characterized by high exit barriers for Growers. To enter the market, Growers must make substantial financial investments tied to Broiler-specific equipment and facilities, which offer no use outside of raising Broilers. This means that even faced with sub-competitive pay, Growers will not exit the Broiler Grow-Out Services market, because of the risk or inevitability of financial ruin from an inability to service that debt. Thus, once Growers enter the Broiler Grow-Out Services market, they become a captive audience, with little ability to avoid or circumvent anticompetitive practices.

93.     A single grow-out house can cost $300,000 or more. In 1999, Growers had an average of 3.6 grow-out houses. While the average Grower surveyed had been in the Broiler

business for 16 years, one third still had more than $200,000 in total farm debt. In 2009 following a Pilgrim's bankruptcy, Growers terminated as a result had up to $600,000 in lingering debt.

94.     A relatively well-performing Grower will often spend fifteen to twenty-five years recouping their investment or paying down their debt, and for those less fortunate the possibility of economic independence is simply a fiction.

95.     Moreover, Integrators monitor Growers' debt burdens, requiring them to undertake unnecessary and expensive upgrades if they ever do near financial independence— with the intent of keeping Growers debt-laden and subservient. For example, in 2004, 49% of Growers were mandated to make improvements costing an average of $49,037.

96.     Indeed, Integrators will explicitly threaten Growers that if they refuse to make these expensive and unnecessary upgrades, they will be cut off from receiving further flocks to raise and face inevitable financial ruin.

97.     Pursuant to the Integrator's investment requirements, Growers shoulder over fifty percent of the total investment costs across the *entire Broiler industry*.

98.     These large financial investments into Broiler-specific equipment and facilities mean that Growers can generally only service this debt by continuing to raise Broilers. As a result, Growers are insensitive to (*i.e.*, unlikely to exit the market because of) changes in compensation.

99.     Indeed, USDA economists have acknowledged that "once the investment is made, growers face the risk of opportunistic behavior by integrators, who may have considerable monopsony power at that point."

100.    Another commentator observes that "[o]nce one enters the life of a grower, the

trap is closed: high capital costs and large debt to enter the business, no input on product prices, no market in which to sell the goods and no way out except bankruptcy[.]"

101.    And a 2008 Pew Commission report reflects that "[o]nce the commitment is made to such capital investment, many farmers have no choice but to continue to produce until the loan is paid off. Such [CFAs] make access to open and competitive markets nearly impossible for most . . . poultry producers, who must contract with integrators if they are to sell their product."

102.    Demand for Broiler Grow-Out Services is inelastic. Broilers are a staple food product and other meat products such as beef or pork are not considered to be reasonable substitutes for Broilers, either at the wholesale or retail levels. For the same reasons, demand for Broilers is inelastic, although prices for Broilers are responsive to changes in supply.

103.    The Broiler industry is highly concentrated. In 1995, there were 55 federally inspected Broiler companies operating in the United States. There were 41 in 2010, and by 2014, only 34—only 20 or so of which have any meaningful presence. The Broiler industry's top-4-firms concentration ratio increased from 40.9% in 1997 to 57.9% in 2013.  During the same time period, the top-8-firms concentration ratio increased from 53.1% in 1997 to 79.3% in 2013.

104.    As a result of vertical integration, there is no spot or cash market for Broilers, and there has not been for decades. Thus, there is no alternative for Growers to raise Broilers outside the confines of an agreement with an Integrator like Defendants.

105.    Broiler Grow-Out Services are fungible. Growers raise Broilers using Integrator's own birds, feed, and medicine. Growers bring to the table labor, investment capital, and land that are largely homogenous.

106.    The Broiler industry is replete with opportunities to collude.

107.    Affording the Cartel members opportunities to effectuate their scheme against

22

Growers, their officers regularly meet and communicate with one another through the National

Chicken Council ("NCC"), a trade association whose officers represent a perpetual revolving

door of high-ranking executives from Defendants and their Co-Conspirators.

