# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER LITIGATION | No. 6:17-CV-00033-RJS |
| This Document Relates To All Cases | The Honorable Robert J. Shelby |

**DEFENDANTS' JOINT MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL
PROCEDURE 12(b)(2), (3), and (6) AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

      A.    Grower Pay and the Tournament System. ....................................... 4

      B.    Agri Stats. ........................................................................................ 4

ARGUMENT ....................................................................................................... 5

I.     PLAINTIFFS HAVE FAILED TO ALLEGE AN AGREEMENT NOT
      TO POACH EACH OTHER'S GROWERS. ............................................ 6

      A.    Plaintiffs Do Not Plead Direct Evidence of a "No Poaching"
           Conspiracy. ...................................................................................... 6

      B.    Plaintiffs Fail to Allege Circumstantial Evidence of a Plausible
           Conspiracy. ...................................................................................... 7

           1.    Plaintiffs Have Not Alleged Parallel Conduct. ................... 7

           2.    Plaintiffs Have Not Sufficiently Alleged That Any
                Parallel Conduct Was the Result of a Plausible
                Agreement. ............................................................................ 8

                a.    Obvious, Alternative Explanations for Low Rates
                    of Growers Switching Integrators Exist. ................... 8

                b.    Plaintiffs Have Not Alleged "Plus Factors" That
                    Support an Inference of Conspiracy. ......................... 9

II.    THE COMPLAINT DOES NOT SUFFICIENTLY ALLEGE A
      PLAUSIBLE INFORMATION-EXCHANGE CONSPIRACY. ............. 11

      A.    Plaintiffs Cannot Plead a *Per Se* Antitrust Violation. ................... 12

      B.    Plaintiffs Fail to Allege an Information-Exchange Agreement
           Among Defendants. ....................................................................... 13

           1.    Plaintiffs Do Not Plead an Agreement Directly. ............... 14

           2.    Plaintiffs Do Not Plead Facts From Which an Agreement
                Can Be Inferred. ................................................................ 14

                a.    There is an Obvious, Alternative Explanation for
                    Defendants' Participation in Agri Stats. ................... 15

b.      Plaintiffs Do Not Sufficiently Plead "Plus
Factors." ................................................................................ 17

III.    PLAINTIFFS' PACKERS AND STOCKYARDS ACT CLAIM MUST
ALSO BE DISMISSED. ......................................................................... 17

A.      Plaintiffs Do Not Plausibly Allege an Anticompetitive Agreement
or Effect. .......................................................................................... 18

B.      Plaintiffs Fail to Satisfy the PSA's Mandatory Venue Provision. ................. 20

C.      If Plaintiffs' Sherman Act Claim is Dismissed, the PSA Claim by
Non-Oklahoma Plaintiffs Must Also Be Dismissed for Lack of
Personal Jurisdiction. ....................................................................... 20

CONCLUSION .................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ...................................................................................9

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*,
  No. 15 C 08020, 2016 WL 3521883 (N.D. Ill. June 28, 2016) ..............................10

*Been v. O.K. Indus., Inc.*,
  495 F.3d 1217 (10th Cir. 2007) .................................................................................18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................. *passim*

*Bragdon v. Abbott*,
  524 U.S. 624 (1998)....................................................................................................10

*Bristol-Myers Squibb Co. v. Superior Court*,
  137 S. Ct. 1773 (2017)................................................................................................21

*Bristow Endeavor Healthcare, LLC v. Blue Cross and Blue Shield Ass'n*,
  No. 16-5149, 2017 WL 2350204 (10th Cir. May 31, 2017)............................. *passim*

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) .................................................................................18

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)........................................................................................14

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) .................................................................................11

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357
  873 F.2d 1357 (10th Cir. 1989) ...........................................................................6, 7, 9

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  458 F.3d 1073 (10th Cir. 2006) ..................................................................................6

*Consol. Metal Prods., Inc. v. Am. Petro. Inst.*,
  846 F.2d 284 (5th Cir. 1988) ......................................................................................9

*Credit Bureau Servs., Inc. v. Experian Info. Sols.*,
  No. 12-61360-CIV, 2012 WL 6102068 (S.D. Fla. Dec. 7, 2012)............................10

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................19

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010).........................................................................13, 14

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003)...........................................................................6

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) .....................................................................12

*Jewell v. United States*,
    749 F.3d 1295 (10th Cir. 2014) ....................................................................20

*Kelsey K. v. NFL Enters., LLC*,
    2017 WL 2311312 (N.D. Cal. May 25, 2017) ...................................................15

*Khan v. Bank of New York Mellon*,
    535 F. App'x 778 (10th Cir. 2013) ..................................................................3

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ............................................................8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007).............................................................................12, 13

*London v. Fieldale Farms, Inc.*,
    410 F.3d 1295 (11th Cir. 2005) ....................................................................18

*Maple Flooring Mfrs.' Ass'n v. U.S.*,
    268 U.S. 563 (1925).......................................................................12, 13, 16

*McFarland v. Memorex Corp.*,
    493 F. Supp. 657 (N.D. Cal. 1980) ................................................................20

*Missouri Pet Breeders Ass'n v. Cty. of Cook*,
    106 F. Supp. 3d 908 (N.D. Ill. 2015) ..............................................................3

*Mitchael v. Intracorp, Inc.*,
    179 F.3d 847 (10th Cir. 1999) ......................................................................16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).................................................................................17

*In re Musical Instruments and Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .......................................................................9

*Parker v. Brown*,
   317 U.S. 341 (1943) ........................................................................................................3

*In re Processed Eggs Prods. Antitrust Litig.*,
   206 F. Supp. 3d 1033 (E.D. Pa. 2016) ...........................................................................13

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) .......................................................................................5

*Superior Offshore Int'l, Inc. v. Bristow Group Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2010) ..........................................................................11, 16

*Terry v. Tyson Farms, Inc.*,
   604 F.3d 272 (6th Cir. 2010) ......................................................................................5, 18

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ......................................................................................9, 19

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .....................................................................................11, 12

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ....................................................................................14, 15

*TYR Sport v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 802 (C.D. Cal. 2010) ..........................................................................10

*United States v. Citizens & S. Nat'l Bank*,
   422 U.S. 86 (1975) ...................................................................................................11, 12

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ........................................................................13

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ........................................................................................................13

*Vincent v. The Money Store*,
   736 F.3d 88 (2d Cir. 2013) .............................................................................................10

*Wampler v. Sw. Bell Telephone Co.*,
   597 F.3d 741 (5th Cir. 2010) ..........................................................................................12

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
   796 F.2d 1216 (10th Cir. 1986) ......................................................................................12

*White v. R.M. Packer Co., Inc.*,
   635 F.3d 571 (1st Cir. 2011) ...........................................................................................11

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ........................................................................11

**Statutes and Regulations**

7 U.S.C. § 197b(a) ........................................................................................................20

28 U.S.C. § 1406(a) ......................................................................................................20

9 C.F.R. §§ 201.3, 201.100 ...........................................................................................4

**Other Authorities**

Fed. Trade Comm'n & U.S. Dep't of Justice. Antitrust Guidelines for
    Collaborations Among Competitors (Apr. 2000) ..................................................10

Thomas M. Jorde & David J. Teece, *Rule of Reason Analysis of Horizontal
    Arrangements: Agreements Designed to Advance Innovation and
    Commercialize Technology*, 61 ANTITRUST L.J. 579 (1993) ..................................12

James M. MacDonald, Econ. Research Serv., U.S. Dep't of Agric., Technology,
    Organization, and Financial Performance in U.S. Broiler Production, Econ.
    Info. Bulletin No. 126 (June 2014) .........................................................................3

Charles A. Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. Civ. § 1757 (3d ed.)...................21

## INTRODUCTION

Plaintiffs attempt to dress up as violations of antitrust law their generalized dissatisfaction with longstanding, transparent, and government-monitored practices in the chicken industry.  To do so, they allege a conspiracy among Defendants "not to compete for Broiler Grow-Out Services" with the purpose and effect of keeping Grower compensation below competitive levels.  (Dkt. 137 ("Compl.") ¶ 1.)   But what Plaintiffs are really doing is using the antitrust laws to punish Defendants' efforts to produce chickens as efficiently as possible.

