IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


IN RE:  BROILER CHICKEN GROWER LITIGATION


| | |
|---|---|
| HAFF POULTRY, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -vs- | ) No. CIV-17-033-RJS |
| | ) |
| TYSON FOODS, INC., et al., | ) |
| | ) |
| Defendants. | ) |


TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE ROBERT J. SHELBY**

**UNITED STATES DISTRICT JUDGE**

APRIL 20, 2018


*REPORTED BY:      BRIAN P. NEIL, RMR-CRR*
*United States Court Reporter*

1                         A P P E A R A N C E S

2

3              **Eric L. Cramer** and **Daniel Walker,** Attorneys at Law,
   Berger & Montague, 1622 Locust Street, Philadelphia,
4  Pennsylvania, 19103, attorneys on behalf of the Plaintiffs;

5              **Melinda R. Coolidge** and **Samantha S. Derksen,** Attorneys
   at Law, Hausfeld, LLP, 1700 K Street, NW, Suite 650,
6  Washington, D.C., 20006, attorneys on behalf of the Plaintiffs;

7              **Kristopher E. Koepsel** and **M. David Riggs,** Attorneys at
   Law, Riggs, Abney, Neal, Turpen, Orbison & Lewis, 502 West
8  Sixth Street, Tulsa, Oklahoma, 74119, attorneys on behalf of
   the Plaintiffs;

9
               **Larry D. Lahman,** Attorney at Law, Mitchell & DeClerck,
10 202 West Broadway, Enid, Oklahoma, 73701, attorneys on behalf
   of the Plaintiffs;

11

12
               **John D. Harkrider, Jonathan Max Justl,** and **Michael L.**
13 **Keeley,** Attorneys at Law, Axinn, Veltrop & Harkrider, 114 West
   47th Street, New York, New York, 10036, attorneys on behalf of
14 Defendant Tyson;

15             **Lawrence R. Murphy, Jr.**, Attorney at Law, Richards &
   Conner, 525 South Main Street, 12th Floor, Tulsa, Oklahoma,
16 attorney on behalf of Defendant Tyson;

17             **Benjamin L. Stewart,** Attorney at Law, Bailey Brauer,
   8350 North Central Expressway, Suite 206, Dallas, Texas, 75206,
18 attorney on behalf of Defendant Pilgrim's Pride;

19             **Reid E. Robison,** Attorney at Law, McAfee & Taft, 211
   North Robinson, Tenth Floor, Oklahoma City, Oklahoma, 73102,
20 attorney on behalf of Defendant Pilgrim's Pride;

21             **Leonard L. Gordon,** Attorney at Law, Venable, LLP, 1270
   Avenue of the Americas, New York, New York, 10020, attorney on
22 behalf of Defendant Perdue Farms.

23

24

25

1          Friday, April 20, 2018

2                    * * * * *

3          THE COURT:  Good morning, everyone, and welcome

4    back.  We'll call our consolidated Case No. 6:17-CV-033.  It's

5    In Re:  Broiler Chicken Grower Litigation case.

6          Counsel, I have your names here on a seating chart, but

7    would you kindly make your appearances and reintroduce

8    yourselves?

9          MR. HARKRIDER:  Thank you very much, Your Honor.  My

10   name is John Harkrider representing Tyson Foods, and I am here

11   with my partner, Mike Keeley, and my associate, Jonathan Justl.

12   I have the pleasure of having from Tyson legal Jane Duke and

13   Bill Burke sitting behind the bar.

14         THE COURT:  Very good.  Welcome to all of you.

15   Thank you.

16         MR. GORDON:  Good morning, Your Honor.  Leonard

17   Gordon from the Venable firm for Perdue.

18         THE COURT:  Thank you.

19         MR. STEWART:  Your Honor, Ben Stewart from Bailey

20   Brauer in Dallas on behalf of Pilgrim's, and we have our

21   Oklahoma counsel, Reid Robinson.

22         MR. ROBINSON:  Good morning, Your Honor.

23         THE COURT:  Good morning.  Welcome.

24         MR. ROBINSON:  Thank you.

25         MR. CRAMER:  Good Morning, Your Honor.  Eric Cramer

1   from Berger & Montague from Philadelphia for the plaintiffs.

2   I'm here with my partner you met last time, Dan Walker, also

3   from Berger & Montague.   And we're happy to have our client

4   here, Mr. Steve Haff, and his wife Robin Haff, from Haff

5   Poultry.

6              THE COURT:   Very good.   Thank you.

7              MS. COOLIDGE:   Good morning, Your Honor.   Melinda

8   Coolidge from Hausfeld for the plaintiffs as well, and I'm here

9   with my associate, Samantha Derksen.

10             THE COURT:   Great.   All right.   Well, welcome to all

11  of you --

12             MR. RIGGS:   Your Honor -- excuse me -- David Riggs,

13  interim liaison counsel, with Kris Koepsel of our firm.

14             MR. LAHMAN:   Larry Lahman from Mitchell & DeClerk of

15  Enid, Oklahoma, for the class.

16             THE COURT:   Very good.   All right.   Well, thank you.

17  Welcome, everyone.   That's usually the longest part of the

18  hearing.

19             All right.   Let's take up some housekeeping and then we

20  have a couple of motions on the calendar to take up today.   So

21  I'm reminded -- do you all remember Rocky and Bullwinkle?

22  There was -- after commercial breaks, you'd come back to the

23  cartoon and the narrater would say -- it would give you an

24  update about where we've been and when we last saw our heroes

25  they were, you know, on the train tracks tied to the tracks or

1   something.  So I think it's helpful usually to take inventory
2   where we've been.

3           So we were here together last with our heroes on
4   January 19th for a hearing on a number of motions, and we got
5   as far as the motions to dismiss filed by the Koch and
6   Sanderson Farms defendant groups on the basis of -- well,
7   raising personal jurisdiction issues.  We ended up granting
8   those motions and dismissing those groups of defendants.  In
9   view of that fact, we hit the pause button to give the
10  plaintiffs an opportunity to evaluate whether they prefer to
11  continue with the remaining claims here with the remaining
12  defendants or dismiss the case and seek relief elsewhere.

13          In February, the plaintiffs notified us all that they
14  intended to proceed here against the remaining defendants and
15  then mentioned that they intended to file suit in another
16  district, which they have since done, and seek relief from the
17  JPML to consolidate the cases back and then for pretrial
18  proceedings.  It appears to me that that process is underway,
19  has been initiated, and I think I saw a notice that there may
20  be a hearing in May.  But we'll continue here and we'll
21  continue to address the issues you presented and move forward
22  without waiting.

23          Of course, I think one of the defendants -- or some of
24  the defendants moved for a stay pending the resolution of the
25  MDL proceedings and we've declined to do that.  I think

1   especially given the age of the case and the importance of the

2   issues and the fact that those defendants had already

3   participated in the briefing on the issues we'll be taking up

4   today, it seemed to me the best course was to proceed and we

5   issued an order to that effect.

6        So today -- so we deferred initially then -- there's

7   two sets of motions, the defendants' motion to dismiss under

8   Rule 12, invoking Rule 12(b)(2), 12(b)(3), and 12(b)(6).  There

9   was more argument devoted to some of that than others and we'll

10  address all of those issues.  And then there's a second

11  motion -- it's Perdue's motion -- to compel arbitration with

12  one of the six plaintiffs, Nancy Butler, also seeking to

13  dismiss or to stay the proceedings or the claims.

14       There's one issue I was hoping to get the benefit of

15  your thoughts about before we get into the merits of the

16  motions, and that is the bankruptcy court order out of the

17  Northern District of Texas relating to Pilgrim's Pride.

18  Mr. Stewart, maybe you can address that.

19       Am I reading the bankruptcy court's order to suggest

20  that the complaint we have before us is inoperable in that

21  court's view?

22            MR. STEWART:  In terms of Pilgrim's Pride, yes, Your

23  Honor, the plaintiffs are enjoined from proceeding on the

24  current complaint.

25            THE COURT:  Is our microphone on at the podium?  Oh,

1    it is.  All right.  I just want to make sure the other folks in

2    the courtroom can hear you.

3            Is that a function of the -- why is that?  Is that

4    because of the dates that are alleged to be the operative dates

5    for the conspiracy dating into 2008?

6            MR. STEWART:  I think that is primarily the issue,

7    Your Honor, the alleged conspiracy going back before the

8    effective date of the plan.  All of those claims would be

9    barred by the confirmation order.  Based on the current

10   complaint, it's unclear -- there are no allegations that

11   Pilgrim's rejoined any conspiracy after that time.

12           THE COURT:  You don't think the allegations in the

13   complaints are, assuming them to be true at this stage of the

14   proceedings, that Pilgrim's has continued to participate in the

15   conspiracy after 2009, including and through the date of the

16   filing of the complaint?

17           MR. STEWART:  I don't, Your Honor.  I think that

18   there has to be a specific allegation of rejoining the

19   conspiracy.  As the bankruptcy court noted, all contracts,

20   including any agreement to participate in a conspiracy, were

21   rejected at the time of confirmation of the plan and the

22   effective date of the plan.  There are no allegations that

23   Pilgrim's has specifically rejoined a conspiracy or engaged in

24   any action that would constitute rejoining a conspiracy after

25   that date.

1    THE COURT:  Well, of course, you can ratify a

2    conspiracy by continuing to participate with knowledge of what

3    your co-conspirators are doing.  But these issues haven't been

4    briefed before us, and it's unclear to me that under *Stern v.*

5    *Marshall* and the like that an Article I judge can or -- I mean,

6    I understand the bankruptcy bar and I understand the operation

7    of the bankruptcy, the discharge, the availability of claims,

8    and the bar of claims and the like.

9    But you think the effect of that bankruptcy order is to

10   say that this complaint is dismissed or what?

11   MR. STEWART:  No, Your Honor, I don't.  I don't

12   think that that complaint or the bankruptcy court's order has

13   any direct effect on Your Honor.  I think it enjoins the

14   plaintiffs from proceeding against Pilgrim's based on this

15   complaint.  It's a fine distinction.  But I think that the

16   bankruptcy court does have jurisdiction over the plaintiffs to

17   order that they cannot proceed based on this complaint, even if

18   he doesn't have jurisdiction to tell Your Honor what to do.

19   THE COURT:  And what happens if I see it

20   differently, if I think that the allegations in the complaint

21   give rise to an inference at this stage of the proceeding that

22   Pilgrim's Pride continued to participate in the conspiracy

23   after the bar date?

24   MR. STEWART:  At that point then, Your Honor, I

25   think the plaintiffs would have to -- they'd have to decide

1    what they're going to do.  Are they going to replead against

2    Pilgrim's based on your ruling, or are they going to abide by

3    the bankruptcy court's injunction and not proceed against

4    Pilgrim's?

5            THE COURT:  And you think it's a -- I know that it

6    operates as a bar to a claim.  But where the claim covers a

7    period of time, is there a difference in law in your mind about

8    whether the claim is barred or the recovery period for the

9    claim?  You say it's an ongoing violation and I'm not saying

10   that.  We're just talking hypothetically to understand the

11   application of the order.

12           Suppose it's an ongoing violation.  Does it not just

13   operate as a bar to the damage period that would be available

14   against Pilgrim's?

15           MR. STEWART:  Under these circumstances, I don't

16   think it would, Your Honor, because the claim arises before the

17   effective date of the plan.  And so I think it's a bar to the

18   claim itself until we have an operable pleading that says the

19   claim doesn't begin until after that date.

20           THE COURT:  Do you think that -- how do you think

21   that operates here?  Do you think that anybody needs to -- in

22   this case needs to seek any relief from this court?  Do you

23   think a motion is appropriate?  Do you think Pilgrim's Pride is

24   just out of the case?  Is there a reason that you're here

25   today?

1    MR. STEWART:  Well, we're here because we're still
2    technically in the case, Your Honor.  Even though the
3    plaintiffs are barred from proceeding on their present
4    complaint, they have the opportunity to possibly amend that
5    complaint and we haven't been effectively dismissed from this
6    action.  So we're here at your pleasure.
7            THE COURT:  All right.  Thank you, Mr. Stewart.
8            MR. STEWART:  Thank you, Your Honor.
9            THE COURT:  Ms. Coolidge.
10           MS. COOLIDGE:  Good morning, Your Honor.  Just a few
11   comments on the -- I think if you look at the full transcript,
12   the judge in the bankruptcy court agreed with us, that there
13   was clearly an ongoing violation as to the information
14   exchange.
15           THE COURT:  As it was pled?
16           MS. COOLIDGE:  As it was pled, correct.  And it
17   seemed to be an issue of semantics and the fact that we had
18   said 2008, that things started in 2008, or at least 2008, that
19   the bankruptcy court didn't like.  We have no problem with
20   rephrasing claims in our complaint so that it doesn't implicate
21   Pilgrim's bankruptcy.  And so our thought was after the hearing
22   today, we'd have a sense of what a new complaint should look
23   like and we can make it fit with the bankruptcy court's order.
24           THE COURT:  This is my primary concern if we get
25   this far -- and I'm not prejudging the outcome of the motions

1    we're going to argue today.  I have some preliminary thoughts

2    about the motions that I'll share with you and then we'll have

3    argument, but I'm here, as I always say, with an open heart and

4    an open mind.  If the motions to dismiss are granted, then it's

5    a moot question; but if the motion to dismiss is not granted,

6    then we're proceeding.

7            What I just hate to see is for a -- we're a year into

8    the case and we're not yet through the pleading stage, and

9    that's not unusual but I'm mindful of that, another round of

10   amendments.  And maybe what you're saying -- maybe what both of

11   you are saying is that just where we are is that we'd have to

12   seek further amendment and then I guess we don't yet have

13   answers.  So as long as those amendments didn't raise new

14   issues that would trigger more Rule 12 motions, then I think

15   we're fine.  Otherwise, at some point -- I'm just wondering if

16   there's another way to remedy the issue.

17           You think the pleading itself -- well, that judge's

18   view -- that court's view was that the pleading itself

19   implicates the bar and so you can't proceed as to Pilgrim's

20   Pride on this complaint.  That's the ruling and I guess the law

21   -- it's not the law of the case but it's -- or maybe it is.

22           MS. COOLIDGE:  I think that Your Honor could

23   disagree with that and we're certainly open to hearing further

24   thoughts on it.  Our thought was whatever semantic changes we

25   make to the complaint to fit within this order shouldn't

1  trigger additional motions to dismiss.  Of course, we don't

2  have control over that as the plaintiffs but we would hope that

3  the complaints would be answered.

4           THE COURT:  All right.  Well, I guess one step at a

5  time is a good way to proceed.  Thank you both for your

6  thoughts about that.

7           All right.  I think the thing that makes most sense

8  probably is to first take up the Rule 12 motion.  We've read,

9  of course, and now twice prepared for argument on the Rule 12

10  motion.  I think I understand the arguments you've all advanced

11  in your papers.  Once again, let me thank you for the quality

12  of your briefing.  It's refreshing and it's a joy to read your

13  papers.

14           Keeping with my practice, I think it's -- my preference

15  is to give you a sense of my leaning and then that will help

16  us, I hope, focus and sharpen our argument and presentation

17  today.  My reaction coming to the bench -- but, again, without

18  having made a formal decision about it -- is that applying Rule

19  12 and *Iqbal* and *Twombly*, but mindful of the additional

20  requirements when we're talking about pleading a conspiracy and

21  an antitrust case, my sense of it is that the "no poach"

22  agreement that's alleged in the complaint, if it were evaluated

23  standing alone, fails to clear the plausibility hurdle.  The

24  information sharing agreement that's alleged in the complaint,

25  in my view, assuming the truth of all the allegations in the

1    complaints, does seem sufficient.  There's argument in the

2    papers about whether those two independent theories or

3    agreements -- I guess it's alleged they're independent

4    agreements -- should be considered collectively or

5    independently.  It's not clear to me that it matters.

6         If it's true -- and the defendants may persuade me

7    today that I'm mistaken -- but if it's true that the

8    information sharing agreement that's alleged in the

9    consolidated complaint is itself sufficient to give rise to an

10   actionable Sherman Act claim, then don't we just stop there at

11   a Rule 12 motion?  In this sense of whether the law says I

12   consider the agreements collectively or together, the

13   plaintiffs argue that if there's a synergy between the two they

14   work together.  But my practice has been -- my way of thinking

15   about Rule 12 and Rule 56 is that once you have an actionable

16   claim, that's the end of your Rule 12 inquiry and we reserve

17   until Rule 56 the question of splitting parts of claims or

18   defenses.  Rule 56, of course, was amended to allow that, to

19   take issue with parts of claims or defenses.  I read Rule 12 to

20   be that a claim succeeds or fails.

21        By way of example, in a breach of contract -- this is

22   an imperfect example -- but in a breach of contract claim where

23   there's a breach of contract in the complaint and it's premised

24   on, say, three separate breaches, suppose one of those breaches

25   is barred for some reason, one of the breach theories is

1    barred, say the statute of limitations or something, but the

2    other two are actionable.  My view has always been, well, then

3    the motion to dismiss is denied; if we're going to start

4    parsing parts of claims, that's Rule 56 stuff, not Rule 12

5    stuff.

6         I think as I've thought about it in the context of this

7    case, and mindful of the concerns that we require careful

8    pleading of antitrust claims under the Sherman Act because of

9    the cost and time and expense of litigating these cases, it

10   doesn't seem inconsistent in my mind that we would reserve the

11   question of the "no poach" agreement until after discovery.

12   The additional related discovery would just not be that

13   onerous.

14         I mean, the alternative is -- and maybe I'm moving well

15   beyond the papers here -- but the alternative seems to be

16   striking an alternative theory in a complaint and I guess,

17   what, language in a complaint?  It seems premature to me.  But

18   with respect to the information sharing agreement, it seems

19   robust and plausible.

20         Going back to the "no poach" agreement, and maybe in

21   contrast to the "no poach" agreement, I'm pretty heavily

22   persuaded that the facts that are alleged, even if we assume

23   the truth of the facts that are alleged respecting the "no

24   poach" agreement, there aren't any facts there that suggest the

25   existence of an agreement among the integrators to not poach.

1    There are secondhand statements and even -- let me be clear.

2            I'm assuming the truth of the hearsay and secondhand

3    statements in the consolidated complaint respecting a "no

4    poach" agreement, but at best it seems to me that they

5    establish -- I'm trying to remember -- is it Peco?  Pesco?

6    Sorry.  I should have this -- Peco.  I think at most it seems

7    to me that there might be a reasonable inference that Peco had

8    an agreement with -- and I'm trying to remember now the

9    integrator --

10            **MR. CRAMER:**  Tyson.

11            **THE COURT:**  Tyson.  Thank you, Mr. Cramer.

12            In any event, I just don't -- and it's -- the

13    reasonable inferences to be drawn is not a clear exercise,

14    intellectual exercise.  But it doesn't seem to me that the

15    facts set forth in the complaint on "no poach" generate a

16    plausible claim for relief, that there was an independent "no

17    poach" agreement.  Some of the facts that are set forth in that

18    part of the complaint seem to me to lend plausibility to the

19    information sharing agreement that's alleged, but on balance it

20    seems sufficient to me even if it was just an information

21    sharing agreement that is pled in the complaint.

22            So that's a starting point.  Of course, there are a lot

23    of subarguments that are advanced by the parties, but I wanted

24    to share those preliminary thoughts at least and begin there.

25    I think that the effect of that ruling that -- it's not a

1   ruling -- but that leaning would be not favorable to the

2   defendants.  So let me invite the defendants to maybe first

3   approach the podium and help me understand what it is that I'm

4   misunderstanding.

5           Mr. Harkrider.

6           **MR. HARKRIDER:**  Thank you very much, Your Honor.  We

7   actually anticipated your leaning so hopefully you'll bear with

8   me.

9           But I want to start off, if I might, with taking a big

10  step back and looking at really the purpose of the antitrust

11  laws.  The antitrust laws were once famously said by Thurgood

12  Marshall to be the Magna Carta of free enterprise, and that's a

13  pretty lofty thing to say and I think it is worth sort of

14  unpacking exactly what that means.

15          I think what that means is that it sets forth

16  essentially and protects the free enterprise system of this

17  great country and it prohibits certain conduct that almost

18  always harms competition, so-called sort of per se price-fixing

19  agreements.  We do not think we have one before you, Your

20  Honor, and we'll go through that.

21          There's, of course, a --

22          **THE COURT:**  I don't either.  I didn't mention that.

23  But I think it seems to me we really are advancing under a rule

24  of reason.

25          **MR. HARKRIDER:**  Correct.  That's correct.

1     **THE COURT:**  And I think the plaintiffs, I think,

2    largely -- I don't know if they concede that in their papers.

3    Reading between the lines, I think that's where we are.  But go

4    ahead.

5     **MR. HARKRIDER:**  That's correct, Your Honor.  We feel

6    that as well.

7     There's this other sort of middle category of behavior

8    that may be captured under the rule of reason, and that's where

9    you have certain market conditions and you have certain

10   behavior and certain plausible facts or allegations that make

11   it seem likely that there's an actual harm to competition.  It

12   may be that the plaintiffs believe that we have such a case

13   before you; we do not.

14    What we think we have is actually a third category of

15   conduct, and that third category of conduct is conduct that

16   affirms, may gauge it, that is efficient from their point of

17   view, it drives down costs, which is something that is

18   generally thought of as good for consumers.  But it might also

19   drive down the price that people are paying because they're

20   operating more efficiently, and it may also require other firms

21   to make investments, to innovate, in order to participate in

22   the market.  Those are things that actually benefit

23   competition, but they may from time to time be things that

24   people on the other side of the market don't like.  That's what

25   we think we have.

