# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER LITIGATION<br><br>This Document Relates To All Cases | Case No. 6:17-cv-00033-RJS<br>The Honorable Robert J. Shelby<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' CORRECTED SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS** |

**I.       INTRODUCTION**

Defendants'[1] belated attempt to attack Plaintiffs' detailed relevant geographic market allegations fails for three main reasons. ***First***, the Consolidated Amended Complaint ("CAC") sufficiently alleges a relevant geographic market, which is defined by reference to whether changes in price—here, pay—would cause new or existing sellers—here, Growers—to move in response to such changes. The CAC alleges that, absent the challenged conduct, Integrators would compete nationwide for established or new Growers. CAC ¶¶ 82, 129, 134, 135, 141. Additionally, the CAC also relevantly alleges that services demanded of Growers are standardized across the country, *id.* ¶¶ 134, 141, 143, Co-Conspirators share the detailed Grower pay information at issue on a nationwide basis, *id.* ¶ 138, and Integrators, regardless of region, impose on Growers near uniform contracts, *id.* ¶ 134. Defendants' renewed motion is largely premised on contesting these factual allegations, which is why courts typically reject market definition challenges at the pleading stage. *E.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d. Cir. 2001). ***Second***, whether the market is national or regional has no effect on the sufficiency of the claims—*and Defendants do not argue otherwise*. The Co-Conspirators comprise nearly the entire national market for buying Grow Out services, they all use the same Grower payment system (known as the tournament system or ranking system), and thus they are dominant whether or not the market is national. ***Third***, because (a) the purpose of defining a relevant market is a means to determine whether conduct has the potential to cause anticompetitive effects, and (b) the CAC alleges—*and Defendants admit*—that the challenged conduct had anticompetitive effects, including suppressed Grower pay, the CAC would be sufficient even if the geographic market was not.[2]

---

[1] "Defendants" refers to all defendants named in the CAC, *see* CAC ¶¶ 10-24, with the exception of defendant Pilgrim's Pride, which did not join in the filing of the supplemental brief. Defendants' Corrected Supplemental Brief in Support of Their Motion to Dismiss ("DB") at 1 n.1, ECF 234. "Co-Conspirators" refers to non-party Integrators named in the CAC that shared detailed, competitively sensitive, non-public information about Grower compensation through Agri Stats. CAC ¶¶ 25-39.

[2] And as discussed below, a plaintiff need not separately plead or prove a relevant market (or market power) when it can directly prove anticompetitive effects, and Defendants have conceded those effects by acknowledging that the purpose of their information sharing was to lower costs, a substantial portion of which is Grower pay. *Law v. NCAA*, 134 F.3d 1010, 1019-20 (10th Cir. 1998) ("the purpose in antitrust law of market definition [] is not an end unto itself but rather exists to illuminate a practice's effect on competition" and those effects may be shown "indirectly by proving that the defendant possessed the requisite market power within a defined

## II. ARGUMENT

### A. Plaintiffs Sufficiently Allege a Section 1 Sherman Act Claim under Both a *Per Se* Standard and the Rule of Reason

The CAC states a Section 1 claim under both a *per se* standard and the rule of reason. The rule of reason requires proof that "the alleged agreement causes adverse, anticompetitive effects in the relevant market." *Law v. NCAA*, 902 F. Supp. 1394, 1404 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998). *Per se* analysis is reserved for "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). A standalone information sharing claim is analyzed under the rule of reason. *See Todd*, 275 F.3d at 198. But the overarching scheme, of which the information sharing agreement is one component, and the no-poach agreement are analyzed together using *per se* analysis. *See Todd*, 275 F.3d at 198; *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1214 (N.D. Cal. 2015).[3]

Plaintiffs plead their Section 1 claims under both modes of analysis. *See* CAC ¶¶ 129-54, 169. Plaintiffs allege the elements under the rule of reason *in detail*: relevant market, *see id.* ¶¶ 129-36; market power, *see id.* ¶¶ 129-36; and anticompetitive effects, *see id.* ¶¶ 137-54. Consequently, the Court should reject Defendants' claim that their failure to raise relevant market arguments properly in their motion to dismiss—confined to a single footnote in their motion, Defs.' Joint Mot. to Dismiss Br. at 11 n.6—was because Plaintiffs only pled a *per se* theory. That is plainly wrong, and the failure to properly raise the arguments is reason enough to reject Defendants' relevant supplemental motion.[4]

---

market *or* directly by showing actual anticompetitive effects, such as control over output or price") (emphasis added). An agreement by buyers of services that has the effect of lowering the price paid for those services has long been deemed anticompetitive. *Id.* at 1023; *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1161 (9th Cir. 2011).

