### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER ANTITRUST LITIGATION (NO. II) | No. 6:20-md-02977-RJS-CMR<br><br>The Honorable Robert J. Shelby<br>The Honorable Cecilia M. Romero |

### MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DENYING DEFENDANT'S MOTION TO EXCLUDE[1]

Plaintiffs, individually and on behalf of a class of similarly situated growers of broiler chickens (Growers), assert an antitrust claim against Defendant Pilgrim's Pride Corporation (PPC). Plaintiffs allege PPC, along with 20 other co-conspirator poultry companies (Integrators), engaged in a nationwide conspiracy to suppress Grower compensation in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Section 202 of the Packers and Stockyards Act, 7 U.S.C. § 192(a).[2]

Now before the court is Plaintiffs' Motion for Class Certification[3] and PPC's Motion to Exclude many of the expert opinions Plaintiffs rely on in their Motion.[4] For the reasons

---

[1] When citing to the parties' filings, the court cites to the CM/ECF page number in the CM/ECF heading rather than the respective document's page numbers at the bottom of each page.

[2] For class certification purposes, the analysis for both claims is substantially the same because § 202 of the Packers and Stockyards Act "incorporated the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1228 (10th Cir. 2007) (quotation and citation omitted). The parties do not argue any of the analysis differs. As a shorthand, the court will refer only to Plaintiffs' antitrust claim for this Order.

[3] Dkt. 454, *Plaintiffs' Motion and Memorandum of Law in Support of Motion for Class Certification* [SEALED] (*Motion for Class Certification*).

[4] Dkt. 456, *Defendant Pilgrim's Pride Corporation's Motion to Exclude Certain Opinions of Plaintiffs' Expert Witness Hal J. Singer Pursuant to Federal Rule of Evidence 702* [SEALED] (*Motion to Exclude*).

explained below, the court GRANTS Plaintiffs' Motion for Class Certification and DENIES PPC's Motion to Exclude.

## I.  BACKGROUND[5]

### A. Factual Background

#### 1. The Parties

Before poultry reaches a grocery store shelf or a consumer's plate, the chickens—known as broilers—move through a production process largely controlled by companies like PPC and its alleged co-conspirators, known as Integrators.[6]  Integrators hatch the chicks, make broiler feed, deliver chicks and feed to Growers, collect the grown broilers from Growers, and deliver them to Complexes where the broilers are processed before the meat is sold.[7]  PPC operates twenty-six Complexes throughout the United States and is the second largest Integrator in the country, accounting for more than 20% of broilers sold.[8]  Collectively, PPC and its alleged co-conspirators account for 98% of nationwide broiler production, with 60% of that production concentrated amongst the top five Integrators.[9]

Plaintiffs are, or were, Growers providing broiler grow-out services during the proposed class period.[10]  Haff Poultry, Inc. was an Oklahoma-based Grower for Tyson, a major Integrator and alleged co-conspirator, until October 2015 when it quit providing broiler grow-out

---

[5] Because this matter is before the court on a motion to certify a class, the court accepts as true all well-pleaded factual allegations contained in the complaint.  *See Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004) (citations omitted).  For purposes of this background, the court draws from factual allegations in Plaintiffs' Complaint and its Motion for Class Certification.

[6] *Motion for Class Certification* at 8.

[7] *Id.*

[8] Dkt. 59, *Consolidated Class Action Complaint* (*Complaint*) ¶ 18.

[9] *Motion for Class Certification* at 8.

[10] *Id.*; *Complaint* ¶¶ 5–11.

services.[11]  Nancy Butler is a Kentucky-based Grower for Integrator and alleged co-conspirator Perdue during the proposed class period.[12]  Johnny Upchurch provided broiler grow-out services for Integrator and alleged co-conspirator Koch in Alabama until December 2014, when he left the industry.[13]  Jonathan Walters was a Grower for Integrator and alleged co-conspirator Sanderson in Mississippi until he stopped providing broiler grow-out services in December 2015.[14]  Myles B. Weaver and Melissa Weaver provided broiler grow-out services for PPC in West Virginia until 2019.[15]  Marc McEntire and Karen McEntire were Texas-based Growers for PPC until in they left the industry in 2014.[16]  Finally, Mitchell Mason was a Grower in Alabama for Integrator and alleged co-conspirator Wayne Farms until he left the industry in 2014.[17]

### 2.  Market for Broiler Grow-Out Services

Broiler production is "concentrated into localized networks of production,"[18] with each step of the process revolving around a particular Integrator Complex.  Broiler grow-out services are the only step in the chicken production process not performed by Integrators.[19]  Instead, Integrators contract with Growers who provide the land, facilities, equipment, utilities, and labor required to raise broilers until they reach the desired slaughtering age and weight.[20]  Integrators

---

[11] *Complaint* ¶ 5.

[12] *Id.* ¶ 6.

[13] *Id.* ¶ 7.

[14] *Id.* ¶ 8.

[15] *Id.* ¶ 9.

[16] *Id.* ¶ 10.

[17] *Id.* ¶ 11.

[18] *Id.* ¶ 45.

[19] *Motion for Class Certification* at 8.

[20] *Id.*

establish precise specifications for a Grower's grow-out house and provide all of the inputs necessary for the Grower to raise the broilers until they are ready for processing.[21]

Integrators contract with Growers through "take-it-or-leave-it" standard form contracts that are largely similar across Integrators.[22]  The contracts include "nearly identical terms governing Integrator control and Grower compensation."[23]  Due in part to each Integrator's unique grow-house specifications, Integrators require Growers provide broiler grow-out services for only one Integrator.[24]  Integrators do not negotiate the terms or compensation of individual Grower contracts.[25]  Every Grower within a Complex has the same contract as other Growers servicing the Complex, with the only distinction being Growers whose grow-houses meet higher technological specifications are paid at a higher rate.[26]  The contract sets forth a Grower's base pay and typically includes additional pay to compensate for fuel, utilities, and other inputs required to raise broilers.[27]  Any adjustments Integrators make to pay within a Complex is reflected in each of the contracts available to the Growers in the Complex.[28]

Although base pay is established in the Grower's contract, Integrators determine a Grower's final pay for a flock of broilers through a so-called "tournament system."[29]  Growers raise a flock of broilers for approximately seven weeks.[30]  At the end of the grow cycle, a

---

[21] *Complaint* ¶¶ 54–56.

[22] *Motion for Class Certification* at 8; *Complaint* ¶ 57.

[23] *Complaint* ¶ 57.

[24] *Id.* ¶ 58.

[25] *Motion for Class Certification* at 12.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 12–13.

[30] *Id.*

Grower "settles" the flock by delivering it to the Integrator's Complex where the broilers are weighed.[31]   The respective Integrator then compares all Growers settling within a given Complex in the same week.[32]   Growers are ranked based on how efficiently they raised their broilers—a function of the pounds of live broilers delivered compared to the pounds of feed utilized through the grow-out process.[33]   Growers with a higher "feed conversion" ratio receive a bonus above the designated base pay while lower performing Growers have their base pay discounted, with the total average compensation across the group equaling base pay.[34]

According to Plaintiffs, in an efficient market for broiler grow-out services, Integrators, regardless of geographic region, would compete for Growers.[35]   This competition could manifest in a variety of ways.   For example, Integrators located in the same area could attempt to incentivize high-performing Growers to switch from one Integrator to another.   Integrators could move into new locations and incentivize established Growers to switch Integrators.[36]   Or, Integrators could incentivize new Growers to move to areas where Integrators have existing Complexes.[37]   Regardless, the competition between Integrators for Growers would generate upward pressure on Grower base pay.

---

[31] *Id.*

[32] *Id.*; *Complaint* ¶ 147.

[33] *Motion for Class Certification* at 13.

[34] *Id.* at 12–13; *Complaint* ¶¶ 147–48.

[35] *Complaint* ¶ 135.

[36] *Id.*

[37] *Id.*

### 3.  The Alleged Conspiracy

Since at least 2008, PPC and its co-conspirator Integrators allegedly engaged in a nationwide conspiracy to suppress Grower pay to artificially low levels.[38]  According to Plaintiffs, to reduce competition for Growers and prevent a price war between Integrators, PPC and its co-conspirators participated in the so-called "Overarching Agreement."[39]  The Overarching Agreement was comprised of two "mutually reinforcing" sub-agreements: (1) the No-Poach Agreement (NPA) and (2) the Information Sharing Agreement (ISA).[40]

The NPA was an industrywide agreement between PPC and other Integrators to refrain from poaching, soliciting, or recruiting Growers from one another.[41]  Integrators varyingly referred to the NPA as a "no cold call" agreement, a "gentlemen's agreement," or a prohibition on "direct" or "active" recruitment of one another's Growers.[42]  As a result of the NPA, Plaintiffs allege Growers rarely switched between Integrators, and Integrators were discouraged from moving into areas with an existing Integrator because they could not recruit established Growers.[43]  In the limited instances in which Growers did switch Integrators, it was typically not to obtain better contract terms but rather as a result of changes in company ownership or because the Grower was terminated by their previous Integrator.[44]  Without the risk of a competitor

---

[38] *Id.* ¶¶ 1–4; *Motion for Class Certification* at 8.

[39] *Motion for Class Certification* at 8, 13.

[40] *Id.* at 8.

[41] *Complaint* ¶ 79.

[42] *Motion for Class Certification* at 6–7.

[43] *Complaint* ¶ 85, 141.

[44] *Id.* ¶ 85.

poaching an Integrator's Growers by offering higher compensation, the effect of the NPA, according to Plaintiffs, was to artificially suppress Grower pay through reduced competition.[45]

The NPA was supported and enforced by the ISA, the other component of the Overarching Agreement.[46]  As Plaintiffs allege, under the ISA, PPC and other Integrators participated in "a nationwide reciprocal exchange of competitively sensitive Grower pay information . . ."[47]  This was executed through direct exchanges of information between Integrators and indirectly through the use of third-party co-conspirator, Agri Stats.[48]  Agri Stats collects a range of "granular" non-public information from PPC and its co-conspirator Integrators—including Grower compensation data—which it then disseminates on a weekly basis to all participating Integrators.[49]  Though the data is purportedly anonymized, according to Plaintiffs, the reports are "so granular and disaggregated" that co-conspirators can identify the data belonging to each Integrator, the location of specific Complexes, and the base Grower compensation paid at each Complex.[50]  Through the sharing of competitively sensitive information, co-conspirators are able to monitor the Grower compensation of other Integrators to ensure rates remain largely similar.[51]  In tandem with the NPA, the ISA reduces competition for Growers and suppresses Grower compensation to artificially low levels.

---

[45] *Id.* ¶ 141.

[46] *Motion for Class Certification* at 8.

[47] *Id.*

[48] *Id.*

[49] *Complaint* ¶¶ 69–72.

[50] *Id.* ¶¶ 73–74.

[51] *Id.* ¶ 74.

According to Plaintiffs, neither the NPA nor the ISA would be economically rational in a competitive market.[52]  These agreements are only coherent in the context of the Overarching Agreement.  In other words, agreements not to recruit high performing Growers and the sharing of competitively sensitive information by PPC and its co-conspirator Integrators is only economically rational if the firms are operating as a cartel in a conspiracy to suppress Grower compensation.[53]

### B.  Procedural Background

On December 17, 2020, the Judicial Panel on Multidistrict Litigation centralized for pretrial proceedings the five individual member cases[54] comprising this MDL in the Eastern District of Oklahoma.[55]  Plaintiffs filed a Consolidated Class Action Complaint on February 19, 2021.[56]  The Complaint named as Defendants PPC, along with Tyson Foods and select subsidiaries, Perdue Foods, Koch Foods and select subsidiaries, and Sanderson Farms along with select subsidiaries.[57]  Plaintiffs have since reached class settlement agreements with

---

[52] *Motion for Class Certification* at 18; *Complaint* ¶ 76.

[53] *Motion for Class Certification* at 18.

[54] The current Member Cases are 6:17-cv-00033-RJS-CMR, 6:20-cv-00478-RJS-CMR, 6:20-cv-00480-RJS-CMR, 6:20-cv-00479-RJS-CMR, 6:21-cv-0033-RJS-CMR.  Additionally, 6:22-mc-00002-RJS-CMR is a related case in this MDL.

[55] Dkt. 1, *Transfer Order from the Judicial Panel on Multidistrict Litigation*; Dkt. 2, *Conditional Transfer Order from Judicial Panel on Multidistrict Litigation.*

[56] *Complaint.*

[57] *Id.* ¶¶ 12–25.

each Defendant except PPC.[58]  For purposes of this Order, the court refers to the original co-Defendants as co-conspirators.

On March 28, 2023, Plaintiffs filed a Motion for Class Certification, presently before the court.[59]  Plaintiffs support their bid for class certification with, among other evidence, the expert report of Dr. Hal J. Singer.[60]  On March 29, 2023, PPC filed its present Motion to Exclude certain of Singer's opinions under Federal Rule of Evidence 702 and *Daubert*.[61]  The court heard two days of oral argument on the Motions in July 2023.[62]  The Motions are now fully briefed and ripe for review.

## II.   PROPOSED CLASS DEFINITION

Named Plaintiffs seek to certify a nationwide class of Growers who provided broiler grow-out services for PPC or one of its 20 co-conspirators while those Integrators participated in the alleged Overarching Agreement.[63]  Specifically, Plaintiffs' Grower class is defined as follows:

> All individuals and entities in the United States and its territories that were compensated for Broiler Grow-Out Services by a Defendant or Co-Conspirator (excluding Claxton and Allen Harim), or by a division, subsidiary, predecessor, or affiliate of a Defendant or Co-Conspirator (excluding Claxton and Allen Harim), at

---

[58] *See* Dkt. 144, *Order Preliminarily Approving of Settlement with Tyson Defendants, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; Dkt. 145, *Order Preliminarily Approving Settlement with Perdue, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; Dkt. 367, *Order Preliminarily Approving Settlement with Koch, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; Dkt. 482, *Order Preliminarily Approving Settlement with Sanderson, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*.

[59] *Motion for Class Certification*.

[60] Dkt. 454-1, *Exhibit 1: Expert Report of Hal J. Singer, PH.D.* (*Singer Report*).

[61] *Motion to Exclude*.

[62] Dkt. 523, *Minutes of Proceedings*-Motion hearing held on July 13, 2023; Dkt. 524, *Minutes of Proceedings*-Motion hearing held on July 14, 2023.

[63] *Motion for Class Certification* at 8–9.

any time during the period of January 27, 2013 through and including December 31, 2019 ("Class Period").[64]

The proposed class includes 24,354 Growers who raised at least one flock of broilers for either PPC or one of PPC's co-conspirators during the class period.[65]

## III.   LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.[66]  To certify a proposed class, Plaintiffs must first demonstrate the class satisfies all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and then establish the standards are met for at least one subsection of 23(b).[67]  Plaintiffs here seek certification of a damages class pursuant to Rule 23(b)(3).[68]  Certification under Rule 23(b)(3) requires a party demonstrate "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[69]

Rule 23 "does not set forth a mere pleading standard."[70]  Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule."[71]  "[T]he party seeking class certification must prove the requirements 'are *in fact*' satisfied."[72]  As the party

---

[64] *Id.*

[65] *Id.* at 12.

