# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER ANTITRUST LITIGATION (NO. II) | No. 6:20-md-02977-RJS-CMR<br><br>The Honorable Robert J. Shelby<br>The Honorable Cecilia M. Romero |

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OFFERED BY PILGRIM'S PROFFERED EXPERTS[1]

Now before the court is Plaintiffs' Motion to Exclude Certain Opinions Offered by Pilgrim's Proffered Experts under Federal Rule of Evidence 702 and *Daubert*.[2]

The cases comprising this multidistrict litigation arise out of an alleged violation of Section One of the Sherman Act.[3] Plaintiffs, a certified class[4] of broiler chicken growers (Growers), allege Defendant Pilgrim's Pride Corporation (PPC), along with 20 other co-conspirator poultry companies (Integrators), participated in an unlawful horizontal conspiracy to suppress Grower pay.[5] The alleged conspiracy, referred to as the Overarching Agreement, was effectuated through "two mutually reinforcing" sub-agreements: (1) the No-Poach Agreement (NPA), "an industrywide agreement not to recruit or solicit one another's Growers," and (2) the

---

[1] When citing to the parties' filings, the court cites to the CM/ECF page number in the CM/ECF heading rather than the respective document's page numbers at the bottom of each page.

[2] Dkt. 455, *Plaintiffs' Motion and Memorandum of Law in Support of Motion to Exclude Certain Opinions Offered by Pilgrim's Proffered Experts* (*Motion to Exclude*).

[3] Dkt. 59, *Consolidated Class Action Complaint* (*Complaint*).

[4] Dkt. 574, *Memorandum Decision and Order Granting Plaintiffs' Motion for Class Certification*.

[5] Dkt. 454, *Plaintiffs' Motion and Memorandum of Law in Support of Motion for Class Certification* (*Motion for Class Certification*) at 8.

Information Sharing Agreement (ISA), "a nationwide reciprocal exchange of competitively sensitive Grower pay information . . . ."[6]

In support of their claim and class certification, Plaintiffs retained Dr. Hal J. Singer, an expert in antitrust economics, to provide an expert report and testimony.[7] In defense and rebuttal to Singer's opinions, PPC provides expert reports and testimony from three experts: Dr. John B. Carey,[8] Dr. Justin McCrary,[9] and Dr. Celeste Saravia.[10] Plaintiffs' Motion seeks to exclude certain of these experts' opinions.

Carey is a professor of Poultry Science at Texas A&M University, retained by PPC as an industry expert.[11] He has over forty years of professional and academic experience in the field of poultry science, including the poultry extension field, which serves "as a practical link" between academia on one side, and Integrators and Growers on the other.[12] Carey holds a Ph.D. in Poultry Management and Physiology from Kansas State University and a M.S. in Poultry Nutrition and Biochemistry from South Dakota State University.[13] He was retained by PPC to provide opinions concerning whether Plaintiffs' allegations and Singer's opinions "accurately reflect the reality of the broiler growing industry."[14]

---

[6] *Id.*

[7] *Id.* at 11; *see also* Dkt. 455-1, *Exhibit 3: Expert Report of Hal J. Singer, PH.D.* (*Singer Report*).

[8] Dkt. 455-1, *Exhibit 1: Expert Report of John B. Carey, PhD* (*Carey Report*).

[9] Dkt. 455-2, *Exhibit 8: Expert Report of Justin McCrary, PH.D.* (*McCrary Report*).

[10] Dkt. 455-2, *Exhibit 7: Expert Report of Celeste Saravia, PH.D.* (*Saravia Report*).

[11] Dkt. 501, *Pilgrim's Pride Corporation's Opposition to Plaintiffs' Motion to Exclude Certain Opinions Offered by Pilgrim's' Proffered Experts* (*PPC's Opposition*) at 8; *Carey Report* ¶ 1.

[12] *Carey Report* ¶ 1.

[13] *Id.* at ¶ 2.

[14] *Id.* at ¶ 9.

McCrary is an economist with expertise in labor economics, antitrust, corporations, law and economics, economic modeling, and statistical methods.[15] He is currently the Paul J. Evanson Professor at the Law School at Columbia University and holds a Ph.D. in Economics from the University of California, Berkeley.[16] His work has been published in the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*.[17] He was retained by PPC to offer opinions on Singer's economic and econometric analysis.[18]

Saravia is an economist with expertise in industrial organization.[19] For nearly two decades, she has worked for Cornerstone Research, consulting on economic issues related to competition.[20] She holds a Ph.D. in Economics from the University of California, Berkeley.[21] She has published in the *American Economic Review* and contributed to several books and treatises on competition-related issues for the American Bar Association.[22] PPC retained Saravia to evaluate whether Plaintiffs can demonstrate antitrust injury through common evidence and to assess Singer's opinions concerning antitrust injury.[23]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence and *Daubert* impose "on a district court a gatekeeper obligation 'to ensure that any and all scientific testimony or evidence admitted is not

---

[15] *McCrary Report* ¶ 1.

[16] *Id.*

[17] *Id.* ¶ 5.

[18] *Id.* ¶ 12.

[19] *Saravia Report* ¶ 1.

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶ 2.

[23] *Id.* ¶ 7.

only relevant, but reliable.'"[24]  Rule 702 permits a witness "qualified as an expert by knowledge, skill, experience, training, or education," to offer opinion testimony if the proponent of the expert testimony demonstrates "it is more likely than not that:"

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[25]

Once an expert is found to be qualified, courts in the Tenth Circuit follow a two-step inquiry to ensure the Rule 702 criteria is satisfied.[26]

First, the court "must determine if the expert's proffered testimony—whether it concerns scientific, technical, or other special knowledge—has 'a reliable basis in the knowledge and experience of his [or her] discipline."[27]  *Daubert* sets forth several factors, "neither definitive nor exhaustive,"[28] the court may consider in making a reliability determination: "whether a theory has been or can be tested or falsified," "whether the theory or technique has been subject to peer review and publication," "whether there are known or potential rates of error with regard to specific techniques," and "whether the theory or approach has general acceptance."[29]  For experts offering

---

[24] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

[25] Fed. R. Evid. 702.

[26] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005).

[27] *Id.* at 1232–33 (quoting *Daubert*, 509 U.S. at 592).

[28] *Id.* at 1233 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150, 152–53 (1999)).

[29] *Daubert*, 509 U.S. at 593–94.

non-scientific opinions based upon personal knowledge or experience, the court asks whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[30]  Fundamentally, the reliability analysis is focused not "upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions."[31]  However, conclusions may be excluded if "there is simply too great an analytical gap between the data and the opinion proffered."[32]

The second step in the inquiry asks "whether proposed testimony is sufficiently 'relevant to the task at hand.'"[33]  In other words, in order to "help the trier of fact"[34] as Rule 702 requires, "expert testimony must 'fit'—it must relate to a disputed issue in the case."[35]  The court evaluates "the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact."[36]  In determining whether expert testimony will aid the trier of fact, courts may consider several factors, including "whether it is within the juror's common knowledge and experience" and "whether it will usurp the juror's role of evaluating a witness's credibility."[37]

---

[30] *Kumho Tire Co.*, 526 U.S. at 152.

[31] *Bitler*, 400 F.3d at 1233 (citing *Daubert*, 509 U.S. at 595).

[32] *Dodge*, 328 F.3d at 1222; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

[33] *Dodge*, 328 F.3d at 1234 (quoting *Daubert*, 509 U.S. at 597).

[34] Fed. R. Evid. 702(a).

[35] *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (quoting *Daubert*, 509 U.S. at 591–92).

[36] *Bitler*, 400 F.3d at 1234.

[37] *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citations omitted).

# ANALYSIS

Plaintiffs move to exclude the entirety of Carey's Report under Rule 26 of the Federal Rules of Civil Procedure, arguing it was impermissibly authored by Defense counsel. Alternatively, they specifically challenge many of his opinions under Rule 702 as either outside his expertise or irrelevant. Plaintiffs also challenge select opinions concerning the NPA, the ISA, and Growers' state of mind offered by all three of PPC's experts. The court addresses each argument in turn below.