108.   The NCC's membership includes representatives from Integrators responsible for

some 95% of Broiler production. The NCC offers a "forum in which industry members can share

ideas and work towards solutions to common problems." It is the "unified voice of the chicken

industry" and has a committee dedicated to "Growout" operations.

109.   The NCC has three annual board meetings attended by Defendants' senior

executives, including a January meeting held along with the International Poultry Expo, a mid-

year Board of Directors Meeting, and the NCC Annual meeting in October.

110.   For the 2010-11 NCC cycle, the executive committee included the following

individuals, serving one-year terms:

     a.    Lampkin Butts, *Sanderson Farms*, Laurel, MS;
     b.    Alan Duncan, Mountaire Corporation, Little Rock, AR;
     c.    Ron Foster, Foster Farms, Livingston, CA;
     d.    Ben Harrison, Jr., Amick Farms, LLC, Batesburg-Leesville, SC;
     e.    Michael Helgeson, Gold'n Plump Poultry, St. Cloud, MN;
     f.    Tom Hensley, Fieldale Farms, Baldwin, GA;
     g.    Mark Hickman, Peco Foods; Tuscaloosa, AL;
     h.    Donald Jackson, *Pilgrim's Pride Corporation*, Greeley, CO;
     i.    Mark Kaminsky, *Koch Foods*, Park Ridge, IL;
     j.    Bernard Leonard, *Tyson Foods*, Springdale, AR;
     k.    Bill Lovette, Case Foods, Troutman, NC; and
     l.    Elton Maddox, Wayne Farms LLC, Oakwood, GA.

111.   For the 2010-11 NCC cycle, the following individuals were appointed to the

board of directors serving three year terms:

     a.    John Comino, Southern Hens, Moselle, MS;
     b.    Paul Downes, Mountaire Corporation, Millsboro, DE;
     c.    Elise Durbin, Marshall Durbin Companies, Birmingham, AL;
     d.    Gary George, George's, Inc., Springdale, AR;
     e.    Trent Goins, OK Foods, Fort Smith, AR;
     f.    Donald Jackson, *Pilgrim's Pride Corporation*, Greeley, CO;

g.     Donnie King, **_Tyson Foods_**, Springdale, AR;
h.     Elton Maddox, Wayne Farms LLC, Oakwood, GA;
i.     Pete Martin, Mar-Jac Poultry, Gainesville, GA;
j.     James Perdue, **_Perdue Farms_**, Salisbury, MD;
k.     Todd Simmons, Simmons Foods, Siloam Springs, AR; and
l.     Robert Turley, Allen Family Foods, Seaford, DE.

112.    For the 2011-12 NCC cycle, the executive committee included the following

individuals, serving one-year terms:

a.     Lampkin Butts, **_Sanderson Farms_**, Laurel, MS;  (Chairman)
b.     Bill Lovette, **_Pilgrim's Pride Corporation_**, Greeley, CO; (Vice Chair)
c.     Michael Helgeson, GNP Company, St. Cloud, MN; (Sec'y/Treasurer)
d.     Alan Duncan, Mountaire Corporation, Little Rock, AR;
e.     Ron Foster, Foster Farms, Livingston, CA;
f.     Ben Harrison, Jr., Amick Farms, LLC, Batesburg-Leesville, SC;
g.     Mark Hickman, Peco Foods; Tuscaloosa, AL;
h.     Mark Kaminsky, **_Koch Foods_**, Park Ridge, IL;
i.     Bernard Leonard, **_Tyson Foods_**, Springdale, AR;
j.     Elton Maddox, Wayne Farms LLC, Oakwood, GA;
k.     Jim Perdue, **_Perdue Farms_**, Salisbury, MD, and
l.     Don Taber, House of Raeford, Rose Hill, NC.