The purported "Scheme" Plaintiffs assert actually comprises two alleged agreements. (*E.g.*, Compl. ¶¶ 4, 138, 166.)  *First*, Plaintiffs allege a supposed agreement among Defendants not to recruit or contract with Growers contracted by another Integrator.[1]  (Compl. ¶¶ 3, 79.) ***Second***, Plaintiffs challenge as anticompetitive Defendants' submitting cost information to Agri Stats – an independent third party – for use in benchmarking reports.  (Compl. ¶¶ 2, 66.)  Neither alleged agreement is sufficiently pled or plausible under *Twombly*.  As set forth below, Plaintiffs' allegations amount to little more than a description of the Grower-Integrator relationship, the structure of the Broiler industry, and the benchmarking services used by Integrators to increase efficiency and control their own costs.  These allegations cannot establish Plaintiffs' alleged "Scheme" as a matter of law.

**"No Poaching" Agreement.**  Plaintiffs fail to plead any support for an agreement not to "poach" (recruit or contract with) each other's Growers.  Instead, Plaintiffs offer only speculation. Plaintiffs plead a handful of anecdotes, none of which names a specific Integrator, a specific Grower, a specific time or place an agreement was made, or the geographic location of the Integrators covered by such an agreement.  None indicates that those involved in the anecdotes had first-hand knowledge to support their stories.  (Compl. ¶¶ 80–84.)  Further, Plaintiffs concede there is an obvious, alternative explanation why only limited switching might occur: Growers invest significant amounts to meet Integrator-specific requirements.  (*E.g.*, *id.* ¶ 55.)  This means there are high switching costs for Growers to move to a new Integrator, which might have different needs or specifications.  Plaintiffs do not allege why it would be likely that Integrators would

---

[1]    In the poultry industry, vertically integrated companies, like Defendants, are referred to as "Integrators."

attempt to poach each other's growers given the Integrator-specific nature of the investments alleged in the Complaint.

On the other hand, Plaintiffs admit that Growers *do switch* Integrators. (*Id.* ¶ 86.) Indeed, it is notable that not one of the named Plaintiffs pleads that he or she even *attempted to switch* Integrators and was denied. Furthermore, Plaintiffs fail to plead even one instance where a Defendant needing to increase production refused to consider hiring a competitor's Grower. In sum, Plaintiffs fail to allege the first agreement in their "Scheme."

**Information-Sharing Agreement.** Plaintiffs' claims that Defendants entered an agreement to share information through Agri Stats also are wholly inadequate. Plaintiffs conflate the individual agreements that Defendants have with Agri Stats to provide information and receive reports with an agreement among the Defendants themselves, but Plaintiffs plead no support for their dramatic extension. Alleging a plausible Sherman Act violation based on conduct so obviously designed to increase production efficiency requires more than is offered by Plaintiffs. Plaintiffs plead no specifics on *when* this supposed agreement among Defendants was made, *which Defendants* made it, or *how*, over an alleged class period dating back to *at least* 2008, it operated and was enforced. They also offer no circumstantial support from which an agreement could be inferred. Without pleading these basics, Plaintiffs fail to plausibly allege, as they must, the second agreement in the putative "Scheme." Their claims fail for this reason alone.

Plaintiffs' information-exchange-based claims additionally fail because they are pled under the wrong legal standard. They assert the "Scheme" is unlawful *per se*. (Compl. ¶ 169.) But courts have *repeatedly* recognized that information exchanges are examined under the "rule of reason." This is because information exchanges are routinely acknowledged to be efficiency-enhancing and good for competition.

In short, Plaintiffs fail to plead the basic facts (the "who, what, when, where" and, perhaps most importantly, the "how"); they plead their case under the wrong legal standard (*per se* rather than rule of reason); and they rely on conclusory assertions that conflict with other allegations. As set forth below, the law demands more.

Finally, dismissal with prejudice is proper because Plaintiffs cannot correct these deficiencies through amendment. If Plaintiffs were able to sufficiently plead a *per se* violation of the Sherman Act, they would have done so. Even if Plaintiffs amended their Complaint to describe a violation under the rule of reason, their allegations would still lack the necessary detail to satisfy

*Twombly*.  Any attempts to amend their claims under the Packers and Stockyards Act ("PSA") are similarly futile.  As sophisticated litigators, Plaintiffs have marshalled their best factual allegations in this Complaint – and those efforts have fallen short.

## BACKGROUND

Defendants Tyson, Pilgrim's Pride, Perdue, Koch, and Sanderson Farms are five of at least 25 poultry Integrators in the United States.  (*Id.* ¶¶ 26–39, 50, 99.)  Their basic production model has been the same since the 1960s.  (*Id.* ¶¶ 49–50.)  Integrators operate in "localized networks of production" around the country to produce Broiler chickens.  (*Id.* ¶ 45.)  To ensure the quality and consistency of the chickens they sell in the retail market, Integrators own feedmills that produce chicken feed, hatcheries where breeder chickens' eggs are hatched, and complexes where fully-grown Broilers are processed and chicken products are produced for sale.  (*Id.* ¶¶ 47–50, 91.)

Integrators contract with nearby Growers to feed and care for hatched Broiler chicks until they reach slaughtering age.  (*Id.* ¶ 54.)  Under this arrangement, Integrators provide chicks, feed, and veterinary services and provide technical advice to the Growers, including specifying the Growers' equipment.  (*Id.* ¶¶ 54, 63.)  These practices ensure that the Broilers are raised to the Integrator's specifications and are suitable for sale and consumption.  Growers provide labor, utilities, and upfront investment in facilities.  (*Id.* ¶¶ 54–55.)  Integrators provide the precise specifications for the construction and maintenance of the facilities reflecting their individual judgment as to the most efficient manner to grow chicks.  (*Id.*)  By necessity, "[B]roiler production is geographically concentrated," such that "the mean distance from a [G]rower to the [I]ntegrator's processing plant was 34 miles, and 90 percent of all birds [are] produced on farms within 60 miles of the plant."[2]

---

[2]   James M. MacDonald, Econ. Research Serv., U.S. Dep't of Agric., Technology, Organization, and Financial Performance in U.S. Broiler Production, Econ. Info. Bulletin No. 126 (June 2014), at 5, 29, https://www.ers.usda.gov/webdocs/publications/43869/48159_eib126.pdf. [hereinafter *U.S. Broiler Production Report*].  Note that, although this source has not been cited by the Plaintiffs, the Court "may take judicial notice of government reports."  *Khan v. Bank of New York Mellon*, 535 F. App'x 778, 780 n.3 (10th Cir. 2013); *see also Parker v. Brown*, 317 U.S. 341, 363 n.9 (1943) (noticing data in USDA publications); *Missouri Pet Breeders Ass'n v. Cty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) (noticing USDA publication in dismissing complaint).

A.      **Grower Pay and the Tournament System.**

Integrators pay Growers pursuant to contracts, which typically specify a compensation formula.  Many Integrators pay Growers using a "Tournament System," which is an incentive-pay arrangement that rewards Growers for efficient grow-out (*e.g.*, attaining more pounds of meat using less feed).  (Compl. ¶¶ 146–149.)  Grower pay is tied to a base pay that is set forth in their contracts with the Integrators.  Each week a group of Growers "in a given location" settle their flocks with their Integrator.  (*Id.* ¶ 147.)  Integrators then rank their Growers on a feed-conversion metric.  (*Id.* ¶¶ 147, 149.)  Growers who performed above average on feed conversion earn more than the average base pay, and Growers who performed below average earn less than average.  (*Id.* ¶ 148.)