1     But we also think that that is essentially

2   fundamentally the foundation of the free enterprise system in

3   this country.  Not to say that there are winners and losers,

4   but obviously in any transaction one might say, oh, I want to

5   get paid more; or with respect to any business practice, they

6   might say, I don't want to make an investment in, you know,

7   your specific -- your specific, you know, ventilation system or

8   heating system or things of that nature, which are complained

9   about in the complaint.

10     And so when you really look at what this case is

11   actually involving, at its core it's involving really two

12   practices that we think are plainly procompetitive.  One is

13   that the integrators all have different specifications for

14   their housing with respect to equipment and lighting and

15   ventilation and things of that nature and that the growers have

16   to build their houses to those specifications.  The natural

17   consequence of that is that it may make it very difficult to

18   switch, but that's the sort of product differentiation that we

19   think is actually procompetitive.

20     They don't allege, by the way, that there's an

21   agreement between the integrators to have different

22   specifications, but it is one of the things that may make it

23   difficult to switch, which is one reason you may see low

24   switching, notwithstanding the fact that there may be no

25   agreement whatsoever not to poach, as you suggested as a

1  leaning in your initial comments.

2          The second part of what they're complaining about is

3  benchmarking, essentially cost benchmarking, that there's an

4  organization called "Agri Stats" that everyone is

5  participating -- that firms are participating with and getting

6  information from.  We believe that benchmarking is

7  procompetitive and we believe the Tenth Circuit has actually

8  reached that result.  In *Intracorp*, the Tenth Circuit held that

9  the use of third-party benchmarking services simply reflects,

10  quote/unquote, the legitimate and reasonable concerns to lower

11  cost.

12          Now --

13          THE COURT:  Won't it depend --

14          MR. HARKRIDER:  Yeah.

15          THE COURT:  Won't it depend on what information is

16  being exchanged and under what circumstances?

17          MR. HARKRIDER:  Sure.  I think that that's true.

18  But if you look at *Intracorp*, what you find is that *Intracorp*

19  involves the prices that chiropractors are charging and a rule

20  essentially that this third party, Intracorp, is promulgating

21  that says that insurance companies should not be paying more

22  than 80 percent of what the chiropractors charge.  That

23  information is disseminated throughout the industry and I

24  think -- I'm not a hundred percent; I try and be careful on my

25  representations -- but I think one of the allegations or the

1   results of the case is that that's actually what actually

2   happens in the industry, is that people are -- that the

3   insurance companies actually don't reimburse over the

4   80 percent.   That seems to have a pretty natural tendency at

5   the end of the day that someone who is, you know, charging

6   above the 80th percentile, the 90th percentile, the 95th

7   percentile doesn't get reimbursed.   But my basic point is that

8   the -- that the information that is actually at issue in

9   *Intracorp* is chiropractors' prices.

10        If you look at the *Bristow* case -- I think it's in the

11   Third or Fourth Circuit -- which is helicopters, that's talking

12   about the, I think, future prices, future capacity, which is

13   also very sensitive.

14        I think it also goes beyond what is the -- and we'll

15   get into greater detail in a moment -- but it goes beyond, as

16   you suggested, if this is not per se, it's under rule of

17   reason.   One of the core things that they need to allege in a

18   rule of reason case is, you know, a relevant market.   They've

19   defined a relevant product market but the relevant geographic

20   market that they're alleging is a nationwide geographic market.

21        I'll start citing some cases and I'll go into this when

22   I get beyond sort of the general sort of antitrust view, is

23   that, you know, it's pretty obvious -- and, of course, it held

24   already -- that the market for grower services is actually

25   very, very local.   It stands to reason it's pretty difficult to

1    transport live birds for slaughter, you know, across the

2    country or more than 35 or 40 miles.  In fact, there are zero

3    allegations whatsoever in the complaint that credibly suggest

4    that in response to a price increase in Texas, that somebody in

5    Kansas is going to, you know, switch to a different integrator,

6    which is what you would need in order for a nationwide market.

7    In fact, you would probably need someone from California going

8    to New York.  There are no allegations with respect to a

9    plausible geographic market.

10           Now, maybe they're alleging a nationwide market because

11   they're worried about individual facts predominating when they

12   get to the class certification issue.  I'm not sure why they're

13   alleging a national market.  But the basic point is -- I think

14   it's black-letter law -- that you need to have -- under a rule

15   of reason claim, you need to have a properly defined relevant

16   market which they have not.

17           THE COURT:  The allegation, as I understand it, is

18   that the defendants, together with the co-conspirators, control

19   98 percent of the market and that market was robust throughout

20   the country, and that the point is the information sharing, the

21   price-controlling portion of the agreement, affects pricing in

22   all those regions, that the conduct is not so localized.

23   That's the growers, of course, with the integrators but that

24   the integrators are coordinating prices and controlling prices

25   and information nationwide.

1        You think that's insufficient?

2            MR. HARKRIDER:   I think that's plainly insufficient,

3    Your Honor, respectfully.   I think that they need to define a

4    relevant geographic market.   It may be that there are a

5    thousand relevant geographic markets but they haven't alleged

6    that.

7            THE COURT:   Relevant geographic market for what?

8            MR. HARKRIDER:   For the provision of grower

9    services.   They need to allege -- the product market has two

10   dimensions.   It has a product part of it and it has a

11   geographic part of it and in both cases the test is the same.

12   It is in response, called a SSNIP test, a small and significant

13   non-transitory increase in price; or in this case, a decrease

14   in price.

15           THE COURT:   Easy for you to say.

16           MR. HARKRIDER:   Easy for me to say.   And the

17   question would be, in response to a reduction in compensation,

18   would you switch to an integrator in another part of the

19   country?   And there are no allegations whatsoever that that is

20   satisfied.

21       And so, Your Honor, I respectfully submit that you

22   would actually be making new law and saying that if -- if one

23   is alleging that the conduct is occurring in all parts of the

24   country, that you do not need to actually allege credible facts

25   supporting a relevant geographic market, sort of an exception

1    to the rule of the geographic market definition.

2           So going back to sort of this broad overview, you know,

3    the plaintiffs know they can't attack product differentiation

4    and they know they can't attack benchmarking, so what they do

5    is they essentially add these conclusory allegations with

6    respect to both of them.  They say, okay, well, we can't attack

7    product differentiation so we'll say that there's an agreement

8    not to poach each other's growers.  We can't attack

9    benchmarking so what we'll say is that there's an agreement

10   between the defendants to use a benchmarking service.  But

11   they're grafting on these very conclusory statements, and yet

12   there are virtually no facts to suggest that -- of the sort

13   that we would respectfully submit that *Twombly* actually demands

14   to suggest that it is plausible that an information sharing

15   agreement, in fact, exists.

16          So let's look at what they actually allege with respect

17   to information sharing.  So in paragraph 2, they allege that

18   defendants and co-conspirators illegally agreed to share

19   detailed data on grower compensation with one another.

20          In paragraph 56, they allege that since 2008, and

21   likely earlier, as part of the scheme to artificially suppress

22   grower compensation, defendants and their co-conspirators have

23   agreed to and shared with themselves detailed grower

24   compensation information.  Similar conclusory allegations are

25   made with respect to "no poach"; they basically say there's an

1    agreement not to poach.

2          But what's effectively missing from that is any

3    additional facts.  You don't know who made that agreement.  You

4    don't know where that agreement was made.  You don't know when

5    that agreement was made.  And actually the when is actually

6    quite important because they allege that the agreement started

7    in about 2008, but yet they also allege that prices have been

8    declining since the 1980's.  Which means that unlike another

9    case, where you might find that the allegations are plausible

10   because, you know, there was a meeting and then something

11   changed after that meeting -- and there are lots of cases that

12   hold that that might be sufficient -- there's no allegation of

13   like a meeting and agreement to use Agri Stats and that after

14   that meeting either people before didn't use Agri Stats and now

15   they use Agri Stats; or before the agreement, prices -- you

16   know, grower compensation was at one level and then after the

17   agreement grower compensation was at another level.  You

18   actually have no details whatsoever to make the allegations

19   plausible other than the naked allegation that there is an

20   actual agreement.

21          We would suggest that if you look at the actual

22   allegations in the complaint in *Twombly*, the complaint in

23   *Twombly* actually alleges that there was an agreement between

24   the various defendants.  In two paragraphs, in paragraph 51 and

25   in paragraph 61, *Twombly* alleges that the defendants,

1    quote/unquote, agreed not to compete with each other and

2    otherwise allocated customers and markets to each other so

3    there's an actual allegation.  So *Twombly* is just not a

4    parallel conduct case; it is a case where there's an actual

5    allegation that there was a conspiracy, just like there's an

6    actual allegation with respect to Agri Stats, but there are no

7    -- there were no additional facts in *Twombly* other than the

8    fact that people weren't going into each other's territories.

9           In this case, there are no actual facts other than the

10    allegation that they use Agri Stats.

11           THE COURT:  Well, that's just not so, is it?  I

12    mean, the allegations in the complaint and under *Twombly*, I'm

13    required, as you know, to consider -- to assume the truth of

14    the well-pled allegations --

15           MR. HARKRIDER:  Sure.

16           THE COURT:  -- but I'm required to evaluate the

17    pleading in its entirety.

18           Among other things, the plaintiffs say there's other

19    indicia of this agreement, including the fact that high-level

20    executives at the companies routinely move from one company to

21    the other and they do so without restrictions on competition or

22    confidentiality, which is unusual, especially in an industry

23    like this; that the nature and quality of the information that

24    all of the defendants share and receive through Agri Stats is

25    of a quality and type that supports the inference that there is

1    such an agreement, including contemporaneous cost information

2    They talk about the nature of the market itself and how it's

3    structured as additional evidence to support the effectiveness

4    of an agreement that they allege to be in place here.  I mean,

5    there's a handful of other allegations.

6         But all of that in its entirety, I think, underlies the

7    basic question, which is whether there's a plausible claim

8    alleged.  We don't separate it out into constituent pieces;

9    right?

10        **MR. HARKRIDER:**  Sure.  No, I understand that.  But

11   I'm respectfully suggesting that with respect to information

12   sharing, there still needs to be allegation that there was an

13   actual agreement between the defendants to use Agri Stats.

14   There's -- there may be allegations that people are using Agri

15   Stats, but are they using it pursuant to an actual agreement?

16        So let's look at the actual information sharing

17   cases --

18        **THE COURT:**  The allegation, as I understand it, is

19   that there's an agreement to exchange information for the

20   purpose of allowing the defendants to control prices and it

21   injures competition and that Agri Stats is the vehicle through

22   which the defendants have agreed to do this.  I think that's

23   the allegation that's in the complaint and Agri Stats affords

24   that vehicle.

25        What is missing in the complaint but it seems to me not

1    essential is -- nor do I know that the plaintiffs would have

2    access to this information at this stage -- Agri Stats -- I

3    understand from the complaint -- and I'm trying to limit

4    myself, I'm trying to be disciplined.  Additional information

5    was supplied in the briefing, but if it's not in the complaint,

6    I don't think I should consider it at this stage even if it's

7    helpful to my own understanding.

8         Agri Stats is a multi-industry entity, right, it

9    doesn't just work in the space, it operates in other spaces?

10   So I assume, but don't know, that the name "Agri Stats"

11   suggests to me that maybe it's more closely related to this

12   industry than others.  It's not clear to me why Agri Stats

13   would choose the kind of information that it receives from the

14   defendants and redistributes to the defendants unless it is --

15   has selected that information -- those categories of

16   information that the defendants request or because that's what

17   the defendants want to aggregate and assimilate and get back.

18        Is that not a fair inference also from the complaint?

19            MR. HARKRIDER:  I'm not sure it is.  So I think if

20   you look at the other information sharing cases that are cited

21   by the plaintiffs, there is a very significant difference

22   between this case and those cases.  And so what the -- what

23   they are asking you to do is to essentially go beyond any law

24   that I'm aware of.  So I think that there's a fundamental

25   distinction between sort of a vertical arrangement, which is

1    this vertical arrangement where, you know, Tyson or somebody

2    else uses Agri Stats.

3            And so think of this as almost hub-and-spoke, and so

4    there's a fundamental difference between a vertical agreement

5    and a horizontal agreement.  There are no allegations that we

6    see other than sort of a blanket allegation that there are

7    actual agreements between the defendants.  And so just bear

8    with me for a moment as we look at the other cases where courts

9    have allowed information sharing cases to proceed.

10           If you look at *American Linseed*, in *American Linseed*,

11   which is a Supreme Court case, there was an agreement that they

12   would report to the bureau by pre-paid telegraph all quotations

13   made at variance with things -- with prices above the price

14   list.  There was an agreement that no council member shall

15   dispatch changes in his prices as last filed with the bureau

16   with more than one buyer.  There was an agreement under penalty

17   of fine to attend a monthly meeting to report upon matters of

18   interest, including the information that was exchanged.  There

19   was an agreement that the discount rate would be at one

20   percent, which is essentially a price-fixing agreement, and the

21   survey participants together determined the geographic regions

22   for which the sales data would be reported.  So there were

23   detailed allegations with respect to not only the type of

24   information that was going to be shared, but also that they

25   would actually be required to actually meet and discuss it.

1          Think of *Todd v. Exxon,* a Second Circuit case.   In *Todd*

2     *v. Exxon,* they all participate together, the defendants, to

3     craft the survey questions.   There's no allegation that the

4     individual defendants are coming together.   You may be

5     inferring it, Your Honor, but there is no allegation that the

6     individual defendants in this case are actually coming together

7     to decide what the survey questions are going to be.

8          *Todd v. Exxon* also involved a situation where after --

9     and this is why I said the date was important -- after the

10    survey was designed and after the information was disseminated,

11    Exxon's prices -- or, you know, the compensation for their, I

12    think, engineers starts to decline.   So you have a meeting, you

13    have an exchange of information, and then you have a change in

14    behavior, which, as I said before, is actually missing from

15    this case.

16         So, again --

17         **THE COURT:**   That's a sufficient set of

18    circumstances.   Is it a necessary set of circumstances?

19         **MR. HARKRIDER:**   Well, look at *Container Corp*.   So in

20    *Container Corp.*, the same situation is occurring.   In *Container*

21    *Corp.*, you have an agreement between the defendants to

22    actually -- defendant to defendant, defendant to defendant, to

23    actually exchange information.   And so what's happening is

24    somebody says, you know, what was the last price you charged,

25    and the other defendant actually provides it to them.

1    THE COURT:  Isn't this just a more -- again, I'm

2    not -- so we're clear, I'm not making any judgment about the

3    claims here.  But the allegations, isn't this just a more

4    sophisticated mechanism for that that's alleged so that you --

5    I mean, looking at this nefariously -- and I'm not, except that

6    I'm just reading the allegations in the complaint -- this is

7    just a clever way to avoid that problem; you just use a

8    third-party service.  So you have an agreement about what

9    information you'll exchange and you just, instead of meeting or

10   e-mailing it to each other or calling each other or meeting, or

11   whatever we used to do, now we just use a third-party

12   aggregation service, and that way we don't even have to talk to

13   each other directly, we can talk to each other indirectly.

14       Isn't it just even a more sophisticated and better

15   mechanism than the one, for example, in *Todd*, more modern?

16       MR. HARKRIDER:  Well, I think probably two

17   responses.

18       The first is that you're essentially then making new

19   law.  There are no cases that we are aware of that hold that

20   the use of a third-party benchmarking service alone in a

21   market, let's say that is highly concentrated, which they

22   allege, is alone sufficient to get past a motion to dismiss.

23       THE COURT:  I think I agree with that.  You used

24   that word "alone" many times in the papers.  I underlined it

25   every time I saw it.  It's not an allegation standing alone in

1    this complaint, is it?

2           MR. HARKRIDER:   Well, I think it is respectfully

3    with respect to the information sharing.

4           So you say there are other allegations, like

5    allegations that the, you know, employees, high executives, are

6    moving between the various -- you know, the various -- the

7    various defendants but that doesn't necessarily tie to the

8    information sharing.  They don't say that once they go to the

9    other defendant, they start, you know, discussing -- or they

10   start, you know, discussing grower compensation or they start

11   talking about Agri Stats.

12          THE COURT:   Well, except that the defendants have --

13   again, under the allegations in the complaint, the defendants

14   have interestingly decided not to impose confidentiality,

15   nondisclosure restrictions, on high-level executives amongst

16   themselves.

17          MR. HARKRIDER:   Right.  But there's no allegation

18   that there's actual agreement to do so.

19          THE COURT:   That's just not so, is it?  I mean, the

20   issue that I think we're having is, the plaintiffs aren't in

21   the room, and that's not an unusual experience in these cases.

22          So aren't we left to evaluate all of the allegations in

23   the complaint together in their totality to decide whether

24   there's enough there to suggest that there's a plausible claim

25   that the conspiracy that's alleged exists?  It seems to me that

1   what you're inviting me to do here is consider these facts in

2   isolation of each other.

3           I think I agree with you.  I don't see a case that

4   stands for the singular proposition that if you engage in a

5   third-party aggregator system and you gather and accumulate

6   information about your competitors in that way, that that's --

7   it's self-sufficient to establish an agreement.  But that's

8   only -- that's the vehicle that's alleged -- that's a vehicle

9   that's alleged here is a mechanism, but there is an allegation

10  that there is agreement between the defendants, and as further

11  evidence of that are the other facts about the tours, the

12  exchange of executives, and the like.

13          Am I not giving enough credit to the argument you're

14  making, or am I misunderstanding it?

15          MR. HARKRIDER:  I think the difference between what

16  you're saying and what I'm saying respectfully is that there's

17  an incredible lack of detail in what they're alleging.  You

18  might say, well, how could a defendant -- how could a plaintiff

19  have detail at this stage of the pleadings?  But if you look at

20  the cases that they're citing, the cases that they're citing

21  all have far more detail.

22          For example, when they're citing, you know, the --

23  they're citing, you know, *In re Fresh & Process Potatoes*

24  *Antitrust Litigation,* which involved a meeting in the fall of

25  2004 in Blackfoot, Idaho, where specific individuals get

1  together and actually agree on essentially what is going to be,

2  you know, production of potatoes.

3       When you look at things like *West Penn* or *Evergreen* or

4  *In re Text Messaging*, all of those are cases where there is a

5  meeting and then after the meeting there's a change in

6  behavior.  West Penn hates Highmark and then -- I'm sorry --

7  UPMC hates Highmark, and then after the meeting they suddenly

8  won't deal with anybody that used to deal with Highmark.  In *In*

9  *re Text Messaging,* after the meeting, the prices go up.

10       And so could they have maybe said, you know, prices

11  were at a certain level and then people agreed to exchange

12  information vis-a-vis Agri Stats and then prices or, you know,

13  grower compensation changed as a result of that?  Perhaps.

14       But effectively what it seems Your Honor is doing is

15  actually essentially what the Supreme Court in *Twombly* said you

16  couldn't do, in the sense that what you're effectively having

17  is parallel conduct.  What is the parallel conduct?  The

18  parallel conduct is actually people subscribing to Agri Stats.

19  The question is, why are they doing it?  Are they making a

20  unilateral decision, or are they making a decision pursuant to

21  an agreement between the defendants?  What's lacking is some

22  plausibility around the agreement between defendants.

23       To take a step back, what your ruling might do is that

24  essentially it would become almost unlawful, or at least you'd

25  survive a motion to dismiss, if you used a third-party

1    information service, a benchmarking service, if your market was

2    highly concentrated, which would have, you know, a very

3    chilling impact with respect to something that people the Tenth

4    Circuit itself had held --

5                 THE COURT:  I think that's -- I think I part ways

6    with you completely about that.  That seems like a dramatic

7    oversimplification of the facts that are presented in this

8    case.  I think this seems to me one of the challenges with

9    trying to apply the existing case law, is this seems like a

10   very factually-intensive inquiry based on the face of the

11   complaint.  Among other things, we have to consider the market

12   in which we're operating.  We have to consider the nature,

13   type, quality, and timeliness of the information we're

14   exchanging.  The other factors that are alleged here that give

15   opportunity and support the plausibility of the underlying

16   agreement, we've already touched on many of them.

17                 I think the proposition you just stated is if somebody

18   -- if this goes the way that I've suggested initially -- and I

19   don't know yet -- I would strongly disagree with the

20   proposition that someone apply the holding in some future

21   decision to just say that if you aggregate information then

22   you're liable.

23                 MR. HARKRIDER:  Well, I think --

24                 THE COURT:  That ignores all of the other evidence

25   that's in the complaint.

1    MR. HARKRIDER:   But I think that it -- respectfully

2  it might not be that difficult to match those allegations.   And

3  so in any case, one could say, oh, it's a highly concentrated

4  industry.   In any case, one could say, oh, you know, we don't

5  -- you know, the plaintiffs are getting a relatively small

6  share.

7    But perhaps let's move on from that point and move to

8  the point of at least -- I think there are two separate points.

9  So one point is the fact that there is, in our view, very clear

10  lack of a plausible geographic market.   I think if you look at

11  the case law that's out there, two points are worth noting.

12    The first point is that information sharing cases are

13  almost always evaluated under the rule of reason instead of

14  under a per se rule.