[3] A party need not name specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case. *See, e.g.*, *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). In *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, the court held defendants were adequately given notice of *per se* and rule of reason analysis where plaintiff did not disclaim a rule of reason theory and alleged both price fixing and information exchange in the complaint. No. C-07-5944 JST, 2016 WL 5871243, at *5 (N.D. Cal. Oct. 7, 2016).

[4] Courts in this Circuit have regularly held that arguments raised in a perfunctory manner, such as in a footnote, are waived. *See, e.g.*, *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) (noting that the court exercises caution in "pursu[ing] late and undeveloped arguments"); *Carroll v. United*

2

### B. Plaintiffs' Relevant Market Allegations Are Well-Pleaded

#### 1. The appropriate geographic market is national

Defendants' challenge to the sufficiency of the alleged relevant geographic market should be rejected for three main reasons. **First**, Plaintiffs sufficiently plead a plausible geographic relevant market. A relevant market for antitrust purposes includes a product market and a geographic market. *Christou v. Beatport*, *LLC*, 849 F. Supp. 2d 1055, 1064 (D. Colo. 2012). The relevant product market—here, a services market—is composed of products (here, services) that have reasonable interchangeability of use or cross-elasticity of demand between the product and potential substitutes. *Id.* at 1065. The relevant product market is provision of broiler Grow-Out Services. CAC ¶ 129.

The relevant geographic market is defined not by reference to which products are interchangeable, but rather the area within which changes in price—here, pay—would cause new or existing customers—here, sellers—to move or establish themselves in response to such changes. The relevant *geographic* market is thus the *area* in which sellers of services (here, Growers) can turn—in a market absent the challenged conduct—to sell their services (here, Grow-Out Services) in response to artificially depressed pay. *See Todd*, 275 F.3d at 201-02; *see also In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) ("Outlining a geographic market entails mapping an area within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative suppliers if the defendant were to raise its prices or restrict its output.") (citation omitted).

The CAC satisfies this test. As set forth in the CAC, "[t]he relevant geographic market is the United States," CAC ¶ 129, because "[a]bsent the conduct challenged in this Complaint, Integrators would consider each other to be competitors for Broiler Grow-Out Services whether Integrators happen to be in the same region or not, given that Integrators (a) could open plants in areas where another Integrator (or other Integrators) already exist, and (b) would compete with each other on a nation-wide basis for established Growers or to incentivize potential new Growers to move to areas where Integrators have established Complexes." *Id.* ¶ 135. *See also id.* ¶ 82

---

*States*, 227 F. Supp. 3d 1242, 1248 n.2 (W.D. Okla. 2017) (declining to consider issue raised only in a footnote).

6:17-cv-00033-RJS   Document 239   Filed in ED/OK on 06/01/18   Page 5 of 16

(describing a new Grower who decided on where to establish a grow-out operation because he believed that would be the area with higher pay).

Further, the appropriate geographic market is national if the business operates on a national level, as alleged Co-Conspirators' businesses do, even if certain individual market participants operate on the local level. *See, e.g.*, *United States v. Grinnell Corp.,* 384 U.S. 563, 575 (1966) (ruling that geographic market for security alarm services was national even though the activities of individual service stations were local).[5] The CAC alleges that the services demanded of Growers are standardized across the country, CAC ¶¶ 134, 141, 143, the information that is part of the illegal agreement is nationwide, *id.* ¶ 138, and that the "Integrators, regardless of region of the country, [] impose on Growers near uniform contracts (CFAs)," *id.* ¶ 134. Thus the CAC alleges a plausible geographic market *on its face*.