[66] Fed. R. Civ. P. 23; *see also Shook*, 386 F.3d at 971 ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (citation omitted).

[67] *See* Fed. R. Civ. P. 23(a)–(b).

[68] *Motion for Class Certification* at 9.

[69] Fed. R. Civ. P. 23(b)(3).

[70] *Brayman v. KeyPoint Gov. Sols., Inc.*, 83 F.4th 823, 837 (10th Cir. 2023) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

[71] *Dukes*, 564 U.S. at 350.

[72] *Black v. Occidental Petroleum Corp.*, 69 F. 4th 1161, 1174 (10th Cir. 2023) (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

seeking certification here, Plaintiffs carry the burden of "affirmatively demonstrat[ing] [their] compliance with Rule 23."[73]

In evaluating whether a party has met its burden, the court conducts "a rigorous analysis, often necessarily 'prob[ing] behind the pleadings."[74]  The analysis typically requires some consideration of the merits, but this inquiry is limited to the extent it is "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[75]  At this stage, the court "must generally accept the substantive, non-conclusory allegations of the complaint as true."[76] However, this does not mean the court may "relax or shift the burden of proof to liberally construe Rule 23's requirements or resolve doubts in favor of certification."[77]

In addition to Plaintiffs' Motion, the court has before it PPC's Motion to Exclude certain opinions of Dr. Hal J. Singer,[78] the expert witness Plaintiffs rely upon in seeking class certification.  PPC's Motion is made pursuant to Rule 702 of the Federal Rules of Evidence[79] and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[80]  Rule 702 governs the admissibility of testimony by expert witnesses and "imposes on a district court a gatekeeper obligation" to ensure

---

[73] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350).

[74] *Occidental Petroleum Corp.*, 69 F. 4th at 1174 (quoting *Comcast*, 569 U.S. at 33).

[75] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

[76] *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).

[77] *Occidental Petroleum Corp.*, 69 F. 4th at 1174; *see Wallace B. Roderick Revocable Living Tr. V. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) ("Relaxing and shifting Rule 23(a)'s strict burden of proof results in an abuse of discretion.") (internal quotations and citations omitted).

[78] *Motion to Exclude*.

[79] Rule 702 provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

[80] 509 U.S. 579 (1993).

expert testimony or evidence "admitted is not only relevant, but reliable."[81]  The court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."[82]  As a recent amendment to the Rule clarified, admissibility does not require the court determine an expert's opinions are correct, but rather that, by a preponderance of the evidence, it is "more likely than not" the opinions are reliable.[83]

PPC presents its own experts to rebut Singer's opinions.  This is common in antitrust litigation, but "contradictory expert testimony does not control admissibility."[84]  So long as an expert's testimony is reliable, "it is for the factfinder to determine each expert's trustworthiness and credibility through the 'conventional devices' of 'cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"[85]

## IV.    ANALYSIS

Plaintiffs argue certification of the proposed class of Growers is appropriate because they have satisfied their burden under Rule 23(a) and Rule 23(b)(3).  Plaintiffs contend common issues predominate and they have established they will prove "essential elements" of their claims with class-wide proof.[86]  In response, PPC argues class certification should be denied because "there is no common evidence for resolution of Plaintiffs' sweeping wage-suppression claims" as "[t]he market for grower services is highly localized with myriad local factors that determine

---

[81] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 589).

[82] *Id.* (citing *Daubert*, 509 U.S. at 592–93).

[83] *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

[84] *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017).

[85] *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 30 (S.D.N.Y. 2020) (quoting *Daubert*, 509 U.S. at 596).

[86] *Motion for Class Certification* at 9–10.

grower pay."[87]  PPC raises numerous arguments challenging Plaintiffs' Rule 23 showing, as well as the admissibility of Singer's expert opinions supporting Plaintiffs' Motion.

As explained below, the court concludes Plaintiffs have met their burden under Rule 23 and grants their Motion.  Further, PPC's challenges to the admissibility of Singer's opinions go to the weight a trier of fact should ascribe to them and do not render them so unreliable as to be inadmissible.  Accordingly, PPC's Motion to Exclude is denied.[88]

There is substantial overlap in the parties' arguments on Plaintiffs' Motion for Class Certification and PPC's Motion to Exclude.  For clarity and efficiency, the court's analysis of PPC's Motion is incorporated into the class certification analysis.  Any residual issues pertaining to the Motion to Exclude are addressed at the end of the order.

### A.  Rule 23(a)

Because of the unique nature of class actions, use of this litigation vehicle is justified only in circumstances where the class representatives are "part of the class and 'possess the same interest and suffer the same injury' as class members."[89]  The four requirements of Rule 23(a)— numerosity, commonality, typicality, and adequacy of representation—guarantee "named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."[90]

---

[87] Dkt. 502, *Pilgrim's Pride Corporation's Opposition to Plaintiffs' Motion for Class Certification* [SEALED] (*Opposition to Class Certification*) at 8.

[88] PPC only challenges the reliability of Singer's opinions and does not dispute his qualifications.  Singer holds a Ph.D. in economics from Johns Hopkins University, is a managing director of economic consulting firm Econ One, and is a professor in the economics department at the University of Utah, where he teaches advanced antitrust economics to Ph.D. candidates.  *See Singer Report*, Appendix 1.  The court finds Singer is qualified to offer expert economic testimony in this case.

[89] *Dukes*, 564 U.S. at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

[90] *Id.*

### 1. Numerosity

The numerosity prong of Rule 23(a)(1) requires plaintiffs show "the class is so numerous that joinder of all members is impracticable."[91]  Though plaintiffs "must offer 'some evidence of established, ascertainable numbers constituting the class,'" there is "no set formula to determine if the class is so numerous that it should be certified."[92]  In addition to raw numbers, there are several "factors that enter into the impracticability issue."[93]  These may "include[e] the nature of the action, the size of the individual claims, and the location of the members of the class."[94] "Because it is such a fact-specific inquiry," the court has "wide latitude" to determine the standard has been met.[95]

Plaintiffs argue the proposed class of 24,354 Growers is sufficient to meet the numerosity requirement.[96]  The court also observes the facts and circumstances of the case, notably the nationwide dispersion of Growers, indicates joinder of such a large number of members would be impracticable.  PPC does not contest the numerosity requirement and the court finds it satisfied.

---

[91] Fed. R. Civ. P. 23(a)(1).

[92] *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (quoting *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)).

[93] *Horn v. Assoc'd Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977).

[94] *Colo. Cross Disability Coal.*, 765 F.3d at 1215 (quoting 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206–07 (3d ed. 2005)).

[95] *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

[96] *Motion for Class Certification* at 22 (citing *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 290–92 (D. Utah 2021) (finding numerosity satisfied by proposed class of 2,425)).

## 2. Commonality

The commonality prong of Rule 23(a)(2) requires Plaintiffs demonstrate "there are questions of law or fact common to the class."[97]  To satisfy this requirement, the proposed class's claims must depend on a "common contention" of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[98]  Key "to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."[99]  That being said, "a single issue common to the class" will suffice.[100]  In a case alleging an antitrust conspiracy courts often find commonality readily met because "by their nature, [these cases] deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy."[101]

Plaintiffs argue the commonality requirement is satisfied because, among other issues, the existence of the alleged antitrust conspiracy is common to the class.[102]  In its Opposition, PPC contends Plaintiffs have failed to establish commonality because they have not offered "proof that all 21 Integrators, acting as a single cartel, had a general policy to enter into either the Overarching Agreement or the [NPA] nationwide or a general policy of suppressing grower pay

---

[97] Fed. R. Civ. P. 23(a)(2).  Though similar, the question of commonality is distinct from the "far more demanding" predominance inquiry under Rule 23(b)(3), discussed below.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

[98] *Dukes*, 564 U.S. at 350.

[99] *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1253 (10th Cir. 2014) (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

[100] *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999) (citation omitted).

[101] *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 232 (D. Minn. 2001) (quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D. Pa. 1976)); *see also In re Urethane*, 768 F.3d at 1254–55 (finding the more demanding predominance element is typically met in antitrust price-fixing cases because the existence of a conspiracy and its impact are common questions capable of class-wide proof).

[102] *Motion for Class Certification* at 23; Dkt. 514, *Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification* [SEALED] (*Plaintiffs' Class Certification Reply*) at 18–19.

as part of the [ISA]."[103]  Absent such proof, PPC asserts the Supreme Court's decision in *Dukes*

forecloses Plaintiffs' effort to demonstrate commonality under Rule 23(a)(2).[104]  The court

disagrees.

PPC reads *Dukes* to require all plaintiffs, regardless of the nature of their claim, prove

defendants operated under a "general policy" or engaged in some sort of "uniform practice" in

order to establish commonality.[105]  In *Dukes*, the Supreme Court held a proposed class of Title

VII claimants alleging Wal-Mart engaged in a pattern or practice of sex discrimination failed to

satisfy Rule 23(a)(2) because they had not adduced evidence the company operated "'under a

general policy of discrimination,' which is what [plaintiffs] must show to certify a companywide

class."[106]  PPC argues Plaintiffs fail to meet this standard here because they have not provided

evidence of the Overarching Agreement or its constituent subparts, and the evidence

demonstrates "extensive and material variance" in the way Integrators use Agri Stats data.[107]  At

bottom, according to PPC, "[t]hese facts demonstrate the 'opposite of a uniform practice' of any

relevant nature 'that would provide commonality needed for class certification.'"[108]

The court does not share PPC's reading of *Dukes*.  *Dukes* involved employment

discrimination claims under Title VII.  As the Court there noted, in a Title VII case "the crux of

the inquiry" is the rationale for particular employment decisions.[109]  In that context, plaintiffs

could not demonstrate commonality without proving a company-wide policy or uniform practice

---

[103] *Opposition to Class Certification* at 21.

[104] *Id.* (citing *Dukes*, 564 U.S. at 354).

[105] *Id.* at 21–22.

[106] *Dukes*, 564 U.S. at 358 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).

[107] *Opposition to Class Certification* at 21–22.

[108] *Id.* at 22 (quoting *Dukes*, 564 U.S. at 355).

[109] *Dukes*, 564 U.S. at 352.

of discrimination.  Otherwise, the litigation would be consumed by inquiries into "literally millions" of discretionary decisions of individual store managers.[110]  Without the "glue" of a general company policy "holding the alleged *reasons* for all those decisions together," the examination of class members' claims could not "produce a common answer to the crucial question *why was I disfavored*."[111]  The portions of *Dukes* PPC relies on are unique to the Title VII discrimination context and inapt here for at least two reasons.

First, the express language of the opinion and the precedent discussed by the Supreme Court indicates language concerning general policies or uniform practices has specific application in Title VII claims.  Plaintiffs there alleged Wal-Mart engaged in a pattern or practice of discrimination—a discrete type of Title VII claim.  As the Court explained, "In a pattern-or-practice case, the plaintiff tries to 'establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice.'"[112]  Further, the Court draws heavily from its prior decision in *Falcon*—also a Title VII discrimination case addressing Rule 23(a)'s requirements.  The Court cites *Falcon* for the proposition that companywide class certification requires claimants "demonstrate that the entire company 'operate[s] under a general policy of discrimination.'"[113]  On its face, the portions of *Dukes* PPC relies on appear to be cabined to the Title VII context.

Second, the Tenth Circuit's treatment of antitrust class actions following *Dukes* further suggests PPC's reliance is misplaced.  In *Urethane*, an antitrust case involving an alleged price-fixing conspiracy decided three years after *Dukes*, the Tenth Circuit addressed a challenge to a

---

[110] *Id.*

[111] *Id.* (emphasis in original).

[112] *Id.* at 352 n.7 (quoting *Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

[113] *Id.* at 358 (quoting *Falcon*, 457 U.S. at 159 n.15).

district court's certification of a Rule 23(b)(3) class.[114]   The Circuit affirmed the district court's determination that common issues predominated because "key elements of the price-fixing claim," including the existence of the conspiracy and impact, "raised common questions that were capable of class-wide proof."[115]   Indeed, the Circuit continued, "Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact," meaning a question common to the class.[116]   This opinion came in the wake of *Dukes* and the decision squarely addresses *Dukes* for other reasons.   Notwithstanding, the Circuit did not suggest that, post-*Dukes*, plaintiffs seeking class certification for an alleged antitrust conspiracy must prove a general policy or uniform practice to establish commonality.

The court agrees with Plaintiffs and concludes the Rule 23(a)(2) commonality requirement is satisfied.   A single common issue whose answer will drive the litigation forward clears this hurdle.[117]   Here, the existence of a conspiracy in violation of antitrust law, among others, is an issue common to the class.

### 3.  Typicality

Rule 23(a)(3) requires Plaintiffs show their claims "are typical of the claims" of the class they seek to represent.[118]   Similar to commonality, "typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's

---

[114] *In re Urethane*, 768 F.3d at 1254–56.  The Rule 23(a)(2) commonality inquiry is akin to the Rule 23(b)(3) predominance inquiry.  However, the "'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Brayman v. KeyPoint Gov. Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023) (quoting *Amchem Prods.*, 521 U.S. at 609).  In other words, if predominance is satisfied, commonality is satisfied.

[115] *In re Urethane*, 768 F.3d at 1254.

[116] *Id.*

[117] *Brayman*, 83 F.4th at 837 (citation omitted).

[118] Fed. R. Civ. P. 23(a)(3).

individual circumstances."[119]  The claims of Plaintiffs and the proposed class members "need not be identical to satisfy typicality."[120]  So long as Plaintiffs' claims are "based on the same legal or remedial theory" as other class members, "differing fact situations of the class members do not defeat typicality."[121]  "[I]n the antitrust context, typicality 'will be established by plaintiffs and all class members alleging the same antitrust violations by defendants.'"[122]

Plaintiffs assert typicality is met because all proposed class members seek to recover underpayments resulting from the same alleged violation of antitrust laws, the Overarching Agreement to suppress Grower compensation.[123]  PPC reiterates in opposition its view that there is no evidence of an Overarching Agreement and argues typicality is not met because, concerning the NPA, "a majority of the named Plaintiffs" either did not try to switch Integrators, did not want to switch Integrators, or lived in locations with a single Integrator so could not have been subject to the NPA.[124]  In reply, Plaintiffs contend PPC's argument misstates their factual allegations and is "legally irrelevant" for purposes of establishing typicality.[125]  The court agrees.

As stated above, on a motion for class certification, the court must accept Plaintiffs' well-pleaded factual allegations as true.  As Plaintiffs allege, the effects of the Overarching Agreement, including the NPA and the ISA, were nationwide and transmitted through the compensation of all Growers.[126]  According to Plaintiffs, the impact of the alleged antitrust

---

[119] *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010).

[120] *Id.* at 1198.