### a. Exclusion of Carey's Report Under Rule 26

Plaintiffs first argue the entirety of Carey's Report should be excluded under Rule 26 of the Federal Rules of Civil Procedure because it was "impermissibly" authored by Defense counsel.[38] In response, PPC asserts Plaintiffs' argument is based on Carey's deposition testimony that he received guidance from counsel in editing and structuring the report, assistance permitted by Rule 26.[39] According to PPC, this involvement was far short of the "ghostwriting required for exclusion."[40] On the record before it, the court agrees.

Federal Rule of Civil Procedure 26(a)(2)(B) requires expert witnesses to prepare and sign an expert report.[41] Although the Rule "does not preclude counsel from providing assistance to experts in preparing the reports,"[42] counsel's "involvement is generally limited to ensuring the formal requirements of the rule are satisfied, [and] the expert must substantially participate in the

---

[38] *Motion to Exclude* at 18.

[39] *PPC's Opposition* at 15.

[40] *Id.*

[41] Fed. R. Civ. P. 26(a)(2)(B).

[42] Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 1993 amendment.

preparation of the report."[43]  The Rule does not permit counsel to "prepare the expert's opinion from whole cloth, and then have the expert sign the drafted report as his own."[44]  In other words, an expert's report may not be "ghost written" by counsel.[45]

Plaintiffs assert Carey did not substantially participate in the drafting of his Report and the writing and analyses were "performed exclusively by [PPC's] counsel [] without Dr. Carey's input."[46]  In support of their allegation, Plaintiffs point to Carey's deposition testimony where, when asked what percentage of the report he authored in comparison to PPC's counsel, Carey "did not identify any portion of the report that he personally authored."[47]  Further, according to Plaintiffs, Carey served his expert report one month after being retained and spent only 50 to 55 hours on the matter.[48]  This, Plaintiffs argue, was an insufficient amount of time to examine the thousands of pages of deposition testimony and discovery Carey purports to have reviewed in preparing his 60-page report.[49]

Though portions of Carey's deposition responses seem to indicate a lack of knowledge concerning the preparation of his report, the evidence Plaintiffs proffer is insufficient to conclude the report was "ghost written" by counsel or that Carey did not substantially participate in its preparation.  As PPC acknowledges, counsel assisted Carey with editing and structuring the

---

[43] *Newsome v. Tull*, No. CIV-18-0791-HE, 2019 WL 5197566, at *2 (W.D. Okla. Aug. 6, 2019) (citing *Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 942 (E.D. Mich. 2014); *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999)).

[44] *Skycam, Inc. v. Bennett*, No. 09-CV-294-GKF-FHM, 2011 WL 2551188, at *6 (N.D. Okla. June 27, 2011) (internal quotations and citations omitted).

[45] *See Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291–96 (E.D. Va. 2001).

[46] Dkt. 513, *Reply Memorandum of Law in Support of Plaintiffs' Motion to Exclude Certain Opinions Offered by Pilgrim's Proffered Experts* (*Plaintiffs' Reply*) at 11.

[47] *Id.* (emphasis in original removed).

[48] *Id.*

[49] *Id.*

Report, but Rule 26 permits this involvement.[50]  Courts have found an expert "substantially participated in preparation" of a report even where the expert orally dictated the substance of his opinions to an attorney and the attorney then drafted the report.[51]  The evidence before the court of Carey's involvement does not support a conclusion the Report should be excluded under Rule 26.[52]  Plaintiffs may appropriately explore on cross-examination at trial Carey's knowledge of his opinions and the information underlying them.  Plaintiffs' request to exclude the entirety of Carey's Report under Rule 26 is denied.

### b. Carey's Relevant Market Opinions

Plaintiffs next argue Carey's relevant market-related opinions in Section IV of his Report should be excluded because he is not qualified to offer them.[53]  Carey challenges the opinion in Singer's relevant market analysis that Growers do not have alternative labor options.[54]  Carey opines "Dr. Singer's market analysis fails to take into account [G]rowers' alternative options for their labor"[55] and "Singer's opinion that [G]rowers do not have alternative labor options ignores the practical realities of [G]rowers' wide range of alternative options."[56]  Plaintiffs assert Carey is not qualified to offer these opinions because, as Carey acknowledges, he "is neither an

---

[50] *PPC's Opposition* at 15.

[51] *See Skycam, Inc.*, 2011 WL 255188, at *6.

[52] *See, e.g., Newsome*, 2019 WL 5197566, at *3 (excluding expert report where the expert "did not even see the report until after it had been provided to [opposing] counsel," opinions were founded on information the expert did not have at the time the report was produced, and the expert had not reviewed any record evidence); *Rodgers v. Beechcraft Corp.*, No. 15-CV-0129-CVE-PJC, 2017 WL 979100, at *5–7 (N.D. Okla. Mar. 14, 2017) (excluding report where expert did not participate in drafting the report, was retained only four days before the report was signed, admitted to reviewing but not reading evidence provided, and "denied that he personally had any knowledge supporting several of the opinions offered in the report").

[53] *Motion to Exclude* at 19.

[54] *Id.* (citing *Carey Report* ¶ 63).

[55] *Carey Report* ¶ 14.

[56] *Id.* ¶ 63.

economist, an econometrician, nor an expert in industrial organization."[57]  According to Plaintiffs, the opinions are excludable notwithstanding Carey's expertise in the industry because "'experience one has in a given trade, however extensive and closely related to the business side of that industry,' is no substitute for expertise in antitrust economics necessary to opine about an 'industry's relevant markets.'"[58]

In Opposition, PPC argues Carey's four decades of experience in the poultry industry qualify him to offer industry background opinions on whether Growers have alternative options for their services.[59]  PPC asserts Carey is not offering econometric or economic opinions concerning the relevant antitrust market, but is instead "responding to Dr. Singer's erroneous factual assumptions about the industry that bear on the ultimate issue as to the relevant labor market."[60]  Even though Carey's opinions may have "economic implications," PPC maintains they are admissible because they are within his field of expertise as an industry expert and are relevant to the question of whether Growers have alternative labor options.[61]

The court agrees with Plaintiffs that Carey is not qualified to critique or otherwise offer opinions concerning Singer's econometric analysis defining the relevant antitrust market. However, to the extent Singer offers opinions resting on assumptions concerning factual background about the Grower industry, Carey's experience in the industry qualifies him to offer at least some kinds of relevant opinions in response.

---

[57] *Motion to Exclude* at 19.

[58] *Id.* (quoting *Berlyn, Inc. v. Gazette Newspapers Inc.*, 214 F. Supp. 2d 530, 538 (D. Md. 2002) (internal quotations omitted)).

[59] *PPC's Opposition* at 16–17.

[60] *Id.* at 17.

[61] *Id.* at 18 (citing *ClearPlay, Inc. v. Dish Network, LLC*, No. 2:14-cv-00191-DN-CMR, 2023 WL 121278, at *6 (D. Utah Jan. 6, 2023); *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. 04-4213, 2011 WL 167259, at *5–6 (D. Minn. Jan. 14, 2011); *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 761–62 (S.D. Iowa 2019)).

Defining the relevant antitrust market is a highly technical exercise, typically involving econometric analysis concerning "reasonable interchangeability" and "cross-elasticity."[62] Singer conducts this analysis by performing a version of a hypothetical monopsonist test called a "critical elasticity analysis."[63] The test "seeks to understand suppliers' alternative outside options for selling their services in response to a price decrease for their services."[64] If the hypothetical monopsonist can profitably impose a Small but Significant and Non-Transitory Decrease in Price (SSNDP), typically five-percent, for the services in the analysis, then the services are a relevant antitrust market.[65] Singer concludes the SSNDP in his test would be profitable, which implies Growers do not have alternative selling options for their services.[66] However, Singer does not stop there. He then offers four paragraphs of opinions over three pages discussing industry background facts purportedly corroborating his econometric analysis.[67]

Carey is not qualified to critique Singer's econometric analysis defining the relevant antitrust market. Moreover, his experience-based opinions about Growers' alternative labor options are not relevant to Singer's hypothetical monopsonist test. His opinions do not rebut Singer's conclusion or challenge the assumptions in the test because they do not engage with the analysis Singer performs, nor is Carey qualified to do so. However, if at trial Singer offers factual opinions about the Grower industry and factors which make it difficult for Growers to transition to alternative industries—such as unique requirements for broiler grow houses and

---

[62] *Telecor Comms., Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1130–31 (10th Cir. 2002) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

[63] *Singer Report* ¶¶ 47–49.