113.    For the 2011-12 NCC cycle, the following individuals were appointed to the

board of directors for three-year terms:

a.     William Andersen, Keystone Foods, Huntsville, AL;
b.     Robin Burruss, Tip Top Poultry, Marietta, GA;
c.     Joe DePippo, Hain Pure Protein Corporation, Brevard, NC;
d.     Carl George, George's, Inc., Springdale, AR;
e.     Robert Johnson, House of Raeford, Rose Hill, NC;
f.     Bernard Leonard, **_Tyson Foods_**, Springdale, AR;
g.     Mike Roberts, **_Perdue Farms_**, Salisbury, MD;
h.     Joe Sanderson, Jr., **_Sanderson Farms_**, Laurel, MS;
i.     Thomas Shelton, Case Foods, Eden, MD; and
j.     Jerry Wilson, **_Pilgrim's Pride Corporation_**, Greeley, CO.

114.    For the 2011-12 NCC cycle, NCC also elected Jason Penn, Pilgrim's Pride's

Executive Vice President for Sales and Operations, and Sara Lilygren, Tyson Foods Senior Vice

President of External Relations, as "New Members."

115.    For the 2012-13 NCC cycle, NCC elected four officers to one-year terms:

a.    Mike Brown, Vienna, VA, as President;
b.    Bill Lovette, *Pilgrim's Pride Corporation*, Greeley, CO, as Chairman;
c.    Michael Helgeson, GNP Company, St. Cloud, MN, as Vice-Chair; and
d.    Jerry Lane, Pres., Claxton Poultry, Claxton, Georgia, as Secretary.

116.    For the 2014-15 NCC cycle, NCC selected four officers for one-year terms:

a.  Jerry Lane, president of Claxton Poultry in Claxton, Georgia, as Chairman.
b.  Todd Simmons. Chief Executive Officer of Simmons Foods, as Vice-Chair
c.  Mike Popowycz, vice chairman and chief financial officer at Case Foods, as Secretary-Treasurer.
d.  Mike Brown, of Vienna, Virginia, was elected to another term as president of NCC.

117.    For the 2015-16 NCC cycle, NCC selected four officers for one-year terms:

a.  Todd Simmons, Chief Executive Officer of Simmons Foods in Siloam Springs, Arkansas, as Chairman
b.  Mike Popowycz, vice chairman and chief financial officer at Case Foods, as Vice-Chair
c.  Ben Harrison, president and chief executive officer of Amick Farms, LLC., as Secretary-Treasurer.
d.  Mike Brown, of Vienna, Virginia, was elected to another term as president of NCC.

118.    For the 2016-17 NCC cycle, NCC selected four officers for one-year terms:

a.  Mike Popowycz, vice chairman and chief financial officer of Case Foods (Troutman, North Carolina), as Chairman
b.  Ben Harrison, president and chief executive officer of Amick Farms, LLC, as Vice-Chair
c.  Mark Kaminsky, chief operating officer at *Koch Foods*, as Secretary-Treasurer.
d.  Mike Brown, of Vienna, Virginia, was elected to a fifth term as president of NCC.

119.    In 2011, the NCC held meetings throughout the country, including its Annual

Conference, attended by all executive committee officers and directors.

120.    In 2012, the NCC held meetings throughout the country, including a March board

of directors Meeting, a June board of directors meeting, an October board of directors meeting,

and its Annual Conference in October, attended by all executive committee officers and

directors.

121.    In 2013, the NCC held meetings throughout the country, including an October

board of directors meeting and its Annual Conference in October, attended by all executive committee officers and directors.

122.    In 2014, the NCC held a January board of directors meeting, a March "Day in Washington" meeting attended by the executive committee, a June board of director meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

123.    In 2015, the NCC held a January board of directors meeting, an April "Day in Washington" meeting attended by the executive committee, a June board of directors meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

124.    In 2016, the NCC held a June board of directors meeting, and its Annual Conference in October.

125.    Agri Stats hosts regulator "poultry outlook conferences" for Integrator's executives, including an April 23, 2015, conference in Atlanta, Georgia.