The Tournament System has existed in some form since at least the mid-1970s.  It has remained a staple of the industry because it drives efficiency and product quality that benefits consumers.  Through this competitive mechanism, Defendants maximize the volume of meat for sale by rewarding Grower efficiency.  Both the Grain Inspectors, Packers and Stockyards Administration ("GIPSA"), an agency of the U.S. Department of Agriculture ("USDA"), and the U.S. Department of Justice ("DOJ") monitor this system.  *See, e.g.*, 9 C.F.R. §§ 201.3, 201.100.

B.      **Agri Stats.**

Many Integrators subscribe to Agri Stats, a third-party research firm owned by Eli Lily & Co.  According to its website (*see* Compl. ¶¶ 67, 69), Agri Stats has been providing its services to the Broiler industry since 1985, and it provides similar services to several other industries.  *See* Agri Stats, Inc., *Company History*, http://www.agristats.com/history (last visited Aug. 10, 2017) [hereinafter *Agri Stats Company History*]; Agri Stats, Inc., *Partnership and Services*, http://www.agristats.com/partnership (last visited Aug. 10, 2017).  Agri Stats produces reports and sells those reports to subscribers, including Integrators.  (Compl. ¶ 25.)

Plaintiffs do not dispute that the data in Agri Stats reports is anonymous.  (*Id.* ¶ 73.)  They assert that, nonetheless, industry participants "can" use it to identify specific Integrators' data.  (*Id.*)  Plaintiffs offer no specific factual allegations to support this conclusion.

*      *      *

In short, both the Tournament System and benchmarking through Agri Stats have been part of the Broiler industry for decades.  They are longstanding, disclosed practices with real, efficiency-enhancing and competition-increasing benefits driving their use.  As set forth below,

4

Plaintiffs' efforts to turn these practices and their dissatisfaction with the Grower-Integrator relationship into antitrust violations must fail.

## ARGUMENT

The crux of a conspiracy claim is ***an agreement***.  Plaintiffs' claims must be dismissed because they fail to allege facts demonstrating a "plausible" agreement to conspire among Defendants.  Doing so requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, Plaintiffs must set forth "factual allegations" that "raise a right to relief above the speculative level." *Id.*  Plaintiffs' allegations fall far short of this requirement.

Plaintiffs' Sherman Act claim may not advance unless they plead "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.  Plaintiffs carry the burden of "mak[ing] clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations." *Bristow Endeavor Healthcare, LLC v. Blue Cross and Blue Shield Ass'n*, No. 16-5149, 2017 WL 2350204, at *2 (10th Cir. May 31, 2017).  Plaintiffs do not meet that burden with respect to any part of their alleged "Scheme." (Compl. ¶ 4.)

To plead an agreement, it is not sufficient that Plaintiffs assert a conclusion that one existed among all Defendants and a crowd of co-conspirators.  (*See* Compl. ¶ 79.)  Furthermore, allegations of "parallel business behavior," without facts supporting any agreement, "fall[] short of conclusively establishing agreement or . . . constituting a Sherman Act offense." *Twombly*, 550 U.S. at 553 (internal quotation marks omitted).  It is not enough to plead facts that are "consistent with conspiracy." *Id.* at 554.  Where, as here, Plaintiffs plead facts "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," their Complaint must be dismissed. *See id.*; *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (holding that allegations lack plausibility when they "are so general that they encompass a wide swath of conduct, much of it innocent").[3]

---

[3]   Plaintiffs' PSA claim demands the same. *See, e.g.*, *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010) (applying *Twombly* and affirming dismissal of a Grower action against Tyson under the PSA).

## I. PLAINTIFFS HAVE FAILED TO ALLEGE AN AGREEMENT NOT TO POACH EACH OTHER'S GROWERS.

Plaintiffs assert the Defendants agreed not to "poach" each other's Growers.  Plaintiffs may plead such a conspiracy with direct evidence – *i.e.*, with "the proverbial smoking gun," *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (internal quotation marks omitted) – or with circumstantial evidence that allows such an agreement to be inferred – *i.e.*, parallel conduct and "plus factors" that make plausible that the parallel actions were deliberately taken in service of an agreement.  *See Twombly*, 550 U.S. at 553, 557; *see also Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("[E]ven conscious parallel business behavior, standing alone, is insufficient to prove conspiracy.").  Plaintiffs successfully plead neither.

### A. Plaintiffs Do Not Plead Direct Evidence of a "No Poaching" Conspiracy.

At its heart, Plaintiffs' direct "no poaching" claim amounts to an assertion that there is a **perception** among some Growers that there **might** be an agreement among Integrators:  *e.g.*, "[I]t **seems** to be a written [sic] rule that if you go grow for one company, you really don't have the opportunity to even cross those lines to go to another company."  (Compl. ¶ 83 (emphasis added).)  Plaintiffs' most specific attempt to directly plead an agreement is an excerpt from a years-old complaint letter sent to GIPSA about one non-defendant, Peco Foods, and statements made by an unnamed secretary at Peco to an unidentified Grower at an unspecified time.  (*Id.* ¶ 80.)  This does not qualify as direct evidence in any sense.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006) ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.").  Plaintiffs do not allege with whom Peco conspired, for what geographic region, or how long the agreement was to stay in place.  Nor do they allege whether and how that secretary was knowledgeable regarding the alleged actions of Peco or the other alleged conspirators.  The same is true for Plaintiffs' far-weaker efforts to plead an agreement directly:  conclusory statements about "unwritten pacts" are not the same as pleading "who, what, where, and when."  (*E.g.*, *id.* ¶¶ 81, 82.)  *See Bristow Endeavor Healthcare, LLC*, 2017 WL 2350204, at *2.  Nor do such generalized assertions about all Integrators provide Defendants with "fair notice" about the claim against **each of them** or the grounds upon which it rests.  *Twombly*, 550 U.S. at 555.

### B.       Plaintiffs Fail to Allege Circumstantial Evidence of a Plausible Conspiracy.

Plaintiffs also fail to plead a circumstantial case.  Specifically, Plaintiffs have neither adequately alleged parallel conduct, nor additional factors as they must to support an inference that a plausible "no-poaching" agreement exists.  *See Twombly*, 550 U.S. at 553, 557; *Cayman Exploration Corp.*, 873 F.2d at 1361.  Where, as here, the Complaint contains legitimate explanations for the alleged parallel conduct, the failure to plead sufficient "plus factors" is even more stark.

### 1.       Plaintiffs Have Not Alleged Parallel Conduct.

Plaintiffs do not sufficiently allege that Defendants, in parallel, declined to poach each other's Growers.  For example, Plaintiffs do not allege that Growers previously moved between Integrators freely and that this movement stopped as a result of the purported conspiracy.  Plaintiffs also do not plead any change in the numbers of Growers switching Integrators that would allow an inference that an agreement not to poach was made and in place.  Instead, they allege that, "as a result" of the supposed "no poaching" agreement, 2.88% of Growers actually switched and about "5% of Growers were able to switch Integrators" in 2014.  (Compl. ¶¶ 85–87.)[4]  But pleading an industry average is not the same thing as pleading that the industry is acting in parallel.  Plaintiffs do not plead whether these numbers are higher or lower than before the alleged "no poaching" agreement supposedly began in 2008 or whether that is a low number given the substantial switching costs described in the Complaint.  Plaintiffs point to no other change in pattern or practice that supports their alleged rate of switching as the product of a "no poaching" agreement.  Other than alleging that Growers do not switch much, Plaintiffs do not plead anything that suggests Defendants' conduct with respect to Grower hiring is parallel at all.