15    The second point is that under the rule of reason, the

16  Tenth Circuit, for instance, in *Campfield v. State Farm Mutual*

17  *Insurance* said that the rule of reason requires the plaintiffs

18  to allege a valid market, and the claims brought by the

19  plaintiffs that fall under the rule of reason must fall because

20  of the legally inadequate market definition within his

21  complaint.

22    So if you look at the allegation, the only allegation

23  in the complaint is that the market is actually national, not a

24  series of local markets across the United States, but an actual

25  national market they plead in paragraph 40, but that's

1    inconsistent with the actual allegations in the complaint.

2           In paragraph 45 of the complaint, they allege that it's

3    localized networks of production.  In paragraph 89 and 141,

4    they allege that the localized nature of production means that

5    a grower's ability to market his or her services and design

6    geographic proximity to integrators' complexes.

7           In *Wheeler v. Pilgrim's Pride* in the Eastern District

8    of Texas, the court noted that due to the cost and other

9    logistical concerns, the growers are typically located within

10   40 to 50 miles of the integrators' processing plants.

11          In *M & M Poultry v. Pilgrim's Pride* from the Northern

12   District of Virginia -- Western Virginia -- of the Northern

13   District of West Virginia -- sorry -- Pilgrim's generally

14   contracts with broiler growers whose farms are no more than

15   50 miles from its feed mills.

16          So there's very little reason to believe that there's a

17   national market and there are no facts to allege that it is, in

18   fact, a national market.  All the facts -- specific facts in

19   the complaint suggests that they're actually local markets.

20          This court in *Drake v. Cox Communications* said that the

21   proposed nationwide market for public service announcements was

22   fatally overbroad and dismissed the complaint.

23          So we don't think that there is any plausible

24   allegation that there is a national market, and we believe that

25   the law is pretty clear that in the absence of a plausible

1    market definition that a case has to be dismissed.

2                THE COURT:  Will you pause there for a moment,

3    please?

4                MR. HARKRIDER:  Yes.

5                THE COURT:  I was a teeny bit concerned about this

6    argument in advance of our hearing for this reason.  As I read

7    the papers again, it was clear to me that this was an issue

8    that was addressed by the parties but not in great detail, the

9    relevant market argument.  What I've been thumbing through here

10   is the briefing.  I can't find where the relevant market issue

11   is raised in the opening brief by the defendants.  It is

12   addressed -- I think it is in there somewhere; I can't find it.

13           In the reply, it merits about a paragraph of

14   discussion, and I know that there was -- there is citation in

15   the reply to the *Cinema Village* case and the *Wheeler* case but

16   it's almost in passing.  I'm not certain that the issue of the

17   relevant market was adequately addressed by the parties and I

18   haven't claimed exceptional expertise in this area.  I know the

19   relevant market is a issue and I know it's something that has

20   to be addressed.

21           Can you point out for me where the argument is fleshed

22   out in the opening brief?  People have it?  Yes, hi.

23                MR. CRAMER:   It's in footnote 6 of defendants'

24   motion.

25                THE COURT:  Footnote 6 of the opening brief?

1          MR. CRAMER:   Yes.

2          MR. HARKRIDER:   Yeah.   Page 11.

3          THE COURT:   On page 11.   So this is where -- this is

4  what I was fearful of.

5        As I was preparing for this hearing and about the

6  issues that needed to be addressed, this is one of the issues I

7  was thinking about that I didn't feel like I was adequately

8  informed of the law, which may be the reason I asked you the

9  question I did when we started discussing this before, relevant

10  market for what.   It seems like a significant departure from

11  the thrust of this.   The central thrust of the argument is

12  whether the plaintiffs have adequately pled the conspiracy or

13  the constituent parts of the conspiracy.

14        What do I do if I think that I don't have sufficient

15  briefing on the relevant market?   Do we just have additional

16  briefing, or is that a failure of proof by the defendants at

17  this stage?

18          MR. HARKRIDER:   So I think two things.   So, first of

19  all, the reason I think that there wasn't as much briefing is

20  because the complaint itself doesn't say it's a rule of reason

21  case; it says it's a per se case.

22          THE COURT:   That's fair.

23          MR. HARKRIDER:   And so our view was you need to

24  allege it's a rule of reason case, and then I guess -- I don't

25  know if we ferreted them out or they finally just said it's a

1   rule of reason case and then we responded to that.

2           THE COURT:  That's fair.  It's not a criticism.

3           MR. HARKRIDER:  Sure.

4           THE COURT:  I'm just -- I think that is a fair

5   explanation, I think, of the development of the argument.  Go

6   ahead.

7           MR. HARKRIDER:  Sure.  I think our view is that it

8   is the burden of the plaintiff to make credible allegations as

9   to a relevant market.  They've made allegations with respect to

10  a relevant market but it's a nationwide relevant market,

11  notwithstanding the fact that it is plainly local.  And, again,

12  I'm not sure why they did that, whether they believe it's

13  national or it's because of the concern on class certification.

14          But our belief would be that the case should be

15  dismissed, as many cases -- or several cases have held, that if

16  you do not allege a credible relevant market in a rule of

17  reason case, then the case should be dismissed.

18          THE COURT:  I'm guessing that there are additional

19  arguments you'd like to discuss before you sit, but let me ask

20  you to jump ahead for a moment and address my preliminary

21  thoughts.

22          If I conclude that there is an adequately pled

23  information sharing agreement among the defendants under

24  *Twombly*, then how do you think the "no poach" allegations or

25  theory is addressed at this stage?  Or is it?

1    MR. HARKRIDER:  So they're alleging that "no poach"

2    is a per se claim.  It certainly would be helpful to analyze it

3    within the context of a relevant market.  We do think the "no

4    poach" claim is literally *Twombly*.  In *Twombly*, you had a

5    situation where you had high barriers to entry -- this was

6    regional Bell operating companies -- and, you know,

7    Southwestern Bell, or SBC, didn't want to go to New York.  So

8    notwithstanding the fact that there was a clear allegation that

9    they would not go into each others' territories, the fact was

10   more easily understood as a result of the natural -- the

11   barriers to entry that came from product differentiation.

12        So we think the "no poach" agreement is plainly and

13   sufficient --

14        THE COURT:  And if I agree with you, but I think the

15   information sharing agreement is plausibly alleged, then what

16   is the effect, do you think, in view of this motion?

17        MR. HARKRIDER:  Well, I think two things.  I think,

18   first of all, if you were to hold that they have not alleged a

19   plausible relevant market, and therefore, the information

20   sharing were to fall apart, we would think that the complaint

21   should be dismissed.

22        If you were to for some reason --

23        THE COURT:  Let me stop you there --

24        MR. HARKRIDER:  I'm sorry.

25        THE COURT:  -- and say back to you what I think you

1    just said.

2                    MR. HARKRIDER:   Yeah.

3                    THE COURT:   That if I find that a "no poach"

4    agreement is not plausibly alleged in the consolidated

5    complaint, then what's left to evaluate today is evaluated

6    under a rule of reason which draws the relevant market into the

7    analysis?

8                    MR. HARKRIDER:   Correct.

9                    THE COURT:   Right.  I'm with you.  Go ahead.

10                   MR. HARKRIDER:   Now I think I've lost my train of

11   thought.

12                   THE COURT:   You were doing so well too.

13                   MR. HARKRIDER:   Thank you, Your Honor.

14        I think with respect to -- I know I was going to make

15   another point with respect to information sharing but you had

16   wanted to address this.  So I don't know if --

17                   THE COURT:   I guess the question I'm asking -- and I

18   was interrupting you and it wasn't clear to me if you had moved

19   off the information sharing agreement when you went back to

20   relevant market -- but my question is, how is the motion

21   addressed if I think there's an information sharing -- a

22   plausible information sharing conspiracy alleged?

23                   MR. HARKRIDER:   I think if there's a plausible

24   information sharing agreement that is alleged, I think there

25   are two possibilities.  You might find that they have not

1    alleged a plausible relevant market, in which case the case

2    should be dismissed.  You might find that the national market

3    that they alleged is plausible for some reason -- obviously I

4    think it's implausible -- and think that the information

5    sharing part of the case should continue.  But we do not

6    believe that the "no poach" agreement has really anything to do

7    with the information sharing agreement.

8            It might be fine if they want to, you know, use that as

9    additional color, but we don't think it is an independent claim

10   under Section 1 of the Sherman Act.  In fact, courts

11   routinely -- I was in a case in the Fourth Circuit, the *Saw*

12   *Stop* case, where there were two claims and on a motion to

13   dismiss the Fourth Circuit allowed one claim to go forward and

14   dismissed the other claim.

15           So we don't think it's unusual at all if a claim is

16   legally insufficient for it to be dismissed from the complaint.

17           THE COURT:  So I understand the complaint to advance

18   the theory that these are separate agreements among the same

19   co-conspirators as part of the same overarching conspiracy.  In

20   those instances, you think that today is the day, this is the

21   motion to separate one of those theories from the other and

22   just remove, what, that set of issues from the case?

23           MR. HARKRIDER:  I think remove it as an independent

24   ground by -- as an independent violation of the Sherman Act.

25   And so I think maybe two different ways of thinking about this.

1    One is that I don't know if Your Honor is going to have

2    a written ruling, but I think it would be a little confusing to

3    hold that a "no poach" agreement in this circumstance states an

4    independent claim under Section 1 of the Sherman Act because it

5    is so close to *Twombly*.   The only allegations are that people

6    didn't go into each other's territory in that case; and in this

7    case, they didn't take each other's growers, not withstanding

8    the fact that the growers plausibly really couldn't switch

9    under the claims, you know, because of high barriers to entry

10   which is what they allege.

11   But you might be asking a separate question, which is,

12   you know, could you say that there is an overarching

13   conspiracy, you know, that has these two constituent elements?

14   But when you look at the allegations of their complaint, this

15   is not a case where they're saying, you know, there's an

16   overall agreement to fix prices and these are two parts of it.

17   They say that there's an overall agreement to reduce grower

18   compensation and there are two ways that they're doing it.   One

19   is through an information sharing agreement, which you've said

20   you think has some plausibility, and the other is through a "no

21   poach" agreement, which you seem to be leaning to suggest is

22   implausible.   So if the "no poach" goes, all you're left with

23   is the information sharing agreement.

24   I'm not sure if that fully answers your question.

25   THE COURT:   So let's think forward to the jury

1    instruction conference and we're discussing the form of the
2    verdict that's going to go to the jury.  I suppose the question
3    that goes to the jury is, do you find for the plaintiff or the
4    defendant on Count 1, which I assume is the Sherman Act claim;
5    right?  And then we'll have a set of instructions that explain
6    to the jury what could constitute a violation of Section 1 of
7    the Sherman Act claim.  Or maybe we're charging the jury that
8    they could only find a Section 1 violation if they found that
9    there was an information sharing agreement or maybe -- I don't
10   know.  But this is my point.

11        We're not parsing out parts of the theory at this
12   stage.  If there is an actionable basis on which the jury could
13   find for the plaintiff under Count 1, then we're moving past
14   the Rule 12 stage, are we not?

15        MR. HARKRIDER:  I would respectfully submit, first,
16   that you might be wanting to move beyond the information -- you
17   know, beyond the 12 rule -- beyond the pleading stage with
18   respect to the count that survives, which is information
19   sharing.  There's a separate count, I think as I read it, for,
20   you know, the "no poach" agreement.  There's a "no poach"
21   agreement and there's an information sharing agreement.

22        It's unclear to me how a market fact or color or
23   atmospherics can state an independent cause of action.  If it
24   doesn't -- I'm sorry.  Go ahead.

25        THE COURT:  I'm reading Count 1 of the consolidated

1    complaint.  It begins on page 38.  It's a single count for

2    agreement in restraint of trade, in violation of Section 1 of

3    the Sherman Antitrust Act.  It doesn't -- it doesn't set forth

4    two separate claims; it's a single claim.  It doesn't even set

5    forth here the independent or separate bases in which it's

6    alleged that the defendants violated the Sherman Act.

7           Am I focused on something that's just not of any great

8    moment?  Maybe I am.

9           I can anticipate that the next question might be this:

10   If the motion to dismiss is denied and there's discovery served

11   relating to the question of a "no poach" agreement, I can

12   anticipate objections, and that's why I'm -- that's partially

13   why I'm addressing the issue today.

14           MR. HARKRIDER:  Right.  I think not only can you

15   anticipate objections, but I think my prime -- one of my

16   primary concerns is just sort of -- I don't want to say

17   judicial clarity when people are reading decisions, but I do

18   think decisions matter and I think decisions matter in terms of

19   the guidance that defendants take from them.  Which is one

20   reason I was concerned -- we share different concerns.  But,

21   you know, if you were to hold on information sharing, there is

22   going to be an article in the antitrust trade press that says

23   be careful of using benchmarking services because that alone

24   may -- or I wouldn't say "alone"; I know we don't like that

25   word -- but, you know, that can be used as something that, you

1    know, can impose antitrust liability.

2          Similarly, if you say, okay, there's this "no poach"

3    agreement, that they're alleging a "no poach" agreement, and

4    I'm going to allow those allegations, you know, they do

5    specifically allege a "no poach" agreement.  It's not as if

6    they say there's an information sharing agreement and there's

7    some "no poach" facts out there.  They specifically allege a

8    "no poach" agreement.

9          I think for the purpose of judicial clarity, it is

10   worthwhile to have an opinion that says, first -- either,

11   first, at the -- either, first, that parallel conduct in terms

12   of not going after each other's customers and entering each

13   other's markets in some respects where there are high barriers

14   to entry doesn't plausibly suggest a violation of Section 1.  I

15   think that people would be surprised to find that if all you

16   have done is simply not gone after each other's customers where

17   there are high switching costs, that that would have some --

18   you know, attack some level of Section 1 liability.  People

19   read cases very carefully and they will cite that opinion back

20   in, you know, many different contexts.

21         So, to me, part of this is a discovery issue but part

22   of this is, you know, essentially -- I don't want to say you're

23   overruling *Twombly*, but you're certainly reaching a different

24   result than *Twombly* reached with respect to virtually identical

25   facts.

1        I do have -- sorry.

2            THE COURT:   Let me use another analogy.   And maybe

3    we are spending too much time on this issue.   But I just have a

4    sense that this could become an important thing for us to have

5    an understanding about.

6            Let's instead think about a trade secret theft claim,

7    where there are allegations that a certain executive defendant

8    who left a company misappropriated trade secrets relating to

9    product formulations, customer lists, and something else;

10   there's a single claim advanced with constituent parts.   And

11   say there's a motion to dismiss the trade secret theft claim,

12   and that motion fails because there are allegations in the

13   complaint from which a reasonable jury could conclude that

14   there was a violation of the Trade Secret Theft Act in this

15   state.

16           You wouldn't at Rule 12, I don't think, ordinarily say,

17   well, we're going to allow the case to proceed and the claim to

18   proceed with respect to the product formulation claims but not

19   the customer list claims.   I mean, it seems to me that's the

20   sort of work that's done at summary judgment once there's been

21   an opportunity for discovery.   Was there a factual basis to

22   present to the jury as a means of finding a violation of the

23   Trade Secret Theft Act that there was a misappropriation of

24   customers lists?   And maybe there isn't any.   In which case

25   maybe that has an effect on the evidence that's produced or the

1      form of the jury verdict form, for example.  I don't think it's

2      often the case that at Rule 12 at the beginning of the pleading

3      stage, we would say, well, the case can proceed now with

4      respect to the product formulations and something else but not

5      the customer lists.

6           Is that an apt analogy?  Maybe it's not.

7           MR. HARKRIDER:  I guess the reason I'm not sure it's

8      an apt analogy respectfully is that you could certainly imagine

9      a court saying, you know, I've looked through the allegations

10     of the complaint and, you know, there are specific allegations.

11     Let's imagine that the claim is that, you know, a trade theft

12     claim and there were customer lists and then product

13     formulations; that's the allegation.  Let's say there are

14     specific facts that are actually alleged with respect to

15     customer lists but no facts whatsoever alleged with respect to

16     product formulations.

17          I can certainly imagine an opinion -- I think we've

18     read them all -- that might say, I'm going to -- you know,

19     having evaluated the allegations of the complaint, I'm going to

20     allow, you know, the trade misappropriation claim, the single

21     claim, to proceed because it looks like there is -- you know,

22     there are specific allegations with respect to, you know, trade

23     secrets, you know, with respect to, you know, customer lists.

24     I don't find, however, that there are specific allegations with

25     respect to product formulations; but notwithstanding that, I'm

1    still going to let the claim survive because there is enough

2    with respect to, you know, customer lists.

3            So I think that courts routinely look at the

4    allegations to see if the allegations are specific.  You know,

5    think about claims that allow -- in fact, this happened in the

6    potato case.  One of the defendants gets dropped because there

7    are no allegations with respect to that defendant.

8            And so, you know, courts, I think, routinely look at

9    the specific allegations, tie them back to the claim, and then

10    might say, you know, we find it sufficient to go forward as a

11    claim but only with respect to this part -- you know, with

12    respect to these allegations, there are, in fact, no

13    allegations.  You wouldn't want parallel conduct after *Twombly*

14    saying it doesn't violate the Sherman Act to say that parallel

15    conduct can now be used to bolster, you know, lawful conduct,

16    bolster an actual Section 1 offense.

17            So I'm not sure if that answers your question.  That's

18    why I said it's important to be clear in the opinion even if

19    the claim were to go forward.

20            **THE COURT:**  It's not super clear to me that the kind

21    of ruling you just described is one that's often given, though

22    maybe it is.  I don't know.  I'm mindful that -- I think part

23    of the rationale for *Twombly* -- and it's essentially robust

24    rationale in the context of antitrust claims -- is to ensure

25    that we aren't putting defendants to too much time and expense

1  defending claims unless we determine that they're plausible

2  claims in the first instance.  So you can't just come into

3  court, pay your filing fee, and now the defendants are on the

4  hook for a five-year case and millions of dollars in discovery.

5  But if the claim is going to proceed, if there are actionable

6  theories, then I just -- it's not clear to me that the same

7  rationale applies for the scope of the discovery on the

8  theories in support of the claim.

9          Do you see what I'm saying?  Let me be more specific.

10  And maybe I'm being naive about this.  I'm not sure.

11          But it seems to me that if the Sherman Act claim

12  survives on the adequacy of the information sharing

13  allegations, then the incremental additional costs related to

14  permitting discovery on "no poach" is -- it's not significant.

15  Not that there wouldn't be any, but surely there would be

16  questions in many of the depositions that would already be

17  taking place and surely there would be interrogatories and

18  other things.

19          But it doesn't seem to me that the rationale for

20  *Twombly* and the like at Rule 12 would provide a basis

21  ordinarily for saying, well, we're going to just carve out one

22  of the theories without discovery now on the basis of the

23  allegations.  But I'm not sure.

24          MR. HARKRIDER:  Well, I think, again, it's two

25  things -- and maybe I'm just an antitrust nerd, and called

1   worse -- but I do think opinions matter with respect to

2   guidance.  I respectfully suggest that the impact of the, you

3   know, legal costs isn't just, you know, money out of pocket,

4   it's also the chilling with respect to potentially

5   procompetitive conduct.  I wouldn't underestimate, you know,

6   the difference between "no poach" allegations and Agri Stats

7   with respect to, you know, discovery to begin with.

8           Agri Stats is very focused presumably in discovery.  It

9   is, did you believe in Agri Stats?  Did you participate in Agri

10  Stats?  Were there meetings with respect to Agri Stats?  What

11  sort of information did you give Agri Stats and what was the

12  impact with respect to prices?  So that's Agri Stats.  I mean,

13  I'm sure there's other stuff but that's Agri Stats.

14          "No poach" is an examination of every single -- what we

15  would think hundreds of relevant markets.  Did somebody switch?

16  What were the specifications of your house?  Were those

17  specifications so difficult that it was, you know, difficult

18  for you to switch or not to switch?  Did somebody ask you to

19  switch?  You know, who were the other integrators in the

20  relevant market so that you could have switched to?  Those are

21  very, very different.  They're both involving poultry, they're

22  both involving plaintiffs, but they're not both involving the

23  same core set of facts.

24          And so I think there's a huge difference with respect

25  to the discovery burden, but I also think -- and, you know,

1   again, I might be different on this -- but the idea when

2   somebody reads -- I think Your Honor might be really

3   underestimating how much the new law is that they're

4   breaking -- that you are actually creating because, you know,

5   in all of the hub-and-spoke cases -- and this clearly is a

6   hub-and-spoke case, and, you know, I think *Total Benefits* is a

7   good case on this -- there needs to be an allegation with

8   respect to the actual rim.  All the other cases that are

9   information exchange cases involve defendants actually meeting

10  with each other.  Defendants aren't actually meeting with each

11  other to discuss -- you know, no credible allegations, you

12  know, on a specific date people met to discuss Agri Stats.

13         So you have a bunch of these vertical agreements and

14  there's a huge difference between those vertical agreements,

15  which, you know, *Intracorp* is again vertical agreements.  I'm

16  just wondering, How does one even distinguish *Intracorp* from

17  this case?  Is it market definition?  I mean, what's the

18  distinction?  The Tenth Circuit has already held that it is

19  procompetitive to try and exchange information for the purpose

20  of reducing costs.  It might not be lawful if the market is,

21  you know, a properly defined relevant market, et cetera, you

22  know, to have an agreement between defendants, but these are

23  still, you know, sort of parallel -- this is still parallel

24  conduct.  And so, you know, what's missing, again, is -- I know

25  I'm going back to information exchange -- but what's really

1   missing is the rim.  So that's why I say this case is so

2   unusual.