*Second*, Defendants' motion should also be rejected because "market definition is a deeply fact-intensive inquiry," and thus "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200 (collecting cases); *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1222 (D. Kan. 2013) ("[M]any courts recognize that the definition of the relevant market and a defendant's power in that market are issues of fact."). Further, defining a geographic market as "nationwide" does not require proof that every Grower would switch to any Integrator in response to changes in levels of pay. Rather, all that is required is showing that *a sufficient number* of Growers—whether existing Growers, new entrants, or Growers who intend to expand operations—would be able to switch in response to changes in pay such that the Co-Conspirators' ability to reduce pay below competitive levels would be constrained (in a world absent the challenged conduct). *See, e.g.*, *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 6091244, at *7 (N.D. Ind. Oct. 19, 2016). That is typically highly fact-specific and data-intensive and is thus not

---

[5] *See also Kamakahi v. Am. Soc. for Reprod. Med.*, No. C 11-01781 SBA, 2013 WL 1768706, at *12 (N.D. Cal. Mar. 29, 2013) (plaintiffs sufficiently alleged national market where plaintiffs alleged "nationally coordinated conduct among entities located throughout the United States"); *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 381 (E.D. La. 2013) (market for pool products was national where pricing was set on a national basis, even though individual service centers operated in particular local markets); *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 50 (D.D.C. 1998) (drug wholesale market national where pricing in one region affected pricing nationwide, even though some customers were regional).

appropriate to resolve on the pleadings.

***Third***, Defendants' main argument—*i.e.*, that the allegations of barriers to Grower mobility purportedly undermine the concept of a nationwide market, *see* DB at 3, is wrong. True, the CAC rightly alleges that Defendants make it difficult for Growers to move once in established operations. CAC ¶ 93. That is one reason the alleged conduct successfully suppressed Grower pay. *Id*. But new market entrants looking to provide Grow-Out Services or those seeking to expand are not so constrained. And the CAC alleges exit barriers but explicitly contemplates some material level of Grower mobility in response to artificial suppression of pay. *Compare id.* ¶ 93 (alleging high exit barriers) *with id.* ¶¶ 82 (a new Grower moved to a region because it was area in which he believed opportunities for higher pay would be best), 135 (Integrators could incentivize potential new Growers to move to areas where Integrators have established Complexes).

Absent the Conspiracy, a Grower facing artificial suppression of compensation in one area would look to move to, or establish itself in, an area with higher, competitive compensation. *See id.* ¶¶ 82, 135. And absent the nationwide suppression of competition for Growers, Integrators could compete by offering to pay for relocation or longer-distance shipping of Broilers, or otherwise could find ways to attract Growers (including new Growers). *See id.* ¶¶ 82 (describing a new Grower who moved to a new region because it was "the broiler capital of [his] state," thinking that it provided the best opportunity for higher pay), 141 (new Integrator in a particular area would have to incentivize new farmers to invest in being Growers). In short, a fair inference from the CAC is that, in a competitive market, a sufficient number of Growers would view an Integrator in another region as a reasonably good substitute given an incentive to move or establish itself in the first instance. For example, if (absent the Conspiracy) a particular Integrator located in Oklahoma decided to promote itself as the "high pay/best treatment" Integrator in order to attract the best Growers from around the country, the CAC alleges that that would incentivize new and/or established Growers to take up the offer. That is a national market.

Defendants' cited cases are not to the contrary. Nearly all concern a proposed market that is *too narrow*, not too broad. For example, Defendants cite *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111 (10th Cir. 2008), decided on summary judgment, which involved allegations by an owner of an auto-glass repair shop that State Farm Insurance used its market power to depress demand for the plaintiff's specialty of windshield repair. DB at 3. The plaintiff alleged the relevant market to be "the State Farm insured repairable windshield repair market, in

5

the geographic area of the United States of America*.*" *Campfield*, 532 F.3d at 1118. The Tenth Circuit held this definition was "underinclusive" because "the relevant market is one that reflects the total market demand for plaintiffs' product, not just defendants' demand." *Id.* The court found that by limiting the market only to those insured by State farm the plaintiffs had arbitrarily "circumscribe[d] the market to a few buyers in an effort to manipulate those buyers' market share." *Id.* at 1119. By contrast, in this case, Plaintiffs have pled a broad national market that does not attempt to inflate Co-Conspirators' market power—as described below, the Co-Conspirators are dominant no matter whether the geographic market is defined broadly or narrowly.[6]

Defendants cite two inapposite cases that were dismissed due to an overbroad market. DB at 3-5. Defendants' reliance on *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006), DB at 4, for instance, is misplaced. In *Heerwagen*, after discovery and a three-day evidentiary hearing, 435 F.3d at 224, the court rejected a national market for live concert tickets because there was *no evidence* that those seeking to attend a concert in one city would view a concert in another as a reasonable substitute. *Id.* at 228. By contrast, here, the CAC specifically alleges that "Integrators would consider each other to be competitors for Broiler Grow-Out Services whether Integrators happen to be in the same region or not." CAC ¶ 135. *Heerwagen* relevantly reaffirms *Grinnell*, 384 U.S. at 575-76, holding that "we read *Grinnell* to stand for the proposition that in some cases involving services that tend to be provided locally, the market for purposes of the antitrust laws still could be national." *Id.* at 230.[7] In short, Defendants' cited cases