[121] *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

[122] *In re EpiPen Mktg, Sales Prac. and Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *15 (D. Kan. Mar. 10, 2020) (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002)).

[123] *Motion for Class Certification* at 23.

[124] *Opposition to Class Certification* at 41.

[125] *Plaintiffs' Class Certification Reply* at 30.

[126] *Motion for Class Certification* at 13–18.

violation—artificially suppressed pay—was felt by all Growers, regardless of whether an individual Grower tried to switch Integrators, did not want to switch, or could not switch.[127]   The anticompetitive effects of the conduct resulted in lower pay for the entire class.[128]   PPC's argument concerning whether certain named Plaintiffs were able to switch Integrators or desired to do so misconstrues the facts as alleged by Plaintiffs and is not relevant to the typicality inquiry.   The central point is not the switching status of these Plaintiffs, but that, because of PPC's alleged conduct in entering into a nationwide agreement, all Growers were injured by reduced competition resulting from the alleged conspiracy.

The court concludes that, although there may be some variation in the factual situation of Plaintiffs, named Plaintiffs' claims rest on the same legal and remedial theory as members of the proposed class.   Accordingly, Plaintiffs have satisfied the typicality requirement.

### 4.  Adequacy of Representation

The final element of Rule 23(a) requires the party seeking class certification to show they "will fairly and adequately protect the interests of the class."[129]   The court must consider two questions when evaluating adequacy: "(1) [D]o the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[130]   Minor conflicts between class members will not preclude certification—"[o]nly a 'fundamental conflict' about the specific issues in controversy will prevent a named plaintiff from representing the interests of the class

---

[127] *See id.* at 27–29.

[128] *Id.*; *see also Complaint* ¶¶ 134, 137–42.

[129] Fed. R. Civ. P. 23(a)(4).

[130] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (citation omitted).

adequately."[131]   A conflict is fundamental "where some class members claim an injury resulting from conduct that benefited other class members."[132]

Plaintiffs argue adequacy is satisfied because named Plaintiffs and their counsel have no conflicts of interest with the class and, consistent with their involvement in the case to this point, will continue to prosecute the action vigorously in the interests of the class.[133]   Plaintiffs highlight they have already achieved $69 million in settlements for the class, there have been no issues with conflicts in two final approval hearings, and the court has previously found them to be adequate representatives.[134]   PPC asserts named Plaintiffs are not adequate representatives of the class because they have had limited involvement with case strategy and half of the named Plaintiffs stopped working as Growers early in the class period.[135]   The court again disagrees with PPC.

---

[131] *In re EpiPen*, 2020 WL 1180550, at *19 (D. Kan. Mar. 10, 2020) (quoting *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 671 (D. Kan. 2013)).

[132] *Id.*

[133] *Motion for Class Certification* at 23.

[134] *Id.*

[135] *Opposition to Class Certification* at 42.

PPC does not identify any fundamental conflicts, nor any reason to conclude Plaintiffs and their counsel would be unable to prosecute the action vigorously on behalf of the class.[136] Its arguments are particularly unpersuasive in view of Plaintiffs' prosecution of the case to this point.  As Plaintiffs note, they have represented the interests of this proposed class through years of litigation, successfully securing settlements on behalf of the class with all PPC's prior co-Defendants.  At no point has their adequacy been questioned, and the court has affirmatively concluded they are adequate to serve as class representatives for each of the previous settlement classes.[137]  Given that involvement, PPC identifies no reason why Plaintiffs are inadequate for these purposes.  The court concludes Plaintiffs have satisfactorily demonstrated they are adequate representatives of the proposed class.[138]

Accordingly, Plaintiffs have satisfied each of the threshold requirements of Rule 23(a). The court now considers whether they have met their burden under Rule 23(b)(3).

---

[136] PPC cites two out-of-circuit district court decisions to support its argument that Plaintiffs' purported lack of involvement with case strategy renders them inadequate.  *See Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008) (finding an inadequate representative where "her knowledge of the facts and issues in this case were derived almost exclusively from counsel"); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 533 (N.D. Tex. 2005) (finding an inadequate representative where "there are many instances in which she has little or no knowledge outside of that given to her by her attorneys").  The court finds these decisions unpersuasive because the facts are readily distinguishable from Plaintiffs here.  Plaintiffs may not be experts on the legal intricacies of antitrust law or complex litigation procedures, but the court finds no binding authority suggesting they must be to meet the requirements of Rule 23(a)(4).  Other district courts in the Tenth Circuit have persuasively found plaintiffs adequate in the antitrust price-fixing context when they understand their role is to represent the best interests of the class, even when knowledge of relevant legal issues is derived solely from their attorneys.  *See In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 219 F.R.D. 661, 671–73 (D. Kan. 2004) (finding adequacy because named plaintiff "understands" role of class representative even where named plaintiff "admitted in his deposition that all information he possesses regarding [defendant's] alleged overcharge has been provided by his attorney, and that he relied on counsel to obtain factual support for the allegation of collusion in the complaint").

[137] *See Order Preliminarily Approving of Settlement with Tyson Defendants, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel* ¶ 9; *Order Preliminarily Approving Settlement with Perdue, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel* ¶ 9; *Order Preliminarily Approving Settlement with Koch, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel* ¶ 9.

[138] PPC does not challenge the adequacy of proposed class counsel and the court concludes they are adequate.

## B.  Rule 23(b)(3): Predominance

Under Rule 23(b)(3), Plaintiffs must establish "(1) that questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy."[139]  These standards are met "as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation."[140]  Though the court engages in a rigorous analysis to ensure the requirements of Rule 23 are met, it must remain mindful of the central purpose of the inquiry: "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the metho[d] best suited to adjudication of the controversy fairly and efficiently."[141]  The court first analyzes predominance before turning to superiority below.

The predominance inquiry evaluates "whether the common, aggregation-enabling issues in the case are more prevalent or important than the noncommon, aggregation-defeating, individual issues."[142]  The court categorizes "issues in the case as common or not, and then *weigh*[*s*] which issues predominate."[143]  Individual issues or questions are those for which "members of a proposed class will need to present evidence that varies from member to member."[144]  In contrast, "a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-

---

[139] Fed. R. Civ. P. 23(b)(3).

[140] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).

[141] *Amgen*, 568 U.S. at 460 (internal quotations omitted).

[142] *Occidental Petroleum Corp.*, 69 F.4th at 1175 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

[143] *CGC Holding Co.*, 773 F.3d at 1087 (emphasis in original).

[144] *Tyson Foods*, 577 U.S. at 453 (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).

wide proof."[145]  Put differently, a common question is one where a failure of proof at summary judgment or trial would not result in individual questions "overwhelm[ing] the questions common to the class."[146]  Rather, "the failure of proof . . . would end the case for one and for all; no claim would remain in which individual [] issues could potentially predominate."[147]  Again, the court's analysis at this stage turns on "to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor."[148]

The evaluation of whether common issues predominate begins "with the elements of the underlying cause of action."[149]  Plaintiffs allege PPC and its co-conspirators' Overarching Agreement to suppress Grower pay was a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.[150]  "Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states.'"[151]  To establish their claim, Plaintiffs must prove "(1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages."[152]  Though the court considers Plaintiffs' evidence in relation to each of these elements, "[c]lass-wide proof is not required for all

---

[145] *Id.*

[146] *Amgen Inc.*, 568 U.S. at 468.

[147] *Id.*

[148] *Occidental Petroleum Corp.*, 69 F.4th at 1185 (citing *Tyson Foods*, 577 U.S. at 453).

[149] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).

[150] *Motion for Class Certification* at 8.

[151] *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017) (quoting 15 U.S.C. § 1).

[152] *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp.2d 1167, 1183 (N.D. Cal. 2013) (quoting *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008)).

issues."[153]  The presence of individualized issues concerning an element of Plaintiffs' claim—

damages for example—does not necessarily preclude certification.[154]  Predominance "simply

requires a showing that the questions common to the class predominate over individualized

questions."[155]

Courts routinely find predominance met in certain types of antitrust cases involving

alleged unlawful conspiracies and horizontal agreements between ostensible competitors,

particularly when those competitors exercise substantial market power.[156]  Indeed, defendants

seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy "face

an uphill battle."[157]  This is so because, depending on the circumstances, "the existence of a

conspiracy [is] the overriding issue even when the market involves diversity in products,

marketing, and prices."[158]  Further, "[u]nder the prevailing view," antitrust conspiracies such as

price-fixing "affect[] all market participants, creating an inference of class-wide impact even

when prices are individually negotiated."[159]  That inference is "especially strong" where

evidence demonstrates the "conspiracy artificially inflated the baseline for price

---

[153] *In re Urethane*, 768 F.3d at 1255 (citing *Amgen*, 568 U.S. at 469).

[154] *Id.*

[155] *Id.*

[156] *See Amchem Prods.*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws.").

[157] *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 636 (D. Kan. 2008), *aff'd*, *In re Urethane*, 768 F.3d at 1254.

[158] *In re Urethane*, 768 F.3d at 1255 (collecting cases) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case.") (emphasis in original)); *see also In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022) (noting this "type of alleged conspiracy is the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence") (quoting *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015)); 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).").

[159] *In re Urethane*, 768 F.3d at 1254 (collecting cases).

negotiations"[160]—or, in a wage suppression case, artificially depressed the baseline. This is not a "broad presumption" applicable to all antitrust class actions.[161] But, in cases where plaintiffs present evidence of standardized pricing structures, a horizontal conspiracy to fix prices (or the inverse, suppress wages), and an artificially inflated baseline for pricing negotiations (or artificially depressed baseline for pay), the evidence may support "a reasonable conclusion that 'price-fixing would have affected the entire market.'"[162] Plaintiffs here do not rely on an inference of common impact, but it is against this backdrop PPC mounts its challenge to predominance.[163]

Plaintiffs argue common issues predominate in this case "as a whole" and they will establish each element of their Sherman Act claim with class-wide proof.[164] In its Opposition, PPC contends Plaintiffs have failed to meet their burden under Rule 23(b)(3) and challenges

---

[160] *Id.*

[161] *Occidental Petroleum Corp.*, 69 F.4th at 1182.

[162] *Id.* (quoting *In re Urethane*, 768 F.3d at 1255) ("We agree that *In re Urethane* does not endorse such a broad presumption. *In re Urethane* is limited to its facts, in particular plaintiffs' evidence of the polyurethane industry's pricing structure, the defendant's price-fixing conspiracy, and the artificially inflated baseline for pricing negotiations.").

[163] The parties dispute whether this is a price-fixing case. *Compare Opposition to Class Certification* at 38 ("This is not a price fixing case . . . .") *with Plaintiffs' Class Certification Reply* at 16 n.7 (asserting PPC's contention this is not a price fixing case "misstates antitrust conspiracy law.") Though not essential to this Order, the court observes a wage-suppression conspiracy, as Plaintiffs allege here, bears many of the same characteristics that lead courts to find predominance readily met in a price-fixing case. Price-fixing involves a horizontal conspiracy between sellers to artificially drive prices up. Predominance is commonly found in these cases—particularly where there is evidence of a conspiracy to increase prices and a standardized pricing structure—because the nature of the conspiracy supports the conclusion that it would affect the whole market. *See Occidental Petroleum Corp.*, 69 F.4th at 1182. Paralleling this, wage-suppression involves a horizontal conspiracy between buyers to artificially drive the price paid for a seller's services down. In a case with evidence of a conspiracy to suppress pay and a class-wide pay structure, a similar conclusion that the conspiracy affects the whole market could be reasonably reached. *See Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-CBS, 2018 WL 1948687, at *8 (D. Colo. Feb. 2, 2018) (finding it "is presumably true" the strong inference of class-wide impact in a price-fixing case applies in a wage-suppression case where there "is evidence that the conspiracy artificially deflated the baseline for *au pairs'* wages."). *See also Fleischman v. Albany Med. Ctr.*, 728 F. Supp.2d 130, 157 (N.D.N.Y. July 22, 2010) (applying Sherman Act standards for a price-fixing case to a wage-suppression case at summary judgment).

[164] *Motion for Class Certification* at 9.

Plaintiffs' showing on each element of their claim.[165]  Plaintiffs rely on both direct evidence (in the form of documentary and testimonial evidence) and circumstantial evidence (drawing heavily from Singer's expert economic and econometric analysis) to demonstrate their claim is susceptible to common proof.  Ultimately, PPC's arguments to defeat class certification underscore the predominance of common issues in this case, demonstrating the proposed class will either prevail or fall based on class-wide proof.

### 1. Antitrust Violation

Plaintiffs allege that, since at least 2008, PPC and its co-conspirator Integrators participated in the Overarching Agreement to "prevent starting a grower war," "match one another's Grower pay," and "control" Integrator costs.[166]  In other words, PPC allegedly violated antitrust laws by engaging in a horizontal conspiracy with other Integrators to suppress Grower pay.  Plaintiffs argue the Overarching Agreement, "implemented nationwide" through the NPA and ISA, is capable of class-wide proof.[167]  In support of the alleged violation, Plaintiffs set forth direct evidence, in the form of communications between Integrators and deposition testimony, as well as circumstantial evidence, primarily Singer's expert analysis.  According to Plaintiffs, "[t]he *question* of whether Plaintiffs can prove an antitrust violation—or PPC can refute that proof—is common to the Class as a whole."[168]

The court reads PPC's Opposition to argue Plaintiffs are unable to establish an antitrust violation through class-wide proof because, while focusing on the NPA and ISA, Plaintiffs "fail

---

[165] *Opposition to Class Certification* at 23.

[166] *Motion for Class Certification* at 13.

[167] *Id.*

[168] *Id.* (emphasis in original).

to adduce any evidence" of an Overarching Agreement.[169]  PPC contends that to prove a

violation through common proof, "'the circumstances must [] reveal a unity of purpose or a

common design and understanding, or a meeting of minds in an unlawful arrangement' to

suppress Grower pay nationwide over an 11-year period, through either of the alleged

agreements . . . ."[170]  PPC argues the "wide variance" in how Integrators used Agri Stats data and

the fact that only about half of Integrator Complexes "arguably had some form of limited or

sporadic no-poach understanding" demonstrates there is no evidence PPC and its 20 co-

conspirator Integrators had such an "unlawful common design."[171]  Rather, separate proof would

be required to establish which, if any, Integrators acted unlawfully to suppress grower pay at

certain times and at certain locations.[172]

 "The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement

itself."[173]  However, courts have long-held plaintiffs in a case involving an alleged horizontal

conspiracy do not need "the smoking gun"—direct evidence—to establish an antitrust

conspiracy.[174]  Circumstantial evidence will suffice.  Plaintiffs here present both direct and

---

[169] *Opposition to Class Certification* at 23.

[170] *Id.* at 25 (quoting *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 3268339, at *9 (S.D. Ill. July 30, 2021)).

[171] *Id.*

[172] *Id.*

[173] *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006) (citation omitted).