[64] *Id.* ¶ 47.

[65] *Id.*

[66] *Id.* ¶¶ 47–49.

[67] *See id.* ¶¶ 61–64.

Grower debt[68]—Carey's industry expertise qualifies him to rebut these opinions.  In this context, though Carey's opinions may have "economic implications," they "are not economic in nature."[69]  Instead, they are relevant to challenging Singer's non-economic industry opinions and would aid the trier of fact in understanding the broiler Grower industry.[70]

Plaintiffs' request to exclude Carey's opinions concerning Growers' alternative labor options is granted in part and denied in part.  Carey is precluded from offering any opinion pertaining to Singer's hypothetical monopsonist test and his econometric analysis of the relevant antitrust market.  However, to the extent it may be relevant at trial, Carey may offer background opinions about the Grower industry to rebut factual testimony Singer may offer concerning Growers' alternative labor options.

### c.  Carey's Opinions on Grower Switching

Plaintiffs argue Carey's opinions in Section V of his Report about the reasons Grower switching is not more common should be excluded because he is not qualified to offer them and they are irrelevant.[71]  Carey opines that Singer's empirical analysis of Growers switching Integrators "fails to take into account the practical reasons that explain why [G]rower switching is not more common."[72]  Plaintiffs assert Carey acknowledges he is not qualified to critique

---

[68] *See id.*

[69] *ClearPlay, Inc.*, 2023 WL 121278, at *6; *see also Mahaska Bottling Co.*, 441 F. Supp. 3d at 761 (rejecting argument a non-economist industry expert cannot testify regarding economic topics because the expert "does not attempt to create an economic model beyond his expertise but rather focuses his testimony on historical information and trends regarding the beverage industry, a topic on which he is qualified").

[70] As an example of Carey's lack of qualification to offer market-related opinions, Plaintiffs point to Carey's opinions in Section IV concerning the "Sample of Broiler Farm Sales Since 2018."  *Motion to Exclude* at 20.  Plaintiffs argue Carey's deposition testimony demonstrates he lacks knowledge about the analysis and the sources of the data.  This is a question of weight not admissibility and Plaintiffs' concerns are more appropriately addressed through "[v]igorous cross-examination."  *Daubert*, 509 U.S. at 596.

[71] *Motion to Exclude* at 21.

[72] *Carey Report* ¶ 14; *see also id.* ¶¶ 64–79.

Singer's empirical analysis,[73] yet that is what he does when he opines that Singer's measurements "ignore" or "fail[] to take into account" factors affecting Grower switching.[74] Further, according to Plaintiffs, these opinions are not relevant because Singer's analysis is based on real-world data of Growers switching Integrators and therefore already accounts for the various impediments to switching Carey discusses.[75]

In response, PPC argues Carey's opinions are admissible because they "respond directly to Dr. Singer's opinion that the purportedly low Grower switching rate in the industry could be caused only by the alleged [NPA]."[76] According to PPC, Carey's opinions explain the industry-specific factors limiting Grower switching, including a Grower's distance to an Integrator, Integrators' limited needs for additional housing, Integrators' use of waitlists to obtain new Growers, and Integrator-specific housing requirements.[77] PPC contends Carey's opinions will aid a jury "because they undermine Dr. Singer's factual assumption, which is entirely unmoored to actual industry facts, that switching rates are 'low' solely because of the alleged [NPA]."[78]

The court agrees with Plaintiffs that Carey is not qualified to critique Singer's empirical analysis and Carey's opinions on practical impediments to Grower switching are irrelevant. As Plaintiffs explain, Singer's analysis uses "real-world" data of Grower switching rates.[79] Based on this data, he first finds Grower switching rates "were relatively uniform nationwide."[80] He

---

[73] *Motion to Exclude* at 22 (citing Dkt. 455-1, *Exhibit 2: Carey Deposition Transcript* (*Carey Dep.*) at 59:17-60:2, 104:23-105:1, 99:6-100:7 ("The analyses and the metrics and measurements and what have you that he employs are beyond the scope of my expertise.")).

[74] *Id.* (quoting *Carey Report* ¶¶ 14, 64, 79).

[75] *Id.*

[76] *PPC's Opposition* at 18.

[77] *Id.* at 18–19.

[78] *Id.* at 19 (emphasis in original removed).

[79] *Plaintiffs' Reply* at 13.

[80] *Id.*

then compares these switching rates to those that occurred in the Delmarva[81] region during a breakdown in the alleged NPA where switching rates more than doubled before returning to normal once the NPA was restored.[82]  Singer concludes this demonstrates the alleged NPA artificially suppressed Grower switching, but does not opine the NPA is the only limitation on switching.[83]  Singer's use of real-world data to compare switching rates in periods with and without the alleged NPA allows him to isolate the effect of the NPA on Grower switching.  The other impediments Carey discusses are, as Plaintiffs put it, "baked into" Singer's analysis.[84]

Carey's opinions do not challenge the data underlying Singer's analysis or explain why these data would not reflect the practical impediments Carey discusses.  Nor would Carey's expertise qualify him to offer these critiques, as he acknowledges.  Even assuming Carey were qualified to offer these opinions, because they do not explain how Singer's analysis does not already account for other limitations on Grower switching, the opinions do not "logically advance[] a material aspect of the case."[85]  Accordingly, Carey's opinions concerning the practical impediments to Grower switching are also not relevant under Rule 702 and *Daubert*.

Plaintiffs' request to exclude Carey's opinions in Section V of his Report on impediments to Grower switching is granted.

---

[81] Delmarva refers to a region of the country spanning portions of Delaware, Maryland, and Virginia.

[82] *Id.* at 13–14.

[83] *Id.* at 14.

[84] *Id.*

[85] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand)).

### d. Carey's Critiques of Singer's Econometric Models

Plaintiffs next move to exclude opinions in Section VI of Carey's report concerning the suitability of benchmark comparators in Singer's regression models.[86]  Carey opines "Dr. Singer's opinion that the alleged conspirators' [G]rower pay would resemble that of his selected non-conspirator benchmarks if not for the alleged conspiracy uses the wrong pay metric, and fails to account for substantial differences in the non-conspirators."[87]  Plaintiffs contend Carey is not qualified to offer these opinions because they critique Singer's econometric benchmarks and the adequacy of the control variables Singer utilizes to account for differences across Integrators.[88]  Further, Plaintiffs argue Carey's opinions should be excluded because they are duplicative of those offered by McCrary, one of PPC's economic experts.[89]

PPC counters that Carey's opinions concerning Singer's benchmark regressions are admissible because he "relies on his industry knowledge and experience to explain the differences between the Integrators and the Benchmark Integrators."[90]  According to PPC, Carey's industry-specific factual evidence will aid the jury in evaluating whether Singer's Benchmark Integrators are suitable benchmarks for comparing Grower pay across Integrators.[91]  For example, Carey discusses the different standards used by Benchmark Integrators to grow their broilers, the differences in housing, how those differences affect the number of broilers that can be grown per house, and how those differences affect Grower pay on a per square foot

---

[86] *Motion to Exclude* at 22.

[87] *Id.* (quoting *Carey Report* ¶ 14; *id.* ¶¶ 9, 80–87).

[88] *Id.* at 22–23.

[89] *Id.* at 23.

[90] *PPC's Opposition* at 20.

[91] *Id.*

basis.[92]  Carey concludes Singer "fails to consider these differences before assuming [the Benchmark Integrators] are comparable to the alleged conspirators and before assuming that pay-per-pound accurately reflects differences in total pay."[93]  PPC asserts Carey is qualified to offer these background opinions and they will be "useful to a jury in evaluating whether Dr. Singer's assumptions and conclusions concerning his Information Sharing regression are valid, credible, or correct."[94]

The court agrees with Plaintiffs that Carey is not qualified to critique Singer's regression models and Carey's opinions on the suitability of the Benchmark Integrators are inadmissible. When asked at his deposition whether Singer included appropriate control variables to account for the differences across Integrators, Carey acknowledged, "It's not my expertise to evaluate Dr. Singer's methodologies and Dr. Singer's regressions and things of that nature."[95]  He further testified, "The influence of and the importance of variables in Dr. Singer's regression model are beyond my area of expertise."[96]  But if Carey cannot assess whether Singer's control variables adequately account for differences between the Benchmark Integrators and the co-conspirator Integrators, which he admittedly is not qualified to do, his opinions about the adequacy of Singer's models are both irrelevant and unreliable.  Carey's industry expertise would provide no assistance to the trier of fact in determining whether Singer's benchmark comparisons are

---

[92] *Id.* (citing *Carey Report* ¶¶ 88–92).