126.    The Cartel members also have had the opportunity to collude through U.S. Poultry & Egg Export Council ("USAPEEC"), which involves quarterly meetings with executives from all or nearly all Defendants, the U.S. Poultry & Egg Association ("US Poultry"), of which all Defendants are members and holds regular quarterly meetings, the Poultry Federation which holds regular meetings involving executives from, *inter alia*, Pilgrim's and Tyson, and the International Poultry Council, of which Tyson, Sanderson, and Pilgrim are individual members, alongside the NCC, USAPEEC, and US Poultry as organizational members.

127.    The Cartel members also permitted one another to tour each other's Complexes, which revealed confidential business methods employed by a company. These tours afforded the

Cartel the opportunity to conspire among senior executives.

128.    The Cartel members engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.

129.    Another sign that the Cartel members do not view production costs as secret is the fact that it is not unusual for Defendants to permit competitor's CEOs access to each other's production Complexes. In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Farms Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue Farms' operations and panel discussions with Defendants' senior executives.

130.    The Cartel members also permit high level employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's Pride. Similarly, Clint Rivers, Pilgrim Pride's

former President and CEO until December 2008, left the company and became Perdue Farms Senior VP of Operations and Supply Chain Management for Perdue Farms in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provisions to protect confidential information.

131.    Finally, the Broiler industry has historically been the subject of antitrust scrutiny.

132.    During the 1970s, major Broiler producers held weekly conference calls to discuss production levels and prices for Broilers. After the Department of Justice and civil antitrust plaintiffs sued, that practice was stopped and settled for some $30 million, although only to have Agri Stats later fill the void it left behind.

133.    Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the agriculture industry. A workshop held on Normal, Alabama, on May 21, 2010, focused on corporate concentration and a lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants eventually watered down the rules and led to the resignation of the official charged with imposing tougher regulations.

134.    In 2011, the DOJ sued to stop George's Inc.'s acquisition of a Virginia processing plant owned by Tyson, later settling when George's made certain concessions.

135.    A June 2014 USDA report states, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns, [including] the exercise of market power by Broiler integrators [which] have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal Agencies."

## Relevant Market and Monopsony Power

136.    The relevant product market is for the purchase of Broiler Grow-Out Services in the United States (the "Relevant Market").

137.    Here, a hypothetical firm or cartel that controlled a large share of the market for the purchase of Broiler Grow-Out Services, as the Cartel members do here, could and did profitably suppress prices for Broilers below competitive levels.

138.    There are no close economic and/or functional substitutes to Broiler Grow-Out Services. Integrators require the production of Broilers to supply their Complexes.

139.    Defendants purchase in excess of 60% of Broiler Grow-Out Services in the Relevant Market, even without accounting for the share purchased by the Co-Conspirator Integrators. A hypothetical firm or cartel that controlled this share of the market for the purchase of Broiler Grow-Out Services could impose a small but significant non-transitory price decrease for Broilers. Defendants (and their Co-Conspirators) have enormous power over Growers that enable them to significantly depress prices. Due in part to the conduct challenged herein, Growers would not be able to defeat such price suppression by shifting the sale of their services to other Integrators.

140.    Integrators set precise, onerous, and sometimes arbitrary specifications for the construction and maintenance of Growers' facilities. Meeting these specifications is a condition precedent for participating in the Relevant Market. As a result, the barriers to entry in the Relevant Market are high and require substantial capital to overcome.

141.    The Relevant Market is also characterized by high barriers to exit. Because meeting Integrator specifications are generally financed through loans and repaid through compensation for Broiler Grow-Out Services, and the facilities have no utility other than

producing Broilers, Growers are locked into selling Broiler Grow-Out Services until they gain

the financial wherewithal to exit the market.

142.    The relevant geographic market is the United States. Broilers are produced across

the country, and are largely fungible and homogenous.

143.    Defendants collectively possess market and monopsony power in the Relevant

Market in that they have the power, collectively, to suppress compensation to Growers for

Broiler Grow-Out Services below competitive levels.

### Anticompetitive Effects

144.    As a result of the Cartel's unlawful conduct, Grower pay has been suppressed

below competitive levels.