---

[4]    Plaintiffs' alleged conspiracy is further implausible because they do not allege how Defendants and any other co-conspirators might enforce the "no poaching" agreement.  They do not plead what disincentivizes Defendants and any other co-conspirators from hiring Growers from a competing Integrator when it would otherwise be independently rational to do so.  Nor do they plead what "punishment," if any, was levied upon those Integrators who contracted with the 5% of Growers from competing Integrators.

2.      **Plaintiffs Have Not Sufficiently Alleged That Any Parallel Conduct Was the Result of a Plausible Agreement.**

a.      **Obvious, Alternative Explanations for Low Rates of Growers Switching Integrators Exist.**

Plaintiffs also have not pled a plausible circumstantial case because alleged "parallel" refusals to recruit or contract with Growers from other Integrators do not support an agreement if that conduct is just as likely to be the result of "chance, coincidence, independent responses to common stimuli, or mere interdependence." *Twombly*, 550 U.S. at 556 n.4. Put differently, parallel conduct does not support an inference of conspiracy where there is an "obvious alternative explanation" for it. *Id.* at 567. That is exactly the case here.

The alleged low rate of Grower switching is more plausibly explained by ***independently rational*** conduct on the part of both Growers and Integrators. Plaintiffs concede as much. They claim that Integrators have "precise specifications" for the houses and equipment that a Grower must use. (Compl. ¶ 55.) It makes sense that Defendants would be hesitant to contract with Growers who worked with other Integrators. As Plaintiffs also plead, "[a] single grow-out house can cost $300,000 or more" (*id.* ¶ 59), and Growers become "laden with debt from building or upgrading the grow-out facilities." (*Id.* ¶ 60.) Moreover, Plaintiffs also admit that Growers ***do*** switch Integrators, usually when doing so is "accompanied by a benefit to an Integrator" – *e.g.*, solving the problem of "too many Growers under contract." (*Id.* ¶ 88.) Thus, Plaintiffs plead the "natural explanation" for the conduct alleged: Defendants each "liked the world the way it was" and "were sitting tight." *See Twombly*, 550 U.S. at 557–58; *see also LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) ("*Twombly* contemplates a 'factually suggestive' context involving ***some sort of anomalous behavior*** on the part of defendants." (quoting *Twombly*, 550 U.S. at 557 n.5) (emphasis added)).

Plaintiffs also concede why Growers may be "sitting tight." According to Plaintiffs, Growers invest heavily in facilities specific to the Integrator with whom they have partnered. (Compl. ¶¶ 55–56.) Plaintiffs also recognize that not all Growers have more than one Integrator in their geographic area, and, where they do not, switching would require "moving." (*Id.* ¶ 89.) Given these investments, costs, and geographic restrictions, the allegedly low level of switching by Growers is entirely predictable.

It is also notable that not one of the named Plaintiffs is alleged to have attempted to switch Integrators and been denied.  In fact, there are no allegations that *any* Defendant declined to contract with a competitor's Grower when it was otherwise in that Defendant's independent economic self-interest to do so.  In short, Plaintiffs admit that Growers' low rate of switching is perfectly consistent with *their* unilateral self-interest. This means they have not pled a plausible agreement, and the Court should not infer a conspiracy.  *See Twombly*, 550 U.S. at 567.

> **b.**     **Plaintiffs Have Not Alleged "Plus Factors" That Support an Inference of Conspiracy.**

Even if a Complaint pleads parallel conduct, it also must allege "plus factors" – "further circumstance[s] pointing towards a meeting of the minds."  *Twombly*, 550 U.S. at 553, 557. Plaintiffs have not successfully pled parallel conduct, which means their "plus factors" are inapposite.  *See Cayman Exploration Corp.*, 873 F.2d at 1361 (holding that, in the absence of direct evidence, plaintiff "must establish that defendants engaged in consciously parallel action . . . which was contrary to their economic self-interest so as not to amount to good faith business judgment"). Even so, the handful of "plus factors" they attempt to plead – (1) opportunities to conspire, (2) executives' mobility, and (3) industry characteristics – do nothing to make more plausible Plaintiffs' claims that a "no poaching" agreement existed.

*First*, despite the 20 paragraphs devoted to the National Chicken Council and other trade associations in the Complaint, Plaintiffs' allegations that Defendants participate in trade association meetings are not enough.  (Compl. ¶¶ 103–122.)  "[I]t was well-settled before *Twombly* that participation in trade organizations provides no indications of conspiracy."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010); *see also Consol. Metal Prods., Inc. v. Am. Petro. Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988) ("A trade association by its nature involves collective action by competitors.  Nonetheless, a trade association is not by its nature a 'walking conspiracy.'").  Plaintiffs must advance specific allegations that an unlawful agreement was reached at these meetings, and they do not.  *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("Mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").  Plaintiffs' failure to identify any changes in the Defendants' behavior in conjunction with the trade association activities dooms their claim.  *Cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("[A]ll at once the defendants changed their pricing structures,

which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up the prices by a third."). Without such a change in behavior, Defendants' participation in trade associations is the kind of lawful and rational conduct that *Twombly* protects.

Plaintiffs fare no better with their discussions of feedmill cross-testing and plant tours among Defendants. (Compl. ¶¶ 76, 123.) Plaintiffs do not adequately explain how these alleged activities further any conspiracy. Asserting an "opportunity to conspire among senior executives" (*id.* ¶ 123) says nothing about whether those unnamed executives from unspecified Integrators actually reached an agreement or what they agreed to do. Nor do Plaintiffs plead facts supporting an inference that Defendants' stated reason for engaging in these activities – to develop "superior" chicks and "maximize efficiency" – is pretext. (*Id.* ¶ 76.) In fact, such modest collaboration over feedmills and best production practices has been recognized as ***good for competition***. *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors § 3.31(a) (Apr. 2000) (stating that research and development collaborations are usually procompetitive where the combination of "complementary technologies, know-how, or other assets" enables participants to "produce a good more efficiently");[5] *TYR Sport v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 814 (C.D. Cal. 2010) (noting that "joint research is likely to have many procompetitive effects").

***Second***, Plaintiffs' alleged movement of executives between Integrators as a "plus factor" is likewise unremarkable, not to mention inherent in a competitive industry. Plaintiffs do not connect the movements of high-level employees across Integrators to the alleged conspiracy. (*See* Compl. ¶ 78.) And, in reality, it would be odd if executives with relevant industry experience were not occasionally recruited away by competitors. *See ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, No. 15 C 08020, 2016 WL 3521883, at *9 (N.D. Ill. June 28, 2016) ("Hiring a competitor's employees is an ordinary part of competition, and indeed is inherent in any successful economic system."); *Credit Bureau Servs., Inc. v. Experian Info. Sols.*, No. 12-61360-CIV, 2012 WL

---

[5] Consideration of the "well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998); *see also Vincent v. The Money Store*, 736 F.3d 88, 101 & n.12 (2d Cir. 2013) (looking to Fed. Trade Comm'n staff commentary as "persuasive authority" in interpreting the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p).

6102068, at *19 (S.D. Fla. Dec. 7, 2012) (holding that an allegation "that officers of each [defendant] were at other times officers of another" is insufficient to state a conspiracy); *Superior Offshore Int'l*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) (dismissing complaint because alleged opportunities to conspire, including personnel moves, were insufficient without more to permit a reasonable inference of collusion).  In short, this supposed "plus factor" establishes nothing.

*Third*, the remaining "plus factors" Plaintiffs allege are similarly insufficient.  Plaintiffs allege that industry characteristics and a history of government scrutiny of the industry support an inference of an agreement here.  (*See, e.g.*, Compl. ¶¶ 90–101, 124–128.)  However, the law makes clear that these phenomena do not, without more, make a conspiracy plausible.  *E.g.*, *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 580 (1st Cir. 2011) (finding that industry structure alone "does nothing to explain whether the parallel pricing was achieved by agreement or mere interdependent decisions"); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317–18 (11th Cir. 2003) (rejecting historical antitrust violations as "indicative of a present antitrust violation").