3           People are very concerned about not just discovery

4   costs, but who knows what a jury is going to hold and so that

5   puts pressure on people to settle one thing.  And then the

6   other thing is knowing that there's going to be pressure to

7   settle joint and several liability, and all of those things

8   that occur in antitrust, cause sort of a chilling impact where

9   somebody says, do I want to subscribe to an information sharing

10  service?  I'm in the automobile industry.  Do I want to, you

11  know, subscribe to this service, you know, to reduce our costs

12  because it's highly concentrated, you know, the person who was

13  the head of Ford used to be the head of GM.  I mean, you can --

14  these allegations are not that difficult to actually come up

15  with.

16          That's why courts have actually in information exchange

17  cases required these two elements.  They've required, first,

18  element of an actual agreement between defendants around the

19  rim, which is entirely missing from this case, or they've

20  required either -- you know, required specific allegations with

21  respect to whatever the relevant market is.  You can imagine

22  additional allegations, like after we exchanged information

23  prices changed.  They know their compensation that they're

24  getting.

25          You know, you talk about, for instance, you know, the

1    burden that a plaintiff is under because, you know, they're not

2    in the room so how can they make specific allegations as to

3    what was agreed during a conspiracy?  But they know their own

4    prices.  They know their own compensation.  They certainly were

5    capable of alleging, you know, that people joined Agri Stats in

6    19 -- you know, in 2008, and after 2008, you know, our

7    compensation went flat, it went way down, we got a different

8    share of it.  I mean, there's no reason why they couldn't have

9    made those allegations.  That's why people -- and the reason is

10   because information sharing and cost benchmarking, the Supreme

11   Court has held and other courts have held, is actually

12   procompetitive.

13          So, you know, in a roundabout way I'm trying to tie

14   this back to the discovery costs.  The discovery costs is not

15   just, oh, this is very, very expensive.  It's also because it's

16   very expensive, how do I change my conduct as a business?  And

17   that's why I was starting off by saying, you know, the

18   antitrust laws are the Magna Carta of free enterprise.  Because

19   your ruling would essentially be that from now on simply

20   subscribing to an information exchange service, a third-party

21   service, without ever talking to another defendant about it, if

22   the market is otherwise highly concentrated, can violate the

23   Sherman Act.  That's a step no one has ever made before and

24   certainly has a chilling effect, among other things, on

25   everybody who operates information sharing businesses because

1    why -- why would you ever subscribe to it?

2            I just want to make -- I know I've been talking for a

3    long time.  I just want to make a couple points just on this,

4    you know, broad overarching conspiracy.  In *Processed Egg*

5    *Products Antitrust Litigation,* the plaintiffs tried to allege

6    an overarching conspiracy to cut egg supply, and the court held

7    it can't possibly correct that plaintiffs can plausibly allege

8    a single overarching conspiracy with per se liability for all

9    manners of conduct which might otherwise singly be evaluated

10   under the rule of reason.

11           So we know we need to -- we can't just group it all

12   together and through the sum of the parts turn this into

13   something other than a rule of reason case.

14           And then if you look at *Continental Ore v. Union*

15   *Carbide,* they say that, you know, allegations maybe have to be

16   evaluated in their totality.  But if you look then at, you

17   know, *Citric Acid* and *Baby Foods* and *Delta/AirTran,* all of

18   those three cases hold that participation in information

19   exchange alone is insufficient evidence of an overarching

20   conspiracy.

21           So going back to this idea of can you have an

22   overarching conspiracy simply by alleging information exchange,

23   that's why I want to be very factual that you would be very

24   concerned if there was a ruling that said because they

25   subscribe to Agri Stats, there's this overarching conspiracy to

1    cut grower compensation that involves "no poach" and all these

2    other things.  That doesn't seem credible to us.  At the very

3    least, we would suggest that your opinion would be cabined

4    simply to information exchange without giving credibility to

5    the "no poach" allegations and then look rigorously at whether

6    information exchange actually meets the standards of the rule

7    of reason, which it is black letter law in this circuit and

8    throughout the United States that you need to allege a relevant

9    market.

10           You might also be able to allege, for instance, you

11   know, some impact, you know, that prices declined, but they

12   don't make that allegation and they could have made that

13   allegation.  There's no information asymmetry with respect to

14   the prices that -- you know, the compensation that the

15   plaintiffs themselves are getting.  They could have made it and

16   they didn't, and I suspect they didn't make it because they

17   couldn't have made it because they knew that since 1980 their

18   compensation has been declining.  But Agri Stats didn't exist

19   in 1980, to my knowledge, and it's certainly not alleged in the

20   complaint.

21           So I think -- just taking a huge step back, I think we

22   maybe agree on the following propositions.  I think we agree

23   that we're not able to find a case that says participation in a

24   third-party benchmarking service, without detailed allegations

25   that there is an agreement among defendants to all use Agri

1    Stats without, you know, a date on which that agreement was
2    made, without, you know, detailed allegations that they all got
3    together and discussed it, and without detailed allegations
4    that prices changed as a result of it, no one's reached that
5    result.  A lot of courts have actually reached the result that
6    participation in information exchange -- again, the *Intracorp*
7    in this circuit have actually held that it is fine to do so,
8    even though in *Intracorp* they're talking actually about
9    chiropractors' prices.  Now, it's not the chiropractors
10   exchanging that information, it's another third-party service
11   that's exchanging that information, but it very clearly and
12   plainly has an impact on price.
13        So you're making a decision that no court has made
14   before in a pretty important area with respect to a practice
15   that's pretty widespread.  And from now on everybody will know
16   that simply participating, I never talked to a defendant about
17   it, I simply participated, I subscribed, I paid my money, and I
18   got my data, that that itself, if my market is highly
19   concentrated, which is really the biggest fact that they allege
20   here, will get beyond a motion to dismiss and expose me to
21   millions of dollars in legal fees.
22        If I'm a general counsel -- and, you know, I have
23   members of the legal department in this room -- I would
24   certainly counsel my company, don't subscribe to those
25   services; or if you do, there's a substantial legal risk of

1    doing so.

2           So, you know, we're respectfully suggesting that it is

3    new law with respect to information exchange; it is new law

4    with respect to saying, okay, even though it's rule of reason,

5    even though there's no impact on price that's alleged, that you

6    don't need to allege a relevant market and potentially making

7    new law saying, okay, well, I have only this information

8    exchange claim and I'm going to bundle everything else back

9    into it, even though courts have held that information exchange

10   is not a sufficient umbrella to pack in an overarching

11   conspiracy.

12          So I'm not a judicial activist, I'm not suggesting that

13   you are, but my view is that courts, especially in antitrust,

14   should be very careful to follow precedent and depart from it

15   when it makes obvious, you know, sense to do so.  But these are

16   recent cases and we're aware of -- you know, information

17   exchange has been evaluated many, many times, there are dozens

18   of cases out there, and yet none of them involve this fact

19   pattern.

20          THE COURT:  Thank you.  Just one moment.

21               *(Discussion held off the record)*

22          THE COURT:  I think we've been going about an hour,

23   and I know this much, and especially at the clip at which

24   Mr. Harkrider was speaking, our court reporter's fingers are

25   about to fall off.  So we'll take a ten-minute recess and

1  convene here with a response from the plaintiffs.  Thank you.

2  *(Short break)*

3             THE COURT:  Mr. Cramer.

4             MR. CRAMER:  Thank you, Your Honor.  May I proceed?

5             THE COURT:  Please.

6             MR. CRAMER:  So I thought I would start clearing up

7  some misconceptions about the complaint and then jump over to

8  some of the arguments that my opposing counsel made about the

9  information sharing agreement and I'll cover relevant market

10  and what should be done regarding "no poach" and discuss the

11  "no poach."

12        But let me start at paragraph 151 of our complaint

13  because Mr. Harkrider made a big deal out of the fact that we

14  as the plaintiffs do not allege some change to prices or

15  compensation as a result of the alleged conduct and that's just

16  false.  For example, in paragraph 151, we plead, "Since at

17  least 2007, inflation-adjusted Grower pay has shown a

18  significant, downward trend, while consumer prices have

19  increased; this widened gap between farm gate prices and retail

20  prices shows that neither the Grower nor consumer are better

21  off under the Integrators' collective grip."  And it goes on

22  like that.

23        It alleges in paragraph 137 that as a result of the

24  alleged conduct, the information sharing and the "no poach,"

25  the growers' compensation has been suppressed.  And I'm a

1    little surprised, in fact, to hear defendants challenging that

2    point, given that the defendants have admitted it in their

3    motion.  At one, they say that the entire purpose of what they

4    call benchmarking is for the defendants and all the

5    co-conspirators who have agreed to share information through

6    Agri Stats do that so as to control their own costs, presumably

7    nationwide since the information is being shared nationwide.

8    What is one of their biggest costs?  How much they pay the

9    growers.

10              So it's a fair inference from what the defendants are

11   arguing about why they are joining and giving information to

12   and getting information from Agri Stats.  They're doing it to

13   reduce grower pay; that's why they're doing it.  That is the

14   main anticompetitive effect and entry alleged in the case.

15              Under the *Been* case, we know, and under monopsony

16   principles and antitrust principles, when someone's pay is

17   reduced, they produce less of it; and when there's less of

18   something, the supply goes down and the price goes up.

19              And so what we see here as a result of the allegations

20   here, what plaintiffs have pled, and what the defendants have

21   essentially admitted, or at least the implications of it, is

22   that their information sharing and other conduct has led to

23   reduced grower compensation, reduced output of broilers, and

24   therefore, higher prices to consumers overall.  Those are

25   anticompetitive effects of the challenged conduct that we

1    allege in this case.

2            Let me address Mr. Harkrider's point about -- that he

3    made several times to Your Honor about how this will be the

4    first case in which joining a benchmark organization is found

5    to be illegal and we're going to send a chilling effect around

6    the world as a result of it.

7            First of all, as Your Honor pointed out, this case is

8    not simply about joining Agri Stats.  But secondly, the

9    allegations in this case, if they are accepted, as they must

10   be, are allegations that meet the guidelines of the Department

11   of Justice for when we determine an information sharing

12   agreement, or information sharing among competitors, is

13   anticompetitive and they meet the three-part test set out in

14   *Todd v. Exxon,* the Second Circuit case that the defendants have

15   cited.

16           What is that test?  The question is:  Is the

17   information being shared current or historical?  Is the

18   information detailed or aggregated?  Is the information secret

19   or public?

20           And here, we have a situation where the information is

21   current; they're exchanging this weekly or monthly.  It's

22   detailed.  We allege that each of the integrator companies are

23   able to disaggregate it, view it, determine each grower's

24   compensation at each facility.  And it's nonpublic, it's

25   secret, they share it with no one other than themselves.  The

1    growers do not get that information.  We allege that the

2    growers aren't even able to share their own information with

3    other growers.

4         The reason why that is anticompetitive is it puts

5    power, unfair power, in the hands of the integrators which they

6    use to suppress compensation to the growers because knowledge

7    is power in a negotiation.  This is why they share the

8    information so they have power vis-a-vis the growers.

9         So we have -- we have an allegation of the very type of

10   information sharing that the Supreme Court has deemed

11   anticompetitive, *U.S. v. Gypsum* as to the first prong regarding

12   current.  *U.S. v. Gypsum,* the Supreme Court says exchanges of

13   current price information have the greatest potential for

14   generating anticompetitive effects and have consistently been

15   held to violate the Sherman Act.

16        Again, we claim -- we claim, allege, that it's

17   granular, it discloses the intricate details of every

18   integrators' business.  Paragraph 74 we allege that every

19   cartel member knows the base grower compensation paid by every

20   other cartel member, and therefore, are able to constantly

21   monitor each other's compensation levels to growers.  And the

22   sharing of information in this detail has long been deemed

23   potentially anticompetitive.  As the Supreme Court said in

24   *Gypsum*, regardless of its putative purpose, the most likely

25   consequence of any such agreement to exchange price information

1    would be the stabilization of industry prices.

2          Again, as I said, the agreement -- the information

3    that's shared is secret.  *Todd v. Exxon* stated that public

4    dissemination is the primary way for data exchange to realize

5    its procompetitive potential.

6          So the defendants cited to Your Honor, though they did

7    not mentioned today, the *Maple Flooring* case.  That's another

8    Supreme Court case regarding information exchange.  Why did the

9    *Maple Flooring* case, the information sharing there, pass muster

10   where it didn't pass muster in *American Column & Lumbar* and

11   *Gypsum* and *Container*?  Why in *Todd*?  Because the information --

12   in *Maple Flooring,* the information that was exchanged was

13   published in journals, it could be used by both sides of a

14   negotiation, it could be used by the public, and it was also

15   aggregated in general.

16         So here, we have the very type of information being

17   exchanged that the Department of Justice and courts have deemed

18   anticompetitive.

19         All right.  Let's talk about -- but obviously the mere

20   fact that information is being exchanged doesn't make it a

21   violation of the Sherman Act.  Plaintiffs need to plead

22   agreement, that there's an agreement among the defendants to

23   share the information.

24         What have we heard from the defendants?  Well,

25   defendants say the co-conspirators didn't agree with each

1    other, they just agreed with Agri Stats to share information.

2    And then they also say that in all of the cases -- or many of

3    the cases that have found agreement, there are co-conspirator

4    intercommunications about the shared information and those

5    intercommunications are really what established the agreement.

6    We don't have that here.  So their entire argument, though,

7    rests on the notion that exchanging the information through

8    Agri Stats insulates what would otherwise be an illegal

9    information sharing cartel.

10        So let's talk about that first argument, whether

11   co-conspirators are allowed to share information with Agri

12   Stats and then that information gets transmitted back to the

13   defendants and that's not an agreement.  They say that it's a

14   hub-and-spoke but there's nothing connecting the rim, these are

15   just everybody has these independent agreements with Agri

16   Stats.  That's just wrong.  How do we know it's wrong?

17        There are two principles that we can draw from

18   agreement cases, and information sharing cases in particular,

19   about when there's an agreement to share information; number

20   one, when there's a conscience commitment to a common scheme or

21   a common understanding.

22        Well, what is the common understanding here?  The

23   common understanding is, as we've alleged -- and I don't even

24   think it's denied -- that the co-conspirators shared their own

25   detailed, competitive, internal information because, and for

1    reciprocity, in order to get that information back.  That is

2    why they're joining Agri Stats, so that they can give

3    information and get information.  That's not a unilateral act.

4    If all I did was share information and get nothing back or

5    expect nothing back, then that wouldn't give me what I want.

6    What I want is shared information.

7            And then the second point, which I've alluded to -- and

8    this comes out in all of the cases -- the key thing that's

9    connecting all of the co-conspirators is reciprocity, they are

10   exchanging information with each other.  Yes, they're funneling

11   it through Agri Stats, but the whole point of it is to exchange

12   information with each other.

13           THE COURT:  But Mr. Harkrider says those two

14   elements are entirely legal conduct, lawful conduct, even

15   procompetitive conduct.

16           MR. CRAMER:  Well, there's two different things;

17   number one, is there an agreement; and number two, is the

18   conduct that they have -- the thing they've agreed to do

19   potentially anticompetitive?

20           The way I started was to tell Your Honor, well, there

21   are -- the kinds of information being exchanged between the

22   co-conspirators here is of the type that the Department of

23   Justice, *Todd v. Exxon,* and the Supreme Court have said are

24   potentially anticompetitive, current, granular, detailed, and

25   secret; right?

1    If all this was was they shared information with some

2  industry group and the industry group aggregated it and then

3  published it on the Internet so everyone would know about it,

4  that would be a very different situation; right?  Then we would

5  not have the case that we have.

6    **THE COURT:**  I understand.  But the two elements that

7  you just addressed, the purpose of joining an information

8  aggregating service like this, that's going to be present for

9  every entity that enters into a relationship with an

10  information aggregator.  They are going to do it for the

11  purpose of sharing information with the hope of getting

12  information so that they can make business decisions, and

13  courts have said that's fine.

14    **MR. CRAMER:**  Yes.  So it is fine as long as the

15  information doesn't meet the test.  And then, of course, as

16  Your Honor pointed out, we allege other things that have gone

17  on in the marketplace that lead us to believe that this

18  information is being used for nefarious ends.

19    For example, one of the things that Mr. Harkrider said,

20  which was incorrect, is that plaintiffs do not allege

21  communications about the data among and in between the

22  co-conspirators; in fact, we do.

23    In paragraph 121 of the complaint, we allege that Agri

24  Stats hosts regulator poultry outlook conferences for the

25  co-conspirator executives.  It's certainly a reasonable

1   inference from the complaint that at poultry outlook

2   conferences run by a data aggregation service that they talk

3   about the data at those conferences.

4        And we allege in paragraph 77 there are regular chicken

5   media summits, including plant visits and panel discussions

6   among senior executives of broiler production metrics.  Well,

7   where would you get these metrics if not for the information

8   sharing?

9             THE COURT:  Did you say 77?

10             MR. CRAMER:  77.

11             THE COURT:  Right.

12             MR. CRAMER:  We allege in paragraphs 103 and 104

13   that through the National Chicken Council, defendant executives

14   met regularly to discuss, quote/unquote, growout operations.

15   Again, these are all meetings among high-level executives of

16   the defendants and other co-conspirators in the context of a

17   situation where they're all sharing detailed, granular

18   information --

19             THE COURT:  Okay.

20             MR. CRAMER:  -- about their business.

21             THE COURT:  And Mr. Harkrider will stand up and

22   reply before we finish and say, Judge, here's a dozen cases

23   that tell you that meeting in industry meetings is not evidence

24   of any unlawful conduct or any nefarious agreement.  And your

25   answer, I suppose, is, right, except that these are additional

1   factors that are pled here that you take into consideration in

2   the totality of the pleading.

3           MR. CRAMER:  That's exactly right.  We are not

4   alleging that the mere fact that there are industry meetings by

5   itself standing alone proves anything.

6           THE COURT:  Or facility tours or executive exchanges

7   or information exchanges or anything else.  Except all of it

8   together, you suggest, gives rise to a plausible allegation of

9   this agreement in the first instance?

10          MR. CRAMER:  Correct.  For example, I imagine --

11  take a hypothetical.

12          Let's say there was a situation where each of the

13  alleged co-conspirators lived in plastic bubbles and never

14  communicated with the other one ever, they could not

15  communicate.  I imagine the defendants would say they have had

16  no opportunity ever to meet with each other.  They never saw

17  each other.  They never communicated with each other.  They

18  never shook hands.  They never exchanged anything.  They

19  couldn't, they're in plastic bubbles; right?

20          So the reason why courts look at opportunity evidence

21  is because it makes it more likely that the other allegations

22  of an agreement are plausible.  We have opportunity evidence

23  where they're regularly meeting, Agri Stats is running

24  conferences, and they're sharing data.

25          I mean, in *American Column & Lumbar*, the Supreme Court

1    says that genuine competitors do not make daily, weekly, and

2    monthly reports of the minutest details of their business to

3    their rivals.  This is not the conduct of competitors, but it's

4    so clearly that of men -- it was men then -- united in

5    agreement, expressed or implied, to act together and pursue a

6    common purpose; right?  They're sharing detailed information

7    about their businesses with their rivals.  They're meeting with

8    them regularly.

9         Defendants themselves admit and agree that one of the

10   things they do with the shared information is use it to control

11   their costs, nationwide presumably because it's a nationwide

12   information sharing agreement, and thereby suppress

13   compensation.

14        Now, to get back to the argument that merely because

15   they are sharing the information through Agri Stats that

16   somehow this is all insulated, that they're not agreeing with

17   each other, that they're only agreeing with Agri Stats, that's

18   just -- that's just putting form over substance; right?

19        I mean, let's say Agri Stats was setting a price for

20   how much growers get paid and setting a price for how much

21   broilers should be selling at, they set the sale price and the

22   grower price.  And all of the defendants agree to join Agri

23   Stats and abide by its prices knowing that everybody else is

24   going to agree to join Agri Stats, to abide by its prices.

25        Would defendant stand up here and argue that's not a

1    cartel because all they're doing is agreeing vertically with

2    Agri Stats in their own unilateral interest to charge the price

3    that Agri Stats has determined based on the information?  Of

4    course not.  Of course that's an illegal cartel.

5         It's the same thing here.  Running the information

6    through Agri Stats doesn't change whether or not the fact that

7    there's reciprocity and a common scheme.  I think that the

8    agreement part of it is very clear.

9         You know, the defendants have said this is a

10   hub-and-spoke conspiracy.  It's not a hub-and-spoke conspiracy.

11   In a hub-and-spoke conspiracy, what's happening is the hub at

12   one level of the market is getting the spokes at another level

13   of the market to help the hub eliminate competition for the

14   hub.

15        So Toys "R" Us, right, that's a traditional hub/spoke

16   conspiracy.  Toys R Us, a powerful toy retailer, says to the

17   manufacturer, toy manufacturers, don't sell to the big-box

18   retailers, my rivals, because that's going to benefit me.  And

19   so all of the toy manufacturers agree with Toys R Us not to

20   sell to Toys R Us' competitors.  That's a hub/spoke conspiracy.

21   There's nothing exchanged between the spokes in Toys R Us and

22   the hub/spoke is for the benefit of the hub.