---

[6] Defendants also cite *Klein-Becker USA LLC v. Englert*, No. 2:06-CV-378 TS, 2007 WL 2821644 (D. Utah Sept. 26, 2007) and *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir. 1992), DB at 4, which similarly reject plaintiffs' efforts to inflate market share by defining and artificially *narrow* market. *Klein-Becker* is an extremely cursory opinion dismissing an antitrust counterclaim, and noting that the counterclaimants did not even file a substantive response to the motion to dismiss the counterclaim. And without discussion, the court stated that the plaintiffs did not "adequately state an alleged product market as required to state either a Sherman Act § 1 or § 2 claim because they do not offer any plausible explanation as to why a market should be limited in a particular way." 2007 WL 2821644, at *1 (citation omitted). In *TV Commc'ns Network*, the court affirmed dismissal of a Sherman Act claim because the proposed product market was defined as one of the defendant's television channels. The court held that as a matter of law "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." 964 F.2d at 1025. Additionally, both of these cases also involved disputes over the relevant *product* market, not the relevant *geographic* market.

[7] Defendants also cite *Drake v. Cox Commc'ns*, No. 10-2671-JTM, 2011 WL 2680688 (D. Kan. July 8, 2011). DB at 3. This case involved a *pro se* plaintiff who complained that a cable television

6

involve the wrong scope of geographic market, the wrong type of market, and the wrong stage of litigation. They do not support a sub-national market here.

### 2. The Complaint is sufficient whether the market is national or regional.

Whether the market is national as alleged, or regional as Defendants claim, makes no difference to the sufficiency of the Complaint because Co-Conspirators are dominant—they have 98% of the market—no matter how the market is defined. This is because the purpose of defining a market is (one way) to determine whether the alleged co-conspirators have sufficient market power to suppress competition through coordinated conduct. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("*IFD*"). A high share of a relevant market indicates substantial market power.[8] Narrowing the market here would almost certainly make no difference because if the Co-Conspirators have market power nationwide, they almost certainly have market power in any narrower regional market. Defendants and their Co-Conspirators account for 98% of Broiler production in the U.S., CAC ¶ 69, and Defendants account for over 60% by themselves, *id.* ¶ 132. In other words, the Co-Conspirators have sufficient market power for their coordinated efforts to have anticompetitive effects regardless of how the geographic market is defined—*and Defendants do not argue otherwise*. The motion thus cannot undermine the sufficiency of the claim.

### C. Direct Proof of Anticompetitive Effects Obviates the Need to Prove, and Thus to Plead, Market Power in a Relevant Market

Defendants' challenge to the market is irrelevant to the sufficiency of the CAC for another reason: Plaintiffs have directly pled market power and anticompetitive effects. Given that *the purpose* of defining a relevant market is to determine whether the co-conspirators have the market power to cause anticompetitive effects by coordinating, "proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." *IFD*, 476 U.S. at 460.[9] The CAC contains an entire section

---

provider refused to give him free air time. But "[n]owhere in [plaintiff's] many pages of Complaint, Response, and (unauthorized) Surreplies is there any intelligible definition of the relevant market within which Cox and the Ad Council have supposedly acquired monopoly power." *Id.*

[8] *See, e.g.*, *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998).

[9] *See also Law*, 134 F.3d at 1019-20; *Toys "R" Us, Inc.,* 221 F.3d at 937. Defendants argue that *IFD* only applies in cases "where direct anticompetitive effects are clear on the face of the complaint," such as in price fixing cases. DB at 6-7. However, *IFD* did not involve price fixing

devoted to anticompetitive effects, including: (1) the suppression of Grower compensation below competitive levels, CAC ¶ 137; (2) a reduced intensity of price competition, *id.* ¶ 139; (3) the discouragement of new Integrators from moving into areas with only a single Integrator, *id.* ¶ 141; and (4) a reduced output of Broilers available for sale on the retail market, which artificially inflates prices and restricts choice, *id.* ¶ 145; *see generally id.* ¶¶ 137-54. The allegations of anticompetitive effects are supported with economic theory, guidance from the DOJ, and information about the operation of the Broiler Grow-Out Industry. *Id.* ¶¶ 137-54. Defendants' challenge to these allegations fails.