[174] *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010) (holding "[d]irect evidence of conspiracy is not a sine qua non" in a price fixing case, "[c]ircumstantial evidence can establish an antitrust conspiracy"); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy . . . . The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 177 (1940) ("The alleged conspiracy is not to be found in any formal contract or agreement.  It is to be pieced together from the testimony of many witnesses and the contents of over 1,000 exhibits, extending through the 3,900 printed pages of the record.").

circumstantial to establish the alleged antitrust violation, all of which is common to the proposed Grower class.

Concerning the NPA, Plaintiffs present documentary and testimonial evidence of an agreement between PPC and its co-conspirator Integrators to not recruit each other's Growers. For example, a PPC manager discussed in internal communications his relationship with a counterpart at Tyson, writing they "typically have not tried to cross lines, shane [sic] [a Tyson employee] and I have have [sic] a good relationship and we try to stay out of each others [sic] area."[175]  Similarly, a former PPC manager testified in a deposition to an agreement with co-conspirator Harrison Poultry, stating they "made a gentlemen's agreement amongst each other that we [PPC] would not recruit broiler producers [Growers] from Harrison and he [Harrison] would not go to PPC producers [Growers] and try to recruit them."[176]  Another PPC manager testified "the No-Poach was 'an unwritten word' among Integrators to not 'go on anybody's farm while they [] have chickens and try and recruit that grower,'" stating "that rule applied to the 'chicken business, in general, everybody.'"[177]

In addition to this documentary evidence, Plaintiffs also produce circumstantial evidence demonstrating the NPA through class-wide proof.  Much of this evidence is Singer's qualitative and quantitative analysis of other record evidence.  For example, Singer's analysis of Integrator data demonstrates the rate of Growers switching Integrators was low across all Integrators, regions, and years, except for a discrete period of time in the so-called Delmarva region where

---

[175] *Motion for Class Certification* at 14 (quoting Dkt. 454-3, *Exhibit 11*).

[176] *Id.* (quoting Dkt. 454-3, *Exhibit 8*).

[177] *Id.* at 15 (quoting Dkt. 454-3, *Exhibit 13*).  The full context of this quote suggests the purpose of the "unwritten" rule was to prevent the spread of disease.  *Id.*  However, this evidence is only one piece among others offered in support of the NPA.  Its probative value or persuasiveness is a question for summary judgment or trial.  For these purposes, whether it is compelling evidence of the alleged NPA or not is a question common to the class.

the NPA broke-down and a "Grower war" ensued until the NPA was restored.[178]  Singer also

offers opinions that economic theory suggests the existence of the NPA because co-conspirator

behavior "was inconsistent with the expectations of firms behaving unilaterally."[179]  This

circumstantial evidence is further corroborated by testimony from witnesses indicating an

"industrywide practice not to actively recruit Growers from rival Integrators."[180]  For example, a

Koch manager, one of the alleged co-conspirator Integrators, testified a PPC manager in his area

"let [him] know that they [PPC] weren't going to be calling on our growers trying to pick them

up during that time . . . ."[181]

Likewise, Plaintiffs present evidence capable of demonstrating the existence of the ISA

through common proof.  According to Plaintiffs, PPC and all alleged co-conspirator Integrators

provided Grower compensation information to Agri Stats.[182]  In return, they each received

weekly and monthly reports from Agri Stats featuring the competitively sensitive information of

the other co-conspirators.[183]  Plaintiffs provide testimonial evidence from executives at various

Integrators that each co-conspirator would set and adjust Grower compensation based off the

Agri Stats nationwide benchmark.[184]  And, though the data was anonymized, it "was so granular

that Integrators could and did 'reverse engineer' it to identify data applicable to specific

competitors' Complexes."[185]  Plaintiffs also produce evidence of direct "interfirm exchanges" of

---

[178] *Motion for Class Certification* at 15.

[179] *Id.*

[180] *Id.*

[181] *Id.* at 16 n.16 (quoting Dkt. 454-3, *Exhibit 19*).

[182] *Id.* at 16.

[183] *Id.*

[184] *Singer Report* ¶ 69.

[185] *Motion for Class Certification* at 16.

Grower pay information between Integrators.[186]  For example, an internal PPC email demonstrating individuals from PPC, Tyson, Perdue, Wayne, Peco, Keystone, and Fieldale exchanged plans for future Grower pay, determining it "[s]ounds like we are all in about the same place."[187]

As Plaintiffs allege, the NPA and ISA "work together to suppress Grower pay" and together provide class-wide proof of the Overarching Agreement.[188]  According to Singer, economic theory suggests the "21 Integrators' joint participation in the NPA and ISA would be economically irrational in the absence of the Overarching Agreement."[189]

PPC broadly argues Plaintiffs fail to demonstrate common proof will establish the alleged antitrust violation because they provide no evidence of the Overarching Agreement.[190]  As PPC explains, Plaintiffs' evidence concerning the NPA and ISA, including Singer's opinions, treat each sub-agreement as a separate agreement.  They do not serve as evidence of the Overarching Agreement.[191]  In addition, PPC contends common issues do not predominate because "separate proof" will be required to determine how specific Integrators used the shared pay information and whether a particular Complex operated under a NPA at a particular point in time.[192]

PPC's arguments are unpersuasive because they are not tailored to the question at issue in the court's predominance inquiry.  Rather than undermining Plaintiffs' showing that the alleged

---

[186] *Id.*

[187] *Id.* at 18 (quoting Dkt. 454-3, *Exhibit 27*).

[188] *Plaintiffs' Class Certification Reply* at 15 (citing *Singer Report* ¶¶ 200–01).

[189] *Id.*

[190] *Opposition to Class Certification* at 23.

[191] *Id.* at 24.

[192] *Id.* at 25.

antitrust violation is susceptible to class-wide proof, PPC's arguments persuasively demonstrate the first element of Plaintiffs' claim is susceptible to resolution by class-wide evidence.

As an initial matter, the absence of direct evidence of the Overarching Agreement is not fatal to Plaintiffs' claim at this stage. No "smoking gun"[193] or "formal agreement"[194] is required to prove the existence of an unlawful horizontal conspiracy. Plaintiffs' proof of violation can rest entirely on circumstantial evidence.[195] Though Plaintiffs here may not produce direct evidence of the alleged nationwide Overarching Agreement, they produce direct and circumstantial evidence supporting the existence of the purported sub-components, the NPA and the ISA. Then, through the expert opinions of Singer, Plaintiffs offer circumstantial evidence based on conventional principles of economic theory that participation in the NPA and the ISA would not be economically rational in the absence of the nationwide Overarching Agreement.

This discussion illustrates the shortcoming with PPC's arguments at this stage. What is relevant here is not whether the Overarching Agreement exists or not. What is relevant is whether its existence is susceptible to class-wide proof. Plaintiffs and PPC both demonstrate it is. PPC is not arguing "'some fatal dissimilarity' among class members," but rather "'a fatal similarity—[an alleged] failure of proof as to an element of the [P]laintiffs' cause of action.'"[196] Either there is a nationwide conspiracy to suppress grower pay or there is not.[197] If the evidence

---

[193] *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628–29.

[194] *Am. Tobacco Co.*, 328 U.S. at 809.

[195] *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 628–29.

[196] *Occidental Petroleum Corp.*, 69 F.4th at 1179 (quoting *Amgen Inc.*, 568 U.S. at 470).

[197] At times Plaintiffs suggest if the court declines to certify the proposed nationwide class, it could alternatively certify various regional classes. *See Plaintiffs' Class Certification Reply* at 14. The court declines this invitation. Plaintiffs' conclusory assertion that the evidence also supports regional class certification—without even defining the geographic scope of the suggested regional classes—is wholly inadequate. Plaintiffs focus their Motion on a nationwide class, PPC responds to Plaintiffs' request to certify a nationwide class, and that is what the court considers.

Plaintiffs present to establish an antitrust violation is not compelling at summary judgment or trial, the litigation does not devolve into thousands of mini-trials.  For example, a trier of fact would not have to establish if some Complexes operated under an NPA at some points in time—that is not Plaintiffs' theory.  If the evidence does not establish the existence of the alleged nationwide conspiracy for the duration of the proposed class period, Plaintiffs fail to establish an element of their claim and they simply lose their case.

In sum, Plaintiffs have demonstrated the first element of their claim, antitrust violation, presents common questions capable of class-wide resolution.  Accordingly, the court finds common questions will predominate with respect to the alleged antitrust violation.

### 2.  Antitrust Impact

The second element Plaintiffs' must prove to prevail on their Sherman Act § 1 wage-suppression claim is "that the proposed class suffered injury from the alleged antitrust violation—an element commonly called impact."[198]  Antitrust injury "is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful."[199]  In other words, as Plaintiffs allege here, injury results from PPC's anticompetitive conspiracy to suppress Grower pay.  The antitrust injury requirement ensures plaintiffs "recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."[200]

Plaintiffs rely heavily on Singer's economic and econometric analysis, as well as documentary and testimonial evidence, to demonstrate their ability to prove impact through

---

[198] *In re Urethane*, 251 F.R.D. at 634.

[199] *Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005) (quoting *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962 n. 15 (10th Cir. 1990)).

[200] *Id.* at 1124–25 (emphasis in original) (quoting *Atl. Richfield Co., v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

common proof.  As is common in antitrust class certification motions, the primary thrust of

PPC's effort to defeat certification and exclude Singer's opinions is trained on this element.  For

its part, PPC attempts to undermine Plaintiffs' showing through the analysis and opinions of its

own competing experts—Dr. Justin McCrary,[201] Dr. Celeste Saravia,[202] and Dr. John Carey.[203]

Plaintiffs seek to demonstrate the class-wide impact of the alleged conspiracy to suppress

Grower pay through a two-step approach.[204]  At the first step, using documentary, testimonial,

and econometric evidence, Plaintiffs demonstrate their ability to show the Overarching

Agreement suppressed Grower pay through class-wide evidence.[205]  Next, again drawing from

documentary, testimonial, and econometric evidence—notably, evidence of a nationwide price

structure—Plaintiffs demonstrate through common proof this suppressed pay "impacted all or

nearly all members of the Class."[206]  Plaintiffs' approach follows "a roadmap widely accepted in

antitrust class actions that use evidence of general price effects plus evidence of a price structure

to conclude that common evidence is capable of showing widespread harm to the class."[207]

PPC broadly argues Plaintiffs cannot prove impact through common proof because the

market for broiler grow-out services is local, not nationwide, and because Singer's opinions

underlying Plaintiffs' Motion are inadmissible.[208]  However, PPC's arguments are not drawn to

the standards applied in the Rule 23(b)(3) predominance inquiry.  They may be compelling at

---

[201] Dkt. 454-2, *Exhibit 3: Expert Report of Justin McCrary, Ph.D.* (*McCrary Report*).

[202] Dkt. 346-1, *Exhibit 1: Expert Report of Celeste Saravia, Ph.D.* (*Saravia Report*).

[203] Dkt. 346-2, *Exhibit 2: Expert Report of John B. Carey, Ph.D.* (*Carey Report*).

[204] *Motion for Class Certification* at 26–27.

[205] *Id.* at 27.

[206] *Id.* at 29.

[207] *In re High-Tech Emp.*, 985 F.Supp. 2d at 1206 (citations omitted).

[208] *Opposition to Class Certification* at 34–39.

summary judgment or trial, but they will be compelling because they demonstrate Plaintiffs' theory fails on a class-wide basis.  They do not show individualized inquiry will predominate. Further, PPC's critiques of Singer's analysis go to the weight a trier of fact should ascribe to his opinions.  They do not demonstrate his methodology is inadmissibly unreliable.

At this stage, the court need not determine whether Plaintiffs theory will ultimately prevail.  Rather, the question is whether Plaintiffs have demonstrated they have common evidence capable of proving their theory of impact on a class-wide basis.  The court concludes they have met this burden.  The court first discusses the documentary and testimonial evidence Plaintiffs provide, before evaluating Singer's expert report.  The court then explains why it finds PPC's class certification and *Daubert* arguments unpersuasive.

### a.  Documentary and Testimonial Evidence

In support of their theory of impact, Plaintiffs' Motion presents class-wide documentary and testimonial evidence demonstrating the alleged conspiracy suppressed Grower pay.  For example, a Tyson manager, one of PPC's alleged co-conspirators, testified concerning the economic logic motivating the NPA.[209]  He acknowledged that if another Integrator was attempting to recruit one of Tyson's Growers, Tyson would be incentivized to increase the Grower's pay to prevent them from switching Integrators.[210]  He then acknowledged that measures to reduce the chances of a Grower being recruited by another Integrator would reduce the chances Tyson would have to pay the Grower more to retain them.[211]  Further supporting the effects of the NPA, an email between PPC employees discussed reluctance to hire Growers from

---

[209] *Motion for Class Certification* at 27.

[210] *Id.* (quoting Dkt. 454-3, *Exhibit 32*).

[211] *Id.*

Koch, a co-conspirator Integrator, because it would "start another war with Koch, meaning [Koch] will up their pay more and we will lose current growers."[212]

Concerning the other leg of the alleged Overarching Agreement, Plaintiffs also present class-wide documentary evidence demonstrating the impact of the ISA.  For example, an email exchange between executives at two of PPC's co-conspirators discusses compensation adjustments in new Grower contracts and their respective plans to "match" each other.[213] Likewise, an email between executives at PPC and several of its alleged co-conspirator Integrators confirmed "we are all in about the same place" concerning Grower compensation.[214]

At step two of their impact theory, Plaintiffs offer class-wide documentary and testimonial evidence demonstrating that pay suppression was experienced broadly across the class.[215]  As discussed above, Plaintiffs provide documentary evidence the alleged Overarching Agreement, through the NPA and ISA, was applied broadly across Integrators.[216]  Further, Grower compensation was standardized based on "take-it-or-leave-it" contracts, with final pay at each Complex determined by the so-called tournament system.[217]  Under Plaintiffs' theory, these structural aspects of the industry demonstrate impact would be commonly felt throughout the class.

---

[212] *Id.* (quoting Dkt. 454-3, *Exhibit 33*).

[213] *Id.* (quoting Dkt. 454-3, *Exhibit 5*).  The court notes Plaintiffs do not provide the full quotation in their Motion. In the Exhibit, the executive from Perdue states, "We risk losing quite a bit of housing to the new Tyson program so we are countering."  Dkt. 454-3, *Exhibit 5*.  Whether this piece of evidence supports Plaintiffs' theory or undermines it, for Rule 23(b)(3) purposes, the relevant consideration is that it applies on a class-wide basis.

[214] *Id.* (quoting Dkt. 454-3, *Exhibit 27*).

[215] *Id.* at 29.

[216] *Id.* at 20; *Singer Report* ¶¶ 99–104.

[217] *Motion for Class Certification* at 20.  Recall that total compensation distributed at each Complex through the tournament system equaled the average base pay of the Complex.  *See Complaint* ¶ 148.