[93] *Id.* (quoting *Carey Report* ¶ 94).

[94] *Id.*

[95] *Carey Dep.* 108:15-109:2.

[96] *Id.* at 109:25-110:11.

persuasive.[97]  Challenging the suitability of Singer's benchmark comparisons and the construction of his models is the domain of an expert economist.  Indeed, PPC's expert McCrary appropriately does this.[98]

Plaintiffs' Motion to exclude Carey's opinions concerning Singer's regression model comparison in Section VI of Carey's Report is granted.

### e.  Carey's Tournament System Opinions

Plaintiffs contend Carey's opinions in Section VIII of his Report concerning benefits accruing to Growers from the so-called Tournament System are not relevant and should be excluded.[99]  Carey asserts Plaintiffs allege "that the [T]ournament [S]ystem harms [G]rowers" and then offers opinions about the beneficial aspects of the System.[100]  However, according to Plaintiffs, they do not challenge the Tournament System or allege it is part of the Overarching Agreement.[101]  Rather, Plaintiffs argue "the Tournament System ensures that the anticompetitive effects caused by Defendants translate into reduced compensation for all Class members."[102]  According to Plaintiffs, they do not allege the Tournament System harms Growers but discuss it as a "market characteristic" allowing for "harm caused by the Overarching Agreement to be

---

[97] *See, e.g.*, *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (excluding industry expert's damages analysis where he admitted he had no expertise in statistics or regression analysis and "had never used the methods used to create" the model, because he was not a trained economist and could not educate the jury on complex economic methodologies).

[98] *See PPC's Opposition* at 19 (citing *McCrary Report* ¶ 100).

[99] *Motion to Exclude* at 23.  The Tournament System refers to the method Integrators use to determine a Grower's final pay for a flock of broilers.

[100] *Id.* (quoting *Carey Report* ¶¶ 14, 109).

[101] *Id.*

[102] *Id.* (quoting *Complaint* ¶ 150).

spread throughout the proposed Class."[103]   Accordingly, Plaintiffs assert Carey's opinions about purported benefits of the Tournament System are irrelevant.[104]

In opposition, PPC argues Carey's opinions are relevant because Plaintiffs allege the Tournament System harms Growers.[105]   Despite Plaintiffs' contention to the contrary, PPC asserts Plaintiffs' Complaint alleges the Tournament System harms Growers by stating it "is not a 'profit sharing' system"[106] and "the Tournament System ensures that the anticompetitive effects caused by Defendants translate into reduced compensation for all Class members[.]"[107] According to PPC, Singer also challenged the Tournament System by opining the Tournament System is "a deceptive practice."[108]   Given these assertions, PPC argues, Carey's opinions concerning benefits of the Tournament System are relevant.[109]

PPC's arguments are unpersuasive, and the court concludes Carey's opinions about the Tournament System are irrelevant.  Plaintiffs do not allege the Tournament System harmed Growers, that it was part of the alleged conspiracy, or that it otherwise had anticompetitive effects.  Plaintiffs allege the Overarching Agreement—comprised of the NPA and the ISA—was an unlawful conspiracy to suppress Grower pay nationwide.  That is the alleged harm to Growers.  As Plaintiffs argue, one of the ways in which that harm was transmitted broadly throughout the class was the Tournament System.  That is all the statement PPC identifies in support of its argument says—"the Tournament System ensures that the anticompetitive effects

---

[103] *Id.*

[104] *Id.* at 24.

[105] *PPC's Opposition* at 21.

[106] *Id.* (quoting *Complaint* ¶ 149).

[107] *Id.* (quoting *Complaint* ¶ 150).

[108] *Id.* (quoting *Singer Report* ¶ 24).

[109] *Id.*

caused by Defendants translate into reduced compensation for all Class members[.]"[110]  This is a description of the market in which the alleged conspiracy operated, not an allegation that the Tournament System was an element of that conspiracy.

Further, PPC's reference to Singer's Report takes Singer's opinion out of context.  In an opinion describing how the Tournament System functions, Singer states, "I also understand Defendant Sanderson [a co-conspirator Integrator] recently entered into a consent decree with the Department of Justice in a lawsuit claiming that Sanderson's [T]ournament [S]ystem was a deceptive practice . . . ."[111]  In context, Singer does not opine the Tournament System is a deceptive practice; that was an allegation of the Department of Justice against one of PPC's alleged co-conspirators.  In any event, this brief and likely inadmissible statement about another case does not permit Carey to offer otherwise irrelevant testimony.

Plaintiffs do not challenge the propriety of the Tournament System or allege it harms Growers.  Accordingly, Carey's opinions in Section VIII of his Report are not relevant to this case and would not aid the trier of fact.  Plaintiffs' request to exclude these opinions is granted.

**f. Carey's Industry Background Opinions**

Plaintiffs argue Carey's purported industry background opinions in Section III.C of his Report, addressing how Integrators set Grower pay, should be excluded because expert testimony is not required to understand the related record evidence and Carey's opinions risk usurping the role of the jury.[112]  Plaintiffs assert Carey could not identify any scientific or technical expertise underlying the opinions, nor any "analysis supporting them other than his 'experiences.'"[113]

---

[110] *Id.*; *Complaint* ¶ 150.

[111] *Singer Report* ¶ 24.

[112] *Motion to Exclude* at 24 (citing *Carey Report* ¶¶ 30–40).

[113] *Id.*

Because the evidence Carey opines on is readily comprehendible to a jury, "expert testimony as to these disputed factual issues 'will usurp the juror's role of evaluating [the] witness[es'] credibility."[114]  According to Plaintiffs, "Carey's purportedly factual renditions about Integrators' approaches to Grower pay merely recite readily understandable evidence" and do not entail the "scientific, technical, or other specialized knowledge" Rule 702 requires.[115]

In response, PPC contends this portion of Carey's Report provides general industry background information based on his forty years of experience in the industry and would help the trier of fact understand the evidence, as Rule 702 requires.[116]  Carey's opinions, PPC argues, will assist in evaluating contested evidence, such as whether the alleged co-conspirator Integrators used pay data in the same way, whether pay data was used to suppress Grower pay, and whether all Integrators willfully acted to further the objective of the alleged conspiracy.[117]  Further, these pay practices require an understanding of industry customs and are not within the common knowledge of a layperson.[118]  The court agrees.

The admissibility of expert testimony is not limited to only those experts offering "scientific" or "technical" testimony.[119]  Rule 702 also permits expert testimony from those whose "other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[120]  Carey has over forty years of experience in the Grower industry

---

[114] *Id.* at 25 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

[115] *Id.* at 24–25 (quoting Fed. R. Evid. 702).

[116] *PPC's Opposition* at 22.

[117] *Id.*

[118] *Id.* at 22–23.

[119] Fed. R. Evid. 702(a).

[120] *Id.*

and is qualified to offer opinions based on this "specialized knowledge."[121]  Indeed, "[e]xperience alone may provide a sufficient foundation to qualify an expert."[122]  In his Report, he offers opinions, based on his experience, concerning certain Integrators' desire to offer higher pay.[123]  He discusses attending Grower recruiter meetings with Integrators at which Integrators detail their approach to Grower pay.[124]  Carey's "first-hand experience working with broiler [G]rowers and [I]ntegrators, including prospective broiler [G]rowers entering the industry, as well as with existing broiler [G]rowers and [I]ntegrators navigating the science, technology, and best practices associated with live production and broiler grow-out," provide an adequate experiential basis for him to offer expert opinions concerning Integrators' approach to Grower pay.[125]

Further, Carey's opinions on this topic would "help the trier of fact to understand the evidence or to determine a fact in issue."[126]  Certainly, many of Carey's opinions on the various approaches to setting pay draw heavily from other factual record evidence.  However, just as an expert economist's interpretation of facially understandable record evidence through the lens of economic theory may benefit the trier of fact,[127] Carey's interpretation of record evidence through the lens of his specialized industry expertise may aid the trier of fact in determining contested facts in issue.