145.    Since the 1980s, the inflation adjusted market price of Broilers has risen relatively

steadily, while the Growers' share of that market price has fallen, with Integrators pocketing the

difference. Since at least 2007, inflation-adjusted Grower pay has shown a significant, downward

trend, while consumer prices have increased; this widened gap between farm gate prices and

retail prices shows that neither the Grower nor consumer are better off under the Integrators'

collective grip. Since 2008, there has been a nearly 50% increase in Broiler wholesale prices,

despite input costs (primarily corn and soybeans) falling roughly 20% to 23%.

146.    A quarter of Growers have negative net farm income, meaning they spend more

money than they make from providing Broiler Grow-Out Services to Integrators. In 2006,

average income was only $20,000 for medium Growers, accounting for 50% of Broiler

production. In 2011, real Grower returns on investments were negative except for the largest of

Growers, while 20% of small Growers failed to cover cash expenses, and nearly a third of small

and a fifth of large Growers had negative net farm income. These limited or negative earnings

come at the expense of investing hundreds of thousands if not over a million dollars on land, grow-out houses, and capital upgrades. As one commentator has observed, "contract producers who once had acceptable income from their poultry operations now put a few hundred thousand dollars of equity and borrow several hundred thousand more to hire themselves at minimum wage with no benefits and no real rate of return on their equity."

147.    An Oklahoma State University budget published in 2006 shows a loss of $4,260 annually on a $255,000 investment, while the Alabama Farm Business Analysis Association showed negative annual returns in 10 of the 15 years between 1999 and 2009, with average aggregate losses over that time period of $182,000. Some commentators have criticized the latter study as under-reflective of losses, as it reflects payouts 10% above actual average payouts.

148.    Plaintiffs similarly earn incomes disproportionate to their debt burdens and workload, reporting net income between $12,000 and $40,000 a year despite generally working twelve-to-sixteen hours a day, seven days a week, fifty-two weeks a year.

149.    Meanwhile, integrators like Pilgrim's Pride and Tyson rake in more than $1 billion and $3.9 billion a year, respectively, in ***profits***.

## CLASS ACTION ALLEGATIONS

150.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as representatives of a class defined as follows:

> All individuals and entities in the United States and its territories that were paid for providing Broiler Grow-Out Services by a Defendant or Co-Conspirator, or by a division, subsidiary, predecessor, or affiliate of a Defendant or Co-Conspirator, at any time during the period January 27, 2013 through and until the anticompetitive effects of Defendants' unlawful conduct cease.

151.    The following persons and entities are excluded from the proposed Class: federal

government entities, Defendants, Co-Conspirators, and any of their subsidiaries, predecessors, officers, or directors.

153. Plaintiffs' claims are typical of those of the Class.

154. Plaintiffs and all members of the Class were injured by the same unlawful conduct, which resulted in them receiving less in compensation for their Grow-Out Services than they would have in a competitive market.

155. Plaintiffs will fairly and adequately protect and represent the interests of Class. The interests of the Plaintiffs are not antagonistic to the Class.

156. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the class members.

157. Questions of law and fact common to the Class include:

(1) Whether Defendants and their Co-Conspirators' exchange of nonpublic, competitively sensitive information about Grower compensation constitutes (a) an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Antitrust Act, or (b) an unfair or deceptive practice in violation of the Packers and Stockyards Act;

(2) Whether Defendants and their Co-Conspirators' agreement not to "poach" each other's Growers constitutes (a) an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Antitrust Act, or (b) an unfair or deceptive practice in violation of the Packers and Stockyards Act;

(3) Whether Defendants and their Co-Conspirators' sharing of nonpublic, competitive information about Grower compensation suppressed Grower compensation below competitive levels;

(4) Whether Defendants and their Co-Conspirators' sharing of nonpublic, competitive information about Grower compensation suppressed Grower compensation below competitive levels; and

(5) The proper measure of damages for each.

158.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and unfair competition litigation.