*      *      *

Taken together, Plaintiffs fail to allege either direct or circumstantial evidence sufficient to support a plausible agreement not to poach Growers.  Plaintiffs are unable to point to any facts that suggest otherwise.  Consequently, the first leg of their alleged "Scheme" fails.

## II.   THE COMPLAINT DOES NOT SUFFICIENTLY ALLEGE A PLAUSIBLE INFORMATION-EXCHANGE CONSPIRACY.

Plaintiffs assert that Defendants "illegally agreed to share detailed data on Grower compensation" with each other.  (Compl. ¶ 2; *see also* Dkt. 151 at 15.)  This is the second putative agreement in their alleged "Scheme."  As an initial matter, Plaintiffs allege a *per se* violation of the antitrust laws (*id.* ¶ 169), which they cannot satisfy with an information-exchange agreement. It is well settled that information exchanges are addressed under the rule of reason.  *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 198–99 (2d Cir. 2001) (Sotomayor, J.); *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975).  This defect alone compels dismissal.  Further, Plaintiffs fail to plead direct or circumstantial support for this agreement regardless of the standard applied.[6]

---

[6]   A rule of reason case, if alleged, would also fail.  The Complaint alleges a highly-implausible *nationwide* market for Grower services.  (Compl. ¶ 129 ("The relevant geographic market is

### A.      Plaintiffs Cannot Plead a *Per Se* Antitrust Violation.

At the threshold, Plaintiffs' information-exchange claims should be dismissed because such an agreement cannot be a *per se* violation.  That standard applies to a narrow class of cases, like agreements to fix prices or divide markets, in which the alleged restraint on trade is one courts view as "always or almost always tend[ing] to restrict competition and decrease output."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877 (2007).  As the Supreme Court has explained, "the dissemination of price information is not itself a *per se* violation of the Sherman Act."  *Citizens & S. Nat'l Bank*, 422 U.S. at 113.  It is, instead, governed by the rule of reason. *See Todd*, 275 F.3d at 198.

Information exchanges have many potential benefits for competition and, as a result, are not *per se* illegal.  The benchmarking alleged in this case, for example, has been recognized as a tactic to "force[] companies to compare themselves with best-in-class companies, quantify differences in performance, explain these differences, and identify steps to catch up and surpass." Thomas M. Jorde & David J. Teece, *Rule of Reason Analysis of Horizontal Arrangements: Agreements Designed to Advance Innovation and Commercialize Technology*, 61 ANTITRUST L.J. 579, 596 (1993).  Such services were not intended to be "suppress[ed]" by the Sherman Act, and they promote the "intelligent conduct of business operations" by allowing the "individual intelligence of those engaged in commerce" to benefit all engaged in the market.  *Maple Flooring Mfrs.' Ass'n v. U.S.*, 268 U.S. 563, 583–84 (1925).  Thus, the Supreme Court held in *Maple Flooring*:

> Persons who unite in gathering and disseminating information in trade journals and statistical reports on industry, who gather and publish statistics as to the amount of production of commodities in interstate commerce, and who report market prices,

---

the United States."); *see id.* ¶ 135.)  These claims should be dismissed even if pled under the rule of reason.  *See Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("By failing to allege an appropriate market, [Plaintiff] has failed to state a claim under § 2 of the Sherman Act."); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986) (defining the proper geographic market is "the narrowest market which is wide enough so that products from adjacent areas . . . cannot compete on substantial parity with those included in the market"); *Wampler v. Sw. Bell Telephone Co.*, 597 F.3d 741, 744– 46 (5th Cir. 2010) (affirming dismissal for failure to demonstrate that alleged geographic market was sufficient for antitrust purposes); *Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (finding the complaint deficient under *Twombly* because of an overbroad relevant market that combined distinct submarkets).

> are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that ***the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information***.

*Id.*; *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets ***more***, rather than less, competitive." (emphasis added)).

Plaintiffs attempt to avoid their obligation to plead this agreement under the rule of reason with a blanket assertion that the "Scheme" is "a *per se* violation of the Sherman Antitrust Act." (Compl. ¶ 169.)  But pleading an overarching conspiracy does not mean that Defendants "may be found *per se* liable for all manner of conduct which may otherwise singly be evaluated under the rule of reason."  *See In re Processed Eggs Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1040 (E.D. Pa. 2016) (rejecting a similar contention as one that "cannot possibly be correct"); *see also Leegin Creative Leather Prods., Inc.*, 551 U.S. at 893 (recognizing that even where a horizontal cartel is properly pled as *per se* unlawful, a vertical agreement alleged to "facilitate" the cartel "would need to be held unlawful under the rule of reason" if the restraint is not one that always or almost always tends to restrict competition and decrease output).  Plaintiffs' alleged information-exchange agreement falls squarely within the rule of reason's scope.

Plaintiffs' pleading defect compels dismissal as a matter of law.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) ("If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require the application of the rule of reason, the plaintiff's claims will be dismissed."); *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037–38 (N.D. Cal. 2013) ("[If] the court ultimately find[s] that the [plaintiff] cannot maintain a per se or quick look claim, [plaintiff] will then be without recourse to the rule of reason and its case will be dismissed." (internal citations omitted)).

## B. Plaintiffs Fail to Allege an Information-Exchange Agreement Among Defendants.

Plaintiffs cannot allege an agreement to exchange information regardless of the standard applied.  They do not and cannot allege an agreement ***among Defendants*** to share information.  As with the alleged "no poaching" agreement, Plaintiffs do not plead an agreement directly, nor

do they adduce facts to support an inference that one existed. Plaintiffs' allegations reduce to the claim that each Defendant submits information to a benchmarking service, which is perfectly commonplace and legal.

### 1.   Plaintiffs Do Not Plead an Agreement Directly.

Plaintiffs do not allege that Defendants actually agreed among themselves to exchange information. (Compl. ¶¶ 67, 69–75.) They do not specify which Defendants agreed with each other to share information, when they supposedly agreed, what information they agreed to share, or the steps Defendants took to enforce the agreement. *See Twombly*, 550 U.S. at 565 n.10 (holding that dismissal of conspiracy claim is required where "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 436–37 (6th Cir. 2008) ("Plaintiffs only offer bare allegations without any reference to the 'who, what, where, when, how or why.'"). At best, their allegations demonstrate that each Defendant independently decided to participate in benchmarking. (Compl. ¶¶ 67, 69–75.)

Such conclusory allegations, without more, are not enough to survive a motion to dismiss. In *Burtch v. Milberg Factors, Inc.*, for example, the Third Circuit dismissed the plaintiff's claims that the defendants had conspired to refuse to extend credit to the plaintiff for garment purchases after exchanging information about the plaintiff's credit. 662 F.3d 212, 217–18 (3d Cir. 2011). The Third Circuit concluded that the plaintiff had not pled any direct evidence of an agreement, and allegations that the defendants held 27 conversations exchanging information were insufficient without further factual claims that an agreement was made. *Id.* at 226. Here, Plaintiffs' claims fail for the same reasons. Plaintiffs plead only that Defendants participated in benchmarking. As in *Burtch*, the mere exchange of information through benchmarking is not unlawful, absent an actual agreement to suppress compensation. Plaintiffs have not pled such an agreement.