23        Here, we have the opposite.  The hub itself says --

24   Agri Stats says, the purpose -- my purpose for existing, as we

25   allege in the complaint, is to help the co-conspirators, that's

1    my purpose for existing.  And defendants themselves say they

2    used the shared information to suppress their costs, including

3    grower compensation presumably.  So this is not a hub/spoke.

4    We have direct information going from and to the different

5    spokes.  We have a common understanding between the spokes.

6    The whole purpose of the organization is that they are sharing

7    information with each other.

8         Several of the cases, *Container Corp.* and *SRAM*,

9    basically say that it's the information exchange itself that

10   constitutes the agreement.  So in *Container Corp.*, the Supreme

11   Court says that the proof of the information sharing turned on

12   each competitor radically providing information, quote, with

13   the expectation that it would be furnished reciprocal

14   information when it wanted it.  There's no document to which

15   all of co-conspirators agreed -- in which they agreed to share

16   information.  No.  The agreement was inferred from the

17   reciprocity.

18        Same with *SRAM*.  In *SRAM*, at 902, the court stated that

19   the exchange of price information alone can be sufficient to

20   establish agreement under the Sherman Act.  Plaintiffs need not

21   allege the defendants actually discussed the prices they

22   exchanged.  So that's *SRAM*.

23        So I believe we've established agreement and we've

24   established that the agreement has the potential to be

25   anticompetitive because of the type and character of the

1    information exchanged.

2         One other point about a third party -- that Agri Stats,

3    a third party, being involved.   In both *Lindseed* and *American*

4    *Column & Lumber*, those information exchanges were run by third

5    parties.   There was a third party in both of those cases that

6    organized the information that the information flowed through.

7    And I believe it was in *American Column* that American Column,

8    that organization, that third party, had a manager of

9    statistics who would deal with all the statistics and then

10   disperse it to all of the different member companies.

11        But both of those cases are cases in which third

12   parties were organizing and running the information sharing

13   exchange, just as we have Agri Stats doing here.   They are the

14   -- they are the hub -- they're not a hub in a hub/spoke

15   conspiracy, but they are the vehicle through which information

16   is being exchanged.   But the bottom line is that the defendants

17   are exchanging information.

18        Mr. Harkrider cited the *Intracorp* case from the Tenth

19   Circuit.   Okay.   So that is a case where insurance companies

20   shared information relating to prices charged by chiropractors.

21   First thing to note about that case is that the plaintiffs

22   didn't allege an illegal information sharing agreement.   They

23   did not -- the information sharing was part of what was

24   happening but they did not allege illegal information sharing.

25        Second thing about that is the court observed that the

1    prices being shared were not prices that the insurers were

2    fixing, they were prices that somebody else was charging, the

3    chiropractors.

4            And third, which seemed to be important to the court,

5    was that the ultimate result of what the insurers did with that

6    information is they said that no chiropractor will be

7    reimbursed below the 80th percentile of what all the

8    chiropractors are charging in the region.  What the court noted

9    was, well, that caused a lot of chiropractors actually to make

10    more money because it's at the 80th percentile, and it said

11    basically what they've been finding was instead of being

12    harmed, these chiropractors actually were benefited.  That's

13    what the Tenth Circuit said in that case.  It's not an

14    information sharing case.  It's a case where the information

15    being shared was not the information -- was not being used by

16    the companies.  And the ultimate result, the allegation in the

17    case regarding an agreement to suppress compensation to

18    chiropractors, was that chiropractors were benefited.  So that

19    case is very different.

20            And, in fact, there is no case that defendants have

21    cited in which plaintiffs have alleged information sharing

22    among competitors that was granular, current, and secret in

23    which a court dismissed it.  There's just none.  All of the

24    cases, the Supreme Court cases, the *Todd v. Exxon* case, all of

25    the cases in which there's a similar allegation of information

1   sharing have gone forward after either a motion to dismiss or

2   summary judgment.

3           Let's talk about relevant market.  Now, defendants make

4   their relevant market argument in a footnote in their opening

5   motion, and I guess their claim here now is they thought

6   plaintiffs were arguing a per se case, or putting forward a per

7   se case, so therefore, didn't think they needed to raise the

8   relevant market issue.

9           THE COURT:  In fairness, it was not super clear to

10   me, it wasn't the first time I read the complaint.

11           MR. CRAMER:  I think the answer to that is

12   plaintiffs were being careful.  If the court ultimately decided

13   that what plaintiffs had pled was not per se, plaintiffs wanted

14   to make sure that it would survive the rule of reason, which is

15   a perfectly legitimate thing for plaintiffs to do.  That's why

16   we included allegations, lengthy allegations, related to

17   relevant market and relating to anticompetitive effects.  So

18   those are all in the complaint and they're clearly adequately

19   pled, I believe.

20           THE COURT:  And you'd point to what paragraphs in

21   the complaint relating to the relevant market and

22   anticompetitive effects?

23           MR. CRAMER:  Yes, yes.  So let me talk specifically

24   about the market.

25           So plaintiffs plead a nationwide market for growout

1    services.  Well, first, let me step back and say, it's very

2    rare for a court to dismiss a case on a motion to dismiss

3    because of inadequate relevant market allegations, it almost

4    never happens.  It is almost impossible for -- in this case

5    defendants cite, I think, one case -- they mentioned it

6    today -- in which they say the plaintiffs' market was too

7    broad.  Typically, the cases in which plaintiffs fail on a

8    relevant market, either on a motion to dismiss or summary

9    judgment, is because the defendants say the plaintiffs have

10   tightly gerrymandered their market to exaggerate their market

11   power.

12       Here, weirdly enough, the defendants say, no, no, the

13   market's too broad, we don't actually compete with each other

14   across the country.  I would say that is belied by the

15   allegations in the complaint.

16       First, I would point Your Honor to paragraph 135 of the

17   complaint which directly contradicts some of the things that

18   Mr. Harkrider was saying.  Let's look at paragraph 135.  It

19   says, "Absent the conduct challenged in this Complaint,

20   Integrators would consider each other to be competitors for

21   Broiler Grow Out Services whether Integrators happen to be in

22   the same region or not, given that integrators (a) could open

23   plants in areas where another Integrator (or other Integrators)

24   already exist, and (b) would compete with each other on a

25   nation-wide basis for established Growers or to incentivize

1    potential new Growers to move to areas where Integrators have

2    established Complexes."

3         So plaintiffs have argued that if under the SSNIP test

4    that was raised, right, all that means is that if at one area

5    compensation gets below competitive levels, that people would

6    move to another area.  What we've alleged is in a world absent

7    the "no poach," in a world absent the information sharing,

8    instead of stabilizing prices so that they're all the same,

9    growers very well would compete with each other for the best --

10   not growers -- integrators would compete with each other for

11   the best growers; right?  They're very concerned about who are

12   the good growers that run this tournament system and reward the

13   top growers more within a region than the bottom growers;

14   right?  So they really care about efficient growers.  Well,

15   what's the best way in a world without a cartel to get more

16   efficient growers?  Raise your compensation.

17        THE COURT:  Well, except that they say that those

18   growers have to be within a certain number of miles of their

19   plants or it doesn't work.  So what does it matter if the best

20   grower in the nation wants to come and work for me and they're

21   1300 miles from my processing facility?  I can't use that

22   grower.  That's what they say.

23        MR. CRAMER:  That is true, except that we have a

24   country in which people move.  You don't need everyone to move;

25   right?  You don't need every single grower to move.  In order

1    to have an effect on prices, you need the marginal grower to

2    move; you need a few growers to be willing to say, hey, this

3    area, this integrator seems to be rewarding growers more, I

4    want to open up a second operation 200 miles from here to be

5    near that integrator.

6            THE COURT:  Don't the plaintiffs maintain that about

7    five percent of growers move annually, I think?

8            MR. CRAMER:  Yes.  Now, we also allege that

9    three-quarters of the growers are in areas where there's more

10   than one integrator so there could be movement even within an

11   area.  So you don't have to actually pick up and move your farm

12   or move your farm entirely, you can move within a region or

13   move to another region.

14           THE COURT:  Except that I think that the plaintiffs

15   also maintain in their complaint that that's not a practical

16   thing for most growers to do because of the oppressive cost in

17   investment that's required in the facilities, discrete to each

18   integrator, and then it would be -- not only is it

19   prohibitively expensive to move, they can't even operate where

20   they are now because of the compensation rates.

21           MR. CRAMER:  So that is all true.  We have alleged

22   high barriers to mobility, high barriers to movement, and that

23   tends to be actually a plus factor for the existence of a

24   conspiracy, because if mobility was extremely flexible, then a

25   cartel would work.  In order to make the cartel work, you just

1    need to reduce mobility of a few at the margins.

2          But let me just step back and say, Your Honor, we're

3    having a highly-detailed, economic argument about mobility and

4    whether or not growers would move to a region of high

5    compensation from a region of low compensation; or it doesn't

6    have to be old growers, it could be new growers.  I decide I

7    want to get into the business, where do I go?  I want to go to

8    the place with the high-compensation region as opposed to a

9    low-compensation region.  So it doesn't have to be someone

10   moving; it can be someone deciding, I was on my family farm, I

11   want to start a new farm, where should I do that?  Well, I'm

12   going to do that in a high-compensation region.

13         But, again, this is a factual determination.  This is

14   why courts are loathe to decide relevant market on a complaint

15   on a motion to dismiss.

16         **THE COURT:**  Except that Mr. Harkrider and the

17   defendants would say, this is an important and essential

18   consideration when we're evaluating the plausibility of the "no

19   poach" agreement, and that that question has significant

20   consequences because we only reach relevant market if we don't

21   accept the plausibility of the "no poach" agreement theory.

22         **MR. CRAMER:**  Well, I mean, another -- another point

23   is that -- well, let me make two points.

24         First point is, under Supreme Court law, plaintiffs

25   actually don't need to prove relevant market under the rule of

1    reason; plaintiffs need to prove anticompetitive effect.

2         So if Your Honor looks at *Indiana Federation of*

3    *Dentists,* at 460 to 461, the Supreme Court says that the

4    purpose of market definition is to assess whether the conduct

5    could have an anticompetitive effect.  This is the quote:

6    "Since the purpose of the inquiries into market definition and

7    market power is to determine whether an arrangement has the

8    potential for genuine adverse effects on competition, proof of

9    actual detrimental effect, such as reduction of output, can

10   obviate the need for an inquiry into market power, which is but

11   a surrogate for detrimental effect."

12        So plaintiffs would need to show anticompetitive effect

13   and nationwide effect from a nationwide agreement.  That's what

14   plaintiffs have pled, a nationwide agreement to exchange

15   information and share information, which the defendants have

16   admitted they used to suppress their costs, including

17   presumably grower compensation nationwide.  Plaintiffs have

18   alleged that the base compensation that the defendants used to

19   pay growers tends to be similar across the country in part

20   probably due to the information sharing.  Plaintiffs have pled

21   directly that the challenged conduct reduced grower mobility,

22   suppressed grower compensation, restricted broiler output, and

23   artificially inflated broiler prices nationwide.  So we have

24   direct allegations of anticompetitive effect which would

25   obviate the need to prove relevant market.

1    The next thing I would say about relevant market is

2    whether the market is national or local.  So let's say the

3    fact-finder found that there is no national market, or there's

4    only a national market with respect to the information sharing,

5    but there's regional markets with respect to "no poach."  That

6    wouldn't mean the case wouldn't go forward.  Plaintiffs would

7    need to show various different agreements in different regions

8    and that those agreements had an effect in those regions;

9    right?

10    I mean, it doesn't -- the fact that there may be eight

11    markets or ten markets or thirty markets doesn't change the

12    validity of the case.  It obviously makes it more complicated.

13    Plaintiffs believe there's a national market.  Plaintiffs

14    believe we have proved a national effect.  Plaintiffs believe

15    that these integrators in different regions have an effect on

16    each other and ultimately compete with each other for grower

17    services.  But that's -- you know, yes, their mobility is low

18    but it's not zero.  There is mobility and growers compete and

19    they would compete much, much more in a "but for" world absent

20    the information sharing which reduces incentives to move

21    because they're all stabilizing their compensation and the "no

22    poach" which reduces the ability to move.

23    THE COURT:  Did I understand you to say in that

24    exchange -- this is where I'm handicapped, I think, because of

25    the nature of the briefing and the evolution of this issue in

1    the papers and without any independent expertise in this

2    area -- but I think I understood you just to say, well, we

3    don't really need to plead the relevant market under the

4    relevant theories, we just need to say there's a market and

5    then later we'll prove it up.  That's what I thought you said.

6    You haven't pled regional markets.  You've only pled a national

7    market, one single, relevant national market.

8            MR. CRAMER:  Right.  But we've pled -- the whole

9    purpose of pleading -- the purpose of a relevant market and the

10   reason why one is defined is not in Section 1, right, there's

11   no relevant market in Section 1.  The reason why you define a

12   relevant market is, as the Supreme Court said in *Indiana*

13   *Federation of Dentists*, to help prove detrimental effects.  And

14   what we've pled are detrimental effects directly from a

15   nationwide agreement so that obviates the need for relevant

16   market entirely.

17           THE COURT:  You don't think there's a notice issue

18   in the pleading identifying the relevant -- I mean, what

19   happens when we get the expert reports and you're talking about

20   a different market that the defendants thought they were going

21   to conduct discovery about because it wasn't mentioned in the

22   complaint?

23           MR. CRAMER:  Well --

24           THE COURT:  What happens when the expert report

25   comes talking about regional markets and impacts in regional

1    markets, and the defendants say, we didn't conduct any

2    discovery about that because you pled a national market?

3              MR. CRAMER:   Yes.   Though, Your Honor, what

4    defendants are going to argue -- they've already started

5    arguing -- is that there are regional markets and they will

6    make that argument.   All their discovery will focus on proving

7    that there's no national markets; in fact, there's a bunch of

8    regional markets, and our discovery will try to get to the

9    truth.   If the truth is what we allege, what we believe, is

10   that there's a national market, that's what our economist will

11   say.   If the truth is that there's eight regional markets and

12   they have market power in each market, then that's what our

13   expert will say.

14             But the bottom line is, if defendants have used

15   information sharing and "no poach" to suppress the compensation

16   of growers and anticompetitive effect -- and defendants have

17   admitted they did -- and we can prove it, then that obviates

18   the need to prove a relevant market entirely under Supreme

19   Court law.

20             THE COURT:   All right.

21             MR. CRAMER:   But that's what I would say.   This

22   case, if it goes forward, one of the issues that discovery will

23   be taken about is the nature of the relevant market.   I imagine

24   we're going to have a big dispute about it.   I don't think it's

25   a notice issue.   They know what their defenses are.

1          Let me address --

2              THE COURT:   I invited you at the beginning of that

3     exchange to identify -- maybe this is unfair on the fly, but

4     maybe one of your colleagues can take a moment and focus on

5     this -- I invited you to identify the specific paragraphs in

6     the complaint that you would point to in support of your

7     relevant market allegations and anticompetitive effect

8     allegations but we can come back to that.

9              MR. CRAMER:   No.   The complaint, I think, helpfully

10    has captions to that effect.   So I would look at page 30,

11    paragraph 129 -- or right above that there's a caption that

12    says "Relevant Market and Monopsony Power."   So I would point

13    Your Honor to 129 through the end of that section, 136, and

14    then there's a -- on page 32, there's a caption,

15    "Anticompetitive Effects and Injury Suffered by Class Members,"

16    and that runs from 137 all the way to 154.

17         Now, I wouldn't say that that's exclusive.   There are

18    probably other things in the complaint that relate both to

19    relevant market and anticompetitive effects, but the purpose of

20    those sections was to lay out what we thought as our

21    allegations on those points.

22         All right.   Let me say a word about procompetitive

23    justifications and then I'll talk about "no poach."   On

24    procompetitive justifications -- I think I've addressed it

25    mostly -- but the defendants claim that the reason why

1    companies exchange information through information sharing,

2    organizations like Agri Stats, is to benchmark and to help them

3    be more efficient and that is certainly true in some cases.

4    I've explained why there's a test to look at those kinds of

5    cases, where it tends towards the anticompetitive as opposed to

6    procompetitive, whether it's current or historical, whether

7    it's granular or aggregated and averaged, and whether it's

8    secret or public, right, and all of those checkmarks go in

9    plaintiffs' favor.

10             But the other thing I would say about that is, again,

11   come back to defendants' admission.  They admit that one of the

12   things they used the information for is to suppress their

13   costs.  One major cost of theirs is the growers.  That's an

14   anticompetitive effect, not a procompetitive effect.

15             I'd finally say that to the extent that balancing of

16   anticompetitive effect and procompetitive effect need to happen

17   in this case, the motion to dismiss is not the appropriate time

18   for that balancing act to occur.

19             THE COURT:  Will you say that last part one more

20   time, please?

21             MR. CRAMER:  That to the extent that there will be

22   balancing between procompetitive and anticompetitive effects,

23   which is part of what the court or the fact-finder will do in a

24   rule of reason case, that is for the fact-finder or later on

25   summary judgment to see whether plaintiffs have established

1    that anticompetitive effects, to the extent they exist, exceed

2    procompetitive effects.

3              THE COURT:  And is one of those questions going to

4    be whether -- I mean, the defendants, for example, cite

5    secondary sources, I think journal articles or the like, about

6    the procompetitive effects of benchmarking and other things.

7    And will a question here be how the defendants use the

8    information that they get from Agri Stats?

9              MR. CRAMER:  Yes.  That will be a big part of what

10   the economists and fact-finding will get to, how is the

11   information used.  Is it simply aggregated and used to make

12   them more efficient?  Or is it more towards what plaintiffs are

13   saying, that they're essentially using it to stabilize prices

14   that they pay the growers for broilers?  That will be part of

15   what this case is about, a big part of what this case is about.

16             Let me talk for a minute about "no poach."  I know Your

17   Honor feels, and the defendants have argued, that there are no

18   direct allegations of a "no poach" agreement but Your Honor did

19   mention at the outset that there is paragraph 80 which I think

20   is important.  Because in paragraph 80, plaintiffs plead that

21   an employee of a co-conspirator, Peco, told a Tyson grower that

22   he could not be hired due to a no-hire agreement between those

23   companies.  Just like that fact pattern where we have a "no

24   poach" agreement, in the context of paragraphs 81 through 84,

25   where plaintiffs allege multiple growers and industry observers

1    have learned that once you work for one there's a brick wall

2    and you can't work for another, and in the context of an

3    information sharing agreement these companies are sharing

4    detailed information about each other, and in the context of an

5    industry where they're moving from one company to the other,

6    meeting regularly, and in the context of a situation where

7    plaintiffs have alleged that as a result of the "no poach"

8    agreement there is less mobility than there otherwise would be;

9    right?

10              So we don't have to prove that there's no mobility and

11   no movement.  What we have to prove is to the extent that there

12   is an effect, that that effect comes from the agreement.

13   Plaintiffs plead in paragraph 85 that as a result of the

14   cartel's "no poach" agreement, growers very rarely switch

15   integrators.

16              So plaintiffs have pled -- in effect, plaintiffs have

17   pled direct evidence of at least one agreement, plaintiffs have

18   pled industry observers' awareness of a broader set of

19   agreements, and have plaintiffs have pled circumstantial

20   evidence, including the information sharing itself, that lends

21   more plausibility to a broader "no poach" agreement among all

22   of the defendants.

23              THE COURT:  So let's talk for a moment about how to

24   apply *Twombly* to an allegation like the one contained in

25   paragraph 80 of the complaint.

1         So paragraph 80 you've just directed us to, this is the

2    discussion about the phone call with what's alleged to be a

3    secretary at Peco.  So I'm instructed to assume the truth of

4    the allegations in the complaint at this stage, but what that

5    means here, I think, in this context is, I assume that that

6    conversation happened.  But it's not evidence of an agreement

7    between the integrators, is it?  Even if I assume the truth of

8    the statement, the words themselves, that there was such a

9    phone call and somebody said that thing, is that evidence?  Do

10   I then go the additional step under *Twombly* and say, well, and

11   then I conclude that the thing that was said was also true?

12        MR. CRAMER:  Well, I think that in this instance,

13   the circumstances of the conversation would require you, I

14   think, to assume that both the thing was said and that the

15   thing was true.

16        THE COURT:  I think that's not a helpful argument

17   for you, is it?  Because if we look at the circumstances in

18   which the statement was made, there are none.  We have no idea

19   who's made the -- expressed those thoughts, when, in what

20   context, what information that person had.  We can't -- there's

21   nothing about the statement we can evaluate except that it was

22   made.

23        MR. CRAMER:  Fair enough.  Fair enough.  We would

24   have to bring the person, the grower, who made the call or the

25   secretary who made the statement into court and they'd have to

1    testify and there would have to be an assessment of credibility

2    of the two witnesses, but that can't be done on a motion to

3    dismiss.

4         One thing I would draw your attention on this point of

5    Your Honor to is the Tenth Circuit's *Champagne Metals* case

6    because there's a similar colloquy in that case that the court

7    relies upon.  So in *Champagne Metals*, you have this plaintiff

8    upstart aluminum distributor, and it alleges that the

9    established distributors have told all of the mills, the wood

10   mills, that the distributors need -- or aluminum mills that the

11   distributors need -- that if any of the mills deal with this

12   renegade, new, upstart distributor, there will be a group

13   boycott of the mills.

14        So what's the evidence of that?  The sole piece of

15   evidence that the Tenth Circuit says allows this case to go

16   forward is testimony of a third-party mill operator who said, I

17   got a phone call from one established distributor who said to

18   me that if I deal with this plaintiff upstart distributor, the

19   other unnamed, unspoken distributors will not do business with

20   you.