*First*, Defendants assert that Plaintiffs do not allege facts connecting allegedly suppressed Grower compensation to information exchanges. DB at 5. ***But Defendants have conceded that their information exchange allowed them to suppress Grower pay***—the central alleged anticompetitive effect. *See, e.g.*, *Todd*, 275 F.3d at 214 (indicating that suppression of wages can constitute an anticompetitive effect); *Animation Workers*, 123 F. Supp. 3d at 1214; *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012). And, while Defendants cite no case requiring Plaintiffs to allege that certain specific instances of information sharing are responsible for certain instances of suppressed Grower pay, Plaintiffs *do* allege that the anticompetitive effects stem directly from the anticompetitive conduct. That is enough. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

*Second*, Defendants assert that Plaintiffs' allegations are "conclusory and speculative," and do not survive a motion to dismiss after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). DB at 6. But Plaintiffs' allegations of suppression of Grower compensation, reduced intensity of price competition, discouragement of new Integrators from moving into areas, and reduced output of Broilers are sufficiently detailed. These allegations present vastly more than the "[b]road,

---

(which is per se illegal) and was applying the rule of reason. *See* 476 U.S. at 459. *IFD* applies in rule of reason cases. *See, e.g.*, *Todd*, 275 F.3d at 207 (collecting cases); *In re Detroit Auto Dealers Ass'n, Inc.*, 955 F.2d 457, 469 (6th Cir. 1992) (evaluating case under the rule of reason; affirming FTC finding that agreement between dealers to limit showroom hours illegal because it resulted in actual detrimental effects); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (evaluating case under the rule of reason and ruling that proof of boycott's anticompetitive effects obviated the need for an inquiry into market power).

unsupported allegations of actual detrimental effects" in *Sherr*, cited by Defendants, DB at 6, where the plaintiff's allegations did not allege any of the typical anticompetitive effects. *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 884-85 (D. Minn. 2017).

*Third*, Defendants' reliance on *Tarabishi* is misplaced. *See* DB at 6 (citing *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991)). In *Tarabishi*, a physician (Dr. Tarabishi) brought an antitrust action against a hospital, clinic, and other physicians arising out of the termination of his medical staff privileges, allegedly to prevent him from operating a new outpatient surgical clinic in competition with the hospital. 951 F.2d at 1560-63. But Dr. Tarabishi did not prove, after trial, that consumer choices were impaired by the conduct, but instead, simply showed in conclusory fashion that the hospital's denial of staff privileges "reduced competition." *Id.* at 1569 n.15. That is nothing like the CAC, which specifically alleges suppressed Grower compensation, reduced intensity of price competition, discouragement of new Integrators from moving into certain areas, and reduced output and artificially inflated prices of Broilers available for sale. CAC ¶¶ 137, 139, 141, 145.

The CAC pleads that the information sharing agreement was intended to and did drive down Grower pay, CAC ¶¶ 79, 130, 132, 134, 136-39, 141-43, 145, 150, and the CAC clearly pleads the anticompetitive effects. *Id.* ¶¶ 137-54. And Defendants concede those anticompetitive effects, acknowledging that their goal was to lower costs. Defs.' Mot. to Dismiss at 1, 4, 12, 16; Defs.' Reply Br. at 6.[10] A correct reading of *IFD* and subsequent cases shows that *IFD* applies in rule of reason cases, and that it applies here, where Plaintiffs have pled—and Defendants have conceded—anticompetitive effects. Thus, the Complaint would have sufficiently alleged a Section 1 violation even if, counterfactually, it had not included a sufficiently alleged relevant market.

## III.   CONCLUSION

The Court should deny Defendants' motion to dismiss for the reasons set forth above and in Plaintiffs' opposition to the motion to dismiss.

Dated: June 1, 2018                                   Respectfully submitted,

                                                      */s/ Larry D. Lahman*

---

[10] *See also Law*, 134 F.3d at 1019 (holding that where "cost-reduction" scheme "artificially lower[ed] price of [] services, no further evidence or analysis [wa]s required to find market power to set prices").