Additionally, Plaintiffs present testimonial evidence supporting Singer's econometric analysis purportedly demonstrating a nationwide pay structure. This is integral to Plaintiffs' theory because it demonstrates "Grower pay is sufficiently interconnected that pay suppression would be expected to be felt broadly across the Class."[218] As Plaintiffs explain, concerns about "internal equity" motivated Integrators to "compensate similarly situated Growers similarly across Complexes."[219] For example, executives from Sanderson, a co-conspirator Integrator, testified the company paid all of its Growers the same and when it increased Grower contract pay, it would increase "it across the entire company."[220] Representatives from Peco, another co-conspirator Integrator, also testified to uniform pay raises to all Growers at all Complexes.[221] Likewise, PPC representatives testified Grower pay was standardized within a Complex based on housing-type, and employees would compare their compensation to sister Complexes to ensure internal equity.[222]

### b. Expert Report and Econometric Evidence

Plaintiffs draw heavily on the expert economic and econometric opinions in Singer's Report to demonstrate common issues predominate in their showing of antitrust impact. According to Singer, the "standard two-part method" he employs uses "evidence and analyses common to the Class" and demonstrates "the suppression of Grower compensation due to the alleged Overarching Agreement and its constituent parts . . . can be shown to have impacted all

---

[218] *Motion for Class Certification* at 29.

[219] *Id.*

[220] *Singer Report* ¶ 266.

[221] *Id.*

[222] *Id.* ¶¶ 275–76.

or virtually all class members located in each and every geographic region around the country."[223]

At the first step, Singer uses separate multiple-regression analyses[224] to demonstrate the effect on Grower pay of the NPA and the ISA.[225]  Using this "standard" econometric method for comparing prices during an alleged conspiracy period with a benchmark period absent the conspiracy,[226] Singer isolates the effect on Grower pay of the NPA through analysis of the "natural experiment" resulting from the so-called "War on the Shore."[227]  The War on the Shore involved a "temporary breakdown" of the NPA between integrators in Delmarva.[228]  From approximately March 2013 to December 2015, Integrators with Complexes in the region "began to cheat" on the alleged NPA by recruiting Growers from each other.[229]  According to Singer's analysis, the rate of Growers switching from one Integrator to another "more than doubled during the 'War on the Shore' period as compared to the No-Poach period that came before it."[230]

The Delmarva natural experiment allows Singer to "test the hypothesis that, holding other relevant factors affecting Grower compensation constant, Integrators allegedly engaged in the alleged [NPA] *before* the War paid lower prices to Growers than during the period of [NPA]

---

[223] *Singer Report* ¶ 245.

[224] "Multiple-regression analysis is a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable."  *In re Urethane*, 768 F.3d at 1260 (quoting Saks, Michael J., et al., *Reference Manual on Scientific Evidence* 179, 181 (2d ed. 2000)).

[225] *Motion for Class Certification* at 28.

[226] *Singer Report* ¶ 229.

[227] *Motion for Class Certification* at 28.

[228] *Id.*  Delmarva refers to a region spanning portions of Delaware, Maryland, and Virginia.  *Singer Report* ¶ 55.

[229] *Singer Report* ¶ 229.

[230] *Id.* ¶ 244.

breakdown . . . *and* the post-period of higher compensation (relative to the No-Poach period) that followed it."[231]  Singer's regression analysis finds—after controlling for variables such as chicks per flock, flock age, flock weight, feed conversion, local wages, local temperatures, and local fixed effects—the NPA suppressed Grower pay between 4 and 5.2 percent.[232]  He further concludes, due to the similarities of Growers and Integrators throughout the country, the analysis indicates the NPA suppressed Grower compensation "in comparable magnitudes nationwide."[233]

Singer constructs another multiple-regression model to isolate and analyze any effects on Grower Pay of the ISA.[234]  In the model, he identifies and analyzes four "benchmark Integrators" who were not parties to the ISA—they neither participated in Agri Stats nor engaged in direct sharing of Grower compensation information.[235]  Controlling for similar variables as the NPA models, Singer identifies the effect of the ISA by comparing the Grower pay for the benchmark Integrators with that of the co-conspirator Integrators.[236]  Based on the model, Singer estimates the ISA suppressed Grower pay between 4.8 and 6.9 percent.[237]

Having shown the Overarching Agreement's effect on Grower pay through class-wide evidence, Singer then moves to step two where he demonstrates with common proof that those effects were felt broadly throughout the class.[238]  He does this using two econometric techniques commonly used for demonstrating the broad impact of an alleged antitrust conspiracy.[239]  First,

---

[231] *Id.* ¶ 229.

[232] *Motion for Class Certification* at 28; *Singer Report* ¶ 238.

[233] *Singer Report* ¶ 242.

[234] *Motion for Class Certification* at 28; *Singer Report* ¶¶ 209–28.

[235] *Motion for Class Certification* at 28.

[236] *Id.*

[237] *Id.*

[238] *Id.* at 29.

[239] *Singer Report* ¶¶ 246–47.

Singer runs an in-sample prediction on both the NPA and ISA regressions to compare "the prices that Growers were actually paid to the prices they would have been paid in a 'but-for' world absent the alleged conduct at issue."[240]  Second, he analyzes the impact of the challenged conduct using common evidence to determine the existence of a pay structure.[241]

The in-sample prediction method is a standard technique used to test whether the impact of an antitrust conspiracy is widespread.[242]  Using the NPA and ISA regression models, Singer predicts the "but-for" pay a Grower would have received for each transaction in the database—in other words, the pay a Grower would have received for each flock in a world without the NPA and ISA.[243]  He then compares the "but-for" pay for each transaction to the actual pay the Grower received.[244]  If the "but-for" pay is greater than the actual pay the Grower received, Singer concludes the flock was impacted by the challenged conduct.[245]  Singer conducted the analysis at both the Grower and the Complex level and found that, depending on the regression sampled and the level of analysis, between 95 and 100 percent of proposed class members were impacted.[246]

Singer also assesses widespread impact by using an econometric technique known as correlation analysis to determine the existence of a pay structure.[247]  This is a standard

---

[240] *Id.* ¶ 248.

[241] *Id.* ¶ 257.

[242] *Motion for Class Certification* at 30–31 (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 672 (9th Cir. 2022); *In re Capacitors Antitrust Litig.* (No. III), No. 17-md-02801, 2018 WL 5980139, at *7–9 (N.D. Cal. Nov. 14, 2018); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 217 (E.D. Pa. 2017); *In re Korean Ramen Antitrust Litig.*, 13-cv-04115, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017); *In re Broiler Chicken*, 2022 WL 1720468, at *10, *13).

[243] *Id.*

[244] *Id.*

[245] *Id.*

[246] *Id.*

[247] *Id.* at 29–30.

methodology regularly used in antitrust litigation for demonstrating impact with class-wide evidence.[248]  As Singer explains, after first finding through the regression analysis in step one that the challenged conduct generally suppressed Grower compensation, the identification of a pay structure offers class-wide evidence the challenged conduct would "transmit" the pay suppression "broadly across the class."[249]  This test measures "the extent to which an increase in average compensation paid to Growers *generally* is statistically associated with an increase in compensation received by the *individual* Grower."[250]  Singer's analysis finds Grower pay is highly correlated across Complexes, Integrators, regions, and the industry.[251]  He finds "a one cent rise in average Grower compensation at the [C]omplex, Integrator, regional, or industry level is associated with approximately a one cent raise for an individual Grower."[252]  Singer concludes these tests "provide direct evidence of a compensation structure," meaning the suppressive effect of the alleged Overarching Agreement "would be expected to affect the compensation of all Growers and not be contained to individual Growers, complexes, Integrators, or regions."[253]

In addition to his econometric analysis, Singer also offers class-wide evidence applying standard principles of economic theory to record evidence.  For example, in support of his conclusion concerning an industry-wide compensation structure, Singer evaluates documentary

---

[248] *Singer Report* ¶ 255 (citing *In re High-Tech Emp.*, 985 F. Supp.2d at 1206 ("Plaintiffs noted that Dr. Leamer's approach followed a roadmap widely accepted in antitrust class actions that uses evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class.")).

[249] *Id.*

[250] *Id.* ¶ 257 (emphasis in original).

[251] *Motion for Class Certification* at 30.

[252] *Singer Report* ¶ 259.

[253] *Id.*

and testimonial evidence indicating Integrators sought to compensate Growers uniformly, both between Complexes of the same Integrator and between Complexes of different Integrators. According to Singer, the record evidence is consistent with the economic literature discussing "internal equity."[254]  Internal equity, also known as "wage compression," is a well-established economic principle that, to avoid discontent, "employers structure pay such that employees doing comparable work receive similar compensation."[255]  Singer concludes the record evidence, corroborated by his econometric analysis, demonstrates the co-conspirator Integrators "endeavored to keep pay tethered across their Complexes to avoid Grower discontent."[256]

In sum, Singer's report offers common proof—through econometric models and economic theory—capable of demonstrating the class-wide impact of the alleged Overarching Agreement.

### c.   The Court's Conclusions and PPC's Arguments

The court now turns to PPC's arguments that individual questions of impact will predominate and that Singer's opinions are inadmissible.  Each of the arguments PPC raises in opposition to Plaintiffs' predominance showing suffer from the same fatal flaw: they may pose a challenge to Plaintiffs' ability to prevail at summary judgment or trial, but fundamentally do so through arguments and evidence common to the class.  As such, PPC's arguments fail to undermine Plaintiffs' contention that its impact theory is susceptible to class-wide proof.

Relatedly, PPC's overlapping arguments against the admissibility of Singer's opinions suffer from a similar common flaw: they do not undermine the reliability of Singer's methodology, but rather present competing expert opinions that challenge the persuasiveness of

---

[254] *Motion for Class Certification* at 29.

[255] *Singer Report* ¶ 256.

[256] *Motion for Class Certification* at 29; *Singer Report* ¶¶ 264–67.

Singer's analysis.  Fundamentally, PPC "asks the [c]ourt to take sides in a dispute between experts about the intricacies of econometric modeling."[257]  However, this "is not the proper function of a *Daubert* motion.  This is not a case in which an expert is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable."[258]  Singer uses methods and techniques commonly employed by experts in antitrust litigation and adequately explains the bases for the subjective decisions he made when conducting his analysis.  PPC's arguments may render that analysis less persuasive to a jury, but they do not demonstrate it is so unreliable as to be inadmissible.

PPC's impact related arguments broadly fall into three categories: (1) general arguments concerning Plaintiffs' inability to prove impact with common evidence, (2) impact arguments specific to the NPA, and (3) impact arguments focused on the ISA.  The court addresses each in turn.

### i.   General Impact

PPC argues Plaintiffs cannot show all or nearly all class members were impacted by the alleged conspiracy with common evidence because the market for Grower services is local and there is wide variance in Grower pay.[259]  According to PPC, to demonstrate common issues predominate in a wage-suppression case, "Plaintiffs must adduce 'evidence that the compensation structures of the defendants in the pertinent industry were so rigid that the compensations of all [nationwide] class members were tethered together."[260]  PPC argues its

---

[257] *Miami Prods. & Chem. Co. v. Olin Corp.*, 1:19-CV-00385 EAW, 2023 WL 8946114, at *8 (W.D.N.Y. Dec. 28, 2023) (quoting *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012)).

[258] *Id.*

[259] *Opposition to Class Certification* at 34.

[260] *Id.* at 35 (quoting *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F.Supp. 3d 464, 514 (W.D. Pa. 2019)).

experts' analysis demonstrates Grower pay was not tethered nationwide and Singer's models finding a pay structure are too flawed and unreliable to be accepted as common proof.[261]   The court disagrees.

PPC asserts analysis of Grower pay data reveals "extensive pay variance" between different types of housing within the same Complex, between similar housing classes across the same Integrator, between Integrators, and across different states.[262]   This variance is expected because, as PPC argues, the market for broiler-grow-out services is local and Grower pay is determined at the local Complex level.[263]   PPC's experts, McCrary and Saravia, provide graphs purportedly demonstrating the wide variation in Grower pay during the class period.[264]   They argue the graphs, "on their face," refute Plaintiffs' documentary and qualitative evidence that Grower pay is tethered.[265]   Further, PPC contends Plaintiffs' assertions about "internal equity" are based on "flimsy evidence and speculative inferences" that do not rebut the evidence in PPC's pay data and graphs.[266]

In its Motion to Exclude, PPC further explains what it believes to be the failings in Plaintiffs' and Singer's effort to prove the existence of a pay structure.[267]   Saravia contends Singer's pay structure opinions are unreliable because "a simple visualization" of Grower pay data demonstrates Grower pay does not move in "lock-step" throughout the country.[268]   Saravia

---

[261] *Id.* at 34.

[262] *Id.* at 35.

[263] *Id.* at 13.

[264] *Id.* at 14.

[265] *Id.* at 35.

[266] *Id.*

[267] *Motion to Exclude* at 14.

[268] *Id.* at 14–15.

also argues Singer's pay structure regression fails a falsification test, meaning it is "rigged" to always find a pay structure even if run using data for which no structure exists.[269]

PPC's arguments concerning Plaintiffs' common evidence of a pay structure do not defeat predominance, nor demonstrate that Singer's opinions are unreliable. As an initial matter, PPC's argument that the relevant market is local and not national presents a question of fact that will be proven or disproven through evidence common to the class.[270] Plaintiffs allege a nationwide market supported by evidence common to the class. The parties present competing narratives about whether that is correct or not. It will not require individualized inquiry to determine whether proposed class members are part of a nationwide market or a local market. If the market is not nationwide, Plaintiffs' claim fails—that will be common to the class. PPC's arguments on market definition pose a "challenge to the persuasiveness of Plaintiffs' methodology," a matter typically left to the jury, and do not defeat predominance.[271]

PPC's arguments concerning Plaintiffs' pay structure evidence are similarly misplaced. Plaintiffs present a variety of evidence in support of their showing of a nationwide Grower pay structure. Some of the evidence is documentary, some testimonial, and some drawn from Singer's expert opinions. PPC may be correct that the evidence is "flimsy"[272] or fails to show the purported nationwide pay structure, but that is not the relevant question at this stage. The unifying thread in Plaintiffs' evidence on impact—and PPC's opposition—is it is common to the class. If Plaintiffs present testimony from witnesses attempting to establish the co-conspirators concerns about internal equity, PPC can discredit that through cross-examination or with its own

---

[269] *Id.* at 16.

[270] *See Reazin*, 899 F.2d at 975 ("Market definition is a question of fact.") (citation omitted).

[271] *Occidental Petroleum Corp.*, 69 F.4th at 1179 ("[A] challenge to the persuasiveness of Plaintiffs' methodology for determining market power 'is, in general, a matter for the jury.'") (quoting *Tyson Foods, Inc.*, 577 U.S. at 459).

[272] *Opposition to Class Certification* at 35.

witnesses.  But that showing will be common to the class.  Similarly, PPC's graphs purportedly demonstrating the variance in Grower pay is evidence common to the class; it does not require individualized inquiry.