---

[121] *Id.*

[122] *Skycam, Inc.*, 2011 WL 2551188, at *4 (citing *E.E.O.C. v. Beauty Enters., Inc.*, 361 F. Supp. 2d 11, 19 (D. Conn. 2005)).

[123] *Carey Report* ¶ 30.

[124] *Id.* ¶ 31.

[125] *Id.* ¶ 13.

[126] Fed. R. Evid. 702(a).

[127] *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 WL 6681783, at *3 (D. Kan. Dec. 21, 2012) (finding admissible economist testimony evaluating non-economic factors because "it would be helpful to a jury for an expert to put events into an economic context").

The court acknowledges "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702."[128]  However, so long as Carey's testimony serves to place other record evidence—which will have to be introduced through witness testimony at trial—in the context of industry customs and practices, he does not usurp the role of the trier of fact.[129]  Plaintiffs are free to interrogate the bases for Carey's opinions on cross-examination at trial and monitor his testimony to ensure he does not invade the province of the jury by improperly bolstering other fact witnesses' testimony.

Accordingly, Plaintiffs' request to exclude Carey's opinions concerning Integrators' varying approaches to setting Grower pay is denied.

### g.  PPC's Experts' NPA Justifications

Plaintiffs next argue the opinions of all three PPC experts that the alleged NPA was justified by biosecurity concerns are irrelevant and inadmissible.[130]  According to Plaintiffs, PPC's experts opine that Integrators' restrictions on Grower recruitment were motivated by "concerns that 'in person' Grower recruitment could spread avian diseases such as bird flu," not a desire to suppress Grower pay.[131]  Plaintiffs assert the alleged NPA is a *per se* unlawful

---

[128] *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) (internal quotations and citations omitted).

[129] *See, e.g.*, *Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1206–09 (D.N.M. Apr. 25, 2016) (finding expert's "custom-and-usage testimony" would aid the trier of fact in making determinations about specialized meaning of certain language in the industry); *Williams v. First Advantage LNS Screening Sols. Inc.*, No. 1:13cv222-MW/GRJ, 2015 WL 9690018, at *3 (N.D. Fla. Mar. 31, 2015) (concluding industry expert's testimony on industry norms and "reasonable procedures" "offered a factual benchmark against which to measure Defendant's" conduct and would be useful to trier of fact).

[130] *Motion to Exclude* at 25.

[131] *Id.* (citing *Carey Report* ¶¶ 9, 14, 95–108; *Saravia Report* ¶ 68; *McCrary Report* ¶¶ 243–44).

restraint.[132]  Under antitrust law, *per se* restraints do not permit procompetitive justifications, which, they contend, is what PPC's expert opinions are.[133]  Accordingly, Plaintiffs argue the opinions are irrelevant and should be excluded.[134]

In opposition, PPC argues Plaintiffs' challenge to these opinions is a matter for summary judgment, not a *Daubert* motion.[135]  According to PPC, whether the alleged NPA is a *per se* unlawful restraint for which procompetitive justifications are barred is a contested issue.[136]  In certain circumstances, "an otherwise *per se* anticompetitive agreement (e.g. the alleged [NPA]) that is ancillary to some other legitimate business purpose (e.g. preventing the spread of avian-borne illnesses that can cause billions of dollars in losses), is evaluated under the rule of reason."[137]  PPC's experts' opinions will aid the trier of fact's determination about whether recruiting restrictions to prevent the spread of disease "qualifies as a legitimate ancillary purpose that would take any [NPA] out of the realm of a *per se* violation."[138]

The court agrees with PPC that this portion of Plaintiffs' Motion to exclude these opinions is premature at this time.  The court has not determined whether the alleged conspiracy is a *per se* unreasonable restraint or whether it will be subject to analysis under the rule of reason, and it need not do so now.  "Indeed, that decision is more appropriate on a motion for

---

[132] *Id.* at 25–26.

[133] *Id.*

[134] *Id.* at 26.

[135] *PPC's Opposition* at 24.

[136] *Id.* at 25.

[137] *Id.* at 26 (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010)).

[138] *Id.*

summary judgment."[139]  A *Daubert* motion is not the proper vehicle to decide this important contested question.

Moreover, even if the alleged NPA is the type of conduct often subject to the *per se* test, the "modern approach to antitrust analysis"[140] permits a court to more closely review the specific facts of the case to determine if the challenged conduct is a "naked restrain[t] of trade with no purpose except stifling of competition."[141]  Before "condemning" a category of conduct as anticompetitive *per se*, courts "must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."[142]  And PPC is correct; courts routinely admit expert testimony and evidence to facilitate this inquiry.[143]

In their Reply, Plaintiffs assert PPC's argument fails because the "ancillary restraints doctrine" is an affirmative defense which PPC has waived by not pleading it in their answer.[144]  However, as above, whether PPC's argument concerning ancillary restraints is an affirmative

---

[139] *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (citations omitted).

[140] *Behrend v. Comcast Corp.*, No. 03-6604, 2012 WL 1231794, at *11 (E.D. Pa. Apr. 12, 2012) (considering whether plaintiffs' alleged *per se* restraint was a "naked market division . . . rather than merely ancillary restraints on trade").

[141] *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979).

[142] *Polk Bros., Inc. v. Forest City Enter., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984)).

[143] *See, e.g., Behrend*, 2012 WL 1231794, at *8–12 (considering at summary judgment expert's testimony that challenged conduct, typically subject to *per se* treatment, was not naked market restraints but "merely ancillary restraints on trade"); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 484 (W.D. Pa. 2019) (finding "at this stage of the proceedings, the court cannot discern that the alleged 'no-poach' agreements would be legitimate ancillary restraints on trade executed with some other proper business purpose" without additional evidence); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 990 (N.D. Ill. 2022) ("That Plaintiffs rely exclusively on the *per se* theory does not militate in favor of expediting a decision on the applicable analysis.  Rather, because Plaintiffs have a plausible *per se* claim, the question becomes whether the evidence will establish that the non-solicitation agreements do, in fact, nakedly allocate the market for outpatient medical care employees . . . Such questions, however, must await development of the record.").

[144] *Plaintiffs' Reply* at 19.

defense—and if so, whether it has been waived—is better resolved on summary judgment than as part of a broader *Daubert* challenge.

Because the court has not yet decided whether Plaintiffs' claim is subject to *per se* or rule of reason analysis, the opinions of PPC's experts concerning the purported rationale for restrictions on Grower recruiting may be relevant and may help the trier of fact determine contested issues. Plaintiffs' request to exclude these opinions is denied without prejudice to seek their exclusion at a later stage of the litigation should it be necessary.[145]

### h. PPC's Experts' Opinions About Benefits of the ISA

Plaintiffs argue PPC's experts' opinions concerning procompetitive benefits of the alleged ISA should be excluded as irrelevant and because they are inadmissible *ipse dixit* opinions.[146] Plaintiffs assert that, like PPC's biosecurity arguments, these procompetitive justifications are not relevant to their *per se* claim "and should be excluded on that basis alone."[147] For the reasons explained above, the court defers the question related to the applicable standard at this time and does not engage with it further.[148] The court's analysis focuses on Plaintiffs' argument that the expert opinions are inadmissible *ipse dixit*.

Plaintiffs' assert the expert opinions concerning procompetitive benefits of information sharing are inadmissible because there is "simply too great an analytical gap between the data

---

[145] Plaintiffs also argue the opinions are inadmissible because the alleged NPA fails the "less restrictive alternatives test" and because the biosecurity justifications "are manifestly litigation-driven and pretextual." *Motion to Exclude* at 27. Concerning the former, Plaintiffs' *Daubert* motion is not the appropriate forum to determine whether the restraint is "no broader than necessary to effectuate" the justifications PPC offers. *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 970 (10th Cir. 1994). To the latter, Plaintiffs' argument likely goes to the weight the court should afford this evidence, not its admissibility.