159.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## COUNT ONE
### Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act

160.     Plaintiffs incorporate each allegation above as if fully set forth herein.

161.     Defendants and their Co-Conspirators have contemporaneously and frequently exchanged disaggregated data on Grower compensation, with the purpose and effect of suppressing compensation for Broiler Grow-Out Services for all members of the Class below competitive levels.

162.     Defendants and their Co-Conspirators have insulated their cartel by agreeing not to solicit or "poach" one another's Growers.

163.     This information is not public and it is not shared with Growers.

164.     There are no procompetitive justifications for Defendants and their Co-Conspirators' conduct, or if there are, they can be achieved through less restrictive means.

165.     This conduct is a *per se* violation of the Sherman Antitrust Act.

33

## COUNT TWO
### Unfair Practices in Violation of Section 202 of the Packers and Stockyards Act

166.    Plaintiffs incorporate each allegation above as if fully set forth herein.

167.    Defendants and their Co-Conspirators have contemporaneously and frequently exchanged disaggregated data on Grower compensation, with the intent and effect of suppressing compensation for Broiler Grow-Out Services for all members of the Class below competitive levels. This information includes data on even the minutest details of all participating Integrators' operations, including feed, medicine, and bird type and genetics, which are the primary drivers of Growers' compensation.

168.    This information is not public and it is not shared with Growers.

169.    There are no procompetitive justifications for Defendants and their Co-Conspirators' conduct, or if there are, they can be achieved through less restrictive means.

### PETITION FOR RELIEF

Plaintiffs petition for the following relief:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

B.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act and the Packers and Stockyards Act;

C.    A judgment and order requiring Defendants to pay damages to Plaintiffs and the members of the Class, trebled;

D.    An award of attorneys' fees and costs;

E.    An award of pre- and post-judgment interest on all amounts awarded; and

F.    Such other and further relief as the Court deems just and equitable.

## REQUEST FOR TRIAL BY JURY

Plaintiffs request a trial by jury of all issues so triable.

Dated January 27, 2017.                    Respectfully submitted,


*/s/ William A. (Drew) Edmondson*
William A. (Drew) Edmondson, OBA #2628
EDMONDSON LAW OFFICE
P. O. Box 18922
Oklahoma City, OK 73154
Tele: (405) 810-4226
Email: drew.edmondson1@gmail.com

Michael D. Hausfeld
James J. Pizzirusso
Melinda R. Coolidge
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
Tele: (202) 540-7200
Fax:  (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com

Gary I. Smith, Jr.
HAUSFELD LLP
325 Chestnut St., Suite 325
Philadelphia, PA 19106
Tele: (215) 985-3270
Fax:  (215) 985-3271
Email: gsmith@hausfeld.com

Eric L. Cramer
Patrick F. Madden
Christina Black
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: cblack@bm.net

Vincent J. Esades
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
Tele: (612) 338-4605
Fax: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns
BURNS CHAREST LLP
500 North Akard, Suite 2810
Dallas, Texas 75201
Tele: (469) 904-4551
Email: wburns@burnscharest.com

Gregory Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tele: (334) 832-9080
Fax: (334) 409-7001
Email: gldavis@knology.net

Larry D. Lahman, OBA #5166
Roger L. Ediger, OBA #19449
Carol Hambrick Lahman, OBA # 11330
Scott E. Cordell, OBA #31522
MITCHELL DECLERK
202 West Broadway Avenue
Enid, Oklahoma 73701
Tele: (580) 234-5144
Fax: (580) 234-8890
Email: ldl@mdpllc.com
Email: rle@mdpllc.com
Email: chl@mdpllc.com
Email: sec@mdpllc.com

Charles D. Gabriel
GA Bar No. 281649
CHALMERS, PAK, BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, GA 30097
Tele: (678) 735.5903
Fax: (678) 735.5905
Email: cdgabriel@cpblawgroup.com

36

Larry S. McDevitt
David M. Wilkerson
THE VAN WINKLE LAW FIRM
11 N. Market Street
Asheville, NC 28801
Tele: (828) 258-2991
Fax: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com