### 2.   Plaintiffs Do Not Plead Facts From Which an Agreement Can Be Inferred.

Plaintiffs also do not allege circumstantial evidence that Defendants agreed to share information among themselves. To be sure, Plaintiffs assert that each Defendant – and 14 other Integrators alleged to be co-conspirators – sends data to and receives data from Agri Stats weekly. (Compl. ¶¶ 26–39, 67, 70, 72.) But they do not allege how this conduct establishes an agreement *among Defendants* to do so. *Cf. In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327 ("[O]ne

cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker."). Nor would any such allegation make sense. Agri Stats has performed benchmarking for various industries, including poultry, since the 1980s. *See Agri Stats Company History*, *supra* p. 4. Yet, Plaintiffs allege that Defendants began agreeing to unlawfully exchange information through Agri Stats in 2008. (*See* Compl. ¶ 66.) Plaintiffs do not allege any communications among Defendants relating to Agri Stats of any sort. They also do not allege which Defendants began using Agri Stats and when, or any details about what information Defendants agreed ***among themselves*** to provide to and receive from Agri Stats. *Cf. Total Benefits Planning Agency*, 552 F.3d at 435–36 ("[T]he rim holding everything together is missing. . . . [T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other."). Instead, Plaintiffs obliquely assert the types of information Agri Stats collects and the format in which the data is allegedly compiled. (*Id.* ¶¶ 70, 73.) They ask the Court to infer from that alone that Defendants ***must have agreed with each other*** to share that data and to limit competition among themselves. But it is not enough to plead "rhetorical spin that beg[s] the most important question, namely, whether there was any conspiracy to begin with." *See Kelsey K. v. NFL Enters., LLC*, No. C 17-00496, 2017 WL 2311312, at *5 (N.D. Cal. May 25, 2017) (granting motion to dismiss complaint alleging conspiracy to fix and suppress compensation). That is all that Plaintiffs do.

### a.   There is an Obvious, Alternative Explanation for Defendants' Participation in Agri Stats.

Just as with their "no poaching" agreement allegations, there is an obvious, alternative explanation for Defendants' participation in Agri Stats that precludes Plaintiffs' claims. *See Twombly*, 550 U.S. at 567. As discussed above, information exchanges help companies ***compete***. *See supra* Part II.A. Participating in benchmarking to this end is independent, rational behavior, not a conspiracy. *See Bristow Endeavor Healthcare, LLC*, 2017 WL 2350204, at *3 ("A complaint is insufficient if the alleged behavior was as likely to have been the result of legal, unilateral action as the product of illicit collusion." (quotation omitted)).

Moreover, this is true even if, as Plaintiffs allege, Defendants use Agri Stats to "monitor each other's compensation levels to Growers." (Compl. ¶ 74.) It makes unilateral sense that each Defendant would do so (especially in a world without a "no poaching" agreement) to determine

whether it is paying the market-clearing price for Grower services. *Superior Offshore Int'l, Inc. v. Bristow Group Inc.* is instructive on this point. In that case, the court dismissed a Sherman Act claim where "[d]efendants openly shared information about their capacity to serve . . . oil and gas producers, and the costs [d]efendants commonly faced for fuel, helicopters, support facilities, personnel, and maintenance." 738 F. Supp. at 516. The court found that the "[p]laintiff ma[de] no allegation of ***any specific concerted exchange*** of pricing information between or among [d]efendants." *Id.* (emphasis added). Consequently, "the [d]efendants' alleged knowledge of their co-competitors' cost structures, and the competitors' unfettered exchange of business information, [were] neither remarkable nor actionable." *Id.* (quotation omitted). The same is true here. Exchanging information through Agri Stats, including about Growers compensation (*see* Compl. ¶ 70), is entirely consistent with independent business decisions.[7] *See Superior Offshore Int'l*, 738 F. Supp. 2d at 510–11 (holding that, even though firms may take into account how other firms may act, such decisions remain "independent").

Indeed, Plaintiffs plead no support for their alternative conclusion that Defendants allegedly monitor Grower compensation to "***ensure*** that no Integrator is offering materially more in compensation than another." (Compl. ¶ 74 (emphasis added).) They make no effort to plead how that outcome results or could be enforced – *i.e.*, what happens if a Defendant *did* offer more. Because they do not, their allegation that Defendants use Agri Stats to monitor each other's Grower pay is, at ***worst***, as consistent with the intelligent, ***unilateral*** business operations the Sherman Act protects as it is with conspiracy. *See Maple Flooring Mfrs.' Ass'n*, 268 U.S. at 583–84. That is not enough to make an agreement plausible. *See Twombly*, 550 U.S. at 557 (requiring at the pleading stage "allegations plausibly suggesting (not merely consistent with) agreement").

---

[7]   The Tenth Circuit's opinion in *Mitchael v. Intracorp, Inc.* is similarly instructive. There, the court considered allegations that the defendants exchanged information about chiropractic fees throughout the nation, broken down by geographical area and individual procedure, including a list of fees at or below which 80% and 90% of area chiropractors charged. 179 F.3d at 581. The court held that "[a]t most, [the plaintiffs] show that the Insurers shared a ***common concern about chiropractic cost containment***, and that, at times, some of them shared information about how each one individually handled chiropractic claims and that, at times, the Insurers used Intracorp to review chiropractic claims." *Id.* at 860 (emphasis added). Although applying a summary judgment standard in that case, the court noted that "plaintiffs have simply failed to present evidence tending to exclude the possibility that the defendants acted independently out of a legitimate and reasonable concern to control chiropractic costs." *Id.*

**b.      Plaintiffs Do Not Sufficiently Plead "Plus Factors."**

Plaintiffs' circumstantial case fails for the additional reason that they do not (and cannot) plead "plus factors" that make the alleged agreement more plausible.  For example, Plaintiffs' allegations of opportunities to conspire at trade association meetings and through feedmill cross-testing and complex tours (Compl. ¶¶ 76–77, 103–123), as well as their allegations that executives sometimes switch companies (*id.* ¶ 78), remain insufficient as a matter of law.  *See supra* Part I.B.2.b.  Plaintiffs do not sufficiently connect these allegations and Defendants' supposed agreement to share information through Agri Stats.  To the contrary, Plaintiffs' allegations of an overarching "Scheme" conflict and render any motive to collude here ***implausible***.  If Plaintiffs' first alleged agreement were true and Defendants agreed not to poach each other's Growers (Compl. ¶ 79), then Defendants had no motive to enter Plaintiffs' second alleged agreement to submit information so that they may "constantly monitor" what other Integrators are paying.  (*Id.* ¶ 74.)  If there is nowhere for the Growers to go, then there is no motive to ensure a Grower is not being enticed away by better pay elsewhere.  These allegations are ***fundamentally inconsistent*** with a conspiracy and, thus, implausible.  Simply put, Plaintiffs cannot carry their burden to allege that any Defendant, let alone all of them, had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Bristow Endeavor Healthcare, LLC*, 2017 WL 2350204, at *2.  Their claims must fail.

*      *      *

In sum, the second putative agreement in Plaintiffs' alleged "Scheme" fails because they cannot plead an information-exchange agreement as a *per se* antitrust violation as a matter of law, and because they do not allege a plausible agreement among Defendants to share information through Agri Stats regardless of the standard applied.

**III.   PLAINTIFFS' PACKERS AND STOCKYARDS ACT CLAIM MUST ALSO BE DISMISSED.**

Plaintiffs' claim under the PSA merely repeats the Sherman Act allegations and must also be dismissed.  Plaintiffs not only fail to plead any anticompetitive agreement or effects, but also run afoul of both mandatory venue and personal jurisdiction requirements necessary to bring these claims before this Court.

## A.      Plaintiffs Do Not Plausibly Allege an Anticompetitive Agreement or Effect.

Courts have applied *Twombly*'s pleading standards when reviewing motions to dismiss PSA claims. *See Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277–78 (6th Cir. 2010) (applying *Twombly* and affirming the dismissal of a Grower claim against an Integrator under the PSA). Moreover, PSA claims are analytically similar to Sherman Act claims because the PSA "is essentially an antitrust statute." *Id.* at 277. Thus, Plaintiffs cannot sustain a cause of action under the PSA unless they adequately plead an adverse effect on competition. *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1230 (10th Cir. 2007) ("We . . . join the those circuits requiring a plaintiff who challenges a practice under § 202(a) to show that the practice injures or is likely to injure competition."); *see also London v. Fieldale Farms, Inc.*, 410 F.3d 1295, 1303 (11th Cir. 2005) ("Relying upon the PSA's antitrust ancestry, several courts have held that only those unfair, discriminatory or deceptive practices adversely affecting competition are prohibited by the PSA.").