21        I think that's similar; right?  We don't -- we can't

22   assess the credibility of the people involved.  We don't know

23   who those other distributors were.  We don't know whether the

24   distributor on the phone call was exaggerating for effect.  We

25   don't know any of that.  But the Tenth Circuit says, yeah,

1    there's hearsay and there's lack of specificity as to the

2    identity of the co-conspirators but the court said that's

3    direct evidence of a group boycott.  I think that that is

4    instructive for a similar kind of allegation here.

5             THE COURT:  So is the answer that you think that the

6    way to apply *Twombly* to an allegation like this in a complaint

7    is to assume both the fact that the statement was made and

8    assume the truth of the representation or statement when

9    applying that *Twombly* analysis to decide what allegations are

10   going to survive to be evaluated for plausibility?

11            MR. CRAMER:  I think that the -- I think that the

12   only caveat -- the answer to that is yes, with a caveat.  The

13   caveat would be if there were reasons to disbelieve the

14   statement, right, if the statement about an agreement just made

15   no sense, right, or was out of character, or there was some

16   facts and circumstances about the statement that an objective

17   observer reading would say, now that can't be, that doesn't

18   make sense in light of everything else the plaintiff have pled.

19            But here, that's --

20            THE COURT:  I've understood *Twombly* to tell us --

21   the point of *Twombly*, I think, is -- that's not so.  But one of

22   the points that I extract from *Twombly* is that we don't want

23   judges just exercising independent decision-making about what

24   weight to give allegations in the complaint.

25            MR. CRAMER:  Well, *Twombly* explicitly says it's not

1   a probability requirement; right?  The judge doesn't have to

2   determine that plaintiffs are probably right, just that they've

3   made a plausible claim.

4          It would be weird for a secretary of a company to admit

5   an illegal cartel agreement on the phone to a grower.  Now, I

6   guess that can be cut both ways.  But it sounds like there was

7   an agreement, otherwise why would she say it?

8              THE COURT:  Well, this is one thing that I have

9   studied or written on a bit in another case.  But, I mean, it's

10  the claim that has to be plausible, not the fact that's

11  alleged.  But that requires -- gosh, doesn't -- I don't know

12  what to do with this.

13         I've said in other contexts, if there's a fact alleged

14  and the fact itself seems implausible at the Rule 12 stage, you

15  just accept the fact, you don't engage in some probability

16  about the existence of a fact that's asserted, that's a Rule 11

17  issue.

18             MR. CRAMER:  Right.

19             THE COURT:  But I don't know what to -- this

20  statement is just as easily explained by a misunderstanding or

21  miscommunication or anything else as it is to be what it

22  purports to be.

23         How do I -- how does that fit in the analysis?  Is it

24  not just given much weight in my mind when I'm evaluating the

25  plausibility of the claim in view of all the allegations

1    together?

2             MR. CRAMER:  Well, again, Your Honor doesn't --

3             THE COURT:  What if the allegation was I was walking

4    from the cafeteria to a conference room and I overheard two

5    people in another room and heard this statement?  We just

6    assume that there's a conspiracy between -- an agreement

7    between the companies because a statement was overheard by an

8    unattributable person outside the context of a specific

9    conversation?

10            MR. CRAMER:  I think the further away you get from

11   the participants in the conversation, the less likely it is

12   that what the person heard actually reflects the conversation.

13            But in the context of this case, where paragraphs 81

14   through 84 elaborate on the observations of industry observers

15   in government reports talking to the government or

16   investigating these things and saying, look, it just appears

17   like there's this unwritten rule that one integrator won't hire

18   a grower from another integrator, there's a grower who moved

19   into a region knowing that there was a bunch of integrators in

20   that region and he said, I just can't move, they won't let me,

21   and even when I want to at this point, Your Honor, I think that

22   the plaintiffs should be able to get discovery as to that

23   point.

24            Now, I think if Your Honor rules the way that you were

25   leaning, I think we'd be able to get discovery as to that and

1     at some point, at summary judgment or trial, defendants will

2     seek to refute it.

3            I agree with Your Honor, just to double back to the

4     point that was made earlier, that on a 12(b)(6) motion the

5     question is whether plaintiffs have stated a claim for relief.

6     Plaintiffs have two claims here, a Section 1 claim and a

7     Packers and Stockyards Act claim.  If plaintiffs have set forth

8     any set of facts that allow the Section 1 claim to move

9     forward, then the Section 1 claim should move forward and then

10    the question about what discovery should be and the limits to

11    discovery is a secondary issue.

12            THE COURT:  So here's the flip side of that issue in

13    my mind.  Let's go to our trade secret analogy again.  I like

14    that better than contract which we mentioned first.

15            Suppose a plaintiff pleads a viable trade secret theft

16    claim on the basis of product formulation and then throws in

17    the complaint wholly unsupported allegations about customer

18    lists.  For the purpose of engaging in discovery about customer

19    lists, is that permissible?  And remember, we're applying a

20    different Rule 26 standard now than we used to apply so it is a

21    little bit more narrow.

22            But when is the right time to have that discussion

23    about what is the proper scope of discovery?  Can you just bake

24    into a case discovery on issues that wouldn't stand alone

25    because you embed them in a claim that is otherwise viable on a

1    completely different basis?

2              MR. CRAMER:  Well, I think in your --

3              THE COURT:  I'm not saying that's what's done here.

4    I'm just asking the question.

5              MR. CRAMER:  Right, right.  But your hypothetical

6    implies some nefarious intent or nefarious purpose, and I think

7    there would have to be good evidence of that.

8         I mean, here, plaintiffs have alleged a wage

9    suppression scheme that the defendants have used two things to

10   do.  One, information share and reduce the incentives of

11   parties moving because you're going to stabilize all the

12   compensation; and two, in order to make sure there's very

13   little movement, even though we've shared information and

14   suppressed compensation, we're going -- and equalized

15   compensation, stabilized it -- we're going to prevent growers

16   from going from one integrator to the other.  So there's a

17   synergy between the two claims.  It's not two completely

18   unrelated things, they're related.

19             THE COURT:  That's the argument the plaintiffs are

20   advancing, right.

21             MR. CRAMER:  And I think when you're making two

22   related claims about the same entities dealing with the same

23   group of plaintiffs and class members that affects the

24   compensation of those class members in a similar way

25   presumably, I think that it makes sense.

1    I mean, in fact, a lot of discovery -- the way that my

2    opposing counsel described the discovery about Agri Stats was a

3    little too crimped; right?  Plaintiffs are going to be taking

4    broader discovery than, what did you give to Agri Stats and

5    what does that data look like?  We're going to want much more

6    information about what they talked about when they talked about

7    the data, what they talked about when they got together, what

8    other agreements do they have about the growers.  That's all

9    related to the information; right?  It all flows from the

10   information that they're getting.

11   We can stage discovery, right, we don't have to get it

12   all at once.  But once we start getting information relating to

13   communications between the co-conspirators -- the alleged

14   co-conspirators and the defendants, and if those communications

15   start turning up "no poach" agreements or other kinds of

16   agreements, then that becomes part of the case.

17        THE COURT:  My guess is that Mr. Harkrider would

18   agree with the last thing you said, and what I suspect he'd say

19   is, well, then come back and see the court when you get

20   evidence that somebody said, let's have an agreement, I won't

21   poach your growers, you don't poach mine, then let's have

22   discovery on it, but until there's some evidence to support

23   that theory, let's not spend years discovering it.

24        But I don't know that you answered my question directly

25   and I think I complicated it because I suggested some bad

1   intent --

2            MR. CRAMER:  Right.

3            THE COURT:   -- baking in a theory for a purpose.

4   Let's forget the purpose.  Let's just say it's there.  I mean,

5   the point here that I'm trying -- I pressed Mr. Harkrider on

6   the unfairness to the plaintiffs.  Let's press you on the

7   unfairness to the defendants.

8            In that trade secret theory case, why do I get all of

9   the defendants' confidential customer information because I've

10  made a wholly conclusory allegation in a claim that will

11  otherwise survive on a different basis, product formulation?

12  And the defendants say, wow, that is extremely valuable and

13  confidential, sensitive information and there's no basis to get

14  it to you.  You can't prevail on that theory, and if it was the

15  only one you advanced, your claim would have failed.

16           What's the right tool in the toolbox?  What's the right

17  rule in which to have this discussion?  Is it Rule 26?  Is it

18  Rule 12?  56?

19           MR. CRAMER:  So I think it's not Rule 12.  I think

20  -- look, I don't want to give my opposing counsel ideas, but

21  I've seen motions to strike allegations in complaints.  I've

22  seen a motion to strike class allegations in complaints.  Now,

23  typically they're not granted for various reasons, like there

24  could be a Rule 11 motion.  I don't think there's any basis for

25  it.  But there are various ways to deal with what a defendant

1    believes are improper or not well-pled parts of a complaint but

2    Rule 12 isn't it.   Rule 12 just asks whether plaintiffs have

3    stated a claim for relief.

4                **THE COURT:**   So suppose this case moves forward and I

5    make a referral to a magistrate judge to resolve nondispositive

6    motions in the case in a manner I hope that's consistent with

7    the local practice here.   The parties chose this forum for a

8    reason, and you ought not have to deal with different

9    approaches in different courts.

10            How does the magistrate judge go about evaluating what

11   to do with the discovery requests for information about a "no

12   poach" agreement, if I haven't made some ruling about it?   It's

13   liability.   It's in the case.   They look at the complaint, the

14   magistrate judge does, and sees that there's an allegation

15   about it, and the parties argue about whether it's going to be

16   helpful or not.   But don't those arguments essentially boil

17   down to what we're talking about today, whether that theory is

18   actionable?   Do I have to answer that question in connection

19   with this motion?

20               **MR. CRAMER:**   I don't think you do, Your Honor.

21   First of all, the discovery can be staged.   For example,

22   plaintiffs could seek discovery of the specific agreement

23   alleged in paragraph 80.   It could start there and maybe some

24   other overarching discovery about communications between all of

25   the co-conspirators relating to the data or relating to

1    growers; right?  We're going to want communications -- if these

2    guys -- if these defendants are talking to each other about

3    growers, that's relevant to information sharing.  It may also

4    be relevant to "no poach."  If, as a result of getting

5    communications between rivals about growers, more information

6    comes in regarding "no poach," plaintiffs should be able to

7    develop that further.  But, again, it can be staged.

8           We can start with paragraph 80.  We can start with

9    general discovery of communications between defendants about

10   growers and the data that's being shared and the industry

11   generally and it can be taken from there.

12          THE COURT:  All right.

13          MR. CRAMER:  So I think that's all I had, unless

14   Your Honor had other items that you would like me to address.

15   I guess I would say one other thing about "no poach."  I would

16   point Your Honor to a couple of cases.

17          In the *Dentists* case, for example, there was good

18   evidence about "no poach" between two of the defendants in that

19   case -- and I'm in that case -- but not against the third.  The

20   court let it go forward because there was good evidence about

21   one, and in the context of the rest of the case the court let

22   the "no poach" go against the third.

23          Or the *High-Tech* case, yeah, there were written

24   agreements between -- six bilateral agreements between the

25   defendants there, but what the court let go forward was an

1    overarching agreement that was not in writing based upon

2    circumstantial evidence.  So there is -- there is precedent for

3    allowing a "no poach" to go forward in the context of broader

4    claims of anticompetitive conduct is what I would say.

5           And with that, unless Your Honor has further

6    questions --

7           THE COURT:  Give me one moment, would you?

8           MR. CRAMER:  Of course.

9           THE COURT:  Okay.  I think I will have some

10   follow-up but let's reserve that for a moment.

11          And why don't we hear quickly in rebuttal, if there is

12   some, and then why don't we take up the arbitration issue,

13   which I think is more narrow than this one.

14          Mr. Harkrider.

15          MR. HARKRIDER:  Hi again.  I'll try and be brief.

16          First, I just want to address the issue briefly on

17   information exchange with respect to the allegations in the

18   complaint.  They point to paragraph 121 and paragraph 77.  The

19   one thing that is missing in both of those is an allegation

20   that they actually discussed grower compensation at those

21   meetings.  Paragraph 121 says, "Agri Stats hosts regulator

22   'poultry outlook conferences' for Integrators' executives,

23   including an April 23, 2015, conference in Atlanta, Georgia."

24   Nowhere does it say that they're talking about grower

25   compensation.  They could have been talking about anything at

1    that meeting.

2          The same defect is true in paragraph 77, where they say

3    that CEO's have access to each other's production complexes,

4    they talk with each other, there's a Chicken Media Summit.

5    Fine.   But nowhere does it say that they're talking about

6    grower compensation.

7          And so, you know, the reason that matters is because --

8    and I know I'm not necessarily winning this point -- but the

9    one key distinguishing factor between this case and the other

10   cases is the absence of direct communications -- or allegations

11   of direct, credible, specific allegations of direct

12   communications between defendants with respect to Agri Stats.

13   All there is is an allegation that people are subscribing to

14   Agri Stats, plus a lot of opportunities for people to meet

15   together.   Certainly, they might have alleged, for instance,

16   that people were talking about Agri Stats or grower

17   compensation at those meetings but they did not.

18          If you look at *Lindseed* and *American Column,* both of

19   those cases involve direct meetings between defendants talking

20   about communications.   In *American Column,* there are weekly

21   meetings.   In *Lindseed*, there's a requirement that you have to

22   meet and discuss the information or you will actually be fined.

23          And then one quick point on *Intracorp.*   What is being

24   disclosed is the prices being charged by the chiropractors.

25   That seems competitively sensitive.   There's a recommendation

1   that is actually absent from this case that you shouldn't

2   charge above a certain amount; in that case, 80 percent.  Sure,

3   will some people potentially go up to 80 percent?  Fine.  But

4   what about those people who are in the 85th percentile?  90th

5   percentile?  95th percentile?

6          And so simply put, we're not aware of and he still has

7   not -- or counsel has not alleged any case that involves purely

8   vertical agreements between -- between -- between companies and

9   a third-party service without actual allegations with respect

10  to the various defendants.

11         I will grant you that there are hub-and-spokes, there

12  are lots of different hub-and-spokes out there, and Toys R Us

13  is a totally different category.  But *Total Benefits* talks

14  about what is entirely missing in that case -- and that's why

15  they dismiss it -- is that there is no -- all there are are

16  these vertical relationships, there is no rim connecting

17  everything.

18         **THE COURT:**  And Mr. Cramer says that the defendants

19  have not identified a case where each of the three *Todd* factors

20  are satisfied and a court dismisses the case at a Rule 12

21  stage.

22         **MR. HARKRIDER:**  I think *Intracorp* -- I actually

23  think -- well, so *Intracorp* is, you know, with all transparency

24  actually a summary judgment case, it's not a motion to dismiss.

25  Although, I think in this case that actually cuts in our favor

1    because after all the discovery they still don't have it,

2    meaning that -- it's unclear, I guess, a little bit what was

3    actually alleged in the complaint to be fair.  But in

4    *Intracorp*, they are exchanging -- it's price information that's

5    sensitive, it's current information that's sensitive.  So I

6    would say that those factors are met.

7         And there are a lot of other cases out there, *Maple*

8    *Flooring*, etcetera, that are dealing with exchanges of

9    information that are found to be procompetitive.

10        **THE COURT:**  I just wonder -- I guess I already asked

11   you this question and I heard your response, but it seems to me

12   that the devil's in the details, that these arrangements are

13   not inherently unlawful or anticompetitive but that they could

14   rise to that level in the correct circumstances.

15        **MR. HARKRIDER:**  Right.  Which actually takes us to

16   the next point, which is whether this is such a circumstance.

17        And so I think if you look at paragraph 169 of the

18   complaint, they allege that this scheme is a per se violation

19   of the Sherman Antitrust Act, which might have been why we were

20   all confused as to whether we should or should not say

21   something about the rule of reason.

22        We do think that there are cases out there -- I think

23   *Petroleum Products* might be one of those cases in the Ninth

24   Circuit at the district, I think -- that deals with whether you

25   should be striking sort of allegations with respect to claims

1  that are -- you know, if -- we should at the very least not be

2  allowing this claim to, you know, go forward on a per se basis

3  because rule of reason does seem to be the operative procedure

4  here.

5          And I think with respect to whether this is --

6          THE COURT:   Will that depend on whether or not I

7  ultimately conclude the "no poach" agreement is plausibly pled?

8          MR. HARKRIDER:   Yes, absolutely.   And I'll get to

9  that in a minute.   You're absolutely -- you're absolutely

10  correct.

11          And so, you know, let's look at what's being alleged

12  with respect to market definition to see whether it does

13  satisfy, you know, the plausibility standard of relevant

14  market.   My opponent says, well, you know, integrators could

15  pick up and move to where the growers are or growers could pick

16  up and move to where the integrators are.   The problem with

17  that is that they actually plead the opposite.   They plead

18  specifically that the integrators in part because -- I'm sorry,

19  not the integrators -- but the growers in part because they're

20  in so much debt are unable to move, that they are not able to

21  act in a manner that is responsive to demand and to prices.

22  And, again, the obligation to build the houses and the

23  obligation to build the houses to specifications, that costs

24  them a lot of money.   Nowhere is that alleged to be part of a

25  conspiracy; that's unilateral conduct.

1          And so in paragraph 90, they allege, I believe, the

2     integrators -- that there are high barriers to entry for the

3     integrators, and so it wouldn't make sense that the integrators

4     would move to another part of the country where growers would

5     be.

6          And in paragraph 133, they allege that the growers have

7     high barriers to entry so it doesn't make sense that the

8     growers would move to other parts of the country.

9               THE COURT:   So this conversation started a few steps

10    in front of me --

11              MR. HARKRIDER:   Yes.

12              THE COURT:   -- to begin with because of the

13    briefing.   In your reply brief arguing relevant geographic

14    market --

15              MR. HARKRIDER:   Correct.

16              THE COURT:   -- you cite to the *Cinema Village*

17    *Cinemart* case from the Second Circuit.

18              MR. HARKRIDER:   Uh-huh.

19              THE COURT:   You cite us to a district court case out

20    of Texas.

21              MR. HARKRIDER:   Uh-huh.

22              THE COURT:   There's a footnote citation to a Fifth

23    Circuit case, and then there's a citation to a district court

24    decision out of Kansas.

25              MR. HARKRIDER:   Correct.

 1              THE COURT:   I guess my question is what case you
 2      would point us to, if any, for controlling authority in the
 3      Tenth Circuit about the pleading requirement for a relevant
 4      market, if you know one, if there's a Tenth Circuit case that
 5      talks about it; and if not, are these the cases that you think
 6      control?
 7              MR. HARKRIDER:   So I think probably two separate
 8      points.   First is that I can certainly point you to authority
 9      that you need to allege a relevant market under a -- under a --
10      under a rule of reason case.   I think that's actually sort of
11      black letter law.
12              THE COURT:   Let's assume that's true.   You say that
13      -- I mean, there is a relevant market pled here.
14              MR. HARKRIDER:   Right.   But it needs to be a
15      plausible relevant market.   And so --
16              THE COURT:   How do I evaluate that in the Tenth
17      Circuit?
18              MR. HARKRIDER:   Okay.   So I think you evaluate that
19      based upon the actual allegations that they've pled and take
20      them for the truth of what they've pled.   What they've pled
21      repeatedly are local networks, they've pled that you can only
22      switch if you have somebody close by, they've pled that there
23      are high barriers to entry for both the growers and the
24      integrators, and they've pled that the growers will not switch
25      in response to changes in price.   All of those allegations,

1   plus, in fact, the fact that there are two or three other cases

2   out there that directly deal with the issue of, you know, how

3   local is this market, plus I think you can almost take -- I

4   don't want to say take judicial notice of the fact that it's

5   probably hard to, you know, transport poultry across the United

6   States.  It just -- I think all of that, plus *Twombly* in some

7   sense on the question of just plausibility, is it plausible

8   that there is a nationwide market for poultry, you know, for

9   growout services.

10          THE COURT:  If the case proceeds, your expert will

11   likely -- on this point will likely be an economist?

12          MR. HARKRIDER:  Yes, I believe so.  Correct.

13          THE COURT:  And I suspect the plaintiffs will have

14   an economist who will have a different view.  And so at a Rule

15   12 stage, am I supposed to act as an economist and make a

16   judgment about what's plausible and not plausible?

17          MR. HARKRIDER:  Right.  So imagine, for instance,

18   that they had alleged that the market was the state of Oklahoma

19   or that it was three counties, and we said no, no, no, Your

20   Honor, it's five counties; or it's not all of Oklahoma, it's

21   part of Oklahoma.  I think you would be absolutely correct.

22          I think if what you're talking about is, you know, two

23   facially plausible market definitions, sure, that is a factual

24   question.  But if you're talking about a market definition that

25   is implausible on its face -- I think that's the *Drake v. Cox*

1    *Communications* case, which is dealing with local PSA

2    announcements.   Obviously local PSA announcements are not

3    national, there's no national market for that.

4           THE COURT:   Okay.

5           MR. HARKRIDER:   And so I think we're not asking you

6    to act as an economist.   We're simply saying that the test we

7    all agree upon is that in response to a price change, will

8    somebody go to another part of the country?   That is

9    implausible on its face given the allegations of the complaint,

10   including the allegation that people will not move in response

11   to press changes where they're in so much debt.