9

Larry D. Lahman, OBA #5166
Roger L. Ediger, OBA #19449
Carol Hambrick Lahman, OBA # 11330
Scott E. Cordell, OBA #31522
MITCHELL DECLERK
202 West Broadway Avenue
Enid, OK 73701
Telephone: (580) 234-5144
Facsimile: (580) 234-8890
Email: ldl@mdpllc.com
Email: carollahman@gmail.com
Email: rle@mdpllc.com
Email: sec@mdpllc.com

*Additional Class Counsel for Plaintiffs and the Proposed Class*

Michael D. Hausfeld*
James J. Pizzirusso*
Melinda R. Coolidge*
Samantha S. Derksen*
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com
Email: sderksen@hausfeld.com

Gary I. Smith, Jr.*
HAUSFELD, LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
Facsimile: (215) 985-3271
Email: gsmith@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Eric L. Cramer*
Patrick F. Madden*

10

Christina Black*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: cblack@bm.net

Daniel J. Walker*
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bm.net

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

M. David Riggs
Donald M. Bingham
Kristopher Koepsel
RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS
502 West Sixth Street
Tulsa, OK 74119
Telephone: (918) 699-8914
Facsimile: (918) 587-9708
Email: driggs@riggsabney.com
Email: don_bingham@riggsabney.com
Email: kkoepsel@riggsabney.com

William A. Edmondson, OBA #2628
RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS
528 N.W. 12th Street
Oklahoma City, OK 73103
Telephone: (405) 843-9909
Facsimile: (405) 842-2913
Email: dedmondson@riggsabney.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

Vincent J. Esades*
HEINS MILLS & OLSON, PLC
310 Clifton Avenue

11

Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns*
BURNS CHAREST, LLP
900 Jackson Street, Suite 500
Dallas, TX 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
Email: wburns@burnscharest.com

Gregory Davis*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Telephone: (334) 832-9080
Facsimile: (334) 409-7001
Email: gldavis@knology.net

Charles D. Gabriel*
CHALMERS, BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, GA 30097
Telephone: (678) 735-5903
Facsimile: (678) 735-5905
Email: cdgabriel@cpblawgroup.com

Larry S. McDevitt*
David M. Wilkerson*
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Telephone: (828) 258-2991
Facsimile: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

Harlan Hentges (OBA #17911)
HENTGES & ASSOCIATES, PLLC
102 East Thatcher Street
Edmond, OK 73034
Telephone: (405) 340-6554
Facsimile: (405) 340-6562

Email: harlan@organiclawyers.com

John C. Whitfield*
Caroline Taylor*
WHITFIELD BRYSON & MASON, LLP
19 North Main Street
Madisonville, KY 42431
Telephone: (270) 821-0656
Email: john@wbmllp.com
Email: caroline@wbmllp.com

Gary E. Mason*
WHITFIELD BRYSON & MASON, LLP
5101 Wisconsin Avenue, NW
Suite 305
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
Email: gmason@wbmllp.com

J. Dudley Butler*
BUTLER FARM & RANCH LAW GROUP, PLLC
499-A Breakwater Drive
Benton, MS 39039
Telephone: (662) 673-0091
Facsimile: (662) 673-0091
Email: jdb@farmandranchlaw.com

Daniel M. Cohen*
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016
Telephone: (202)789-3960
Facsimile: (202)789-1813
Email: Danielc@cuneolaw.com

David S. Muraskin*
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 861-5245
Facsimile: (202) 232-7203
Email: dmuraskin@publicjustice.net

Hollis Salzman *

13

>Kellie Lerner*
>ROBINS KAPLAN, LLP
>399 Park Avenue, Suite 3600
>New York, NY 10022
>Telephone: (212) 980-7400
>Facsimile: (212) 980-7499
>Email: HSalzman@RobinsKaplan.com
>Email: KLerner@RobinsKaplan.com
>
>Aaron Sheanin*
>ROBINS KAPLAN, LLP
>2440 West El Camino Real
>Suite 100
>Mountain View, CA 94040
>Telephone: (650) 784-4040
>Facsimile: (650) 784-4041
>Email: ASheanin@RobinsKaplan.com
>
>M. Stephen Dampier*
>LAW OFFICES OF M. STEPHEN DAMPIER, P.C.
>55 North Section Street
>P.O. Box 161
>Fairhope, AL 36532
>Telephone: (251) 929-0900
>Facsimile: (251) 929-0800
>Email: dampier.steve@gmail.com
>
>*Additional Class Counsel for Plaintiffs and the Proposed Class*

* Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, I electronically submitted the attached document to the Clerk of the Court for filing using the ECF system for filing.

<u>*/s/ Gary I. Smith, Jr.*</u><br>Gary I. Smith, Jr.