Further, PPC's *Daubert* challenge to the reliability of Singer's pay structure analysis falls short.  PPC's experts largely do not engage with what Singer's pay structure regression purports to do.  PPC's experts argue Singer's opinion that nationwide Grower pay is tethered together is undermined by a "simple visualization of the Grower pay data," as presented in their graph showing variances in Grower pay.[273]  However, Singer does not assert all Growers nationwide are paid at the same level.  Rather, his pay structure regression demonstrates "*changes* in Grower pay are transmitted broadly across Growers, while allowing for *levels* of Grower pay to vary based on objective criteria, such as local taxes, land, and utility costs."[274]  The raw variation in Grower pay across time and place is not relevant to what Singer purports to show with his pay structure regression.[275]

PPC's contention that Singer's pay structure regression is flawed because it fails a falsification test is similarly not persuasive for Rule 702 and *Daubert* purposes.  In their Opposition to PPC's Motion to Exclude, Plaintiffs explain there are infirmities in Saravia's falsification test because she runs the test using data from Complexes that have a pay structure, manipulates the results by running the test on small datasets, and "introduces error when she includes the dependent variable [the grower's compensation regressed on] in the construction of

---

[273] *Motion to Exclude* at 14–15.

[274] *Plaintiffs' Class Certification Reply* at 19; Dkt. 500, *Plaintiffs' Opposition to Defendant PPC Pride Corporation's Motion to Exclude Certain Opinions of Plaintiffs' Expert Witness Hal J. Singer Pursuant to Federal Rule of Evidence 702* (*Plaintiffs' Opposition to Motion to Exclude*) at 26.

[275] The court also observes Singer's various regression models control for factors contributing to the variance in Grower pay levels.

the independent variable [the average of all other growers].”[276]  Resolving this battle of the experts is not the appropriate role of the court on a *Daubert* motion.  Singer relies on a reliable methodology which, based on his explanations and responses to PPC's challenges, he has more likely than not reliably applied to the data in this case.[277]  That meets the threshold for admissibility.  It is for the jury "to evaluate the reliability of the underlying data, assumptions, and conclusions" and determine whether they are persuasive.[278]

PPC also challenges Plaintiffs' evidence that the NPA and ISA were implemented broadly as "anecdotal, out of context, and unpersuasive."[279]  PPC argues Singer ignores evidence of the localized nature of the relevant markets and selectively focuses on a small portion of the documents produced to support his conclusions concerning impact.[280]  PPC asserts individualized inquiry will predominate because only some Integrators used Agri Stats data when setting Grower pay, and those Integrators used this data in different ways.[281]  Concerning direct pay information exchanges, it asserts "there is *no evidence* that 21 integrators nationwide agreed to share pay information directly," but only discrete instances in specific locations at specific times.[282]  Similarly, evidence of the NPA, at best, only supports the conclusion there were "limited or sporadic" understandings at a limited number of Complexes at specific points in time.[283]  Singer's analysis of the Delmarva region does not support the conclusion that a NPA

---

[276] *Plaintiffs' Opposition to Motion to Exclude* at 26–27.

[277] *See In re Urethane*, 251 F.R.D. at 638 (collecting cases) (noting evidence of a "standardized pricing structure" is a reliable methodology commonly used to establish antitrust impact because it "presumably establishes an artificially inflated baseline" and "provides generalized proof of class-wide impact").

[278] *In re Urethane*, 768 F.3d at 1263 (citation omitted).

[279] *Opposition to Class Certification* at 35.

[280] *Id.* at 35–36.

[281] *Id.* at 36.

[282] *Id.*

[283] *Id.*

was implemented nationwide.[284]  Lastly, PPC argues its pay data graphs demonstrate the usage of a tournament system to determine Grower pay does not imply that Grower pay was "tethered together."[285]

Each of these arguments fail to refute Plaintiffs' contention that evidence of the broad implementation of the respective agreements is susceptible to common proof.  PPC itself largely proves this point with its assertion that the evidence is "anecdotal, out of context, and unpersuasive."[286]  Those characterizations may be accurate, but that is for a trier of fact to determine.[287]  The points PPC raises in its Opposition do not indicate individual questions will predominate on the question of impact.  Rather, the arguments would apply with common force to the entire class.  Should a jury find PPC's arguments persuasive, it would constitute a "failure of proof on [the] common question" of nationwide impact.[288]  Further, PPC's citation to *In re Aluminum Warehousing Antitrust Litigation* for the proposition that courts reject efforts to establish class-wide antitrust injury on documentary evidence alone is inapt.[289]  Plaintiffs here do no rely solely on documentary evidence.  They present documentary, testimonial, qualitative economic analysis, and quantitative econometric modeling to support their theory of common impact.  In these circumstances, "courts have long noted that statistical and anecdotal evidence

---

[284] *Id.*

[285] *Id*

[286] *Id.* at 35.

[287] *See Tyson Foods, Inc.*, 577 U.S. at 459 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.").

[288] *Id.* at 457.

[289] *Opposition to Class Certification* at 36 (citing *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 50 (S.D.N.Y. 2020)) (noting courts "have consistently rejected attempts to establish classwide antitrust injury based on documentary . . . alone").

must be considered in tandem."[290]  PPC's general arguments concerning impact do not defeat predominance.

### ii.  Impact and the NPA

In its Opposition and Motion to Exclude, PPC presents several arguments concerning Plaintiffs' inability to show antitrust impact with common proof based on the NPA.  PPC first asserts class certification would be inappropriate due to the large number of putative class members who could not have been injured by the NPA.[291]  Next, PPC contends individualized inquiry would predominate concerning any impact from the NPA because the market for Grower services is local, not nationwide.[292]  Last, PPC challenges the admissibility of Singer's opinions concerning the impact of the NPA.[293]

PPC asserts the class cannot be certified based on the NPA because a large percentage of Growers could not have been impacted by the alleged agreement.[294]  According to PPC, 15-percent of Growers annually were located in areas with only one Integrator—meaning they "could not be 'poached' even assuming the existence of a [NPA]"—and, even accepting Singer's evidence, only about half of the 147 plants operated by Integrators were party to an alleged NPA.[295]  PPC contends that, though the Tenth Circuit has not ruled on whether the presence of

---

[290] *In re High-Tech Emp.*, 985 F. Supp.2d at 1217;  *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *43 (E.D.N.Y. Oct. 15, 2014) ("[E]xpert testimony . . . should be viewed in conjunction with the plaintiff's other evidence.").

[291] *Opposition to Class Certification* at 25–26.

[292] *Id.* at 27–29.

[293] *Id.* at 30–31.

[294] *Id.* at 25.

[295] *Id.* at 26.

uninjured class members warrants denial of certification, 15-percent exceeds the "de minimis" threshold adopted in certain other circuits and precludes certification here.[296]

The court is skeptical the Tenth Circuit has not offered guidance on this question.[297] However, the court need not resolve the issue because PPC's argument concerning uninjured class members fails to engage with Plaintiffs' theory of impact. Plaintiffs allege all class members were injured by the NPA, whether or not they would have or could have switched Integrators, because the anticompetitive effects of the Agreement—suppression of Grower pay— were transmitted broadly across the class.[298] Plaintiffs support their theory of widespread impact with various forms of evidence—including Singer's NPA regression and pay-structure analysis—which, as discussed above, are common to the class. Further, Plaintiffs' theory and evidentiary showing is consistent with other courts that have found the anticompetitive effects of a no-poach agreement are transmitted broadly, not just to those who may have been recruited or switched Integrators.[299] PPC's argument about uninjured class members presupposes a theory of impact distinct from the one Plaintiffs set forth. A jury may find PPC's theory more compelling, but that would be class-wide evidence that Plaintiffs have failed to prove an element of their claim.

---

[296] *Id.*

[297] *See Occidental Petroleum Corp.*, 69 F.4th at 1185 (holding a class "including a significant portion of members" who could not have been harmed by the challenged conduct should not be certified but certification is still appropriate for a class that "consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm" because failure to show antitrust injury does not result in "a myriad of individual inquiries but rather a verdict in [Defendant's] favor") (internal quotations and citations omitted).

[298] *Singer Report* ¶ 95 (noting "a No-Poach agreement would tend to have widespread compensation suppression effects across *all* Growers, not just the compensation for Growers who would have been poached in a but-for world . . . .Agreement to lessen competition for Growers therefore suppress the compensation paid to Growers generally, not just the wages of those Growers whose mobility is directly suppressed by the alleged No-Poach agreement").

[299] *See In re High-Tech Emp.*, 985 F.Supp. 2d at 1192 (considering documentary, economic, and econometric evidence to conclude "all [] employees—not just those who would have received cold calls but for the anti-solicitation agreements—may have been impacted by the agreements").

Next, PPC repeats its argument that, because the market for Grower services is local and not nationwide, impact from any alleged NPA would require individualized inquiry.[300] Challenging Singer's analysis, PPC argues the geographic scope of the market is local and not national because "[n]inety three percent of all growers are located within 50 miles of the plant they serve" meaning "opportunities for growers to switch Integrators are limited to the surrounding plants in their local area."[301]  Supporting this analysis, PPC's experts rebut Singer's opinions with their own economic arguments about the high correlation between Grower pay and local factors.[302]  PPC asserts Singer "fails to perform any quantitative analysis to support his erroneous opinion that the geographic market is national and otherwise ignores all of this data and economic theory demonstrating the absence of a national market."[303]

Notwithstanding this assertion, PPC addresses Singer's quantitative analysis and argues his NPA in-sample regression is flawed and unreliable "because it fails to isolate, and thus does not reliably quantify the effect of any [NPA]."[304]  According to PPC, the regression cannot be used to measure widespread impact because it uses pay data from only Delmarva.[305]  PPC asserts Singer offers no reliable methodology for extrapolating the results of the NPA regression out to the broader class and ignores characteristics distinguishing Delmarva from the rest of the country.[306]  PPC's expert also conducts his own analysis purportedly using Singer's regression

---

[300] *Opposition to Class Certification* at 27–29; *Motion to Exclude* at 29–32.

[301] *Opposition to Class Certification* at 28; *Motion to Exclude* at 30.

[302] *Opposition to Class Certification* at 28; *Motion to Exclude* at 30.

[303] *Motion to Exclude* at 31.

[304] *Opposition to Class Certification* at 30; *Motion to Exclude* at 26–28.

[305] *Opposition to Class Certification* at 30; *Motion to Exclude* at 26–28.

[306] *Motion to Exclude* at 27.

and argues the results demonstrate Singer's models are unreliable because they show changes to Grower pay outside Delmarva when they should not.[307]

In response, Plaintiffs and Singer highlight purported defects in PPC's expert's test and explain why the NPA regression results can be extrapolated nationwide.[308]  According to Plaintiffs, PPC's falsification test does not actually use Singer's model because the expert arbitrarily introduces an additional variable such that it has "no meaningful interpretation or application to Dr. Singer's model."[309]  Concerning the application of the NPA regression results to the broader class, courts uphold the use of extrapolation techniques where, as here, they are used to prove impact and damages—not liability—through common evidence.[310]  Singer also does not simply assume the characteristics of Growers inside Delmarva are comparable to those outside.  Rather, he analyzes evidence and explains the basis for his opinion that Growers are similarly situated—they grow the same type of poultry during the same time periods, under similar contracts, for the same or similar Integrators—such that usage of this yardstick is appropriate.[311]  These arguments and explanations satisfy the standard for reliability and admissibility.

None of PPC's arguments defeat Plaintiffs' showing that impact from the NPA is susceptible of common proof, nor do they sufficiently undermine the reliability of Singer's methods.  Plaintiffs and Singer do not dispute that most Growers are located within 50 miles of

---

[307] *Id.* at 28.

[308] *Plaintiffs' Opposition to Motion to Exclude* at 20–24.

[309] *Id.* at 22.

[310] *Id.; see also In re Urethane*, 768 F.3d at 1257 (distinguishing use of extrapolation models used to prove liability [antitrust violation], which may result in an improper "trial by formula," from permissible uses such as estimating damages).

[311] *Plaintiff's Opposition to Motion to Exclude* at 22–23.

their respective Complex, but they offer evidence demonstrating Growers can and do relocate in certain circumstances.  Further, Plaintiffs offer common evidence—such as Singer's pay structure analysis and NPA regressions—demonstrating that, after controlling for local variables, Grower pay was "tethered together nationwide."[312]  As discussed, PPC's assertion that Singer fails to perform any quantitative analysis is inaccurate.  Singer provides multiple econometric analyses supporting his opinions concerning the common impact of the NPA.  PPC's arguments that his "methodology is 'unrepresentative or inaccurate,'" is a defense "itself common to the claims made by all class members."[313]

PPC relies heavily on *Wheeler v. Pilgrim's Pride Corp.*[314] to support its argument that impact from the NPA cannot be shown through common evidence because of the local nature of the market.[315]  In *Wheeler*, similar to here, a putative class of growers alleged PPC violated the Sherman Act through its participation in a no-poach and information sharing agreement in northeast Texas and Arkansas.[316]  Plaintiffs in *Wheeler* argued they could prove impact through common proof because all Grower pay was determined by the tournament system and each Grower in a particular tournament was paid according to the same base price.[317]  Thus, without further analysis, plaintiffs concluded any suppression of the average price paid for a specific tournament due to the anticompetitive conduct would impact all Growers participating in that tournament.[318]

---

[312] *Plaintiffs' Class Certification Reply* at 25.

[313] *Occidental Petroleum Corp.*, 69 F.4th at 1178 (quoting *Tyson Foods, Inc.*, 577 U.S. at 457).

[314] 246 F.R.D. 532 (E.D. Tex. 2007).

[315] *Opposition to Class Certification* at 29.

[316] *Wheeler*, 246 F.R.D. at 536.

[317] *Id.* at 540.

[318] *Id.*

The *Wheeler* court rejected this argument, concluding proof of injury would be predominated by individual issues because of variation in pay between plants, and the location and proximity of competing plants differed.[319]  For example, the PPC plant in Dallas was outside the competitive radius of the nearest Tyson plant so, even if there was a conspiracy, "the growers near the Dallas plant would not benefit from competition between Tyson and Pilgrim."[320]  PPC points to the *Wheeler* court's conclusion and argues it is even more applicable here where Plaintiffs allege a nationwide class: "[D]ue to geographic limitations some growers are unable to switch from one complex or company to another, while some growers may theoretically do so. The resulting conclusion is that Plaintiffs are unable to demonstrate this 'fact of damages' [antitrust injury] without delving into individualized traits of each complex and/or grower locale."[321]

Though there is superficial appeal to this analogy, the substantial distinction in Plaintiffs' theory of impact and the proof of common evidence here leads to a different conclusion.  In contrast to Plaintiffs in this case, the *Wheeler* plaintiffs offered almost no evidence demonstrating impact but instead "assume[d] the fact of damages automatically flows from the assumption that more competition would alleviate the alleged suppression of the base price."[322]  As has been discussed at length, Plaintiffs here present multiple pieces of detailed quantitative and qualitative evidence capable of demonstrating the class-wide impact of the alleged NPA.  Singer's NPA regression models compare Grower pay to a yardstick to reach an opinion about the suppressive effect of the NPA.  He conducts further economic and econometric analysis to

---

[319] *Id.* at 540–41.