[146] *Motion to Exclude* at 32 (citing *Carey Report* ¶¶ 46–52; *Saravia Report* ¶¶ 89–91; *McCrary Report* ¶¶ 188–90).

[147] *Id.*

[148] *See supra* pp. 21–23.

and the opinion proffered."[149]  At issue, McCrary opines it is "[a] widely recognized economic principle" that when firms share certain information "it can enable them to offer compensation levels that are more competitive with the market."[150]  Similarly, in rebuttal to Singer's opinion that such exchanges "necessarily leads to reduced employee pay,"[151] Saravia asserts "[a]cademic literature and regulatory guidelines demonstrate that employer information exchanges may result in higher" compensation.  According to Plaintiffs, these conclusions lack a reliable foundation.[152]

Plaintiffs contend the underlying support for PPC's experts' opinions is now-withdrawn Department of Justice (DOJ) guidance and an unpublished, non-peer reviewed working paper.[153] According to Plaintiffs, McCrary's opinion that the information exchange at issue in this case falls within regulatory agencies' "Antitrust Safety Zone"[154] is premised on DOJ regulatory guidance that was withdrawn because it was "'out of date' and 'overly permissive on certain subjects, such as information sharing.'"[155]

Concerning the academic literature underlying Saravia's opinion, Plaintiffs argue she relies only on the Cullen paper, an "unpublished, non-peer reviewed working paper, first disseminated weeks before [PPC's] expert reports were served."[156]  Further, Plaintiffs assert that, even if the Cullen paper were a reliable basis for the expert opinions, it does not "support the

---

[149] *Motion to Exclude* at 32 (quoting *Norris*, 397 F.3d at 886).

[150] *McCrary Report* ¶ 188.

[151] *Saravia Report* ¶ 89.

[152] *Motion to Exclude* at 32.

[153] *Id.*

[154] *Id.* at 34 (citing *McCrary Report* ¶¶ 200–22).

[155] *Id.* (quoting Press Release, DOJ, Justice Dep't Withdraws Outdated Enforcement Policy Statements (Feb. 3, 2023), https://www.justice.gov/opa/pr/justice-department-withdraws-outdatedenforcement-policy-statements).

[156] *Id.* at 32 (citing Zoe B. Cullen, Shengwu Li, & Rcardo Perez-Trugliz, *What's My Employee Worth? The Effects of Salary Benchmarking*, NBER, Working Paper Series, No. 30570 (Oct. 2022)).

proposition that exchanges of Grower pay in this case could even conceptually result in increased Grower pay."[157]  The Cullen paper analyzes aggregated industry benchmarking and "explicitly condemns the direct interfirm exchanges" of specific Grower pay rates Plaintiffs allege in this case.[158]  Moreover, Plaintiffs continue, the paper relies on assumptions Saravia admitted in her deposition are "unrealistic."[159]

Plaintiffs also contend McCrary's and Carey's opinions about efficiencies flowing from exchanges of information other than Grower pay data are irrelevant and should be excluded.[160] According to Plaintiffs, McCrary "offers numerous examples of efficiencies unrelated to the exchange of Grower compensation."[161]  Similarly, Carey "could not identify any efficiencies tied to the exchanges of Grower compensation" when questioned at his deposition about efficiencies of information exchanges identified in his Report.[162]  Plaintiffs argue "[t]his case challenges exchanges of Grower pay information, not feed conversion or feed ingredient data, and so efficiencies related to exchanges of information other than Grower pay . . . are irrelevant to the procompetitive justifications analysis in this case."[163]

In its Opposition, PPC contends none of Plaintiffs' arguments are grounds to exclude its experts' opinions.[164]  It argues the opinions rebut Singer's conclusion that the ISA suppressed

---

[157] *Id.* at 32–33.

[158] *Id.* at 33.

[159] *Id.*

[160] *Id.* at 34.

[161] *Id.* (citing *McCrary Report* ¶¶ 188–90).

[162] *Id.* (citing *Carey Dep.* 48:3-50:3).

[163] *Id.*

[164] *PPC's Opposition* at 28.

Grower pay from an economic perspective—through McCrary and Saravia—and an industry perspective—through Carey.[165]

PPC first argues Plaintiffs' assertion that PPC's experts' opinions on the procompetitive effects of information sharing lacks support is "facially absurd."[166] According to PPC, Plaintiffs' position is contrary to a 30-year line of caselaw holding that "[t]he exchange of price data . . . can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."[167] PPC further contends Plaintiffs' challenge to the support underlying McCrary's and Saravia's opinions goes to the weight of the opinions, not admissibility, and "is not a basis for exclusion on a *Daubert* motion."[168]

That aside, PPC also argues the opinions are adequately supported.[169] For his part, McCrary cites to "numerous third-party reports" in other industries with entities similar to Agri Stats that provide benchmarking information and other guidance from the federal government, not just the withdrawn DOJ guidance.[170] Likewise, Saravia supports her opinions with not only the DOJ guidance but also empirical analysis of the information exchange in this case to find it led to increased Grower pay.[171] PPC asserts Plaintiffs' challenge to the Cullen paper are "meritless" because the paper was authored by three distinguished economists and economists frequently rely on these types of working papers.[172]

---

[165] *Id.* at 27.

[166] *Id.* at 28.

[167] *Id.* (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[168] *Id.*

[169] *Id.*

[170] *Id.* (quoting *McCrary Report* ¶ 190).

[171] *Id.* (citing *Saravia Report* ¶ 112–13).

[172] *Id.* at 29–30.

Lastly, PPC contends opinions concerning efficiencies unrelated to the exchange of Grower pay data are relevant.[173] According to PPC, Plaintiffs' argument concerning the ISA largely involves the sharing of information through Agri Stats, and Agri Stats aggregates data on "all aspects of the Grower industry, not just Grower pay."[174] The exchange of non-pay data is relevant because, as Carey opines, "[e]fficiencies in chicken production that result from benchmarking often benefit [G]rowers themselves" by increasing Grower productivity.[175] These efficiencies translate to "more compensation for the more pounds grown."[176]

In Reply, Plaintiffs argue PPC's selective citation to legal precedent concerning information exchanges overlooks nuance applicable here.[177] Plaintiffs allege the ISA involved the exchange of current price data and "[e]xchanges of current price information . . . have consistently been held to violate the Sherman Act."[178] Further, even if the court accepts that the Cullen paper adequately supports PPC's experts' opinions, Plaintiffs argue the paper does not support the proposition that "information exchanges can and do lead to increased Grower pay."[179] As Saravia admits, the paper relies on unrealistic modeling assumptions and, Plaintiffs assert, it "lacks any application to the reciprocal direct interfirm exchanges of specific pay rates in this case."[180] Lastly, Plaintiffs reiterate their claim is limited to exchanges of Grower pay—

---

[173] *Id.* at 30.

[174] *Id.* at 31.

[175] *Id.* (quoting *Carey Report* ¶¶ 49, 50).

[176] *Id.* (quoting *Carey Report* ¶¶ 49, 50).

[177] *Plaintiffs' Reply* at 20.

[178] *Id.* (quoting *Gypsum*, 438 U.S. at 441 n.16).

[179] *Id.* (quoting *PPC's Opposition* at 27).

[180] *Id.*

not other industry data—so Carey's opinions concerning efficiencies related to exchanges of other data are irrelevant.[181]

The court concludes McCrary's and Saravia's opinions are admissible but Carey's opinions about efficiencies resulting from exchanges of information unrelated to Grower pay are irrelevant and inadmissible. McCrary and Saravia are economists, qualified to offer expert opinions based on economic principles, such as the potential procompetitive benefits of information sharing. Though the underlying support for these opinions may be tenuous, it is the sort of information experts in the field typically rely on in conducting their analysis. For example, as PPC notes, the Cullen paper was published through the National Bureau of Economic Research's Working Paper series, a prominent forum through which economists publish economics research.[182] Further, economists frequently engage with and rely upon these sorts of working papers in their work. Notably, Plaintiffs' expert Singer cites to at least three working papers in his own Report.[183] Mindful that "Rule 702 mandates a liberal standard for the admissibility of expert testimony,"[184] the contested expert opinions "more likely than not" meet the minimum standards of reliability such that the opinions are not the mere *ipse dixit* of the experts.[185] Plaintiffs' challenges go to the weight a trier of fact should assign to these opinions, not to their admissibility.[186]

---

[181] *Id.* at 21–22.