As set forth above, Plaintiffs fail to sufficiently allege any unlawful anticompetitive agreements among Defendants (1) not to "poach" each other's Growers or (2) to share compensation information with each other. *See supra* Parts I and II.B. Moreover, the Complaint does not allege a single fact connecting Defendants' challenged conduct to ***anticompetitively*** low pay. That is, Plaintiffs fail to provide any detail alleging that Growers were compensated ***below a competitive level***. (*See* Compl. ¶¶ 151–154 (describing industry trends and Grower debt levels).) *See, e.g.*, *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017) (holding that a negative effect on a market participant is distinct from an injury to competition).

***First***, the Complaint offers only conclusory statements that Defendants' information exchange has "artificially reduced the compensation of all Growers below levels that would have prevailed in its absence." (Compl. ¶ 144.) It includes a vague reference to "[e]conomic theory and antitrust jurisprudence" for the (untrue) proposition that information exchanges reduce price competition and suppress compensation. The Complaint also cites to DOJ human resources guidance, which suggest only that information exchanges regarding employment compensation can be, but are not necessarily, anticompetitive. These statements fall far short of *Twombly*'s requirements that the allegations "raise the right to relief above the speculative level." 550 U.S. at 555.

18

*Second*, the Complaint refers to a "downward trend" in Grower pay, but does nothing to suggest that it is related to an unlawful agreement entered into by Defendants. (*Id.* ¶ 151.) Instead, Plaintiffs only allege that Grower pay has shown a "downward trend" since "at least 2007" and that Integrators have benefited from "input costs (primarily corn and soybeans) falling roughly 20% to 23%" while some Growers have struggled financially. (*Id.*)

In fact, the Complaint notes that this alleged decrease in Grower pay is part of a general decline in Grower compensation, citing the fact that "[s]ince the 1980s, . . . Growers' share of [the market price of Broilers] has fallen . . . ." (*Id.*) But Plaintiffs do not dissociate declines in Grower pay caused by market trends from those supposedly caused by information sharing through Agri Stats. Moreover, given their assertion that the Agri Stats agreement began in 2008, Plaintiffs cannot establish that alleged declines in Grower pay per pound of chicken produced is attributable to any agreement. For both of these reasons, Plaintiffs' allegations are insufficient. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (granting motion to dismiss because "[a]lthough the complaints are replete with allegations about defendants' pricing behavior *after* the conspiracy allegedly began, they say next to nothing about defendants' pricing behavior *before* the conspiracy began"); *cf. In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (finding plaintiffs' allegation of prior coordination to be plausible because all defendants changed their pricing structures and levels simultaneously in an industry conducive to collusion). Unless Plaintiffs are alleging a conspiracy causing ongoing injury that dates back to the 1980s, the alleged reduction in Grower pay relative to retail chicken prices is just as, if not more, plausibly the result of other market factors (*e.g.*, higher retail prices for chicken resulting from changes in consumer dietary preferences).

*Third*, while Plaintiffs describe the GIPSA-monitored Tournament System under which Growers are compensated, they do not explain how that system suppresses Grower pay. To the contrary, they plead that the Tournament System's offense is "pegg[ing]" Grower compensation to the allegedly "suppressed base pay amount" (Compl. ¶ 150), using base pay as the average above, at, or below which Growers competing against each other are paid. (*Id.* ¶¶ 148–50.) They all but concede that the Tournament System has ***nothing to do*** with setting (and, thus, suppressing) base pay.

*Fourth*, Plaintiffs assert a ripple effect on Broiler supply and prices, claiming that suppressed Grower pay leads to "reduce[d] Broiler output" and "artificially inflated prices." (*Id.*

¶ 145.)  Plaintiffs plead no facts to support this bold conclusion.  Moreover, this putative effect is directly contradicted by Plaintiffs' theory that Integrators control almost *everything* about Broiler grow-out.  (*Id*. ¶ 91 ("Integrators control both the products, i.e., the chickens, and . . . the feed mills, veterinary care, trucking operations, slaughterhouses, processing facilities, and sales contracts."); *id*. ¶ 55 ("Integrators determine the precise specifications for Growers' grow-out houses and other equipment.").)  If, as Plaintiffs claim, Growers provide only "labor, utilities, and substantial up-front investment capital" (*id*. ¶ 54), then Grower pay has nothing to do with the number of Broilers they produce and, therefore, has ***nothing to do*** with market prices or output.

Thus, the PSA claims must also be dismissed under *Twombly*.

B.      **Plaintiffs Fail to Satisfy the PSA's Mandatory Venue Provision.**

Plaintiffs' PSA claims must be dismissed for the additional reason that venue is improper in the Eastern District of Oklahoma.  The PSA expressly mandates that venue "***shall*** be located in the Federal judicial district in which the principle [sic] part of the performance [of a poultry growing arrangement or contract] takes place."  7 U.S.C. § 197b(a) (emphasis added); *see also Jewell v. United States*, 749 F.3d 1295, 1299 (10th Cir. 2014) (recognizing the "age-old precept that 'shall' means 'shall'").  ***None*** of the named Plaintiffs is alleged to have performed under their Grower contracts in the Eastern District of Oklahoma.  (Compl. ¶¶ 5–9.)  That means that venue in this district is improper, and the PSA claims must be dismissed.  *See, e.g.*, *McFarland v. Memorex Corp.*, 493 F. Supp. 657, 659 (N.D. Cal. 1980) (granting motion to dismiss for improper venue based upon mandatory venue statute (citing 12 U.S.C. § 94)); *see also* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district ***shall dismiss*** . . . ." (emphasis added)).

C.      **If Plaintiffs' Sherman Act Claim is Dismissed, the PSA Claim by Non-Oklahoma Plaintiffs Must Also Be Dismissed for Lack of Personal Jurisdiction.**

Assuming that the Court dismisses the Sherman Act claims, then it must likewise dismiss the PSA claims brought by any non-Oklahoma residents for lack of personal jurisdiction.  This includes Plaintiffs Nancy Butler, Johnny Upchurch, Jonathan Walters, Myles B. Weaver, and Melissa Weaver (non-Oklahoma Plaintiffs).  Without the Sherman Act claims, Plaintiffs can

establish personal jurisdiction in Oklahoma only through the Oklahoma long-arm statute.[8] Oklahoma's long-arm statute permits the exercise of jurisdiction that is consistent with the Fourteenth Amendment.

Under the Fourteenth Amendment, the Court cannot exercise general jurisdiction over the Defendants. None of the Defendants is incorporated in Oklahoma, and none operates in Oklahoma as its principal place of business. (*See* Compl. ¶¶ 10–24.) Nor can the Court exercise specific jurisdiction over the Defendants with respect to the PSA claims brought by non-Oklahoma residents, as their claims have no connection to Oklahoma. Under *Bristol-Myers Squibb Co. v. Superior Court*, a court cannot exercise specific jurisdiction over defendants where plaintiffs' claims do not arise out of defendants' conduct in the forum state. 137 S. Ct. 1773, 1781 (2017).[9] The holding in *Bristol-Myers* would also require dismissal of non-Oklahoma Plaintiffs' claims in their entirety if the Court ultimately rejects certification of Plaintiffs' proposed nationwide class.[10]

Thus, Plaintiffs' PSA claims must be dismissed pursuant to the statute's mandatory venue provision, as well as the non-Oklahoma Plaintiffs' inability to establish personal jurisdiction under Oklahoma's long-arm statute.[11]

---

[8]  The PSA does not contain a nationwide service of process provision.