12          So I think you can -- I think at the -- of course,

13   there are going to be factual questions and close cases and

14   that is absolutely correctly not on a motion to dismiss, but

15   this is not a close question.

16          THE COURT:   And for the authority, the standard,

17   that applies here, you've given me the cases I should rely on?

18          MR. HARKRIDER:   Yes.   Yes, I believe so.

19          THE COURT:   Okay.   And Mr. Cramer's argument --

20   Mr. Cramer's argument that here they need not even plead a

21   relevant market because of the anticompetitive effects?

22          MR. HARKRIDER:   Yes.   So, first of all, *Campfield*,

23   which is 532 F.3d 1111, is a Tenth Circuit case just saying

24   that you need to have rule -- a relevant market in a rule of

25   reason case, just to get that point out there.   That was one of

1    the first points I made.

2         Okay.  Moving to the issue of proof of actual -- or

3    allegations of actual anticompetitive effect, I would suggest

4    we again look at the allegation in the complaint which I think

5    is a governing document.  And their allegation, I believe, in

6    151 is that since 2000 the inflation-adjusted market price of

7    broilers has grown while the share has fallen, and then they

8    say that in 2007 it's been a significant downward trend.  They

9    don't actually allege that the trend has accelerated.  They

10   simply say -- and it would actually follow and makes sense if

11   it's been falling since 1980, it's probably continuing to fall.

12        If you look at these allegations -- for example, in

13   paragraph 152, they say that in the Oklahoma State University

14   budget for growers published in 2006 shows negative annual

15   returns between 1990 and 2009.  So if they're going to say that

16   it's tough being a grower, I'm sure it's tough being a grower.

17   If they want to say that prices have fallen since 1980, I'm

18   sure -- I'm going to take these allegations as true.  If

19   they're going to say that between 1999 and 2009, that there

20   have been declines in grower compensation or negative operating

21   margins, however they want to characterize it, I'm sure that's

22   all true.

23        But the two things that are really missing here are,

24   first of all, because they failed to allege that there was a

25   change -- a specific date on which the information sharing

1    occurred -- you know, started, if it started in 2008, how are

2    you connecting these changes to something that happened in 1980

3    or things that happened between 1999 and 2009?  There needs to

4    be an allegation of actual anticompetitive effect.

5         I would suggest that it should look something like *In

6    re Text Messages,* which says that we met on this day and then,

7    you know, there was a dramatic increase -- there was a meeting

8    on a certain day and then a dramatic increase in the prices

9    thereafter.  That's what's missing here.  What they're showing

10   are trends that occurred -- that started beforehand and

11   continued afterwards, but what they're not showing is that

12   there's a break in those trends.

13        I think that that's very different than the dental case

14   which was, among other things, a quick-look boycott case where

15   they're actually talking about the fact that insurers couldn't

16   get X-rays.  I mean, there's a policy that said you can't get

17   X-rays, and then after the adoption of the policy that said you

18   couldn't get X-rays, you couldn't get X-rays.  I think that's

19   very different than saying, you know, for the last 30 years

20   people haven't been able to get X-rays, and then there was an

21   agreement five years ago and you still can't get X-rays.  Okay.

22   But you have to show some plausible connection, some nexus,

23   between the alleged anticompetitive impact and the actual

24   conduct.

25        That's why I kept on pressing, you know, for example,

1    Your Honor when you were saying, well, in paragraph 80 with

2    respect to *Peco*, when did this actually occur?  You don't know

3    when it occurred.  Well, what else you don't know what occurred

4    is you don't know when the agreement occurred with respect to

5    information sharing.  Was it 2008?  Was it 2007?  Was it 2006?

6    Was it 2012?  We don't know.  We know it was somewhere around

7    2008 maybe, maybe before, but we don't know exactly when.

8         And so the point I'm trying to make is, especially if

9    you're going to say, you know what, I don't need to define a

10   relevant market, I just need to have impact, okay, then tie the

11   impact to the actual event, show that there was -- or allege

12   that there was some break, some change, you know, as a result

13   of -- as a result of the behavior.

14        I think that that's actually, you know, what's almost

15   entirely missing in this case is a specific date.  Just like in

16   *Peco*, we don't know the what, the where, and the when.  We

17   don't know, you know, was this between Tyson and Peco and

18   wherever that secretary was?  And where was that secretary, you

19   know, what district?  You know, if you're going to take the

20   truth of the matter asserted, you still don't know exactly

21   where it was or who else was in that agreement.  You don't know

22   if it was, you know, for a year.  You don't know if it was at a

23   specific, you know, point in time.  So I think if you map that

24   over to what's actually missing in the information exchange, I

25   think that that's -- I think that that's quite telling.

1    There are cases that hold, in fact, that if you're

2    going to be relying upon changes in conduct, you need to tie --

3    you need to not only know what happens after, but you need to

4    know what happens before.  You need to show that there's

5    actually, you know, essentially a break in behavior.  That is,

6    I think, you know, what's actually missing here.

7    I just want to take a quick moment on this broad

8    discovery point.  So, first of all, I'm not against the

9    proposal that you actually correctly telegraphed that I would

10   not be against, which is that they -- if the information

11   sharing goes forward, they should go forward in information

12   sharing, and if something that they learn suggests that there's

13   something with respect to "no poach," then maybe they can go

14   after "no poach."  But we should at least start and everything

15   should be contained to information sharing.

16   I don't think we should underestimate how broad the

17   potential discovery is with respect to "no poach" because it

18   takes you to every part of the country to ask not only what

19   were the switching rates, but who switched, when they switched,

20   why they switched.  It's a highly individualized inquiry that's

21   very fundamentally different than maybe I'm trying to cabin in

22   information sharing and maybe inappropriately.  But certainly

23   the information sharing through Agri Stats is about what you

24   shared with Agri Stats and what that impact was on the

25   marketplace.  Those are fundamentally -- you know, those are

1    fundamentally different -- you know, fundamentally different

2    inquiries.

3           So I guess that might be what I wanted to say, other

4    than the fact that in paragraph 166 they specifically allege,

5    you know, essentially two different -- you know, two different

6    agreements, it's "no poach" and it's information sharing.

7    That's paragraph 166.

8           So the idea that Your Honor could issue an opinion

9    saying, okay, 166(a), you know, can go forward but 166(b)

10   cannot; or, frankly, that this is a rule of reason and all

11   they've alleged is per se and so Count 1 is gone, you know,

12   would both be fine with us, if one wanted to go forward with

13   information sharing, which we think is facially defective

14   because of a lack of specific allegations that defendants met

15   and discussed, lack of specific allegations that after the date

16   that it occurred that there were price changes, and lack of

17   specific allegations as to relevant market, all three of which

18   are independently fatal defects.

19           THE COURT:  Thank you, Mr. Harkrider.

20           Mr. Cramer, briefly in response.  Go ahead.

21           MR. CRAMER:  Yeah, briefly there were a couple

22   points that I just wanted to hit.

23           A point that Mr. Harkrider made repeatedly is that

24   plaintiffs, I assume in any antitrust case, cannot show any

25   competitive effect or an effect of the conduct unless they can

1    show some kind of market shift, some kind of market change

2    after the conduct was alleged to have been initiated.

3            Now, I would submit that certainly it makes causation

4    proof easier if there's a market shift.  But believe me, if

5    plaintiffs were up here putting up an economist and argued

6    there was a market shift, it was around the time of the

7    anticompetitive behavior, therefore, there's causation, these

8    guys would get up and object and they'd put up an economist who

9    would say what?  He would say, no, no, you need to run a

10   regression to show causation.  There are all kinds of other

11   things going on and you need to rule out all those other causal

12   factors.  In order to prove causation in any antitrust case,

13   you almost always need a regression.

14           And what would plaintiffs do here?  They would run a

15   regression to show that the information sharing had an effect

16   on suppressing compensation of growers.

17           Now, the defendants say we didn't allege an effect.  We

18   did allege an effect.  We alleged that as a result of the

19   information sharing and other conduct alleged in the complaint,

20   the growers' compensation was lower.  In fact, as I pointed

21   out, and it was not responded to, not only did we allege it, it

22   was admitted.  The defendants don't deny that they take the

23   information gathered nationally, used nationally to suppress

24   their costs, to lower their costs, major costs of which being

25   grower pay, grower compensation.

 1           The question about causation is not actual versus

 2    actual; it's actual versus "but for."  We have an actual world

 3    with the actual conduct and the actual pay and then we need to

 4    look at the "but for" world.  Without the bad conduct, what is

 5    the pay?  And what plaintiffs allege and will prove is that

 6    absent the illegal -- allegedly illegal information sharing and

 7    other illegal conduct, including "no poach," that grower

 8    compensation would be higher but that takes economic analysis.

 9    Certainly we've alleged enough in the complaint to make that

10    plausible.  There's no case that says one needs to demonstrate

11    or allege a change in behavior after the conduct.

12           Plus, think about it.  Here, we have conduct that went

13    on for a long time.  We don't actually know how long it went.

14    What that would mean is that if one discovers anticompetitive

15    conduct that has been going on for a long time and either

16    inflating prices or suppressing compensation for a long time,

17    and we don't know when it began and it hasn't yet ended, I

18    assume the defendants would say, well, then there's just no way

19    to prove harm because you can't show a change.

20           The point is, there are ways that we can show change,

21    there are ways that we will show change, and we certainly

22    alleged an anticompetitive effect here.

23           Second point I would make on the relevant market, we

24    certainly alleged and pled a relevant market.  I think there

25    were some discussion of the SSNIP test, which is small but

1    significant increase in price -- non-transitory increase in

2    price, and in this context it would be a decrease in price.

3    Basically what that means is that if a defendant in a market --

4    if a company in a market can suppress compensation a small

5    amount below competitive levels for a significant period of

6    time and that would cause people to move to some other company,

7    then both of those companies are in the same market.  If one

8    can suppress prices below competitive levels and it would not

9    cause people to move, then that second company is not in the

10   market.  It's just a test, an economic test, to see whether two

11   companies are in the same market.

12         And yes, it's true, plaintiffs allege that mobility is

13   difficult due to all the things that plaintiffs allege in the

14   case.  But, number one, it's not impossible, it's reduced, it's

15   suppressed as a result of the "no poach" plaintiffs allege.

16         Paragraph 135 is a good example of that.  Plaintiffs

17   allege that absent the "no poach" and absent the information

18   sharing, there would be mobility and movement if the defendants

19   attempted to suppress compensation below competitive levels, a

20   SSNIP, people would move.  That's the allegation.

21         And second, we don't need necessarily people to move.

22   We just need new people to decide to move into areas with high

23   compensation.  I've never been a farmer before.  I've lived on

24   my family farm.  I want to start a farm.  I'm going to start my

25   farm where there's high compensation, not low compensation;

1    right?  And if those -- if that's an economic fact and there is

2    no cartel, then companies in different regions, integrators in

3    different regions, would compete over grower services,

4    especially for those they think that will be good growers, and

5    pay more in those regions.  That would prove a national market.

6            If may be that there are regional submarkets that

7    operate as regional submarkets and if you control the regional

8    market that can allow you to suppress compensation; but if you

9    expand it to include nationally, you can suppress compensation

10   further.  So you could have regional submarkets and a national

11   market.  You can have a lot of power regionally.  That could

12   give you power to suppress compensation.  And then if you

13   expand it even further, that could give you power to suppress

14   competition even further.  That would prove regional markets

15   and national markets.  But, again, the complaint has been pled

16   sufficiently to allow for either result but certainly for the

17   pled national market.

18           The defendants, one case that they've cited -- they

19   have one case -- that a court dismissed because the market was

20   alleged to be too broad, the *Drake v. Cox Communications* case.

21   That's the only one.  Every other case they cite, if the case

22   was dismissed for some reason on relevant market, was because

23   the plaintiffs gerrymandered and tried to make the market too

24   narrow.

25           What is the *Drake v. Cox Communications* case?  It is a

1   per se antitrust case in which the court said that nowhere in

2   Drake's many pages of complaint, response, and unauthorized

3   sur-replies is there any intelligible definition of the

4   relevant market within which Cox and the Ad Council has

5   supposedly acquired monopoly power.

6       So you have -- the only case that they're relying on

7   that we've heard both in the rebuttal and in their first speech

8   is a per se case in which the plaintiff didn't really even

9   define a market at all, let alone a relevant market, that

10  complied with the pleading standards.  So that case, I don't

11  think, can tell us very much.

12      And then the final thing I would say on information

13  sharing agreements and the discussion of what it takes to show

14  an agreement among competitors to share information, what I

15  would point -- and my opposing counsel's argument that in

16  *Lindseed* and some of the other cases there is evidence that was

17  discussed in those cases because, after all, most of those

18  cases are post-trial or post-summary judgment, not motion to

19  dismiss cases.  But there's evidence in those cases that the

20  information that was being shared, in particular the prices,

21  were being discussed at those meetings.  Okay.  So that is

22  true.

23      But I would say, number one, here we're at the

24  complaint stage and plaintiffs have alleged meetings that Agri

25  Stats organizes.  It's certainly a fair inference at this stage

1    that the kinds of information that Agri Stats is distributing

2    is being discussed at Agri Stats meetings and the other

3    meetings that are being held.  That is a fair inference.  I

4    think that should be drawn at this stage.

5         And then, secondly, even if they never met and even if

6    they never talked about the information, remember, the courts

7    have said that it's the exchange of information itself that

8    constitutes the agreement.  *SRAM* said that.  *Container Corp.*

9    said that.  They don't have to talk about it.  If I give

10   information expecting to get my rival's sensitive internal

11   information in return, that's an agreement, end of story.

12        I think that's all I had to say, Your Honor, unless you

13   have any further questions.

14             THE COURT:  I don't but that's helpful.  Thank you.

15             MR. CRAMER:   Thank you.

16             THE COURT:  I know we're going to keep marching

17   today, but you've all figured out from last time you should

18   bring snacks in your bags.  Let's take a few minutes, let's

19   take ten more minutes, and come back and hear about

20   arbitration.  Thank you.

21                       *(Short break)*

22             THE COURT:  Immediately upon returning to Salt Lake,

23   I'm going to have stairs installed at our courts so that you

24   can leap up the stairs into the courtroom.  It feels momentous.

25        All right.  That was super helpful, if it was long.

1    Let's take up the arbitration issue, much more briefly, I

2    think.  I think the beginning and end of the arbitration

3    discussion might be the effective vindication doctrine.  It

4    looks to me like we have a valid arbitration agreement.  I

5    don't see that the 2017 addendum does anything to affect the

6    validity of the underlying agreement.  It's not clear to me

7    but -- I mean, it's a question of contract interpretation.  It

8    appears to me that the arbitration language itself does not

9    address these kinds of claims.  But even if it does, and

10   assuming that the arbitration provision is otherwise valid, I

11   don't see how it survives the effective vindication doctrine.

12        It seems to me the Fourth Circuit case that the

13   defendant, Perdue, relies on is distinguishable.  I thought it

14   was -- it seemed important to me that in the papers Perdue

15   didn't address what I thought is the core of the problem

16   here -- and it was squarely presented by the plaintiffs in

17   their papers -- this arbitration provision eliminates the

18   availability of injunctive relief, punitive damages, and

19   attorneys' fees, and those are significant.  This isn't the

20   Fourth Circuit case, where there were restrictions on the

21   discovery that might be available or the statute of limitations

22   issue which might affect the award of damages that would

23   otherwise be available.

24        I mean, here, this agreement prohibits any injunctive

25   relief in the arbitration and the statute says you can get it,

1   and the same with treble damages.  It seems to me Perdue cites

2   no authority, not a case that we could find, where an

3   arbitration provision with those restrictions in this context

4   survived.

5       But assuming I'm wrong about all of that and that the

6   arbitration provision does apply, it's unclear to me what we do

7   about it here.  I mean, it seems that the relief that Perdue is

8   requesting is untethered to the result it would yield from the

9   invocation of the arbitration agreement.  I don't see how it

10  means that Perdue is suddenly out of the case or entitled to a

11  stay case-wide.  I mean, the claims are going to move forward.

12  There are other growers who claim they've been hurt by Perdue

13  for reasons having nothing to do with any contractual

14  relationship and vice versa.

15      There's a management issue in my mind.  Theoretically,

16  hypothetically, we could have a thousand parallel arbitrations

17  moving on discrete similar claims and have all the core claims

18  here still moving forward with all the same parties, and I

19  don't think that's -- I don't think that's what anybody wants.

20      So let me invite you, Mr. Gordon, if you wish, to

21  address those issues since it's not a helpful at least initial

22  orientation.

23          MR. GORDON:  Thank you, Your Honor.  I think there

24  is a solution to the problems that you identified.  I think the

25  solution that is sort of required by the validity of the

1    arbitration agreement and the procedural posture in which we

2    find ourselves is that Nancy Butler cannot proceed with claims

3    against Perdue.  I think that's important because it upholds

4    the validity of the arbitration agreement and it also is

5    important for the context of this case because it goes to our

6    suitability as a class representative.  It could go -- and I

7    think because of the nature of the discussion we just had, this

8    seems to be a case where you could end up with multiple classes

9    because of local geographic markets.  Because of the effect

10   from the information sharing agreement, if that's the basis we

11   go on, the compensation paid to various categories of growers

12   could be something where you need multiple classes or

13   subclasses.  The fact that she's waived her --

14              THE COURT:  Contract claims.

15              MR. GORDON:  No.  I think she could proceed with her

16   statutory claims as well.  I mean, the arbitration clause says

17   statutory claims.

18              THE COURT:  Okay.

19              MR. GORDON:  And she's also waived her ability to

20   proceed as a class plaintiff, and Judge Payne in this court has

21   upheld those kinds of provisions.

22              So it seems to me the sensible way to proceed, based on

23   the issues you've raised, is to block, strike, dismiss her

24   claim as to Perdue, allow her to proceed otherwise.  When we

25   get to class cert, we'll have to figure out what that means on

1    the effective vindication doctrine, if she's allowed to proceed

2    against the other defendants, the ability to obtain injunctive

3    relief -- I mean, if she wasn't in the case, the court could

4    issue an injunction against Perdue so I don't think the

5    effective vindication doctrine alters that.  Same thing for

6    attorneys' fees and damages.  But I do think it goes very much

7    to her --

8                    THE COURT:  Wait.  Pause.  I'm sorry.

9                    MR. GORDON:  Yes.

10                   THE COURT:  I want to make sure I understood what

11   you just said.

12           Did you just say that the effective vindication

13   doctrine doesn't bar Perdue's application -- or invocation of

14   this arbitration agreement with her because other plaintiffs

15   not named Butler can get that relief, injunctive relief?

16                   MR. GORDON:  The concern of the effective

17   vindication doctrine is that a plaintiff's ability to pursue a

18   statutory remedy is blocked.  That's the purpose of that.

19                   THE COURT:  Is to ensure that it's not you mean?

20                   MR. GORDON:  That the statutory right is not

21   blocked.

22                   THE COURT:  Right.

23                   MR. GORDON:  Right.  Ms. Butler's ability to obtain

24   statutory relief against other defendants is not blocked based

25   on --

1       THE COURT:  Is there a single case, that you're

2   aware of, where the ability to obtain that relief against a

3   third party prevents the invocation of the effective

4   vindication doctrine with respect to the party who's invoking

5   the arbitration?

6       MR. GORDON:  There are certainly cases, Your Honor,

7   where the courts -- and we've cited them -- where the court

8   excised certain claims and directed those to arbitration.  And

9   if Ms. Butler wants to proceed against, you know, Perdue in

10  arbitration, she could do so.  And she could also proceed

11  here --

12      THE COURT:  No.  Is the point -- I'm sorry.  Maybe I

13  misunderstood what you said.

14      The fact that Ms. Butler could get injunctive relief

15  against Tyson, say, means that she -- the effective vindication

16  doctrine doesn't apply here with Perdue?

17      MR. GORDON:  Unless Your Honor is going to stay the

18  whole case or dismiss the whole case -- I mean, Mr. Haff, who

19  is not a Perdue grower, is going to proceed in this case and he

20  will be able to obtain, if the court determines it necessary,

21  injunctive relief as to Perdue so that --

22      THE COURT:  So the point that somebody else, who may

23  or may not pursue the claim on her behalf, could obtain the

24  same relief or related relief means that we shouldn't apply the

25  effective vindication doctrine?  Is there a single case that

1    you're aware of where a court has relied on that?

2          MR. GORDON:  The concerns -- there are -- as I said,

3    there are cases where the court has excised certain claims to

4    arbitration and allowed the class-action proceedings to

5    continue as to others.  And that sounds like that's where

6    you're headed here.  I.

7          Think that Ms. Butler's rights in that instance would

8    be vindicated.  I mean, her statutory entitlement to injunctive

9    relief will not be stopped if she cannot proceed against

10   Perdue, but I think it may go to her ability to serve as a

11   class representative and I think that's important.

12         THE COURT:  I'm sorry if I'm being dunce.  I think I

13   understand what you've now twice told me, and I agree that

14   there are cases where courts separate claims and some go to

15   arbitration and some remain viable in a case.

16         I'm asking, is there a single case, that you're aware

17   of, where a court has said, oh, we don't worry about your

18   effective vindication of your statutory rights because you may

19   end up with that same thing because somebody else is going to

20   go get it for you?

21         MR. GORDON:  I am not aware of a case having to deal

22   with that issue.  I'm not aware of a case sort of getting teed

23   up in the circumstances we find here as well.