[320] *Id.* at 541.

[321] *Id.*

[322] *Id.* at 540.

demonstrate a nationwide pay structure supporting the opinion that changes in Grower pay were transmitted broadly throughout the class.  Plaintiffs supplement these opinions with documentary and testimonial evidence supporting the NPA and its common impact.  Moreover, the *Wheeler* plaintiffs advanced a theory of harm based on lost Grower profits that would have required individualized inquiry into issues such as individual Grower costs.[323]  Plaintiffs' theory here, based only on suppressed pay, does not require such inquiries.  Thus, the court concludes *Wheeler* does not persuasively apply to Plaintiffs' impact showing in this case.

As discussed above, PPC's experts may challenge the judgments Singer made in constructing his models and conducting his analysis, but that is nearly always the case.  Singer relies on reliable methods, incorporating robust datasets, and provides rational explanations for the decisions he made.  PPC's arguments go to the weight a trier of fact should give his opinions, not their underlying reliability.  Moreover, Plaintiffs' definition of the market is a question of fact and PPC's contention that the market for Grower services is local, rather than national, "present[s] class-wide rebuttal evidence."[324]  PPC's arguments concerning impact and the NPA again only bolster Plaintiffs' demonstration that this is a question susceptible to common proof.

### iii.  Impact and the ISA

PPC also challenges Plaintiffs' ability to show impact from the ISA through common proof, arguing individualized issues predominate because the ISA is subject to the rule of reason and Singer's ISA regression is fatally flawed.[325]  These arguments similarly fail to defeat Plaintiffs' Rule23(b)(3) showing.

---

[323] *Id.* at 542.

[324] *Occidental Petroleum Corp.*, 69 F.4th at 1178.

[325] *Opposition to Class Certification* at 32–34.

First, PPC's assertion that the rule of reason applies to the ISA is inconsistent with Plaintiffs' theory of the case and overlooks Plaintiffs' demonstration that, even if the rule of reason applies, common issues predominate.[326]  PPC likely is correct that information sharing between competitors is not necessarily *per se* unlawful.[327]  However, this fails to engage with the theory Plaintiffs advance.

Plaintiffs allege PPC and its co-conspirators engaged in a conspiracy to suppress Grower pay—the Overarching Agreement.[328]  As alleged, the ISA is a sub-component of the Overarching Agreement, not an independent claim under the Sherman Act.[329]  Horizontal conspiracies in restraint of trade, such as price-fixing or wage suppression, are typically considered *per se* unreasonable.[330]  Plaintiffs argue this is a *per se* violation but, in the event the rule of reason applies, Plaintiffs present common evidence capable of proving the ISA suppressed pay for the entire class under that standard.[331]  The court need not determine which

---

[326] *Id.* at 32.

[327] *Michael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was part of, the information exchange.") (citations omitted).

[328] *Motion for Class Certification* at 8.

[329] *Id.*

[330] *See Ohio v. American Express Co.*, 585 U.S. 529, 540–41 (2018) ("Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable per se.") (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).

[331] *Motion for Class Certification* at 16–18; *Plaintiffs' Class Certification Reply* at 22–23.  Plaintiffs explain that if the rule of reason applies, PPC and its co-conspirators' collective market power and the competitive effects of the challenged conduct will be demonstrated through common proof.  *Motion for Class Certification* at 18–19.  For example, Singer offers class-wide evidence demonstrating the anticompetitive effects of the conduct in the form of artificially suppressed pay.  *Id.*  There is also common evidence to prove the market for broiler-grow-out services is nationwide, such as the co-conspirators' use of nationwide Agri Stats data in establishing Grower pay, the fact Growers sometimes can and do relocate, Integrators expand into new areas, and Singer's analysis showing the correlation of Grower pay nationwide.  *Id.*

standard applies at this juncture but is satisfied Plaintiffs have demonstrated impact of the ISA is susceptible to common proof under either.[332]

Second, PPC argues Singer's ISA regression should be excluded because it does not isolate the effects of the alleged ISA and cannot reliably measure any harm.[333] PPC's expert conducts a falsification test, purportedly using Singer's regression, to compare only the Benchmark Integrators against each other and concludes Singer's model fails the test because it finds a difference in pay when there should not be one.[334] PPC also asserts Singer's ISA regression is "irredeemably flawed" because it does not control for housing density, "a critical determinant of total Grower pay, particularly for the Benchmark Integrators."[335]

Neither of PPC's arguments render Singer's ISA regression inadmissible. Plaintiffs explain PPC's falsification test is invalid because, among other reasons, the test used is designed to examine the "robustness" of a model by testing its sensitivity to "slight modifications in assumptions."[336] However, PPC's test excludes "over 98 percent" of the data Singer used in his model, which "is not a 'slight' change."[337] In essence, PPC's falsification test "uses a different model than the one [it] purports to falsify."[338] Concerning inclusion of the density variable,

---

[332] PPC's argument on this issue also underscores the court's previous discussion concerning predominance and antitrust violation—the first element of Plaintiffs' claim. Whether at summary judgment or trial, much of the focus will likely be on Plaintiffs' ability to prove the existence of the Overarching Agreement. However, the central point here is Plaintiffs' success or failure in proving the Agreement turns on evidence common to the class. In their Motion, Plaintiffs aver they will demonstrate with class-wide evidence that "[PPC] and its Co-Conspirators all engaged in a reciprocal exchange of Grower pay rates through Agri Stats and direct interfirm exchanges of specific Grower pay rates." *Motion for Class Certification* at 16. If they fail to do that, individualized issues will not predominate. Rather, it will be a common failure to prove an element of their claim.

[333] *Opposition to Class Certification* at 33; *Motion to Exclude* at 19.

[334] *Opposition to Class Certification* at 33; *Motion to Exclude* at 19.

[335] *Motion to Exclude* at 20.

[336] *Plaintiffs' Opposition to Motion to Exclude* at 15.

[337] *Id.* at 16.

[338] *Id.*

Plaintiffs contend Singer's model already controls for this factor through the use of other variables, such as number of broilers in a flock.[339]

Singer's ISA regression applies an accepted methodology for measuring the impact of the alleged ISA. He provides reasonable explanations for judgments made in constructing the model and PPC's arguments do not undermine its fundamental reliability. Though "the exclusion of major variables or the inclusion of improper variables may diminish the probative value of a regression model . . . such defects do not generally preclude admissibility."[340] PPC's challenges go to the persuasiveness of Singer's opinions and do not warrant exclusion.

### d. Conclusion on Impact

Plaintiffs' documentary and testimonial evidence, along with Singer's Report offering economic and econometric opinions derived from this evidence, demonstrates common issues will predominate concerning antitrust impact. In support of its theory of class-wide impact, Plaintiffs present communications and deposition testimony from PPC and its co-conspirators purportedly discussing the setting of Grower pay. They offer similar evidence supporting the impact of the NPA, such as statements reflecting the Integrators' concerns about internal equity. Plaintiffs bolster this evidence with Singer's economic and econometric opinions. Singer's NPA and ISA regressions demonstrate the general suppressive effect on Grower pay stemming from the challenged conduct. He then performs additional analyses, both qualitative and quantitative, to demonstrate the existence of a nationwide pay structure—an integral link in Plaintiffs' ability to prove class-wide impact. Crucially for the Rule 23(b)(3) predominance analysis, each piece of

---

[339] *Id.* at 17.

[340] *In re Urethane*, 768 F.3d at 1260–61.

evidence Plaintiffs present in support of their theory of impact applies with common force across the proposed class.

PPC's arguments are largely not tailored to this standard.  It raises many arguments challenging aspects of Plaintiffs' theory and the evidence they provide, but the arguments universally pertain to the persuasiveness of Plaintiffs' evidence.  Indeed, PPC's arguments largely serve to bolster Plaintiffs' predominance showing.  At this stage, the question is "to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor."[341]  PPC may be correct, for example, that this is not a nationwide market or that there is no pay structure.  If accepted by a trier of fact, these arguments concerning Plaintiffs' impact showing would likely defeat Plaintiffs' claim, but they would not require individualized inquiry.  They would defeat the claim with evidence common to the class.  What PPC "alleges is 'a fatal similarity—[an alleged] failure of proof as to an element of the [P]laintiffs' cause of action.'"[342]  If a trier of fact does not find Plaintiffs' evidence persuasive, their claim simply fails.

### 3.  Damages

The final element of Plaintiffs' Sherman Act claim is damages.  Having found Plaintiffs demonstrated the first two elements of their claim—antitrust violation and impact—are susceptible to common proof, the court could conclude Plaintiffs have satisfied their burden

---

[341] *Occidental Petroleum Corp.*, 69 F.4th at 1185.

[342] *Id.* at 1179 (quoting *Amgen Inc.*, 568 U.S. at 470).

under Rule 23(b)(3) and end the analysis here.[343]  However, in the interest of completeness, the court will evaluate whether Plaintiffs have shown damages present a common question capable of class-wide proof.

Plaintiffs argue they present a method capable of calculating damages for the class as a whole.[344]  Plaintiffs' method computes aggregate damages using the results of Singer's ISA and NPA regression models.[345]  By multiplying the percent underpayment demonstrated by the models to total Grower pay during the proposed class period, Plaintiffs conclude $924.24 million in damages results from the ISA and $761.22 million results from the NPA.[346]  As Plaintiffs contend, this method is widely endorsed by courts, including the Tenth Circuit, and satisfies the "low burden" the Supreme Court requires for damages calculations in antitrust cases.[347]

In its Opposition, PPC asserts proof of damages is not susceptible to class-wide evidence because Grower compensation is determined by a range of localized factors and therefore Plaintiffs cannot calculate damages based on a common formula.[348]  This argument mirrors PPC's arguments concerning the first two elements of Plaintiffs' claim, which the court has already rejected.  Setting aside that individualized damages issues do not necessarily preclude

---

[343] *See, e.g., In re Urethane*, 768 F.3d at 1255 (holding that after a district court finds common questions predominate concerning antitrust violation and impact, "[t]he presence of individualized damages issues would not change this result.  Class-wide proof is not required for all issues.  Instead, Rule 23(b)(3) simply requires a showing that the questions common to the class predominate over individualized questions."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[E]ven where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure.").

[344] *Motion for Class Certification* at 31.

[345] *Id.*

[346] *Id.*

[347] *Id.* at 31–32 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (noting damages calculations "need not be exact," though they must be consistent with Plaintiffs' liability theory); *In re Urethane*, 768 F.3d at 1256 (affirming class certification with common method for proving damages relying on "regression models (used to show impact) and [] extrapolation models (used to estimate damages)")).

[348] *Opposition to Class Certification* at 39.

class certification, PPC's argument does not engage with Plaintiffs' burden at this stage and, if accepted by a trier of fact, would serve as common evidence that Plaintiffs have failed to prove an element of their claim.

Elsewhere in its Opposition, PPC cites *Comcast* in support of the proposition that, because Singer's models do not establish impact from the alleged Overarching Agreement, they "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).[349]  This argument misconstrues Plaintiffs' theory and the holding of *Comcast*.  Plaintiffs allege the Overarching Agreement is comprised of two sub-components, the NPA and the ISA.  Singer's models assess the impact and damages resulting from those sub-components—not a separate liability theory.  As discussed above, whether Plaintiffs' evidence persuasively proves the existence of the Overarching Agreement is a common issue that goes to its ability to establish the first element of its claim.  Moreover, Plaintiffs' approach is not foreclosed by *Comcast*.  In *Comcast*, the Supreme Court rejected the use of a damages model that did not isolate damages resulting from the alleged liability theory.[350]  Here, Plaintiffs' model includes only the purported damages flowing from the alleged antitrust violation—the Overarching Agreement to suppress Grower pay.

Accordingly, the court concludes Plaintiffs have demonstrated a method capable of establishing class-wide damages through common proof.

### 4.  Predominance Conclusion

The court concludes Plaintiffs meet their burden under Rule 23(b)(3) to establish issues common to the class will predominate over any individual issues.  As is common in

---

[349] *Id.* at 9 (quoting *Comcast Corp.*, 569 U.S. at 35).

[350] *Comcast Corp.*, 569 U.S. at 36 (rejecting damages model because it "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised").

Sherman Act § 1 cases alleging a horizontal conspiracy in restraint of trade, "common questions predominate[] because the key elements of the [wage-suppression] claim—the existence of a conspiracy and impact—raise[] common questions that [are] capable of class-wide proof."[351] Though PPC challenges much of this class-wide proof, its challenges underscore the predominance of these common issues.

Plaintiffs present documentary, testimonial, and economic evidence to support the alleged antitrust violation that PPC and its co-conspirators engaged in a years-long nationwide conspiracy to suppress Grower pay. A horizontal conspiracy of this nature "is the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence."[352] PPC's challenges to the existence and scope of the alleged conspiracy are likewise common to the class. Should these arguments be compelling at summary judgment or trial, the result would be a "failure of proof as to an element of the [P]laintiffs' cause of action."[353] Either the alleged nationwide conspiracy exists, or it does not. Plaintiffs' claim likely will prevail or fall in common based on the answer to that single predominating question.

Similarly, Plaintiffs have shown through their broadly accepted two-step method that antitrust impact presents issues susceptible to common proof. Plaintiffs present documentary, testimonial, economic, and econometric evidence to demonstrate the sub-components of the

---

[351] *In re Urethane*, 768 F.3d at 1254.

[352] *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *7 (quoting *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015)); *see also* 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).").

[353] *Occidental Petroleum Corp.*, 69 F.4th at 1179 (quoting *Amgen Inc.*, 568 U.S. at 470).

Overarching Agreement—the NPA and the ISA—suppressed Grower pay.  They then demonstrate through common evidence that suppression was experienced broadly throughout the class.  PPC's arguments may rebut the assumptions underlying Plaintiffs' theory of impact or challenge the persuasiveness of Plaintiffs' evidence, but those challenges fail to establish that common issues do not predominate.[354]  Rather, PPC's arguments would undermine Plaintiffs' ability to prove class-wide impact.  They would constitute "a failure of proof on the element of antitrust impact [that] would end the litigation for all."[355]

Though Plaintiffs do not rely on an inference or presumption of impact, this case bears all the hallmarks of an antitrust action for which courts routinely find impact involves predominately common issues.  "Under the prevailing view," horizontal conspiracies to fix prices or, as here, to suppress wages "affect[] all market participants, creating an inference of class-wide impact even when prices are individually negotiated."[356]  The Tenth Circuit recently cautioned against broad application of this presumption in all antitrust class actions, but noted specific facts—"standardized pricing structure, the defendant's price-fixing conspiracy, and the artificially inflated baseline for pricing negotiations"—support "a reasonable conclusion that 'price-fixing would have affected the entire market.'"[357]  These considerations apply with equal force, if not more, in this case.