[182] *See PPC's Opposition* at 29.

[183] *See Singer Report* at 224 n.140, 243 n.227, 243 n.231.

[184] *Entrata, Inc. v. Yardi Systems, Inc.*, No. 2:15-cv-00102, 2019 WL 13076536, at *2 (D. Utah Aug. 23, 2019) (quoting *Cook v. Rockwell Int'l Corp.*, 580 F. Supp.2d 1071, 1082 (D. Colo. 2006)).

[185] Fed. R. Evid. 702 (reflecting the 2023 amendment to the Rule).

[186] *See Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1524 (10th Cir. 1984) (affirming admission of expert's testimony though "there may have been considerable evidence contradicting the expert's assumptions" because the "assumptions were not without support" and "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness" falls "on the shoulder of opposing counsel's cross-examination") (internal quotations and citations omitted).

The parties' discussion of antitrust caselaw pertaining to the treatment of information sharing between competitors illustrates the relevance, for now, of these opinions.  The Supreme Court has long held "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects" and "such exchanges of information do not constitute a *per se* violation of the Sherman Act."[187]  However, as Plaintiffs correctly note, certain types of exchanges, such as exchanges of current pricing data, "have consistently been held to violate the Sherman Act."[188]  Though Plaintiffs contend their claim is a *per se* unlawful restraint, the court has not determined whether that is so, as discussed above.[189]  Accordingly, PPC's economic experts' opinions concerning the procompetitive effects of information sharing are relevant and will aid the court, at least on summary judgment, in determining whether Plaintiffs' claim is subject to *per se* or rule of reason analysis.  Plaintiffs may seek the exclusion of these opinions again at a later stage in the litigation should it be appropriate.

However, Carey's opinions concerning benefits flowing from sharing information unrelated to Grower compensation are irrelevant to this case and are excluded.  Carey opines the sharing of non-pay-related benchmark data through Agri Stats results in many efficiencies which "often benefit [G]rowers themselves."[190]  For example, "if efficiencies in live production enable a [G]rower to improve his livability—thus losing fewer pounds to condemnation or mortality— the [G]rower will receive more compensation for the more pounds grown."[191]  True or not, these opinions have no bearing on the claims and defenses in this case.

---

[187] *Gypsum Co.*, 438 U.S. at 441 n.16.

[188] *Id.*

[189] *See supra* pp. 22–24.

[190] *Carey Report* ¶ 49.

[191] *Id.* ¶ 50.

Plaintiffs do not challenge information sharing broadly. Rather, they allege Integrators' sharing of Grower pay data is anticompetitive and results in suppressed Grower pay. That sharing of other sorts of information may allow Integrators and Growers to produce broilers more efficiently, and therefore permit Growers to earn more through increased production, has no relevance to the rate Integrators pay Growers. Mechanisms through which Growers may boost production and earn more money is not an issue in this case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[192]

Accordingly, Plaintiffs' request to exclude McCrary and Saravia's economic opinions concerning potential benefits to information sharing is denied without prejudice. Plaintiffs' request to exclude Carey's opinions in paragraphs 46 through 52 of his Report is granted.

### i. PPC's Experts' Opinions Concerning Growers' State of Mind

Lastly, Plaintiffs argue PPC's experts' opinions concerning Growers' state of mind and knowledge of Integrator pay rates should be excluded because they usurp the role of the jury, would not assist the trier of fact, and serve as a backdoor to the introduction of inadmissible hearsay.[193] According to Plaintiffs, all three of PPC's experts offer opinions supporting PPC's theory that "Growers talk."[194] In other words, Grower pay rates were "virtually public."[195] PPC responds the opinions are admissible and responsive to Singer's "flawed assumptions" that, because Growers do not have access to pay information, the ISA creates information

---

[192] *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18).

[193] *Motion to Exclude* at 35.

[194] *Id.* (citing *Saravia Report* ¶ 98; *McCrary Report* ¶ 225; *Carey Report* ¶ 41).

[195] *Id.*

asymmetries reducing Growers' negotiating leverage.[196]  Plaintiffs challenge the opinions on several separate grounds.[197]

Plaintiffs first argue that whether record evidence demonstrates Grower pay rates were virtually public, a disputed factual question, is understandable to the jury without expert testimony.[198]  According to Plaintiffs, Carey acknowledges "he employed no methodology in reaching these conclusions, drawing upon record evidence that could be conveyed by any fact witness in this case and his personal experiences."[199]  Plaintiffs contend permitting expert testimony on this disputed factual issue "usurp[s] the juror's role of evaluating [the] witness[es'] credibility."[200]  Further, "sweeping" absolute opinions about what Growers knew are inadmissible because experts "cannot testify to 'the understandings and expectations' of witnesses."[201]  Carey admits he does not have expertise in what Growers discuss amongst themselves and his opinions, "offered for the truth of the matter asserted, should therefore be excluded."[202]

Next, Plaintiffs contend many of the opinions are based on "hearsay, speculation, and other inadmissible evidence."[203]  For example, when asked at his deposition for specific examples of Growers receiving compensation data from other Integrators, Carey stated, "[A] [G]rower might tell me I was talking to Grower X from another company the other day and we

---

[196] *PPC's Opposition* at 31.

[197] *Motion to Exclude* at 35.

[198] *Id.*

[199] *Id.* (citing *Carey Dep.* 38:13-39:22).

[200] *Id.* (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

[201] *Id.* at 36 (quoting *McClelland & Assocs., Inc., v. Med. Action Indus., Inc.*, No. 4-cv-2545, 2006 WL 3333061, at *4 (D. Kan. Nov. 15, 2006)).

[202] *Id.* (citing *Carey Dep.* 44:24-45:10).

[203] *Id.*

talked about, amongst everything else, settlement, and my contract pay . . . . So it was relayed to me secondhand, if you would."[204]  Plaintiffs argue experts are not permitted to simply recite factual narratives drawn from admissible or inadmissible evidence.[205]  Because, Plaintiffs assert, these opinions are based on the "out-of-court statements of Grower declarants about Grower pay, offered for the truth of the matter asserted," they are inadmissible.[206]

Lastly, Plaintiffs argue the opinions should be excluded because there is too great a gap between the opinions offered and the facts and data supporting them.[207]  Plaintiffs assert the opinions draw on "*de minimis*" record evidence to support the conclusions, such as "foundationless" deposition testimony from various Integrator executives that pay information was widely known and discussed.[208]  Carey asserts his opinion on the widespread knowledge of Grower pay is based on his review of record evidence and personal experience, stating Poultry Extension Faculty like himself are aware of what local Integrators pay.[209]  But, Plaintiffs assert, his explanation of how his experience supports his opinions is based only on attendance at an Integrator town hall recruiting prospective Growers and a lender presentation to his students that shared pay rates with the identity of the corresponding Integrator redacted.  According to Plaintiffs, the experts' broad opinions that "Growers talk" are "so divorced from the threadbare evidence supporting the claim to warrant the extraordinary remedy of exclusion."[210]

---

[204] *Id.* (quoting *Carey Dep.* 124:9-25, 125:16-126:10).

[205] *Id.* (citing *Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, No. 15-cv-01541, 2018 WL 571877, at *3 (D. Colo. Jan. 26, 2018).

[206] *Id.* at 37.

[207] *Id.*

[208] *Id.* at 37–38.

[209] *Id.* at 39 (citing *Carey Dep.* 124:9-25, 125:16-126:10).