[9]  Although *Bristol-Myers* left open whether its holding applied to class actions, neither the language of the decision nor its approach to jurisdiction in class actions suggests a different result. "In actions involving a plaintiff class, jurisdiction over defendants is acquired and service of process is effected as in any other action." Charles A. Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. Civ. § 1757 (3d ed.).

[10]  If the Court ultimately rejects class certification, exercising personal jurisdiction over Defendants for non-Oklahoma Plaintiffs' claims would violate the Fifth and Fourteenth Amendments. The *Bristol-Myers* Court rejected California's exercise of personal jurisdiction over Bristol-Myers for mass tort claims brought by non-California plaintiffs as inconsistent with the Fourteenth Amendment's Due Process Clause. It expressly left open whether the same analysis would apply under the Fifth Amendment's Due Process Clause to mass tort claims brought in federal court. 137 S. Ct. at 1783–84. Logic dictates that this Court analyze jurisdiction under the Fifth Amendment through the same analytical lens as jurisdiction under the Fourteenth Amendment. Otherwise, defendants effectively would be subject to nationwide personal jurisdiction for mass antitrust claims with little connection to the chosen venue.

[11]  Defendants Sanderson Farms and Koch have filed motions separately moving to dismiss for improper venue and lack of personal jurisdiction regardless of whether the Sherman Act claims are dismissed.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

Dated: September 8, 2017    Respectfully submitted,

/s/ John D. Harkrider
_____

John D. Harkrider (admitted *pro hac vice*)
Kevin H. Kim  (admitted *pro hac vice*)
**AXINN VELTROP & HARKRIDER, LLP (NY)**
114 W 47th St
New York, NY 10036
212-728-2210
Fax: 212-728-2201
jharkrider@axinn.com
kkim@axinn.com

Michael L. Keeley (admitted *pro hac vice*)
**AXINN VELTROP & HARKRIDER, LLP (DC)**
950 F St, NW
Washington, DC 20004
202-721-5414
Fax: 202-912-4701
mkeeley@axinn.com

Mark C. Tatum (admitted *pro hac vice*)
Michael S. Cargnel (admitted *pro hac vice*)
Robert T. Adams (admitted *pro hac vice*)
**SHOOK HARDY & BACON, LLP (MO)**
2555 Grand Blvd
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
mtatum@shb.com
mcargnel@shb.com
rtadams@shb.com

Lawrence R. Murphy, Jr, OBA # 17681
**RICHARDS & CONNOR, PLLP**
525 S Main St, 12th Flr
Tulsa, OK 74103
918-585-2394
Fax: 918-585-1449
lmurphy@richardsconnor.com

Michael Burrage, OBA #1350
Patricia Sawyer, OBA #30712
**WHITTEN BURRAGE**
1215 Classen Dr
Oklahoma City, OK 73103

405-516-7800
Fax: 405-516-7859
mburrage@whittenburragelaw.com
psawyer@whittenburragelaw.com

*Counsel for Defendants Tyson Foods, Inc., Tyson*
*Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc.*

Daniel E. Laytin, P.C. (admitted *pro hac vice*)
Christa C. Cottrell (admitted *pro hac vice*)
Martin L. Roth (admitted *pro hac vice*)
Stacy Pepper (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 N LaSalle St.
Chicago, IL 60654
312-862-2000
Fax: 312-862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
rothm@kirkland.com
stacy.pepper@kirkland.com

David L. Bryant, OBA #1262
James Wesley S. Pebsworth, OBA # 30900
**GABLEGOTWALS**
1100 ONEOK Plaza
100 W Fifth St., Ste. 1100
Tulsa, OK 74103-4217
918-595-4800
Fax: 918-595-4990
dbryant@gablelaw.com
wpebsworth@gablelaw.com

*Counsel for Defendants Sanderson Farms, Inc.,*
*Sanderson Farms, Inc. (Foods Division), Sanderson*
*Farms, Inc. (Processing Division), and Sanderson*
*Farms, Inc. (Production Division)*

Carrie C. Mahan (admitted *pro hac vice*)
**WEIL GOTSHAL & MANGES, LLP (DC)**
1300 Eye St, NW, Ste 900
Washington, DC 20005
202-682-7231
Fax: 202-857-0940
carrie.mahan@weil.com

24

Kevin J. Arquit (admitted *pro hac vice*)
**WEIL GOTSHAL & MANGES, LLP (NY)**
767 Fifth Ave
New York, NY 10153
212-310-8000
Fax: 212-310-8007
kevin.arquit@weil.com

Clayton E. Bailey (admitted *pro hac vice*)
**BAILEY BRAUER, PLLC**
8350 N Central Expy, Ste 206
Dallas, TX 75206
214-360-7433
Fax: 214-360-7435
cbailey@baileybrauer.com

Reid E. Robison, OBA #7692
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
10th Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
405-235-9621
reid.robison@mcafeetaft.com

William S. Leach, OBA #14892
Harold C. Zuckerman, OBA #11189
**MCAFEE & TAFT A PROFESSIONAL CORPORATION**
Two W Second St, Ste 1100
Tulsa, OK 74103
405-235-9621
harold.zuckerman@mcafeetaft.com
bill.leach@mcafeetaft.com

*Counsel for Pilgrim's Pride Corporation*

J. Douglas Baldridge (admitted *pro hac vice*)
Lisa Jose Fales (admitted *pro hac vice*)
Andrew T. Hernacki (admitted *pro hac vice*)
Robert P. Davis (admitted *pro hac vice*)
**VENABLE, LLP (DC)**
600 Massachusetts Ave, NW
Washington, DC 20001
202-344-4264
Fax: 202-344-8300
athernacki@venable.com
jbaldridge@venable.com
ljfales@venable.com

25

rpdavis@venable.com

Leonard L. Gordon (admitted *pro hac vice*)
**VENABLE, LLP (NY)**
1270 Ave of the Americas, 24th Flr.
New York, NY 10020
212-370-6252
Fax: 212-307-5598
lgordon@venable.com

Kevin R. Donelson, OBA #12647
**FELLERS SNIDER**
100 N Broadway, Ste 1700
Oklahoma City, OK 73102
405-232-0621
Fax: 405-232-9659
kdonelson@fellerssnider.com

*Counsel for Defendants Perdue Farms, Inc.*

Cable M. Frost (admitted *pro hac vice*)
Scott W. Pedigo (admitted *pro hac vice*)
**BAKER DONELSON BEARMAN CALDWELL &**
**BERKOWITZ (MS)**
100 Vision Dr., Ste 400
Jackson, MS 39211
601-351-2466
cfrost@bakerdonelson.com
spedigo@bakerdonelson.com

John G. Calender (admitted *pro hac vice*)
**BAKER DONELSON BEARMAN CALDWELL &**
**BERKOWITZ (DC)**
901 K Street NW, Ste 900
Washington, DC 20001
202-508-3474
Fax: 202-220-2274
jcalender@bakerdonelson.com

Robert P. Coffey, Jr., OBA #14628
John R. Woodard, III, OBA #9853
**COFFEY SENGER & MCDANIEL, PLLC**
4725 E 91st St, Ste 100
Tulsa, OK 74137
918-292-8787

Fax: 918-292-8788
John@csmlawgroup.com
robert@csmlawgroup.com

*Counsel for Defendants Koch Foods, Inc., Koch Meat
Co., Inc. (doing business as Koch Poultry Co.)*

**<u>CERTIFICATE OF SERVICE</u>**

On September 8, 2017, I electronically transmitted a true and correct copy of the foregoing document to the Clerk of Court for filing using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ John D. Harkrider</u>
John D. Harkrider