24         THE COURT:  Let's suppose for a moment

25   hypothetically that's not an available theory.  Is an

1   arbitration agreement that expressly prohibits the availability

2   of injunctive relief, is that an issue under the effective

3   vindication doctrine where the statute expressly says you can

4   get it?

5          MR. GORDON:   Your Honor, in *Italian Colors* and

6   *Concepcion*, I mean, the Supreme Court in both those instances

7   found that the fact that a claim might not be worth pursuing

8   individually, not in a class context or not having all the

9   remedies available in a court proceeding, did not mean that the

10  statutory right was blocked and that the statutory right could

11  not be effectively vindicated.

12         THE COURT:   What about injunctive relief?

13         MR. GORDON:   Well, an arbitrator can never have the

14  power to order the same means a federal district court judge

15  does.   I mean, they could -- so, I mean, I think that's always

16  the case when you've got arbitration.

17         THE COURT:   I'm not sure about that.   I wondered

18  about that, thought about it in preparation for this hearing

19  because the arbitration award is usually presented in federal

20  court for approval and invocation and enforcement.

21         But there can't be any injunctive relief here available

22  to Ms. Butler at all, here, there, or anywhere, under your

23  agreement that doesn't -- and the statute expressly provides

24  for that right.   So is that -- is that a statutory right that

25  Perdue's taken off the table?

 1          MR. GORDON:   To the extent that the court finds that

 2    is -- that right, that procedural right, is necessary to

 3    vindicate the substantive right -- and I would argue that it's

 4    not -- but to the extent that the court finds that it is, the

 5    court can excise that portion from the arbitration agreement.

 6          THE COURT:   I should modify the agreement?

 7          MR. GORDON:   There is a savings clause in the

 8    agreement, and we've cited a bunch of cases where the courts

 9    have done that.

10          THE COURT:   And what about attorneys' fees?  How

11    about treble damages?  The Fourth Circuit case talks a little

12    bit about damages and whether that is sufficient, but treble

13    damages serves a different purpose under the statute.  It's

14    available to Ms. Butler but it serves a bigger purpose.  It's

15    not available here under the arbitration agreement.

16          Is that an issue under the effective vindication

17    doctrine?

18          MR. GORDON:   In *Italian Colors*, Justice Scalia calls

19    out that the treble damages provision is something that might

20    be saved or is something that might be an issue.

21          So, again, as to, in this instance, that is something

22    that the court could -- I don't think it needs to.  I think

23    it's a procedural right.  I mean, the Sherman Act is

24    independent of the Clayton Act.  The Sherman Act, which is the

25    substantive right to be vindicated, is independent of the

1   Clayton Act which provides for treble damages and attorneys'

2   fees.

3            THE COURT:   So you mentioned a moment ago this

4   difference between substantive and procedural rights and you

5   suggested that injunctive relief is a procedural right.   So

6   what is it that you think would be a substantive right?

7            MR. GORDON:   The claim.   I mean --

8            THE COURT:   That's it; right?

9            MR. GORDON:   That is the substantive right.

10           THE COURT:   So why are there other cases talking

11  about these other issues if they're not even at issue in the

12  effective vindication doctrine?

13           MR. GORDON:   I think a lot of those issues arise

14  from the facts of those cases.   Several of the effective

15  vindication doctrine cases were payday loan cases or involving

16  Indian tribes.   The *BMO Harris* case, for example, where the

17  choice of law provision, which would seem like a procedural

18  issue, essentially vitiated the plaintiff's claims because the

19  choice of law provision provided that the choice of law would

20  be tribal law which wiped away truth in lending -- the Truth In

21  Lending Act and state usury laws, so that essentially the

22  choice of law provision substantively, which would, again, seem

23  to be a procedural right, vitiated the ability for the

24  plaintiff there to vindicate her rights.

25           MR. CRAMER:   Is injunctive relief an equitable

1   remedy?

2              MR. GORDON:  Yes.

3              THE COURT:  Why do we think that the language in the

4   arbitration provision in the contract applies to these claims?

5   What section of the agreement will we turn to for Ms. Butler to

6   vindicate her claim that Perdue engaged in a conspiracy to

7   suppress grower compensation?

8              MR. GORDON:  The agreement on its face says all

9   claims, including statutory claims.

10              THE COURT:  Well, it says two different things,

11  doesn't it?  I mean, I really think the -- one of the issues

12  that I think is at the forefront of this discussion is what to

13  do with the language in Section VI and the language in Section

14  VII which I read to be different.

15              MR. GORDON:  Are you talking about VII or --

16              THE COURT:  Yeah, VII-B.  You like that language,

17  right?

18              MR. GORDON:  I do.

19              THE COURT:  Because that is everything between us at

20  all times here and forever forward and it's like marriage.

21  But --

22              MR. GORDON:  A noble institution.

23              THE COURT:  -- doesn't that have to be read in

24  concert with Section VI and VI-A?  VI-A seems like it -- and

25  both parts of VI-A in its face -- in fact, the opening

1    sentence -- says that the procedures we're about to talk about

2    apply in this section and Section VII below, and then there's

3    language that follows that is tensioned with the language in

4    VII-B.  It's a legal question.  How do we resolve that tension?

5              MR. GORDON:  I don't see the tension.  I think the

6    agreement contemplates certain, I would call, sort of

7    ministerial disputes being resolved, you know, through

8    consultation with the flock adviser and circumstances like

9    that.  But the arbitration provision, I think, you know,

10   contemplates more grievous, more serious disputes being

11   resolved through an arbitration proceeding.

12             THE COURT:  So let's read together for a minute.

13             Section VI styled "Complaint Resolution Procedure":

14   "The procedures in this Section VI and Section VII below shall

15   govern any and all complaints or disputes between Perdue and

16   the producer arising out of, as a consequence of, for or by

17   reason of, resulting from, or relating in any way to the

18   formation, execution, performance, termination, revocation,

19   cancellation, or expiration of this agreement."

20             Do the plaintiffs' claims in this case fall within the

21   scope of that language?

22             MR. GORDON:  I don't think they do, Your Honor, and

23   that's why we didn't invoke it.

24             THE COURT:  Okay.  So I don't think they do either.

25             MR. GORDON:  Okay.

1    THE COURT:  So then what do we do with the language

2    that's at the beginning of that paragraph, that the procedures

3    in this section and the one that follows shall govern and then

4    the description about to what Section VI and Section VII will

5    apply?

6         MR. GORDON:  I think for agreements that arise out

7    of the contract that are suited to the procedures set forth in

8    Section VI that would apply, that is not what we're here about.

9    We're here about a statutory claim.  The language in Section

10   VII says that it's not limited to claims arising out of the

11   contract.

12        THE COURT:  Right, right.  Section VII-B has that

13   parenthetical.

14        MR. GORDON:  Correct.

15        THE COURT:  What do you make of that, that it's in

16   parentheses?

17        MR. GORDON:  I mean, I think that's drafted to try

18   and add clarity.

19        THE COURT:  Okay.  And what about the opening clause

20   of Section B, "except as provided herein"?  So Section VI is

21   provided herein in the agreement, that language we just read

22   describing the procedures that would apply to both Section VI

23   and Section VII?

24        MR. GORDON:  Correct.

25        THE COURT:  So that clause, "except as provided

1    herein," does it not reach back to Section VI?

2         MR. GORDON:  I think it does, to the extent that a

3    claim under -- where a claim arises out of the contract and

4    would be governed by the procedures in Section VI.  I think

5    it's easy to read them consistently, not inconsistently.

6         So, in other words, Section VI would deal with claims

7    arising out of the contract.  Section VI and VII deal with

8    claims arising out of the contract.  Section VII deals with

9    claims that do not arise out of the contract.

10        THE COURT:  And that would be clear to any grower, I

11   guess, reading this agreement?

12        MR. GORDON:  Well, the other issue, though, Your

13   Honor, is that Ms. Butler had the opportunity to opt not to

14   follow these procedures.  I don't think any of the cases that

15   the plaintiffs have cited here dealt with the situation where

16   the person who was challenging the arbitration provision had

17   such a clear and obvious means of opting in or opting out.

18   It's not a situation where she had 30 days to opt out

19   afterwards and she forgot about it.  I mean, it was presented

20   take option A or option B, and she took option A and that

21   choice should be respected.

22        THE COURT:  So I think what you're saying -- I think

23   I understand.  Your position is, Ms. Butler's claims in this

24   case have nothing to do with this contract but they're barred

25   by Section VII-B?

1          MR. GORDON:   They are barred by the arbitration

2     provision, correct, Your Honor.

3          THE COURT:   There's no -- in a breach of contract

4     case with Perdue, Ms. Butler wouldn't go looking somewhere in

5     the contract for the contractual obligation that Perdue

6     breached?

7          MR. GORDON:   I'm not sure I follow you on that one,

8     Your Honor.

9          THE COURT:   I think I know the answer to that

10    question.   I'm piling on.   You answered the question when I

11    asked you about the scope of Section VI.   Your answer and mine

12    are the same.

13         MR. GORDON:   Okay.

14         THE COURT:   I think her claims don't fall within

15    VI-A.

16         MR. GORDON:   No.   I think if you look at the Tenth

17    Circuit opinion in the cable television box litigation, where

18    the court enforced a provision in the Internet services

19    agreement to deal with a complaint about cable boxes, the

20    plaintiffs' complaints predated the execution of the Internet

21    services agreement and the equitable complaint wasn't about

22    Internet services, it was about the cable box.   But because the

23    clause there was brought, as it is here, the Tenth Circuit

24    enforced that provision, even though the claim predated the

25    execution of that service agreement and was beyond the

1    agreement in which it was contained.

2           THE COURT:   Okay.  I think I understand and I think

3    we've touched on all three of the main points that I had hoped

4    to visit with you about.   Is there anything more that you

5    wanted to tell us about the arbitration provision?

6           MR. GORDON:   I do think it's important to enforce

7    the provision as to Ms. Butler's claims against Perdue and her

8    ability to serve as a class plaintiff as to Perdue.  I mean,

9    she had a choice to waive those and she did.  For the reasons

10   we discussed earlier, I think the effective vindication

11   doctrine really doesn't come into play here because she'll have

12   the ability to vindicate her statutory rights but I think it

13   does go to her adequacy as a class representative.

14          THE COURT:   How many growers have agreements with

15   arbitration provisions like this with the integrators; do you

16   know?

17          MR. GORDON:   About 60 percent.

18          THE COURT:   And how similar do you think the

19   arbitration provision language is in those agreements?

20          MR. GORDON:   Very.

21          THE COURT:   All right.   Thank you.

22          MR. GORDON:   Thank you.

23          THE COURT:   Ms. Coolidge.  So Section VI and Section

24   VII-B should just be read in harmony together and one applies

25   to the procedures and disputes that arise under the contract

1    and the other bars everything else for time and eternity and

2    that's okay, and so there's no problem, and Ms. Butler can get

3    vindication of all her statutory rights through other

4    plaintiffs or other defendants?

5         MS. COOLIDGE:  So for your first point, Your Honor,

6    it's not that clear to me that the dispute resolution

7    procedures don't apply.  The last clause that wasn't read in

8    the court is saying, "or any provision, including, but not

9    limited to, all common law, equitable and/or statutory claims."

10         So it seems to me that Perdue was thinking any dispute

11   first starts with complaint resolution with someone who's

12   specialized in the grower industry and then it goes to

13   arbitration as sort of an escalation up from that.

14         THE COURT:  But that clause -- I'm sorry to

15   interrupt -- that clause, the "including, but not limited to,"

16   isn't that a narrowing of the general language that precedes

17   it?  So we already know from the language above that we're only

18   talking about claims that are a consequence of, or resulting

19   from, or relating in any way to the contract included.  So that

20   word "including" doesn't expand the earlier clause, does it?

21         MS. COOLIDGE:  No, Your Honor, it wouldn't.  It's a

22   fair reading.  I'm not sure that it matters for these

23   circumstances.  I think what matters is what Your Honor started

24   with, which is the arbitration clause isn't enforceable because

25   it is a prospective waiver of Ms. Butler's statutory rights,

1    and in particular, her right to equitable relief, her right to

2    treble damages.  I am also unaware of any case that held that

3    because somebody else can vindicate your rights for you, that

4    means the effective vindication doctrine doesn't apply to your

5    claims.

6            THE COURT:  Why are the attorneys' fees provisions

7    and treble damages provisions at least not more like the Fourth

8    Circuit case?  I mean, why isn't that really just a question

9    about the availability of damages?

10           MS. COOLIDGE:  In *Italian Colors*, Justice Scalia

11   specifically cited to the fact that, you know, it may be okay

12   to prevent a plaintiff from leading a class-action, but treble

13   damages are an important and endemic right within the Sherman

14   Act, the Clayton Act for private parties to be able to seek

15   those rights and those couldn't be waived.  I think it's just

16   the same as the injunctive relief.

17           Perdue's arbitration clause purports to take any

18   ability for Ms. Butler to actually obtain relief under the

19   antitrust laws that Congress set forth for her to do so and

20   eliminates those rights prospectively and illegally.

21           THE COURT:  Could the parties contractually agree --

22   let's set aside for the moment the question of these claims

23   proceeding in arbitration.  Let's suppose they're in court.

24   Could the parties contractually agree that as between them

25   neither will maintain an action to seek recovery of attorneys'

135

1    fees or treble damages or injunctive relief for any reason?

2          MS. COOLIDGE:  I don't think so, not if it

3    eliminates a statutory right.  I think the case law is quite

4    clear, both at the Supreme Court level and in multiple cases

5    and in the Tenth Circuit, that there are certain rights that

6    cannot be waived prospectively and you cannot say, I hereby

7    forego the rights Congress has given to me.

8          THE COURT:  If the arbitration provision applies to

9    Ms. Butler's claims in this case, where does that leave us?

10   What relief is Perdue entitled to?

11         MS. COOLIDGE:  Not much.  Each of the other class

12   representatives will continue their claims against Perdue,

13   Ms. Butler would continue her claims against the other

14   defendants, and so not much will have changed except for

15   potentially some wording around who Ms. Butler purports to

16   represent and who she can bring her claim on behalf of -- or

17   against.  I'm sorry.

18         THE COURT:  Mr. Gordon says that if we enforce the

19   arbitration provisions, at a minimum she can't be -- she's not

20   a suitable class representative because she can't maintain the

21   class claims at least as against one of the defendants.  What

22   say you?

23         MS. COOLIDGE:  I think that's an issue for the class

24   certification stage, whether she has claims typical of other

25   class members.  It's not uncommon to have class representatives

1    represent different parts of a case.  Sometimes you see that

2    someone who -- in a price-fixing case, someone who is no longer

3    purchasing a price-fixed product doesn't represent an

4    injunction class, just represents the damages class, and vice

5    versa.  So it's certainly not an issue for a motion to dismiss.

6            THE COURT:  Imagine a world in which this case goes

7    to trial -- it's a glorious world -- and at the conclusion of

8    that case, though, just imagine hypothetically a jury verdict

9    in favor of the plaintiffs and imagine that there are numerous

10   plaintiffs who can maintain actions against some defendants but

11   not others by virtue of these arbitration provisions.  How are

12   the damages assessed among the defendants in that scenario, do

13   you think?

14           MS. COOLIDGE:  Assessed -- so it's joint and several

15   liability against each of the defendants so each of them is

16   liable for one hundred percent of the damages award.  So do you

17   mean how they would work it out amongst themselves at the end?

18           THE COURT:  No, that's what I meant, that part.  And

19   then is there a restriction on the plaintiffs' participation in

20   the recovery that gets divvied up if one is barred from some

21   portion of the pool because there's an arbitration provision

22   that barred assertion of the claim against one of the

23   defendants?

24           I mean, my question is, suppose Perdue prevails on this

25   motion and we get 8,000 more motions for 8,000 more plaintiffs

1    and they're all granted.  Does it make any difference in the

2    damages that are rewarded or recovered or received by the

3    plaintiffs if they prevail on every claim?

4         MS. COOLIDGE:  I don't think that it would because

5    each plaintiff is required -- is authorized to get one hundred

6    percent times three of his or her damages and it doesn't matter

7    where those damages are coming from.  So I don't know why it

8    would make a difference.

9         THE COURT:  Okay.  Otherwise, I thought the

10   arguments were well-developed in the papers.  I don't have any

11   other questions for you right now.

12        MS. COOLIDGE:  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Mr. Gordon, how do you see that last series of

15   questions I put to Mrs. Coolidge?  Does anything in this case

16   change practically unless possibly the class certification and

17   subclasses, if we get that far?

18        MR. GORDON:  I think it depends on how the

19   plaintiffs end up proving their damages.  I would expect that

20   the damages might be unique to each of the integrators, that --

21   let's assume they prove an agreement and they prove that it has

22   some effect.  I would expect that the effect might be different

23   for Tyson's group of growers than a Perdue group of growers,

24   that the "but for" world for the conspiracy would be different

25   for them and you would end up with subclasses so that the

1   damages that any group of growers might achieve would depend on

2   who their integrator was and I think you end up with classes to

3   that effect.  So it does tie back to classes.

4          But the fact that Ms. Butler, and perhaps many others,

5   either agreed to arbitrate and also agreed to waive the right

6   to proceed as a class plaintiff does go to both class cert

7   issues, class construction issues, and damages that they might

8   be able to recover.

9          **THE COURT:**  It was a short exchange that I had with

10  Ms. Coolidge.  Is there anything more that you wish to add in

11  view of that?

12         **MR. GORDON:**  Not at this time.

13         **THE COURT:**  All right.  Thank you.

14              *(Discussion held off the record)*

15         **THE COURT:**  All right.  Thank you, counsel.  Why

16  don't we -- why don't we end where we began.  I am going to

17  take these motions under advisement.  We will issue a written

18  decision and I don't think it will be, I suspect -- though I

19  can't promise this -- it will be in the next several weeks.  I

20  think we continue marching while we wait to see how the land

21  eventually settles.

22         But I think, Ms. Coolidge, you and I talked at the

23  beginning of the hearing about whether we need some amendment.

24  Is there a motion from the plaintiff or do you wish to submit a

25  motion?  How do you think we should proceed?

1        If we were proceeding in Utah, I know what the local

2   rule would require, and that is the filing of a motion for

3   leave to file an amended complaint attaching the proposed

4   amended complaint as an exhibit so that everyone could evaluate

5   it and we'd all be talking about the same thing, and then if

6   there was a specific objection, we'd receive it and we would

7   know what we need to take up before the complaint's lodged.

8   That seems to me a good mechanism for doing this, but I don't

9   know if the local rule here requires something different.

10       **MS. COOLIDGE:**  We agree that that procedure would

11  make plenty of sense here.  Our preference would be to make

12  that motion once the motion to dismiss has been decided so we

13  understand the full scope.

14       **THE COURT:**  That seems right to me.

15       Anybody on this side of the courtroom disagree with

16  that?  I mean, let's do this one time and let's make sure we're

17  always directing our comments at an operative complaint, if

18  there is one; and if there's not one, then it's a different

19  motion.  I think that makes good sense.

20       I'm going to put our housekeeping burden on all of you

21  to keep track of deadlines instead of me in case I forget to

22  include this in an order.  So I think what I'll propose is that

23  a motion, if there is one, any motion for leave to amend the

24  complaint, should be filed within 30 days of the court's

25  disposition of the motions we heard argued today and should

1    include attached to that motion a copy of the proposed amended

2    complaint.  I don't know how best to do this.  I don't -- I

3    don't know where we're going to be at that point but I'd be

4    surprised if anybody has anything to hide.  I don't expect

5    surprises in the complaint given the bankruptcy issue we're

6    dealing with.

7            Let me encourage you to consider at least attaching a

8    red-line version or e-mailing one to the defendants or

9    something so everybody can see what's different.  It's a long

10   complaint and let's just make it as easy to figure -- in fact,

11   why don't you just attach it to the complaint so I can see it

12   too, if that's agreeable.

13           All right.  What else do we need to take up while we're

14   here today?  Anything more, counsel?

15           **MR. CRAMER:**  I guess, Your Honor, the only other

16   issue is there's a stay of discovery in place.  Does Your Honor

17   want to maintain the stay until the motions are decided or do

18   we want to move forward with 26(f) conferences?

19           **THE COURT:**  I think we should understand what we're

20   dealing with, if we're dealing with anything, before we get

21   into discovery.  That's where I was when I decided the motion

22   in the first instance.  I really don't think it will be very

23   long, I hope within the next several weeks.

24           But along that line, let me just anticipate another

25   motion that might be forthcoming.  I don't know what the JPML

1   will do.  I don't know -- nor do I control it nor do I care

2   really, but we have this case and so we'll proceed.  So once

3   this set of motions is decided, assuming there's a complaint in

4   place and we're moving forward, then we're moving forward.

5   There won't be a stay while we wait on an MDL proceeding

6   irrespective of how these motions are decided.

7            MR. CRAMER:  Fair enough.  Thank you.

8            THE COURT:  Thank you.  All right.  Anything for the

9   defendants, Mr. Harkrider?

10           MR. HARKRIDER:  No.  Other than thank you very much.

11           THE COURT:  All right.  Counsel, once again, thank

12   you so much for your patience and your argument today and your

13   excellent briefing.  We really enjoy our time with all of you.

14   We'll be in recess.

15                  *(The proceedings were concluded)*

16

17

18

19

20

21

22

23

24

25

*C E R T I F I C A T E*

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 25th day of April 2018.

s/ Brian P. Neil
_____
*Brian P. Neil, RMR-CRR*
*United States Court Reporter*