Plaintiffs allege a horizontal conspiracy to suppress Grower pay, provide common evidence purportedly demonstrating a nationwide pay structure, and demonstrate an artificially suppressed baseline for Grower pay.  Perhaps more compelling here, it is undisputed Growers do

---

[354] *See id.* at 1184.

[355] *Id.*

[356] *In re Urethane*, 768 F.3d at 1254 (collecting cases).

[357] *Occidental Petroleum Corp.*, 69 F.4th at 1182 (quoting *In re Urethane*, 768 F.3d at 1255).

not negotiate their pay—base pay is set in standard form, take-it-or-leave-it contracts. The court does not presume impact in reaching its decision, but this backdrop reinforces the conclusion that impact in this case is susceptible to class-wide proof.

Last, and not essential to Plaintiffs' Rule 23(b)(3) showing, Plaintiffs have established a method capable of calculating class-wide damages. In accordance with established methodologies broadly used in antitrust class-actions, Plaintiffs apply the output from the respective NPA and ISA regression models to the total Grower pay during the class period to calculate aggregate class damages. Further, given the predominance of common issues on the elements of antitrust violation and impact, any individualized issues that may arise on this element would not overwhelm the common issues in the case. The court has "a variety of tools" available to address damages.[358]

The court reiterates, its task at class certification is to determine "to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor."[359] PPC's arguments may challenge Plaintiffs' ability to prevail on its claims, but that is a question for another day. For the

---

[358] *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *9 (noting individual damages issues do not preclude certification because the court can appoint a magistrate or special master to preside over damages proceedings, alter or amend the class definition in response to trial developments, or request a trial plan from plaintiffs addressing how "aggregate damages estimated from [an] expert's report can [] be apportioned among the class members").

[359] *Occidental Petroleum Corp.*, 69 F.4th at 1185 (citing *Tyson Foods, Inc.*, 577 U.S. at 453).

question presently before the court, Plaintiffs have met their burden of proving issues susceptible to class-wide proof predominate.[360]

---

[360] Following oral argument on the Motions, the parties submitted supplemental briefing concerning two issues that arose during the hearing: (1) the significance for class certification purposes of adverse inferences Plaintiffs may be entitled to, and (2) Plaintiffs' class definition and whether a jury must find all 21 co-conspirators participated in the alleged conspiracy.  Dkt. 544, *Pilgrim's Pride Corporation's Supplemental Memorandum of Law in Opposition to Plaintiffs' Class Certification Motion* (*PPC's Supplement*); Dkt. 545, *Plaintiffs' Supplemental Memorandum of Law in Further Support of Plaintiffs' Motion for Class Certification* (*Plaintiffs' Supplement*).  First, Plaintiffs' Motion does not rely on any adverse inferences to support its Rule 23(b)(3) showing and, as discussed, the court concludes they have demonstrated common issues predominate.  The court need not determine at this stage whether Plaintiffs are entitled to an adverse inference in connection with the deposition testimony of former PPC executives.  The second issue appears to largely be a misunderstanding concerning answers Plaintiffs' counsel provided in response to questions about the contents of a future jury verdict form and whether a jury must find all alleged co-conspirators participated in the alleged conspiracy.  PPC argues Plaintiffs' counsel's response demonstrated the class cannot be certified and suggested an effort to recast the proposed class definition into one "whose scope is unknowable until the jury enters a verdict.  *PPC's Supplement* at 6.  In Plaintiffs' Supplement, they affirm they are still alleging, and will present evidence of, a nationwide conspiracy involving all 21 alleged co-conspirators impacting all Growers in the proposed class.  *Plaintiffs' Supplement* at 7.  The colloquy with the court about the verdict form concerned "straightforward principles" of antitrust conspiracy law as reflected by model jury instructions.  *Id.*  This dispute appears to arise from a misunderstanding about the nature of the discussion at the hearing and the court need not determine at this stage the appropriate contents of potential jury instructions or verdict forms.

For the benefit of the parties, the court observes the cases PPC cites in support of its argument are distinguishable.  In *Morris*, the court denied class certification because the "crux of [the] litigation" was whether defendants had offered a particular insurance policy provision required by state law to each class member, an inherently individual inquiry.  *Morris v. Travelers Indem. Co. of America*, 2006 WL 166597, at *8 (D. Colo. Jan. 19, 2006).  The class was "self defeating" because the court would have to consider the merits of the controversy—whether defendants had violated the statutory requirement for each individual—before certifying the class.  *Id.*  Similarly, in *Dafforn*, plaintiffs sought to certify a "fail-safe" class whose definition for inclusion in the class required members were charged "an artificially fixed and illegal brokerage fee."  *Dafforn v. Rousseau Assoc., Inc.*, 1976 WL 1358, at *1.  The court denied class certification because "a jury determination that defendants have charged no such illegal fees would at the same time determine that there was no class," which would evade res judicata and allow individuals to relitigate claims.  *Id.* at *2.  Plaintiffs' proposed class here does not suffer from such infirmities.  The class is clearly defined and ascertainable prior to a merits determination.  As Plaintiffs affirm, and the court concludes above, they present evidence capable of demonstrating through class-wide proof that each member of the proposed nationwide class was impacted by the alleged conspiracy.  Whether some of these members ultimately prove to be uninjured does not render this an unknowable class, nor preclude certification.  *See Occidental Petroleum Corp.*, 69 F.4th at 1185 ("[A] class may still be properly certified even if it consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm.") (internal quotations and citation omitted).  Further, even if the evidence does not ultimately prove the involvement of a co-conspirator, a defendant can still "incur liability for a conspiracy under § 1 of the Sherman Act so long as the defendant did not act unilaterally."  *In re Urethane*, 768 F.3d at 1266 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).

## C.  Rule 23(b)(3): Superiority

In addition to predominance, Rule 23(b)(3) requires Plaintiffs "show that a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'"[361]  The Rule sets forth a "non-exhaustive" list of factors to guide the inquiry:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[362]

Fundamentally, courts have observed a Rule 23(b)(3) class action "is superior when it allows for the 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"[363]  The court concludes Plaintiffs have demonstrated a Rule 23(b)(3) class action is the superior method for adjudicating this controversy.

Each of the factors set forth in Rule 23(b)(3) weigh in favor of a finding of superiority. Relevant to individual class members' interest in controlling separate actions and the extent of existing litigation, the litigation has been ongoing in this centralized forum for over three years and class settlements have already been reached with all original Defendants except PPC.[364]  As

---

[361] *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (quoting Fed. R. Civ. P. 23(b)(3)).

[362] *Id.* (quoting Fed. R. Civ. P. 23(b)(3); Fed. R. Civ. P. 23(b) advisory committee's note to the 1966 amendment). The Tenth Circuit notes, "Although Rule 23(b)(3) states that these factors are pertinent to both superiority and predominance, 'most courts analyze [these factors] solely in determining whether a class suit will be a superior method of litigation.'"  *Id.* n.3 (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:64 (5th ed., Dec. 2017 update)).

[363] *Id.* (quoting *Amchem Prods.*, 521 U.S. at 617).

[364] *See* Dkt 1, *Transfer Order from the Judicial Panel on Multidistrict Litigation*; *Order Preliminarily Approving of Settlement with Tyson Defendants, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; *Order Preliminarily Approving Settlement with Perdue, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; *Order Preliminarily Approving Settlement with Koch, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*; *Order Preliminarily Approving Settlement with Sanderson, Certifying the Settlement Class for Purposes of Settlement, and Appointing Settlement Class Counsel*.

Plaintiffs highlight, "Few of the 24,354 members of the Class have opted out of the prior settlement."[365]  Further, concentration of the litigation in this forum is desirable because most proposed class members could not bear the costs of litigating the claims individually.[366]  Even if they could, due to the overlapping nature of the claims, evidence, and witnesses, individual litigation would be "grossly inefficient, costly," and "unnecessarily duplicative."[367]  Given these considerations, the court concludes a Rule 23(b)(3) class action is the superior method "of fairly and efficiently adjudicating the controversy."[368]

### D.  Remaining *Daubert* Challenges

The court addresses most of the arguments in PPC's Motion to Exclude in the discussion above.  PPC's remaining challenges and the court's final conclusion on PPC's Motion are set forth here.

PPC argues substantial portions of Singer's Report should be excluded because it improperly presents disputed facts as expert opinion.[369]  According to PPC, Singer impermissibly "cloaks over 40 pages of disputed facts" as expert opinion by stating the "evidence is 'consistent' with the alleged antitrust conspiracies."[370]  Further, PPC asserts Singer improperly speculates about the mental state of Growers and Integrators and makes

---

[365] *Motion for Class Certification* at 32.

[366] *Id.*

[367] *In re Urethane Antitrust Litig.*, 237 F.R.D. at 453.

[368] Fed. R. Civ. P. Rule 23(b)(3).  PPC only briefly addresses superiority in its Opposition.  *Opposition to Class Certification* at 40.  Repeating its prior arguments, it asserts superiority is not met due to the number of class members "who could not have conceivably suffered any harm and the number of class members who have never tried to switch or could not switch . . . ."  *Id.*  For the reasons explained above, this argument does not engage with Plaintiffs' theory of harm and is similarly not persuasive for the court's superiority analysis.

[369] *Motion to Exclude* at 32.

[370] *Id.* (citing *Singer Report* ¶¶ 83–162).

impermissible credibility determinations about certain deposition testimony.[371]  PPC argues "[a]ll of Dr. Singer's opinions in which he usurps the role of the jury by weighing evidence and making credibility determinations . . . should be excluded."[372]

In their Opposition, Plaintiffs contend Singer's opinions are admissible because he employs a structure, conduct, performance (SCP) analysis commonly used by economists in antitrust cases.[373]  PPC's challenge focuses on Singer's analysis pertaining to the conduct prong of the framework, where he considers record evidence and concludes the observed conduct is "consistent with an alleged conspiracy to suppress the compensation for Broiler Grow-Out services, and inconsistent with competition."[374]  Singer's opinions view record evidence through the lens of economic theory to explain why the challenged conduct is "inconsistent with the 'hypothesis that each Defendant acted unilaterally in its own self-interest . . . .'"[375]  For example, he explains why participating in the NPA is against an Integrator's self-interest in a competitive market and how the ISA would be irrational absent the NPA.[376]

The court agrees with Plaintiffs that Singer's SCP analysis uses a reliable economic framework that is "well accepted in this field."[377]  Though a layperson may understand portions of record evidence on their face, they do not have the expertise required to understand the import of that evidence as it pertains to principles of economics and competition.  The court concludes

---

[371] *Id.* at 32–33.

[372] *Id.* at 33 (citing *Singer Report* ¶¶ 61–64, 69, 83–162, 229, 266–67, 285, Appendix 6; *Singer Rebuttal* ¶¶ 33–35, 41, 67, 69, 72, 88, 90–97, 101, 103, 106–07, 111–13, 130, 191, 202, 211, 230–34, Appendix 4).

[373] *Plaintiffs' Opposition to Motion to Exclude* at 36.

[374] *Id.* (quoting *Singer Report* ¶ 186).

[375] *Id.* (quoting *Singer Report* ¶¶ 200–01).

[376] *Id.*

[377] *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 WL 6681783, at *2 (D. Kan. Dec. 21, 2012).

"it would be helpful to a jury for an expert to put events into an economic context."[378]  To the extent PPC believes Singer's opinions are inconsistent with, or fail to properly consider, relevant record evidence, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[379]

PPC's sweeping request for exclusion of Singer's opinions is premature and unnecessary at this time.  The entirety of Singer's report will not be introduced as evidence at trial.  Rather, his opinions will come in through his direct testimony.  Of course, Singer may not offer opinions concerning the credibility of particular witnesses, nor may he opine on the ultimate issue of whether a conspiracy existed.[380]  However, without knowledge of the substance and form of Singer's future testimony, the proper mechanism for addressing these issues is for PPC to object to any improper testimony at trial.

In sum, considering the totality of PPC's Motion to Exclude, its challenges largely present a classic "battle of the experts" appropriate for the trier of fact to resolve.  It may not be unreasonable at summary judgment or trial to conclude the opinions and analysis of PPC's experts are more persuasive or reliable than Singer's.  However, this does not mean Singer's opinions are so unreliable as to be inadmissible.  Singer relies on established methodologies widely used in antitrust litigation and draws from the same data and evidence used by PPC's experts.  That PPC's experts would reach different conclusions or make different decisions in

---

[378] *Id.* at *3 (finding an economic expert's SCP analysis concluding "certain conduct by the alleged conspirators is consistent with" the alleged conspiracy is admissible).

[379] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[380] The court notes definitively stating a conspiracy exists is distinct from an expert opining that, based on economic theory, certain conduct is "consistent" with the existence of a conspiracy or "inconsistent" with rational self-interested actions.

conducting their analysis does not render Singer's analysis unreliable.  The fields of statistics and econometrics are ultimately as much art as science.  They entail considerable subjective judgment in the manipulation of data to construct reasonably representative models.[381]  The discipline "require[s] the use of professional judgment" and "expert testimony is less likely to be excluded because 'challenges may ultimately be viewed as matters in which reasonable experts may differ.'"[382]  That is the case here.

The judgments Singer made "may diminish the probative value" of his analysis, "[b]ut such defects do not generally preclude admissibility."[383]  It is the province of the jury to weigh the persuasiveness of Singer's "underlying data, assumptions, and conclusions."[384]  The court concludes his opinions meet the admissibility threshold of Rule 702 and *Daubert*.  PPC's Motion to Exclude is denied.

## V.      CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Class Certification[385] is GRANTED, and PPC's Motion to Exclude[386] Singer's expert opinions is DENIED.

The court certifies a class consisting of all individuals and entities in the United States and its territories that were compensated for Broiler Grow-Out Services by a Defendant or Co-Conspirator (excluding Claxton and Allen Harim), or by a division, subsidiary, predecessor, or

---

[381] *See In re Air Cargo Shipping Servs.*, 2014 WL 7882100, at *8 ("Creating statistical models . . . depends upon judgment and art as well as the reasoned manipulation of numbers.  Models are not the real world; rather, such models are a reasoned and educated attempt to describe reality by accepted methods of statistical analysis using available real world observations, data, and knowledge.") (quoting *Falise v. Am. Tobacco Co.*, 258 F. Supp.2d 63, 67 (E.D.N.Y. 2000)).

[382] *Id.* (quoting *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012)).

[383] *In re Urethane*, 768 F.3d at 1261.

[384] *Id.* at 1263.

[385] Dkt. 454.

[386] Dkt. 456.

affiliate of a Defendant or Co-Conspirator (excluding Claxton and Allen Harim), at any time during the period of January 27, 2013 through and including December 31, 2019.  Hausfeld LLP and Berger Montague PC are appointed Class Counsel and named Plaintiffs are appointed as Class representatives.

    **IT IS SO ORDERED** this 8th day of May 2024.


                                        BY THE COURT:

                                        _____
                                        HON. ROBERT J. SHELBY
                                        United States District Judge