[210] *Id.*

In response, PPC argues the challenged opinions are appropriate and admissible rebuttal to the underlying facts and assumptions of Plaintiffs' expert Singer concerning access to Grower pay data and information asymmetries.[211] According to PPC, its economic experts, McCrary and Saravia, do not offer "absolute and unequivocal opinions" about Growers' state of mind or that Growers talk.[212] Rather, to rebut Singer's economic opinions and their underlying assumptions, the economic experts "discuss how the labor market would be affected—from an economic perspective—if Grower pay is widely known and readily available . . . ."[213]

For example, McCrary opines that "as a matter of basic economic logic[,] if price information is readily available from other sources, a set of firms with that knowledge would not have any informational advantage."[214] Similarly, Saravia opines Agri Stats data would not impact Grower pay decisions if it does not inform Integrators of anything they do not already know. "This is relevant here because the evidence shows that [I]ntegrators had sources for learning the actual compensation offered by other [I]ntegrators in their area . . . ."[215] PPC asserts these economic opinions are appropriate rebuttal opinions to Singer's analysis of record evidence relevant to the ISA.[216] Moreover, while Plaintiffs purport to challenge all three experts' opinions, they cite only to Carey's opinions and testimony. "This glaring omission," according to PPC, warrants denial of Plaintiffs' Motion as it pertains to Saravia and McCrary.[217]

---

[211] *PPC's Opposition* at 31.

[212] *Id.*

[213] *Id.*

[214] *Id.* at 32 (quoting *McCrary Report* ¶ 224).

[215] *Id.* (quoting *Saravia Report* ¶ 97).

[216] *Id.*

[217] *Id.* at 33.

Concerning Carey's opinions, PPC argues they are admissible because they are properly based on his specialized knowledge and industry expertise.[218]  As an industry expert, Carey does not have to employ a scientific methodology; he may "explain the customs and practices in his industry of expertise by drawing upon his own experiences and record evidence."[219]  Contrary to Plaintiffs' assertion, PPC contends Carey does not opine on what Growers knew, thought, or believed.[220]  His opinions are limited to his understanding of the information on Grower pay available to Growers based on his experience in the Grower industry and review of record evidence.[221]  Further, his opinions are not based on inadmissible hearsay, but draw "upon his experience speaking with industry participants for forty years, which is permissible."[222]  Fundamentally, PPC asserts, Plaintiffs' challenges to the bases of Carey's opinions go to their weight, not admissibility.[223]

The court agrees with PPC that McCrary's and Saravia's expert economic opinions in rebuttal to Singer are appropriate and admissible.  PPC is correct that, while Plaintiffs purport to challenge the opinions of all three experts, they only discuss Carey's opinions and do not specifically address either McCrary's or Saravia's.  Nonetheless, on the court's review, the economic experts' opinions appropriately respond to Singer's opinions by challenging his assumptions based on their review of record evidence.  According to McCrary and Saravia,

---

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.* at 33–34.

[222] *Id.* at 34 (citing *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971) ("Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court . . . when the expert [] uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right."); *V5 Techs., LLC v. Switch, Ltd.*, 501 F. Supp.3d 960, 964 (D. Nev. 2020) (allowing engineering expert to rely on conversations with sales representatives to form his opinions on building conditions)).

[223] *Id.* at 34.

record evidence suggests Grower pay is widely known, and, as they opine, if that is true, the information asymmetries Singer discusses would not exist.[224] McCrary's and Saravia's rebuttal opinions are reliably based on their economic expertise and draw from the same record evidence Singer bases his opinions on.[225] Further, the experts' opinions will help the jury weigh the evidence presented at trial on this disputed factual issue.

On the other hand, Carey's opinions are more problematic. As discussed above, "[e]xperience alone may provide a sufficient foundation to qualify an expert."[226] However, when a witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[227] From his forty years of experience in the industry, Carey offers only two specific examples of how his experience supports his opinion that Grower pay is widely known: attendance at "several town-hall recruitment open houses hosted by Sanderson Farms [a co-conspirator Integrator] when the company was opening a new complex in Texas . . . ."[228] and a guest lecture in one of his classes from a lender on "the financial aspects of contract broiler growing."[229] But, as Carey testified in his deposition, the financial information provided by the guest lecturer was redacted to omit identification of any particular Integrator.[230] This experience does not support the opinion

---

[224] *See McCrary Report* ¶ 224; *Saravia Report* ¶ 97.

[225] *See Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, 2008 WL 1930681, at *11 (E.D. La. Apr. 29, 2008) (finding "no reliability issue" with rebuttal testimony offered by expert economist "to critique" opposing expert's "methodology and interpretation of the data" where rebuttal expert relied on the same data and simply "analyze[d] the survey data in different ways from" opposing expert).

[226] *Skycam, Inc.*, 2011 WL 2551188, at *4.

[227] *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

[228] *Carey Report* ¶ 42.

[229] *Id.* ¶ 43.

[230] *Carey Dep.* 68:1-69:19.

Grower pay was widely known in the industry and, in fact, suggests efforts were made to prevent the information from being public. These limited experiences fail to adequately support Carey's broad opinion that, "[b]ased on my four decades of experience in the industry, what any given [I]ntegrator pays its [G]rowers is often widely known information among [G]rowers, lenders, and within poultry extension programs."[231]

Without establishing an adequate experiential basis for his opinions, Carey's review of record evidence to support his opinions is also inadmissible. Carey states, "The public nature of [G]rower pay is also supported by the testimony of several deponents [and] . . . comports with my own experience in the industry."[232] Carey then recites, without any additional analysis or opinion, the deposition testimony of several Growers and Integrators. However, "experts may not merely parrot or recite factual evidence, without offering a valid expert opinion based on such evidence."[233] "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."[234] Carey's recitation of fact witnesses' testimony, devoid of an articulated basis to augment that testimony with expert opinion, is an impermissible parroting of the testimony.[235]

Although the court generally focuses on the reliability of an expert's opinions rather than the conclusions, the court may exclude opinions where "there is simply too great an analytical

---

[231] *Carey Report* ¶ 41.

[232] *Id.* ¶ 45.

[233] *Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 2d 1228, 1249 (D. Utah 2022) (quoting *Deem v. Baron*, No. 2:15-CV-00755, 2020 WL 114138, at *13 (D. Utah Jan. 10, 2020)).

[234] *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

[235] *See id.* ("An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate [his] opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert.") (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)).

gap between the data and the opinion proffered"[236] and the opinion "is connected to existing data only by the *ipse dixit* of the expert."[237] Carey's opinions on the widespread knowledge of Grower pay presents such a gap. Though he is an industry expert, he fails to establish how his experience supports the opinions he offers. Accordingly, the opinions are inadmissible *ipse dixit*.

Plaintiffs' request to exclude McCrary's and Saravia's opinions concerning public knowledge of Grower pay is denied without prejudice to raise future objections as appropriate. Plaintiffs' request to exclude the opinions contained in paragraphs 41 through 45 of Carey's Report is granted.

## CONCLUSION

Plaintiffs' Motion to Exclude Certain Opinions Offered by Pilgrim's Proffered Experts[238] is GRANTED in part and DENIED in part.

- The Motion to exclude the entirety of Carey's Report under Rule 26 of the Federal Rules of Civil Procedure is denied.

- The Motion to exclude Carey's relevant market opinions is granted in part and denied in part. Carey may not offer opinions concerning Singer's econometric analysis but may, as appropriate, provide industry background opinions to rebut Singer's separate factual assumptions.

- The Motion to exclude Section V of Carey's Report is granted.

- The Motion to exclude Carey's opinions concerning Singer's regression model comparison in Section VI of Carey's Report is granted.

- The Motion to exclude Section VIII of Carey's Report is granted.

- The Motion to exclude Carey's opinions in Section III.C of his Report on varying approaches to setting Grower pay is denied.

---

[236] *Goebel v. Denver and Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (quoting *Joiner*, 522 U.S. at 146).

[237] *Joiner*, 522 U.S. at 146.

[238] Dkt. 455.

- The Motion to exclude PPC's experts' opinions providing justifications for the NPA is denied.

- The Motion to exclude McCrary's and Saravia's economic opinions concerning potential benefits to information sharing is denied. The Motion to exclude the opinions in paragraphs 46 through 52 of Carey's Report is granted.

- The Motion to exclude McCrary's and Saravia's opinions concerning public knowledge of Grower pay is denied. The Motion to exclude the opinions contained in paragraphs 41 through 45 of Carey's Report is granted.

**IT IS SO ORDERED** this 15th day of May 2024.


BY THE COURT:

_____
HON. ROBERT J. SHELBY
United States District Judge